IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ARRAY TECHNOLOGIES, INC.,

Plaintiff,

vs.

COLIN MITCHELL, an individual; NEXTRACKER, a Delaware corporation; MARCO GARCIA, an individual; DANIEL S. SHUGAR, an individual; SCOTT GRAYBEAL, an individual; and FLEXTRONICS INTERNATIONAL U.S.A., INC., a California corporation.

Defendants.

Case No. 1:17-cv-00087-JAP-LF

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Array Technologies, Inc. ("ATI") complains and alleges as follows against Defendants Colin Mitchell ("Mitchell"), NEXTracker ("NEXTracker" or "NX"), Marco Garcia ("Garcia"), Daniel S. Shugar ("Shugar"), Scott Graybeal ("Graybeal"), and Flextronics U.S.A., Inc. ("Flex") (collectively, "Defendants"). The allegations herein are made based on personal knowledge as to ATI with respect to its own actions, and upon information and belief as to all other matters.

## INTRODUCTION

1. This case is about a conspiracy among Defendants Mitchell, Garcia, Shugar, Graybeal, NX and Flex to conceal thefts and breaches by Mitchell of his contractual obligations as an employee of ATI not to compete with ATI for a period of one year after Mitchell's employment with ATI ended, and not to disclose ATI's trade secrets and confidential information

without a time limitation. ATI is a leading manufacturer and worldwide distributor of solar tracking systems. ATI hired Mitchell in May 2013 as its Business Development Manager, and Mitchell resigned effective on July 8, 2016. In connection with his employment at ATI, Mitchell signed a Non-Disclosure and Non-Competition Agreement in which Mitchell agreed, *inter alia,* that during his employment and for one year after his employment with ATI, he would not work for or assist a competitor in the business of designing or manufacturing solar tracking equipment or systems, and would not disclose ATI's confidential and trade secret information without a time limitation (Exhibit 1). In furtherance of the conspiracy among other acts, Mitchell stole thousands of computer files from ATI containing confidential and trade secret information; agreed with Garcia, Shugar, NX and Flex to knowingly ignore the accurate legal advice of Mitchell's attorney that Mitchell's ATI contract was valid and enforceable; and agreed and worked with Garcia, Shugar, Graybeal, NX and Flex to hide Mitchell's employment at NX by listing him as a Flex employee and representing to the public that he was a Flex employee when in reality he was a NX employee receiving NX paychecks and a NX W-2 in knowing violation of Mitchell's ATI contract. Garcia and Shugar were motivated at least in part to commit the above acts by the prospect of gaining portions of Flex's deferred payment (estimated in two Flex, Ltd. 10K filings with the SEC as between 81 million and 97 million dollars) and other benefits per a future revenue performance schedule from Flex's September 2015 purchase of one hundred percent of NX's outstanding shares.

## THE PARTIES

2. ATI is a New Mexico corporation having a principal place of business at 3901 Midway Place NE, Albuquerque, New Mexico 87109. ATI is a leading innovator and provider of proprietary solar tracking technologies and equipment. ATI sells its solar tracking equipment and related support services and technologies throughout the United States and internationally.

3. Defendant NEXTracker is a Delaware corporation having its principal place of business at 6200 Paseo Padre Parkway, Fremont, California 94555 and is a wholly owned subsidiary of Flex.

4. ATI is informed and believes, and thereupon alleges, that at all times relevant to this Complaint, Defendant Mitchell was, and continues to be, a resident of New Mexico.

5. ATI is informed and believes, and thereupon alleges, that at all times relevant to this Complaint, Defendant Garcia was, and continues to be, a resident of California.

6. ATI is informed and believes, and thereupon alleges, that at all times relevant to this Complaint, Defendant Shugar was, and continues to be, a resident of California.

7. ATI is informed and believes, and thereupon alleges, that at all times relevant to this Complaint, Defendant Graybeal was, and continues to be, a resident of California.

8. Flex is a Delaware Corporation having its principal place of business at 6201 America Center Dr., San Jose, California, 95002. Flex is a subsidiary of Flex Ltd., a Singapore international conglomerate doing business in the United States and multiple countries.

9. Defendants, and each of them, are being individually sued as participants and aiders and abettors in the wrongful conduct complained of herein, and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

**NATURE OF ACTION**

10. Plaintiff brings this action for: (1) misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*; (2) misappropriation under NMSA 1978, § 57-3A-1, *et seq.* ("NMUTSA"); (3) breach of contract; (4) breach of covenant of good faith and fair dealing; (5) breach of fiduciary duty; (6) tortious interference with contract; (7) conversion; (8) unjust enrichment/restitution; (9) fraud; and (10) unfair business practices.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the trade secret laws of the United States, 18 U.S.C. §§ 1836 and 1839. This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

12. This Court has personal jurisdiction over Defendants NX and Flex because they each engaged in acts of trade secret misappropriation, among other tortious and wrongful conduct described herein, in this judicial district.

13. This Court has personal jurisdiction over Defendant Mitchell because he resides in this judicial district and has engaged in acts of trade secret misappropriation, among others, in this judicial district.

14. This Court has personal jurisdiction over Defendants Garcia and Shugar because they engaged in acts of trade secret misappropriation, among other tortious and wrongful conduct described herein, in this judicial district.

15. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because the Defendants misappropriated trade secrets, confidential information and performed other tortious and wrongful acts in this district, and are subject to personal jurisdiction in this district. Venue is also proper in this Court because Mitchell resides in and is subject to personal jurisdiction in this district. In addition, Plaintiff does business in this district, has suffered harm in this district, and will continue to suffer harm in this district as a result of Defendants' actions until relief is granted.

## FACTUAL BACKGROUND

### A. ATI Is a Leader in the Solar Tracking Industry and Its Highly Confidential Cost and Bid Preparation and Related Information Is Critical to ATI's Business and Success.

16. Founded in 1989, Plaintiff ATI is the leading U.S.-based manufacturer of smart, cost-effective, and reliable solar tracking systems for utilities, corporations, small businesses and homeowners. Solar trackers allow solar panels to move to track the movement of the sun across the horizon. Solar trackers increase the panels' direct exposure to the sun and the amount of energy the panels generate.

17. Since 1989, ATI has supplied more than 20,000 trackers to residential customers and more than 6 gigawatts to commercial and utility-scale markets around the globe. ATI has grown to be recognized for its performance-driven products and engineering expertise.

18. Over the past 28 years, ATI has focused its efforts on designing and manufacturing solar tracking equipment, and has pioneered significant innovations in ground-mounted solar systems design and manufacturing. These innovations are the foundation of ATI's success, resulting in a vast and diverse customer base comprised of homeowners and businesses of all sizes.

19. Information regarding the company's bid preparation and contract procurement process, distribution methods, pricing, consumer profiles, advertising strategies, customer lists, manufacturing processes, engineering studies, customers' own confidential information, and ATI's financial planning were among the documents that Mitchell stole from ATI on June 21, 2016.

20. Over the years, ATI has developed an intricate bid preparation and contract procurement model that permits it to offer solar tracking equipment to customers at competitive prices. ATI's bids are tailored to specific customers' needs based on proprietary research. ATI's bid preparation and contract procurement information—including its pricing, profit margins, costs of production, operations and maintenance costs, pricing concessions, promotional discounts,

advertising allowances, volume rebates, marketing concessions, payment terms and rebate incentives—have independent economic value. This information provides ATI with a significant competitive advantage over ATI's competitors in a number of ways, including by enabling ATI to formulate competitive bids.

21. Information about ATI's costs, bid preparation and contract procurement would be valuable to a competitor because it would allow a competitor to set prices which meet or undercut ATI's prices and to undermine ATI's value presentations. ATI's bid preparation and contract procurement information, including its costs and pricing data, is unique to ATI and is information not readily known in the industry. Thus, ATI's bid preparation information has independent economic value and is a trade secret belonging to ATI.

22. The information described in paragraphs 19 and 20 above would have value to ATI's competitors who are unaware of the information because, if known, they could put that information to their own beneficial use by underbidding ATI and undermining its value presentations on solar tracking projects.

**B. ATI Takes Reasonable Efforts to Maintain the Secrecy of Its Contract Procurement and Bidding Preparation Information.**

23. Because of the highly competitive nature of the solar tracking industry, and because ATI needs to maintain its competitive position through the protection of its confidential business data, ATI takes reasonable steps to ensure that its confidential business data, including its bid preparation and contract procurement information, is protected.

24. ATI protects the confidentiality of its bid preparation and contract procurement information by, among other things, requiring its employees to sign employment contracts that include strict confidentiality provisions. ATI protects its highly valuable business information by having its employees sign non-compete agreements that are reasonable in scope. Such agreements are important because ATI employees whose job responsibilities include obtaining contracts or

preparing bids typically involve close contact with ATI's customers and require access to ATI's confidential information, including its bidding information and bidding structure.

25. ATI also restricts access to its bid preparation, contract procurement and other confidential information by ensuring that it is password-protected, accessible only by certain ATI employees, and disseminated within the company only on a "need to know" basis.

**C. Mitchell Violated His Non-Disclosure of Confidential Information and Non-Compete Agreement with ATI Both During and After His Employment with ATI, and the Other Defendants Aided and Abetted and Conspired with Mitchell.**

26. The evidence unearthed to date shows that Defendant Mitchell, ATI's former Business Development Manager, violated his Non-Disclosure of Confidential Information and Non-Compete Agreement both while in ATI's employ and after he departed ATI.

27. In May 2013, when Mitchell was hired by ATI as its Business Development Manager, he was responsible for all aspects of sales from identifying sales opportunities to closing the sale, including: identifying, contracting and/or qualifying potential customers and presenting solar tracking systems to same; articulating ATI products with appropriate product positioning to ATI's customers; and, bid preparation.

28. On or about May 3, 2013, Mitchell executed a "Non-Disclosure, Non-Solicitation, and Non-Competition Agreement" (referred to herein as "NDA") (Exhibit 1).

29. Specifically, Section 2 of the NDA, entitled "Non-Disclosure Agreement," states as follows:

> (a) Employee agrees that Employee shall (i) protect, safeguard and keep secret any Confidential Information (as defined below); (ii) only use or disclose Confidential Information as necessary in connection with Employee's work for employer; (iii) refrain from using Confidential Information for Employee's benefit or the benefit of any third party or in any manner adverse to Employer's interest; and (iv) upon the termination of Employee's employment with Employer, or at any other time upon Employer's

> request , return or destroy all Confidential Information which is in Employee's possession or control, including all originals and copies thereto, whether maintained in physical or electronic format.
>
> (b) The term "Confidential Information" includes any and all information concerning the business and affairs of Employer, whether or not separately identified as "confidential" or "proprietary;" provided, however, that information will not be considered Confidential Information if it is or becomes generally available to the public other than through a breach of this Agreement. Without limiting the scope of the foregoing, Confidential Information includes nonpublic information about Employer's marketing, business or development plans, financial data, customer or vendor lists, tax records, and personnel fi les or histories.
>
> (c) Employee agrees that all right, title and interest in any Confidential Information is and shall remain the exclusive property of Employer, and that the non-disclosure obligation described herein shall survive the termination of Employee's employment with Employer for whatever reason, with or without cause.

Ex. 1 at § 2.

30. Specifically, Section 4 of the NDA, entitled "Non-Competition Agreement," states as follows:

> During the period of Employee's employment with Employer, and for one year after the termination of such employment for whatever reason, with or without cause, Employee shall not, directly or indirectly engage in the ownership or operation of a business which designs and/or manufactures solar tracking equipment or systems, whether as an officer, director, partner, proprietor, investor, associate, employee, consultant, independent contractor or in any other capacity relating to such a business.

Ex. 1 at § 4.

31. Defendant Mitchell violated his non-compete agreement while he was still employed at ATI. On May 25, 2016, Mitchell authored an email to Cristina Clavijo, the head of

Strategic Business Development for Grupo Clavijo, a Spanish company that competes against ATI for sales of solar tracking systems and equipment.

32. In his May 25th email to Christina at Clavijo, Defendant Mitchell wrote, "I really want to thank you again for this opportunity" and "I believe I can be successful in helping you grow your brand and footprint here in the U.S. in a sustainable manner." Mitchell then described the challenges Grupo Clavijo faced to grow in the U.S. market, noting that Grupo Clavijo's cost to install its product was higher than ATI's cost. Mitchell also provided recommendations about what Grupo Clavijo should do to grow in the U.S. market.

33. Like ATI, NX supplies solar tracking equipment. NX is ATI's biggest competitor. NEXTracker is a wholly-owned subsidiary of Flex, Ltd. ("Flex"). ATI has discovered evidence that Mitchell has stolen confidential information from ATI and is assisting NX to compete against ATI.

34. On June 1, 2016, Garcia emailed Shugar "Re Colin Mitchell, 97% of ATI sales" thanking Shugar for their conversation about Colin and telling Shugar that Mitchell makes $300,000 at ATI and suggested that NX offer Colin $340,000. Additionally, Garcia stated that "We will cripple our top USA competitor . . . we will dominate the USA tracker market and keep out our Euro competitors." A few minutes later Shugar responded to Garcia's email and told him that he should hire Colin and that he and Garcia needed to get Flex on board. Upon information and belief, Graybeal was the Flex employee that that they needed to convince.

35. On June 3, 2016, Garcia informed Shugar that he had talked to Mitchell and thought he could hire him for $320,000. Garcia also stated that Mitchell had signed a non-compete with ATI, and that Mitchell was having it reviewed by a lawyer.

36. On June 10, 2016, Mitchell told Garcia via email that Mitchell's attorney told him that a non-compete of this kind is enforceable under New Mexico law. Mitchell attached to his email to Garcia a copy of his May 3, 2013 employment contract with ATI, putting Garcia, NX and

Flex on notice of Mitchell's obligations to ATI regarding the non-disclosure of ATI's confidential information, non-solicitation and non-compete clauses of that contract.

37. Later on June 10, 2016, Garcia emailed Shugar that Mitchell had heard back from his lawyer that the ATI non-compete was enforceable in New Mexico. Garcia said that the plan was to have Mitchell inform Ron (CEO of ATI) that he would be taking a leave of absence and then join NX one month later. Then Garcia said Ron could come after him and Colin wanted support from NX for his legal defense.

38. On June 11, 2016, Garcia informed Mitchell that Shugar spoke to Flex and that they were willing to take on a portion of his legal defense costs and asked Mitchell for his proposed start date at Flex. Thus, as of June 11, 2016, Mitchell had a job offer with ATI's competitor and did not disclose that to ATI.

39. On June 13, 2016, Mitchell emailed Garcia thanking him for his offer to pay his legal fees and telling Garcia his lawyer was Scott Gordon. Mitchell then accepted Garcia's offer. Mitchell did not disclose his acceptance of a job offer at NX to ATI.

40. On June 21, 2016, for more than three hours, Mitchell downloaded approximately 7,000 ATI electronic folders from ATI's hard drive on to his personal separate hard drive. These files contained extensive confidential information and trade secrets belonging to ATI. Mitchell did not have permission or authority from ATI to do the above.

41. On July 8, 2016, Mitchell resigned from ATI.

42. On August 17, 2016, Mirza Baig, Flex's Talent Acquisition Coordinator, emailed Mitchell asking him to complete Flex employment documents. Also on that date NX's Garcia sent Mitchell a written job offer from Flex offering him the title of "Senior Director, Business Development" reporting to Graybeal, Senior Vice President, Energy Segment, at Flex. Flex's offer stated that Mitchell's salary was $160,000 plus $160,000 bonus if he met his performance target. Mitchell accepted Flex's written offer on August 23, 2016. Flex inserted Mitchell into a

competition for the job of Senior Director Business Development with a number of other candidates trying to create the false impression that Mitchell had won a job competition. In addition, these Flex job requisition records falsely state that Graybeal of Flex was Mitchell's hiring manager when in fact it was Marco Garcia and Dan Shugar of NEXTracker. In addition, these records state that Mitchell's recruitment started on August 17, 2016 when in fact his recruitment started in early June 2016. In addition, Flex's records falsely state that Mitchell was responsible for 97% of ATI sales in 2015, accounting for nearly $400 million in sales.

43. In Flex's "requisition" record, Mitchell's purported job description at Flex is described. It states that Mitchell will utilize "a NetSuite CRM system to track and forecast sales activities and request tasks from NX resources. In addition, he will work closely with his Sales support, Operations, Supply Chain and Engineering teams to ensure that NX is consistently exceeding customer expectations while ensuring that NX sales maintain maximum positive contribution margin." In addition, Mitchell's responsibilities were described, *inter alia*, as working to "form excellent working relationships with NEXTracker departments, including operations, supply chain, cost accounting, logistics and engineering to ensure on-time delivery and best in class quality of all NEXTracker products." In addition, Mitchell was to "hire a qualified sales analysist/business analysist (sic) who will work side by side with the candidate (Mitchell) to prepare cost estimators and sales proposals." Many of Mitchell's above described job duties were in fact job duties for NX and not Flex.

44. Consistent with paragraph 43, NX and not Flex paid Mitchell his salary in 2016. In addition, Mitchell's 2016 W2 Wage and Tax Statement listed in Box C his employer as NEXTracker, Inc.

45. Mitchell has misrepresented that he accepted employment with Flex and/or NX. On September 13, 2016, ATI representatives attended a trade convention named Solar Power International ("SPI"). Mitchell was also present at the convention and stopped by ATI's exhibit

booth. At that time, Mitchell told ATI's CEO that he was going to work for Flex. Aware that NEXTracker is owned by Flex, ATI's CEO replied, "You mean NEXTracker?" Mitchell said, "Oh no, they are keeping me far away from them." Mitchell claimed that he was "selling modules" for Flextronics.

46. On October 9, 2016, Mitchell emailed Garcia, Shugar and others regarding confusion in who was to handle the AES Solar account, and stated that AES wanted a quote on the 70 megawatt DC project and that he would love to take over the AES account. The AES Solar project was clearly a NX project not a Flex project. On this date, Shugar emailed a response to Mitchell, Garcia, and others stating "toe stepping? F that! The account is YOURS: Please bring in some Tracker biz… Please bring home some Tracker bacon. THX Shug" Mitchell replied to that email, "I'm on it Dan. Thanks guys."

47. On October 11, 2016 Mitchell emailed Graybeal, his purported supervisor at Flex, telling him that he was asked to take over the AES Solar Account on the NX side. Graybeal knew about Mitchell's ATI contract, approved Garcia and Shugar's plan that Mitchell be made to look like a Flex employee when he was in fact working for NX, and did nothing to stop Shugar, Garcia and others from using Mitchell to obtain ATI's confidential and trade secret information in violation of his contract with ATI.

48. On October 17, 2016, Mitchell emailed Shugar, Garcia and others an update on the AES account describing two bids he was working on for NX to make in Kauai, Hawaii.

49. On November 17, 2016, Peter Wheale, NX's Vice-President of Sales in Australia, asked Mitchell, Garcia and Ryan Booth to help him with responses to ATI's "pitches" on "O&M and LCOE" stating that, "we cannot let ATI in the door any further and stating that a recent portfolio of jobs just went to ATI. Later that day, Garcia responded to Wheale, Mitchell, Shugar and five other NX employees stating that Wheale's issue was discussed at an Executive offsite

today. Garcia made five assignments. As to Mitchell, Garcia stated what he believed had to be done and assignments. Garcia's direction to Mitchell was,

> "Colin really need your help here. ATI is kicking our ass with the O&M pitch that you helped create. What are the real O&M weaknesses of ATI? Please reply all.
>
> This is unacceptable to lose business to ATI when we have lower Capex and they win on lower O&M and lower LCOE.
>
> We are being outsold and out maneuvered. All hands on deck. Thank you."

50. Consistent with paragraph 49 above is the following: After Mitchell resigned from ATI, ATI retained the phone number he used and reassigned it to another employee. On November 18, 2016, a text message was sent to Mitchell's former ATI phone number from the phone of Garcia. The text read as follows:




Hey Colin, you are cc d on an email about ATI winning 130MW in AU using an argument of lower O&M costs vs NX. Pete is now going after another 130MW. Can you please respond with you knowledge of ATI O&M costs and issues?

51. Garcia's text message to Mitchell refers to ATI winning a 130MW (megawatt) project in Australia. Just two days prior to this November 18th text message, ATI was selected by Bouygues in Australia to supply solar tracking equipment for four projects totaling 130 megawatts. NX had also submitted a bid for these projects. In his text message, Garcia states, "Pete is now going after another 130MW." Clearly, Garcia, Shugar and Graybeal knows the contents of Mitchell's contract with ATI, yet Garcia is telling Mitchell to disclose ATI confidential and trade secret information to all the NX employees on this email chain.

52. On November 18, 2016 Mitchell responded to Garcia's request stating that ATI's sales presentation consists of an excel spreadsheet that calculates component costs for NEXTracker batteries, controllers, Zigbee, motors, etc. and tries to make a comparison between the ATI electronics and the NEXTracker electronics. Mitchell also stated that this summary estimates a net present value of a 30-year O&M for the NEXTracker system as coming to somewhere close to .01-.015/watts DC. Mitchell goes on to tell Garcia that a lot of ATI's focus (O&M deficiencies) is on batteries and tracker controllers.

53. On November 18, 2016, in response to a question, Mitchell discussed with NX's Mike Mehawich whether removal of vegetation and tracker costs could save money during bidding.

54. On November 28, 2016, Mitchell responds to another email from Peter Wheale in which Wheale states that ATI has won several Australian contracts and there is an issue about high wind. Mitchell responds,

> "My understanding to Peter's point is that the ATI off the shelf V3 design is capable of withstanding 135 mph wind speed. Though I do think they may look at thinner torque tube gauge thicknesses and lower wind speeds, similar to what I understand we do.
>
> The only exception would be that if the module manufacturer in question has approved the design pressures to the V3 standard clamp. If not, they would have to go with a much longer, more expensive clamp.

> Obviously, a higher wind speed location would result in stronger/more expensive piers or foundations.
>
> The ATI system uses a torque limiting gear box at the center of each row that allows each row to decouple from the driveline at around 50-60 mph, in order for each row to find a position of lower resistance. If the row is pushed all the way to the mechanical stops at 52 degrees +/- then there are mechanical stops at each foundation AND at the center of the row at the gear rack, which resists the wind forces. They claim that this design reduces the torque in the torque tube, because the forces are transferred and spread out through all of the foundations and into the ground. Whereas in our system, in my understanding, the slewing gear drive has to hold the entire row during a high wind event with some perimeter help from dampers.

The above is a clear example of Mitchell violating the terms of his ATI contract by providing Shugar, Garcia and other employees of NX confidential and trade secret information.

55. In the text referenced in paragraphs 49 and 50, Garcia asked Mitchell for information about "ATI O&M costs and issues." "O&M costs" is a reference to operation and maintenance costs. ATI's operation and maintenance costs for its solar trackers are trade secrets and confidential information. Having knowledge of a competitor's "O&M" costs would be very helpful information in a competitive bidding process. It would allow a company to know where to price its bid to underbid the competitor.

56. In violation of his contractual obligations to ATI, Defendant Mitchell has assisted NX in competing against ATI in the sale of solar tracker equipment. NX is using ATI's confidential information and trade secrets to unfairly compete against ATI.

**D. Mitchell's Disclosure of ATI's Confidential and Trade Secret Information Is Inevitable Given His Employment with NX.**

57. In connection with his position at ATI, Mitchell was provided with access to ATI's confidential, proprietary, and trade secret information relating to ATI's operations and maintenance costs, supply costs, marketing strategy, product design methodology, cost structure,

quality issues, and business development plans such as its bid preparation and contract procurement data. As a condition of his employment, therefore, Mitchell executed an NDA.

58. Pursuant to the NDA, Mitchell agreed that he would "protect, safeguard and keep secret any Confidential Information," "only use or disclose Confidential Information as necessary in connection with [his] work for [ATI]," "refrain from using Confidential Information for [his] benefit or the benefit of any third party or in any manner adverse to [ATI's] interests," and "upon termination…return or destroy all Confidential Information which is in [his] possession or control, including all originals and copies thereof, whether maintained in physical or electronic format." Ex. 1 at § 2(a).

59. The NDA defined ATI's "Confidential Information" as:

> [A]ny and all information concerning the business and affairs of [ATI], whether or not separately identified as "confidential" or "proprietary;" provided, however, that information will not be considered Confidential Information if it is or becomes generally available to the public other than through a breach of this Agreement. Without limiting the scope of the foregoing, Confidential Information includes nonpublic information about Employer's marketing, business or development plans, financial data, customer or vendor lists, tax records, and personnel files or histories.

Ex. 1 at § 2(b).

60. As described above, Mitchell was fully informed and aware, through the NDA he signed, that ATI's marketing and business or development plans such as its bid preparation and contract procurement data are confidential and proprietary and are not to be used or disclosed except in connection with legitimate ATI business.

61. The NDA is a valid and enforceable agreement.

62. At all times, ATI performed any and all obligations required of it under the NDA.

63. At no time was Mitchell's performance under the NDA excused.

64. As explained above, Mitchell has been assisting ATI's competitor, NX, in its operations and business development. Upon information and belief, Mitchell is assisting NX in its procurement of solar tracking contracts by providing ATI's information for use as part of NX's bidding packages.

65. The text message from NX's Garcia (¶¶ 49 and 50) and email from Shugar (¶ 46) are inducements to Mitchell to breach his disclosure obligations owed to ATI and to reveal ATI's confidential data and trade secrets, despite the fact that Mitchell was under a contractual obligation to keep ATI's information confidential and to refrain from using it for his own benefit or that of any third party or in any manner adverse to ATI's interests.

66. These text message and emails illustrate why Mitchell's position with NX makes it inevitable that Mitchell will disclose ATI's confidential data and trade secrets (assuming he has not already). Given the work Mitchell performed for ATI, his work for NX will inevitably call upon him to use and disclose ATI's confidential information and trade secrets in violation of the NDA.

67. Moreover, the circumstances of Mitchell's departure and assistance to NX reveal the Defendants' improper motive. Mitchell did not disclose to ATI that he would be assisting NX and instead misled ATI into thinking that Mitchell would be working instead for NX's parent company on unrelated work.

68. ATI is currently submitting bids on numerous projects against NX. Mitchell's assistance to NX will provide NX with an unfair advantage in bid selection.

69. The Court should enter an injunction against Defendants to prevent further harm to ATI.

**COUNT ONE**

**Violation of Defend Trade Secrets Act (18 U.S.C. § 1836)**

**(Against All Defendants)**

70. ATI repeats and alleges each and every allegation above as if fully set forth herein.

71. The Defend Trade Secrets Act, 18 U.S.C. § 1836, was enacted in May 2016 to, among other things, combat, redress and reduce the threat of, and economic impact caused by, the theft of trade secrets belonging to United States companies occurring both domestically and outside of the United States.

72. ATI is the owner of certain valuable trade secrets contained in and relating to ATI's marketing and business plans, such as ATI's bidding preparation and contract procurement information. The details of ATI's bid preparation and contract procurement process, including the details of the operation and maintenance costs for ATI's solar tracking equipment, as well as its distribution methods, pricing, consumer profiles, advertising strategies, customer lists, manufacturing processes, and engineering studies, is extremely valuable in terms of ongoing sales and its ability to competitively bid for and procure various contracts for the design and manufacturing of solar tracking equipment.

73. ATI's trade secrets are related to ATI's products and services that are used in or intended for use in interstate or foreign commerce. As stated above, ATI sells its products throughout the United States. For example, ATI's solar tracking equipment and related support services and technologies are sold throughout the United States.

74. During his employment at ATI, Mitchell was given access to certain confidential and proprietary information constituting "Trade Secrets" as defined in the Defend Trade Secrets Act (18 U.S.C. § 1836).

75. The trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

76. Mitchell gained access to ATI's trade secrets in the course of an employee-employer relationship between ATI and Mitchell. Mitchell was under an obligation to maintain the secrecy of the trade secrets obtained during his employment.

77. ATI's trade secrets are sufficiently secret to derive economic value from not being generally known or readily accessible by proper means by other persons who can obtain economic value from their disclosure or use.

78. ATI's trade secrets are the subject of efforts to maintain secrecy or confidentiality that are reasonable under the circumstances, including confidentiality and/or nondisclosure agreements to be signed by any party granted access to ATI's trade secrets.

79. Defendants know or have reason to know Mitchell acquired ATI's trade secrets such as its bid preparation and contract procurement information—including its pricing, profit margins, costs of production, operations and maintenance costs, pricing concessions, promotional discounts, advertising allowances, volume rebates, marketing concessions, payment terms and rebate incentives—under circumstances giving rise to a duty to maintain the secrecy, or limit the use of, such information.

80. NX is a direct competitor with ATI, attempting to bring to market the same type of solar tracking equipment that Mitchell attempted to sell while at ATI. Mitchell's role at, and assistance to, NX is comparable and encompasses much of the same work he did as ATI's former Business Development Manager. As a result, in working at NX, Mitchell will inevitably rely on, disclose, and make use of ATI's trade secrets related to its bidding preparation and contract procurement plans.

81. Defendants have used or disclosed, or will use or disclose, these trade secrets without ATI's express or implied consent.

82. Such use or disclosure of ATI's trade secrets is reckless and malicious as Defendants either know or should know of the confidentiality, ownership and use restrictions on the trade secrets.

83. Defendants used improper means to acquire knowledge of ATI's trade secrets by inducing Mitchell to breach his duty to maintain secrecy over ATI's trade secrets.

84. As a direct and proximate result of Defendants' current and continued misappropriation of ATI's trade secrets, ATI will suffer imminent and irreparable harm.

85. Unless the Defendants are enjoined from misappropriating and threatening to misappropriate ATI's trade secrets, they will continue to cause ATI irreparable harm for which there is no adequate remedy at law.

**COUNT TWO**

**Violation of New Mexico Uniform Trade Secrets Act (NMSA 1978, § 57-3A-1 *et seq.*)**

**(Against All Defendants)**

86. ATI repeats and alleges each and every allegation above as if fully set forth herein.

87. ATI is the owner of certain valuable trade secrets contained in and relating to ATI's marketing and business plans, such as ATI's bidding preparation and contract procurement information. The details of ATI's bid preparation and contract procurement process, including the details of the operation and maintenance costs for ATI's solar tracking equipment, as well as its distribution methods, pricing, consumer profiles, advertising strategies, customer lists, manufacturing processes, and engineering studies, is extremely valuable in terms of ongoing sales and its ability to competitively bid for and procure various contracts for the design and manufacturing of solar tracking equipment.

88. During his employment at ATI, Mitchell was given access to certain confidential and proprietary information constituting "trade secrets" as defined in NMSA 1978, § 57-3A-2.

89. The trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

90. Mitchell gained access to ATI's trade secrets in the course of an employee-employer relationship between ATI and Mitchell. Mitchell was under an obligation to maintain the secrecy of the trade secrets obtained during his employment.

91. ATI's trade secrets are sufficiently secret to derive economic value from not being generally known or readily accessible by proper means by other persons who can obtain economic value from their disclosure or use.

92. ATI's trade secrets are the subject of efforts to maintain secrecy or confidentiality that are reasonable under the circumstances, including confidentiality and/or nondisclosure agreements to be signed by any party granted access to ATI's trade secrets.

93. Defendants know or have reason to know Mitchell acquired ATI's trade secrets such as its bid preparation and contract procurement information—including its pricing, profit margins, costs of production, operations and maintenance costs, pricing concessions, promotional discounts, advertising allowances, volume rebates, marketing concessions, payment terms and rebate incentives—under circumstances giving rise to a duty to maintain the secrecy, or limit the use of, such information.

94. NX is a direct competitor with ATI, attempting to bring to market the same type of solar tracking equipment that Mitchell attempted to sell while at ATI. Mitchell's current role at NX is comparable and encompasses much of the same work he did as ATI's former Business Development Manager. As a result, in working at NX, Mitchell will inevitably rely on, disclose, and make use of ATI's trade secrets related to its bidding preparation and contract procurement plans.

95. Defendants have used or disclosed, or will use or disclose, these trade secrets without ATI's express or implied consent.

96. Such use or disclosure of ATI's trade secrets is reckless and malicious as Defendants either know or should know of the confidentiality, ownership and use restrictions on the trade secrets.

97. Defendants used improper means to acquire knowledge of ATI's trade secrets by inducing Mitchell to breach his duty to maintain secrecy over ATI's trade secrets.

98. As a direct and proximate result of Defendants' current and continued misappropriation of ATI's trade secrets, ATI will suffer imminent and irreparable harm.

99. Unless the Defendants are enjoined from misappropriating and threatening to misappropriate ATI's trade secrets, they will continue to cause ATI irreparable harm for which there is no adequate remedy at law.

**COUNT THREE**

**BREACH OF CONTRACT**

**(Against Defendant Mitchell)**

100. ATI repeats and alleges each and every allegation above as if fully set forth herein.

101. Mitchell has breached the NDA, a copy of which is attached hereto as Exhibit 1. The NDA is a valid and enforceable contract.

102. The NDA prohibits Mitchell from engaging directly or indirectly in the ownership or operation of a business which designs and/or manufactures solar tracking equipment or systems both during his employment with ATI and for one year after the termination of his employment with ATI.

103. As alleged in the paragraphs above, Mitchell has breached the NDA by providing information and assistance to ATI competitors Grupo Clavijo and NEXTracker.

104. As described above, Mitchell was fully informed and aware, through the NDA he signed, that ATI's confidential information is not to be used or disclosed except in connection with legitimate ATI business. Despite this, Mitchell used and disclosed ATI's confidential information for purposes unrelated to legitimate ATI business.

105. By engaging in the conduct described above, Mitchell has violated the NDA he signed in May of 2013.

106. At all times, ATI performed all of its obligations under the NDA.

107. At no time was Mitchell's performance under the NDA excused.

108. Further, as a result of Mitchell's contractual breaches, ATI continues to be damaged and irreparably injured, including, without limitation, by the loss of sales and profits it would have earned but for Mitchell's contractual breaches.

109. As a direct and proximate result of Mitchell's breach of the NDA, ATI has sustained severe economic injury for which it is entitled to monetary compensation in an amount to be determined at trial and an injunction to prevent further unlawful dissemination of ATI's confidential information and trade secrets.

**COUNT FOUR**

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Against Defendant Mitchell)**

110. ATI repeats and alleges each and every allegation above as if fully set forth herein.

111. ATI and Mitchell entered in a valid and enforceable contract, namely, the NDA, a copy of which is attached hereto as Exhibit 1.

112. The NDA prohibits Mitchell from engaging directly or indirectly in the ownership or operation of a business which designs and/or manufactures solar tracking equipment or systems

both during his employment with ATI and for one year after the termination of his employment with ATI.

113. Pursuant to the NDA, Mitchell also agreed that he would "protect, safeguard and keep secret any Confidential Information," "only use or disclose Confidential Information as necessary in connection with [his] work for [ATI]," "refrain from using Confidential Information for [his] benefit or the benefit of any third party or in any manner adverse to [ATI's] interests," and "upon termination…return or destroy all Confidential Information which is in [his] possession or control, including all originals and copies thereof, whether maintained in physical or electronic format." (Ex. 1 at § 2(a).)

114. At all times, ATI performed all of its obligations under the NDA.

115. At no time was Mitchell's performance under the NDA excused.

116. Mitchell unfairly interfered with ATI's right to receive the benefits of the NDA, including by consulting for ATI's direct competitor while still employed at ATI, assisting ATI's direct competitor NX upon termination of his employment at ATI, and disclosing ATI's confidential information and trade secrets to NX.

117. As a direct and proximate result of Mitchell's breach of the NDA, ATI has sustained severe economic injury for which it is entitled to monetary compensation in an amount to be determined at trial and an injunction to prevent further unlawful dissemination of ATI's confidential information and trade secrets.

**COUNT FIVE**

**BREACH OF FIDUCIARY DUTY**

**(Against All Defendants)**

118. ATI repeats and alleges each and every allegation above as if fully set forth herein.

119. Mitchell was employed as a Business Development Director for ATI with access to ATI's highly valuable business information. His job responsibilities included procurement contracts or preparing bids, which typically involve close contact with ATI's customers and require access to ATI's confidential bidding information and bidding structure.

120. As the Business Development Director and employee for ATI, Mitchell owed a fiduciary duty to ATI not to actively exploit his position within the corporation for his own personal benefit or to hinder the ability of ATI to continue the business, or a subset thereof, for which it was developed.

121. Mitchell's fiduciary duty included a duty of loyalty, good faith, inherent fairness, and the obligation not to profit at the expense of ATI.

122. Mitchell breached his fiduciary duty to ATI before offering his resignation by diverting time and resources to consult with Grupo Clavijo and NX while continuing to collect compensation from ATI.

123. Mitchell also breached his fiduciary duty to ATI by assisting ATI's direct competitor NX upon termination of his employment at ATI, misappropriating ATI's confidential information and trade secrets while still employed by ATI, and disclosing ATI's confidential information and trade secrets to NX, and by concealing his actions from ATI.

124. A conspiracy existed between Defendants to assist and induce Mitchell to violate his fiduciary duties owed to ATI.

125. As set forth more fully above, specific acts were carried out by Defendants pursuant to the conspiracy, including but not limited to efforts to claim that Mitchell was employed by Flex and not NX, promises to help Mitchell with legal fees and expenses, and Defendants' requests to obtain confidential information and trade secrets to assist with competition against ATI.

126. Defendants knew that Mitchell owed fiduciary duties to ATI.

127. Defendants intentionally provided substantial assistance or encouragement to Mitchell to commit acts which the Defendants knew to be a breach of duty.

128. As a result of Mitchell's breaches of his fiduciary duty, ATI has suffered and continues to suffer substantial damages, the amount of which will be determined at a later date.

## COUNT SIX

## TORTIOUS INTERFERENCE WITH CONTRACT

### (Against Defendants NX, Garcia, Shugar and Flex)

129. ATI repeats and alleges each and every allegation above as if fully set forth herein.

130. On or about May 3, 2013, Mitchell executed the NDA, a copy of which is attached hereto as Exhibit 1.

131. The NDA prohibits Mitchell from engaging directly or indirectly in the ownership or operation of a business which designs and/or manufactures solar tracking equipment or systems both during his employment with ATI and for one year after the termination of his employment with ATI.

132. Upon information and belief, Defendants NX, Garcia, Shugar, Graybeal, and Flex knew of Mitchell's obligations under the NDA.

133. Defendants NX, Garcia, Shugar, Graybeal, and Flex interfered with ATI's contractual relationship with Mitchell by seeking Mitchell's assistance in NX's operations in violation of Mitchell's obligations under the NDA.

134. Pursuant to the NDA, Mitchell also agreed that he would "protect, safeguard and keep secret any Confidential Information," "only use or disclose Confidential Information as necessary in connection with [his] work for [ATI]," "refrain from using Confidential Information for [his] benefit or the benefit of any third party or in any manner adverse to [ATI's] interests," and "upon termination…return or destroy all Confidential Information which is in [his] possession

or control, including all originals and copies thereof, whether maintained in physical or electronic format." (Ex. 1 at § 2(a).)

135. As described above, Mitchell was fully informed and aware, through the NDA he signed, that ATI's marketing and business or development plans such as its bid preparation and contract procurement data are confidential and proprietary and are not to be used or disclosed except in connection with legitimate ATI business.

136. Defendants NX, Garcia, Shugar, Graybeal and Flex intentionally disrupted and continue to intentionally disrupt ATI's contractual relationship with Mitchell.

137. Defendants NX, Garcia, Shugar, Graybeal and Flex previously solicited, and upon information and belief continue to solicit, Mitchell's assistance notwithstanding their knowledge that Mitchell is prohibited from assisting ATI's competitors for one year following termination of his employment at ATI.

138. Defendants NX, Garcia, Shugar, Graybeal and Flex previously requested, and upon information and belief continue to request and receive from Mitchell ATI's confidential information and trade secrets, notwithstanding their understanding that Mitchell is prohibited from sharing such information.

139. The intentional acts of Defendants NX, Garcia, Shugar, Graybeal and Flex have actually and proximately caused a disruption and breach of the contractual relationship between ATI and Mitchell.

140. The aforementioned acts of Defendants NX, Garcia, Shugar, Graybeal and Flex were and continue to be willful, oppressive, fraudulent, and malicious, warranting an award of punitive damages in addition to the actual damages suffered by ATI.

141. Defendants NX, Garcia, Shugar, Graybeal and Flex's acts have resulted in a loss of beneficial contractual relationships and actual profits to ATI.

142. As a direct and proximate result of Defendants' interference. ATI has sustained significant economic harm and damages.

143. Further, as a result of Defendants' interference, ATI continues to be damaged and irreparably injured, including, without limitation, by the loss of sales and profits it would have earned but for Defendants' continuing improper actions.

144. As a result of the foregoing, ATI has sustained severe economic injury for which it is entitled to monetary compensation in an amount to be determined at trial and an injunction to prevent further unlawful dissemination of ATI's confidential information and trade secrets.

**COUNT SEVEN**

**CONVERSION**

**(Against All Defendants)**

145. ATI repeats and alleges each and every allegation above as if fully set forth herein.

146. ATI has rightful ownership and right of possession over certain valuable trade secrets and confidential information, such as ATI's bidding preparation and contract procurement information.

147. Defendants intentionally exercised dominion over ATI's trade secrets and confidential information, including, but not limited to, ATI's bidding preparation and contract procurement information.

148. As a result, ATI was dispossessed of its right to the exclusive use and possession of its

149. Defendants' tortious conduct with regards to ATI's trade secrets and confidential information is the proximate cause of damages suffered by ATI.

150. Defendants' tortious conduct constituted the conversion of an identifiable sum of money, the amount of which is to be determined at trial.

151. Defendants' tortious conduct was not privileged or excused.

152. Defendants' tortious conduct was willful and malicious, warranting an award of punitive damages in addition to the full value of the converted property.

**COUNT EIGHT**

**UNJUST ENRICHMENT/RESTITUTION (Against All Defendants)**

153. ATI repeats and alleges each and every allegation above as if fully set forth herein.

154. Defendants have been enriched and have benefitted from their use of ATI's valuable trade secrets, including ATI's marketing and business plans, such as ATI's bidding preparation and contract procurement information.

155. Defendants have been enriched at ATI's expense, as ATI expends significant resources to competitively bid on various projects, whatever their scale, location or requirements. The details of ATI's bid preparation and contract procurement process, including the details of the operation and maintenance costs for ATI's solar tracking equipment, as well as its distribution methods, pricing, consumer profiles, advertising strategies, customer lists, manufacturing processes, and engineering studies, is extremely valuable in terms of ongoing sales and its ability to competitively bid for and procure various contracts for the design and manufacturing of solar tracking equipment.

156. Given Defendants' inequitable misconduct, including their misappropriation of ATI's confidential information and trade secrets to intentionally and knowingly steal, exploit and utilize for their own financial benefit ATI's confidential information and trade secrets, permitting Defendants to retain the profits they have gained (and will continue to gain) from procuring contracts using ATI's confidential information and trade secrets would be contrary to equity and good conscience.

157. As a result, ATI is entitled to an order imposing a constructive trust and requiring Defendants to disgorge any profits obtained, now or in the future, as a result of their improper actions, including any profits obtained as a result of procuring contracts using ATI's confidential information and trade secrets.

## COUNT NINE

### FRAUD AND CONSTRUCTIVE FRAUD
(Against all Defendants)

158. ATI repeats and alleges each and every allegation above as if fully set forth herein.

159. As described above in detail, while employed by ATI, Mitchell accepted a job with NX and failed to disclose this to ATI. Mitchell failed to tell ATI that his loyalties had shifted from ATI to NX.

160. After accepting NX's employment offer and before resigning from ATI, on June 21, 2016, Mitchell used his status as a trusted employee of ATI to download approximately 7,000 ATI electronic folders from ATI's hard drive on to his personal separate hard drive. These files contained extensive confidential information and trade secrets belonging to ATI and Mitchell copied this information for purposes unrelated to the interests of ATI.

161. Also, as described above in detail, after beginning his employment with NX, Mitchell told ATI CEO, Ron Corio, that Mitchell was working for Flex and not NX.

162. Mitchell's failure to disclose the fact of his acceptance of NX's offer of employment, his failure to disclose his copying of ATI's confidential information and trade secrets, and the fact of his employment with NX to ATI was intentional.

163. Mitchell had a duty to disclose the fact of his acceptance of NX's offer of employment, his copying of ATI's confidential information and trade secrets, and the fact of his employment with NX to ATI.

164. Mitchell's misrepresentations were made intentionally or with reckless disregard for the truth.

165. Mitchell's omissions and misrepresentations were made with the intent to deceive and to induce ATI to act upon them.

166. Mitchell's conduct set forth above was a breach of a legal or equitable duty, contrary to public policy and to sound morals.

167. ATI actually and detrimentally relied upon Mitchell's omissions and misrepresentations.

168. A conspiracy existed between Defendants to assist and induce Mitchell to defraud and commit constructive fraud against ATI.

169. As set forth more fully above, specific acts were carried out by Defendants pursuant to the conspiracy, including but not limited to efforts to claim that Mitchell was employed by Flex and not NX, and promises to help Mitchell with legal fees and expenses.

170. Defendants knew that Mitchell owed duties to ATI and knew that he was attempting to hide his employment with NX from ATI.

171. Defendants intentionally provided substantial assistance or encouragement to Mitchell to defraud and commit constructive fraud against ATI.

172. As a result of Mitchell's fraud and constructive fraud, ATI has suffered and continues to suffer substantial damages, the amount of which will be determined at a later date.

## COUNT TEN

## NEW MEXICO UNFAIR PRACTICES ACT
**(Against All Defendants)**

173. ATI repeats and alleges each and every allegation above as if fully set forth herein.

174. As described above in detail, while employed by ATI, Mitchell accepted a job with

NX and failed to disclose this to ATI. Mitchell continued to sell his services to ATI but failed to tell ATI that his loyalties had shifted from ATI to NX.

175. On June 21, 2016, Mitchell used his status as a trusted employee of ATI to copy ATI's trade secrets and confidential information for his own purposes and failed to disclose this to ATI. Also, as described above in detail, after beginning his employment with NX, Mitchell told ATI CEO, Ron Corio, that Mitchell was working for Flex and not NX. These were false or misleading representations.

176. Mitchell's false or misleading representations were knowingly made in connection with the sale of his services in the regular course of his business.

177. Mitchell's representations were of the type that may, tend to, or do deceive or mislead any person.

178. A conspiracy existed between Defendants to assist and induce Mitchell to violate the New Mexico Unfair Practices Act.

179. As set forth more fully above, specific acts were carried out by Defendants pursuant to the conspiracy, including but not limited to efforts to claim that Mitchell was employed by Flex and not NX, and promises to help Mitchell with legal fees and expenses.

180. Defendants knew that Mitchell owed duties to ATI and knew that he was attempting to hide his employment with NX from ATI.

181. Defendants intentionally provided substantial assistance or encouragement to Mitchell to violate the New Mexico Unfair Practices Act.

182. As a result of Mitchell's violations of the New Mexico Unfair Practices Act, ATI has suffered and continues to suffer substantial damages, the amount of which will be determined at a later date.

## JURY DEMAND

183. ATI requests trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, ATI seeks the following relief:

1. A permanent injunction prohibiting Defendants from using or disclosing ATI's confidential information or trade secrets.

2. Permanent injunctive relief enjoining Defendants from encouraging, causing or permitting Mitchell to violate contractual obligations Mitchell owes to ATI.

3. A permanent injunction restraining and enjoining NEXTracker and Mitchell from altering, destroying or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper and electronic documents, including current or archived electronic logs, metadata, and directories.

4. Permanent injunctive relief requiring the immediate return of ATI's stolen data, in forensically sound fashion.

5. An accounting to establish, and an order requiring, restitution and/or disgorgement of the sums by which Defendants have been unjustly enriched.

6. Compensatory damages, past and future, in an amount to be determined at trial.

7. Exemplary and punitive damages for Defendants' willful and malicious acts.

8. Threefold actual damages for the New Mexico Unfair Practices Act claim.

9. Pre-judgment and post-judgment interest at the maximum rate allowed by law.

10. Attorneys' fees and costs incurred by virtue of this action.

11. Such other and further relief as the Court may deem appropriate under the circumstances.

Dated: August 30, 2017 Respectfully Submitted,

/s/ David F. Cunningham
David F. Cunningham
Thompson, Hickey, Cunningham,
Clow, April & Dolan, P.A.
460 St. Michael's Drive, Suite 1000
Santa Fe, New Mexico 87505
(505) 988-2900
(505) 988-2901 fax

Spencer Reid
Kurt Wihl
Keleher & McLeod PA
P.O. Box AA
Albuquerque, NM 87103-1626
(505) 346-9128
(505) 346-1370 fax

Attorneys for Plaintiff
ARRAY TECHNOLOGIES, INC.