**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**ARRAY TECHNOLOGIES, INC.,**

     **Plaintiff,**

**vs.**                                 **No. 17 CV 0087 JAP/LF**

**COLIN MITCHELL,**
**NEXTRACKER,**
**MARCO GARCIA,**
**DANIEL S. SHUGAR,**
**SCOTT GRAYBEAL,**
**FLEXTRONICS INTERNATIONAL USA, INC.,**

     **Defendants.**

**MEMORANDUM OPINION AND ORDER**

Defendants Colin Mitchell (Mitchell), NEXTracker (NX), Marco Garcia (Garcia), Daniel

S. Shugar (Shugar), Scott Graybeal (Graybeal), and Flextronics International USA, Inc.

(Flextronics) ask the Court to dismiss Counts Three through Ten of Plaintiff Array Technologies,

Inc.'s (ATI's) AMENDED COMPLAINT (Doc. No. 52).[1] The Court will refer to NX, Garcia,

Shugar, Graybeal, and Flextronics as "the NX/Flextronics Defendants." The Court will refer to

Mitchell and the NX/Flextronics Defendants as "Defendants." The Court will dismiss the claim

against Mitchell in Count Eight for unjust enrichment, and the Court will dismiss the claim

against Defendants in Count Ten under the New Mexico Unfair Practices Act (NMUPA). The

---

[1] *See* DEFENDANTS' MOTION TO DISMISS COUNTS III-X OF ARRAY TECHNOLOGIES, INC.'S
AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) (Doc. No. 61)
and DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
DISMISS COUNTS III-X OF ARRAY TECHNOLOGIES, INC.'S AMENDED COMPLAINT PURSUANT TO
FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) (Doc. No. 62) (together Motion); PLAINTIFF ARRAY
TECHNOLOGIES, INC.'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNTS
III-X OF ARRAY TECHNOLOGIES, INC.'S AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF
CIVIL PROCEDURE 12(B)(6) (Doc. No. 65) (Response); and DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION TO DISMISS COUNTS III-X OF ARRAY TECHNOLOGIES, INC.'S AMENDED COMPLAINT
PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) (Doc. No. 78) (Reply).

Court will deny the Motion as to Counts Three through Seven, Count Eight as to the NX/Flextronics Defendants, and Count Nine.

## I.    STANDARD OF REVIEW

In ruling on the Motion, the Court must "assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014) (citation omitted). In evaluating a Rule 12(b)(6) motion, the Court must "accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view the facts in the light most favorable to the nonmoving party." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir. 1998). However, the Court is under no obligation to accept bare conclusory allegations, *Hall v. Belmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) or to accept legal assertions without factual support. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In sum, to survive the Motion, the Amended Complaint must contain sufficient factual allegations "to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true...." *Twombly*, 550 U.S. at 555.

## II.    BACKGROUND

Since 1989 ATI has designed, manufactured, and sold solar tracking equipment, related technologies, and support services to customers in the United States and abroad. (Am. Compl. ¶ 2.) ATI's solar trackers allow solar panels to move with the sun, which increases the panels' direct exposure to the sun and the amount of energy generated. (*Id.* ¶ 16.) ATI has pioneered significant innovations in ground-mounted solar tracking systems. (*Id.* ¶ 18.)

A.      Mitchell's Employment at ATI

On May 3, 2013, ATI hired Mitchell as a Business Development Manager responsible for

"all aspects of sales from identifying sales opportunities to closing the sale, including:

identifying, contracting and/or qualifying potential customers and presenting solar tracking

systems to same; articulating ATI products with appropriate product positioning to ATI's

customers; and, bid preparation." (Am. Compl. ¶¶ 1, 27.) Mitchell executed a NON-

DISCLOSURE, NON-SOLICITATION AND NON-COMPETITION AGREEMENT (NDA).

(*Id.* ¶ 28, Ex. 1.) Mitchell agreed that, during his employment and for one year thereafter, he

would not to work for or assist an ATI competitor:

> During the period of [Mitchell's] employment with [ATI], and for one year after
> the termination of such employment for whatever reason, with or without cause,
> [Mitchell] shall not, directly or indirectly engage in the ownership or operation of
> a business which designs and/or manufactures solar tracking equipment or
> systems, whether as an officer, director, partner, proprietor, investor, associate,
> employee, consultant, independent contractor or in any other capacity relating to
> such a business.

(NDA ¶ 4.) Mitchell also agreed to

> (i) protect, safeguard and keep secret any Confidential Information (as defined
> below); (ii) only use or disclose Confidential Information as necessary in
> connection with [Mitchell's] work for [ATI]; (iii) refrain from using Confidential
> information for [Mitchell's] benefit or the benefit of any third party or in any
> manner adverse to [ATI's] interests; and (iv) upon the termination of [Mitchell's]
> employment with [ATI], or at any other time upon [ATI's] request, return or
> destroy all Confidential Information which is in [Mitchell's] possession or
> control, including all originals and copies thereof, whether maintained in physical
> or electronic format.

(NDA ¶ 2(a).) "Confidential Information" is defined as

any and all information concerning the business and affairs of [ATI], whether or not separately identified as "confidential" or "proprietary;" provided, however, that information will not be considered Confidential Information if it is or becomes generally available to the public other than through a breach of this Agreement. Without limiting the scope of the foregoing, Confidential Information includes nonpublic information about [ATI's] marketing, business or development plans, financial data, customer or vendor lists, tax records, and personnel files or histories.

(NDA ¶ 2(b).)

As mentioned, the non-disclosure provisions of the NDA survived Mitchell's resignation:

(c) [Mitchell] agrees that all right, title and interest in any Confidential Information is and shall remain the exclusive property of [ATI], and that the non-disclosure obligation described herein shall survive the termination of [Mitchell's] employment with [ATI] for whatever reason, with or without cause.

(NDA ¶ 2(c).) The NDA provided for injunctive relief in the event of a breach:

[Mitchell] understands and agrees that [ATI] shall suffer irreparable harm in the event that [Mitchell] breaches any of [Mitchell's] obligations hereunder and that monetary damages will be inadequate to compensate [ATI] for such breach. Accordingly, [Mitchell] agrees that, in the event of a breach or threatened breach by [Mitchell] of any of the provisions of this Agreement, [ATI], in addition to any other rights, remedies or damages available to [ATI] at law or in equity, shall be entitled to a temporary restraining order, preliminary injunction and permanent injunction in order to prevent or to restrain any such breach by [Mitchell], or by any other person acting for, on behalf of, or with [Mitchell].

(NDA ¶ 6.)

ATI uses "an intricate bid preparation and contract procurement model" that allows ATI to offer solar tracking equipment to customers at competitive prices. (*Id.* ¶ 20.) ATI's bid proposals are tailored to specific customers' needs based on proprietary research. (*Id.*) ATI's bid preparation and contract procurement information—including pricing, profit margins, costs of production, operations and maintenance costs (O&M costs), pricing concessions, promotional discounts, advertising allowances, volume rebates, marketing concessions, payment terms, and rebate incentives—have independent economic value because the information gives ATI an

advantage over competitors. (*Id.*) Because a competitor could use this information to undercut ATI's bid prices, the information is an ATI trade secret. (*Id.* ¶¶ 21–22.) In addition to having employees sign the NDA, ATI limits employee access to its electronic data. (*Id.* ¶¶ 24–25.)

### B.    Mitchell's Contacts with ATI's Competitors

ATI alleges that Mitchell violated the NDA while he was employed at ATI and after he resigned on July 8, 2016. (*Id.* ¶ 31.) On May 25, 2016, Mitchell wrote an email to Ms. Cristina Clavijo, the head of Strategic Business Development for Grupo Clavijo (Grupo), an ATI competitor. (*Id.*) Mitchell said, "I really want to thank you for this opportunity" and "I believe I can be successful in helping you grow your brand and footprint here in the U.S. in a sustainable manner." (*Id.* ¶ 32.) Mitchell described certain challenges that Grupo faced in the United States market noting that Grupo's cost to install its systems was higher than ATI's cost. (*Id.*) Mitchell recommended ways that Grupo could increase its presence in the United States. (*Id.*)

NX is ATI's largest competitor in the market for solar tracking equipment. (*Id.* ¶ 33.) NX is a wholly-owned subsidiary of Flextronics. (*Id.*)[2] On June 1, 2016, NX employees Garcia and Shugar exchanged emails. (*Id.* ¶ 34.) Garcia's first email was entitled "Re Colin Mitchell, 97% of ATI sales." (*Id.*) Garcia informed Shugar that Mitchell earned $300,000 at ATI and that NX should offer Mitchell a salary of $340,000. (*Id.*) Garcia asserted "We will cripple our top USA competitor ... we will dominate the USA tracker market and keep out our Euro competitors." (*Id.*) In response, Shugar told Garcia that he should hire Mitchell and that Garcia and Shugar "needed to get Flextronics on board." (*Id.*) The person at Flextronics that they needed to get "on board" was Graybeal, Flextronics' Senior Vice President, Energy Segment. (*Id.*)

---

[2] In September 2015, Flextronics acquired NX to add a solar tracking component to its energy business. (Mot. at 2.) NX is an independent subsidiary of Flextronics with a separate location, set of officers, accounting system, and reporting structure. (*Id.*) Beginning in 2014, ATI lost significant sales to NX due to NX's "innovative technology and engaging customer service that enabled customers to successfully develop their projects with greater profitability." (*Id.* at 3.)

In a June 3, 2016 email, Garcia told Shugar that he had talked to Mitchell and thought he could hire him for $320,000. (*Id.* ¶ 35.) In addition, Garcia stated that Mitchell had a "non-compete" with ATI and that Mitchell was having it reviewed by a lawyer. (*Id.*) On June 10, 2016, Mitchell informed Garcia that Mitchell's attorney determined the NDA was enforceable under New Mexico law. (*Id.* ¶ 36.) Mitchell attached an electronic copy of the NDA to the June 10, 2016 email. (*Id.*) Garcia emailed Shugar informing him about the enforceability of the NDA and outlining a plan to have "Mitchell inform Ron (CEO of ATI) that he would be taking a leave of absence and then join NX one month later." (*Id.* ¶ 37.) (*Id.*) Garcia informed Shugar that Mitchell had requested "support from NX for his legal defense." (*Id.*)

In a June 11, 2016 email, Garcia told Mitchell that Shugar had spoken to Flextronics and that they were willing to "take on a portion of [Mitchell's] legal defense costs, and [Garcia] asked Mitchell for his proposed start date at Flex." (*Id.* ¶ 38.) On June 13, 2016, Mitchell sent an email telling Garcia his attorney's name and thanking Garcia for the offer to pay part of his legal expenses. (*Id.* ¶ 39.) In the June 13, 2016 email, Mitchell accepted Garcia's offer of employment. (*Id.*)

On June 21, 2016, for about three hours, Mitchell downloaded approximately 7,000 electronic files from ATI's hard drive and transferred the files to his personal hard drive without ATI's permission. (*Id.* ¶ 40.) The electronic files contained "extensive confidential information and trade secrets belonging to ATI[.]"(*Id.*)

On July 8, 2016, Mitchell resigned his employment at ATI. (*Id.* ¶ 41.)

On August 17, 2016, Mirza Baig, Flextronic's Talent Acquisition Coordinator, emailed Mitchell asking him to fill out Flextronic employment documents. (*Id.* ¶ 42.) On that date, Garcia sent Mitchell a written job offer from Flextronics for the position of "Senior Director, Business

Development" at a salary of $160,000 plus a $160,000 bonus if Mitchell met a performance target. (*Id.*) Garcia stated that Mitchell was to report directly to Graybeal. (*Id.*) On August 23, 2016, Mitchell accepted a written offer from Flextronics, and Mitchell began his new employment in September 2016. (*Id.*)

###### C.     Mitchell's Employment with NX/Flextronics

ATI alleges that Flextronics "inserted Mitchell into a competition for the job of Senior Director Business Development with a number of other candidates trying to create the impression that Mitchell had won a job competition." (Am. Compl. ¶ 42.) ATI maintains that the NX/Flextronics Defendants concealed Mitchell's employment with NX by giving the impression that Mitchell was an employee of Flextronics, which is not a direct competitor of ATI. (*Id.* ¶ 43.) For example, Flextronics' job requisition records "falsely" stated that Graybeal was Mitchell's hiring manager "when in fact it was Marco Garcia and Dan Shugar of NEXTracker." (*Id.*) The records also falsely represented that Flextronics began recruiting Mitchell on August 17, 2016; but instead, NX began recruiting Mitchell in early June 2016, as indicated by the Garcia/Shugar emails. (*Id.*) Flextronics' hiring records described Mitchell's position: "Mitchell will utilize 'a NetSuite CRM system to track and forecast sales support, Operations, Supply Chain and Engineering teams to ensure that NX is consistently exceeding customer expectations while ensuring that NX sales maintain maximum positive contribution margin.'" (*Id.* ¶ 43.) Mitchell's job description included responsibility for "working to 'form excellent working relationships with NEXTracker departments, including operations, supply chain, cost accounting, logistics and engineering to ensure on-time delivery and best in class quality of all NEXTracker products.'" (*Id.*) The records indicated that Mitchell would "'hire a qualified sales analysist/business analyst [sic] who will work side by side with ... [Mitchell] to prepare cost estimators and sales

proposals.'" (*Id.*) On Mitchell's W-2 Wage and Tax Statement, NX is named as Mitchell's employer. (*Id.* ¶ 44.)

On September 13, 2016, Ron Corio (Corio), the CEO of ATI, attended the "Solar Power International" trade convention. (*Id.* ¶ 45.) Mitchell visited ATI's exhibit booth and told Corio that he was working for Flextronics. (*Id.*) Corio responded, "You mean NEXTracker?" (*Id.*) Mitchell stated, "Oh, no, they are keeping me far away from them[,]" and Mitchell represented that he was "selling modules" for Flextronics. (*Id.*)

D.      Mitchell's Contribution to NX Sales

On October 9, 2016, Mitchell emailed Garcia, Shugar, and others regarding the "AES Solar" account. (*Id.* ¶ 46.) Mitchell stated that "AES wanted a quote on the 70 megawatt DC project and that he would love to take over the AES account." (*Id.*) On that date, Shugar responded to Mitchell, Garcia, and others: "The account is YOURS: Please bring some Tracker biz .... Please bring home some Tracker bacon. THX Shug." (*Id.*) Mitchell responded, "I'm on it Dan. Thanks guys." (*Id.*)

On October 11, 2016, Mitchell informed Graybeal that Mitchell "was asked to take over the AES Solar Account on the NX side." (*Id.* ¶ 47.) ATI alleges that emails to Graybeal show that Graybeal joined in Garcia's and Shugar's plan to conceal Mitchell's position with NX and to violate the NDA. (*Id.*)

On October 17, 2016, Mitchell sent an email to Shugar, Garcia and others containing an update on the AES account and describing two NX bids on a project in Kauai, Hawaii. (*Id.* ¶ 48.)

On November 17, 2016, Peter Wheale, NX Vice President of Sales in Australia, sent an email asking Mitchell, Garcia, and Ryan Boothe to help him respond to ATI's "pitches" on

"O&M[3] and LCOE"[4] stating that "we cannot let ATI in the door any further" and noting that "a portfolio of jobs just went to ATI." (*Id.* ¶ 49.) Later that day, Garcia responded to Wheale, Mitchell, Shugar, and five other NX employees stating, "Wheale's issue was discussed at an Executive offsite today." (*Id.*) Garcia then emailed Mitchell:

> Colin really need your help here. ATI is kicking our ass with the O&M pitch that you helped create. What are the real O&M weaknesses of ATI? Please reply all. This is unacceptable to lose business to ATI when we have lower Capex[5] and they win on lower O&M and lower LCOE. We are being out maneuvered. All hands on deck. Thank you.

(*Id.*)

On November 18, 2016, Garcia mistakenly sent a text message to Mitchell's old ATI cellphone, which had been reassigned to another ATI employee: "Hey Colin, you are cc d on an email about ATI winning 130 MW in AU using an argument of lower O&M costs vs NX. Pete is now going after another 130 MW. Can you please respond with you [sic] knowledge of ATI O&M costs and issues?" (*Id.* ¶ 50.)[6] ATI alleges that the text message to Mitchell's ATI cell phone referred to a successful ATI proposal to supply solar tracking equipment for four projects in Australia totaling 130 megawatts.[7] (*Id.* ¶ 51.) NX had submitted unsuccessful bids for those projects. (*Id.*) On November 18, 2016, Mitchell emailed in response to Garcia's text and email requests: "ATI's sales presentation consists of an excel spreadsheet that calculates component

---

[3] O&M refers to "operation and maintenance costs." (Am. Compl. ¶ 55.)

[4] LCOE refers to "levelized cost of electricity." National Renewable Energy Laboratory, https://www.nrel.gov/analysis/tech-lcoe-documentation.html (last visited Dec. 19, 2017).

[5] Capex refers to capital expenditures. Corporate Finance Institute, https://corporatefinanceinstitute.com/resources/knowledge/modeling/how-to-calculate-capex-formula (last visited Dec. 19, 2017).

[6] The Amended Complaint contains a digital image or "screen shot" of the text. (Am. Compl. ¶ 50.)

[7] ATI contends that this text message was the first time ATI discovered Mitchell's breaches of the NDA. "But for Garcia's mistake in texting Mitchell at his old ATI provided cell phone number to ask him for ATI information a few months into Mitchell's employment at NX, ATI might never have uncovered the Defendants' wrongdoing." (Resp. at 2.)

costs for NEXTracker batteries, controllers, Zigbee,[8] motors, etc. and tries to make a comparison between the ATI electronics and the NEXTracker electronics." (*Id.* ¶ 52.) Mitchell also stated that the ATI summary estimates a net present value of a 30-year O&M for the NEXTracker system "as coming to somewhere close to .01-.015/watts DC."[9] (*Id.*) Mitchell stated that "a lot of ATI's focus (O&M deficiencies) is on batteries and tracker controllers." (*Id.*) On that date, Mitchell also responded to a question from NX's Mike Mehawich on "whether removal of vegetation and tracker costs could save money during bidding." (*Id.* ¶ 53.)

On November 28, 2016, Wheale sent Mitchell another email recounting ATI's successful bids on several Australian contracts and noting that high winds were an issue related to those contracts. Mitchell emailed Wheale in response:

> My understanding to Peter's point is that the ATI off the shelf V3 design is capable of withstanding 135 mph wind speed. ... The ATI system uses a torque limiting gear box at the center of each row that allows each row to decouple from the driveline at around 50-60 mph, in order for each row to find a position of lower resistance. If the row is pushed all the way to the mechanical stops at 52 degrees +/- then there are mechanical stops at each foundation AND at the center of the row at the gear rack, which resists the wind forces. They claim that this design reduces the torque in the torque tube, because the forces are transferred and spread out through all of the foundations and into the ground. Whereas in our system, in my understanding, the slewing gear drive has to hold the entire row during a high wind event with some perimeter help from dampers.

(*Id.* ¶ 54.) ATI alleges these messages illustrate that Mitchell provided detailed information about ATI's costs and equipment design to NX employees, Shugar, Garcia, and Wheale. (*Id.*) For example, the information Mitchell provided to Garcia and Wheale about ATI's sales presentation techniques appeared to be aimed at enabling NX to underbid ATI on a subsequent Australian project. (*Id.* ¶ 55.) ATI alleged that Mitchell was well aware that ATI's cost

---

[8] ZigBee is a wireless networking standard that is aimed at remote control and sensor applications and is suitable for operation in harsh radio environments and in isolated locations. Radio Electronics.com,  http://www.radio-electronics.com/info/wireless/zigbee/zigbee.php (last visited Dec. 19, 2017).

[9] DC stands for "direct current." MIT School of Engineering, https://engineering.mit.edu/engage/ask-an-engineer/whats-the-difference-between-ac-and-dc (last visited Dec. 19, 2017).

information and sales presentation techniques were confidential and that he was prohibited from disclosing that information. (*Id.* ¶ 60.)

ATI asserts that the text message and emails further illustrate that NX and Flextronics induced Mitchell to breach the NDA. (*Id.* ¶ 65.) ATI contends that the text message and corresponding emails "illustrate why Mitchell's position with NX makes it inevitable that Mitchell will disclose ATI's confidential data and trade secrets (assuming he has not already). Given the work Mitchell performed for ATI, his work for NX will inevitably call upon him to use and disclose ATI's confidential information and trade secrets in violation of the NDA." (*Id.* ¶ 66.) According to ATI, these allegations support its claim for injunctive relief to prevent further irreparable harm to ATI. (*Id.* ¶ 69.) ATI argues that the circumstances surrounding Mitchell's resignation from ATI, two weeks after accepting employment with NX and after downloading ATI's confidential electronic files, when added to allegations that Mitchell concealed his employment with NX by claiming that he worked for Flextronics, not only reveal Mitchell's improper motive and willful breaches of the NDA, but also show that the NX/Flextronics Defendants encouraged Mitchell to violate the NDA. (*Id.* ¶ 67.)

   E.   Claims in the Amended Complaint

In Count One of the Amended Complaint, ATI asserts a claim against all Defendants

under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836.[10] (*Id.* ¶¶ 70–85.) In Count Two,

ATI asserts a claim against all Defendants under the New Mexico Uniform Trade Secrets Act

---

[10] The DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C.A. § 1836(a). The statute also provides:

> In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may--
>> **(A)** grant an injunction--
>>> **(i)** to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not--
>>>> **(I)** prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or
>>>> **(II)** otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;
>>> **(ii)** if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and
>>> **(iii)** in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited;
>> **(B)** award--
>>> **(i)(I)** damages for actual loss caused by the misappropriation of the trade secret[.]
>> **(C)** if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B)[.]

18 U.S.C.A. § 1836(b)(3).

(NMUTSA), NMSA 1978 § 57–3A–1 *et seq.*[11] (*Id.* ¶¶ 86–99.) In Counts One and Two, ATI

requests injunctive relief. (*Id.* ¶¶ 85, 99.) In Count Three, ATI asserts a claim against Mitchell

for breach of contract and asks for monetary damages and an injunction to prevent further

dissemination of ATI's confidential information. (*Id.* ¶¶ 100–109.) In Count Four ATI makes a

claim against Mitchell for breach of the implied covenant of good faith and fair dealing under

New Mexico law. (*Id.* ¶¶ 110–117.) In Count Five, ATI asserts a claim against all Defendants for

breach of fiduciary duty. ATI asserts that Mitchell breached his fiduciary duty to ATI (*Id.* ¶¶

118–128) and that the NX/Flextronics Defendants conspired with or aided Mitchell in the breach

of his fiduciary duty to ATI. (*Id.* ¶¶ 124–128.) In Count Six, ATI contends that the

---

[11] The NMUTSA defines a "trade secret" as information, including a formula, pattern, compilation, program, device, method, technique or process, that:

> (1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

NMSA 1978 § 57-3A-2(D).

Under NMUTSA "misappropriation" means:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) disclosure of (sic) use of a trade secret of another without express or implied consent by a person who:
>
>> (a) used improper means to acquire knowledge of the trade secret; or
>>
>> (b) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: 1) derived from or through a person who had utilized improper means to acquire it; 2) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or 3) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>>
>> (c) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

NMSA 1978 § 57–3A–2(B). "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy or espionage through electronic or other means." NMSA 1978 § 57-3A-2(A).

NMUTSA provides for damages for the misappropriation of a trade secret for the "actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." NMSA 1978 § 57–3A–4(A). If a claimant proves that willful and malicious misappropriation occurred, "the court may award exemplary damages in an amount not to exceed twice any award made under Subsection A of this section." NMSA § 57–3A–4(B).

NX/Flextronics Defendants committed a tortious interference with ATI's contractual relationship with Mitchell. (*Id.* ¶¶ 129–144.) In the Count Seven claim for conversion, ATI argues that Defendants "intentionally exercised dominion over ATI's trade secrets and confidential information" and that their tortious conduct "constituted the conversion of an identifiable sum of money[.]" (*Id.* ¶¶ 145–152.) In Count Eight, ATI asserts a claim of unjust enrichment/restitution against all Defendants claiming that they used ATI's confidential information for their own benefit. (*Id.* ¶¶ 153–156.) ATI argues that it is entitled to an order imposing a constructive trust over all past and future profits that the NX earned from its use of ATI's confidential information. (*Id.* ¶ 157.) Count Nine presents a claim of fraud and constructive fraud against all Defendants. (*Id.* ¶¶ 158–172.) ATI alleges that from June 13, 2016, the date Mitchell allegedly accepted an employment offer from NX, until July 8, 2016, the date Mitchell resigned from ATI, Mitchell intentionally concealed his acceptance of employment with NX and copied "ATI's confidential information and trade secrets" from ATI's electronic files. (*Id.* ¶¶ 160, 163.) ATI further alleges that after Mitchell resigned, he falsely represented to Corio that he was employed with Flextronics. (*Id.* ¶ 161.) ATI alleges that the NX/Flextronics Defendants conspired to assist Mitchell in defrauding ATI by claiming that Mitchell worked for Flextronics and by promising to pay a portion of Mitchell's legal fees for breaching the NDA. (*Id.* ¶¶ 168–172.) In Count Ten, ATI claims that Mitchell and the NX/Flextronics Defendants violated the NMUPA, which prohibits using false or misleading statements in connection with the sale of goods or services. *See* NMSA 1978 § 57–12–1 *et seq.* (*Id.* ¶¶ 173–182.)

III.     DISCUSSION

    A.     Count Three Claim against Mitchell for Breach of Contract

Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence

of a contract, breach of the contract, causation, and damages." *Abreu v. N.M. Children, Youth*

*and Families Dep't.* 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011). Defendants contend that ATI

has failed to allege facts supporting breach and damages. Defendants first contend that Mitchell

did not breach the NDA by accepting employment with Flextronics. However, ATI clearly

alleges that Mitchell breached the NDA by accepting employment with NX, "ATI's biggest

competitor." (Am. Compl. ¶ 33; NDA ¶ 4.) The June 2016 emails show that Mitchell was

negotiating with NX employees, Garcia and Shugar, for a position with NX and that Mitchell

accepted NX's offer of employment in a June 2016 email even though later emails attempt to

show that Flextronics hired Mitchell. The NDA clearly prohibited Mitchell from working for

NX, a "business which designs and/or manufactures solar tracking equipment or systems." (NDA

¶ 4.)

    In addition, the Amended Complaint is replete with allegations that after Mitchell was

employed with NX, or Flextronics as asserted by Defendants, Mitchell violated the nondisclosure

provisions of the NDA. Mitchell allegedly helped NX employees Garcia and Wheale respond to

ATI's sales "pitches" for projects in Australia by sharing ATI's confidential bid preparation and

product design information.

    Defendants next assert that ATI failed to allege what specific confidential information

Mitchell provided to NX. Alternatively, Defendants contend that ATI failed to state specific facts

illustrating that the information Mitchell provided constitutes Confidential Information as

defined in the NDA. Defendants argue that these allegations merely state that Mitchell "will inevitably" disclose confidential information in his new position.

ATI counters that its Amended Complaint contains numerous allegations showing that Mitchell failed to "protect, safeguard and keep secret" Confidential Information, which is broadly defined to include the cost data and the technical information about ATI's equipment. In addition, one week after Mitchell accepted Garcia's offer of employment, Mitchell downloaded 7,000 electronic files that contained "extensive confidential information and trade secrets belonging to ATI" — a clear breach of the NDA provision on safeguarding Confidential Information. In November 2016, a few months after Mitchell resigned from ATI, Mitchell responded to an email from Wheale, VP of NX's Australia sales, asking for help responding to ATI's "pitches" on "O&M and LCOE." (*Id.* ¶ 49.) Mitchell described ATI's excel spreadsheet comparing costs for NX components and ATI components. (*Id.* ¶ 52.) In short, the Amended Complaint sufficiently alleges that Mitchell breached both noncompetition and nondisclosure provisions of the NDA.

Finally, Defendants assert that ATI's Amended Complaint fails to adequately plead what damages ATI incurred from the alleged breaches. According to Defendants, ATI has merely alleged that it was and continues to be damaged by "the loss of sales and profits it would have earned but for Mitchell's contractual breaches." Defendants characterize these allegations as mere "boilerplate conclusions" because "[ATI] identifies no customers or potential customers, no specific opportunities, and no facts from which the Court could plausibly conclude that ATI has in fact been damaged." (Mot. at 13.)

In response, ATI contends it "does not know with certainty at this stage of the litigation every contract it would have won and what profits it would have made but for Mitchell's

conduct." (Resp. at 6.) ATI also points to statements in the Joint Status Report and Provisional

Discovery Plan (JSR) that "ATI lost bids on 31 projects in which it was competing against

NEXTracker and the net profit lost was in excess of $40 million dollars." (*Id*. at 6 n. 3.)

Although the Court cannot consider the JSR allegations in ruling on the Motion, ATI has

sufficiently pleaded damages caused by Mitchell's conduct in the Amended Complaint.

> Nothing in [*Twombly*] or in the Supreme Court's subsequent decision in [*Iqbal*]
> requires a plaintiff to specifically plead each and every element of damages ….
> Such a requirement would result in a near wholesale abandonment of the concept
> of notice pleading. The Supreme Court's decision in [*Twombly*] and [*Iqbal*]
> require only that a plaintiff plead sufficient facts to make his or her legal claim
> plausible.

*Isengard v. New Mexico Pub. Educ. Dep't*, No. 08 CV 0300 JB/RLP, 2009 WL 5220371, at *7–8

(D.N.M. Dec. 9, 2009) (unpublished) (finding that a party who pleaded a claim for consequential

damages had sufficiently stated an entitlement to certain "close-out" costs incurred as a result of

a breach of contract). *See also Anderson v. XTO Energy, Inc.*, No. 13 CV 941 SWS/KK, 2014

WL 11511698, at *2 (D.N.M. Nov. 24, 2014) (unpublished) (finding that plaintiffs sufficiently

alleged they suffered "financial damages" from the non-payment of royalties under oil and gas

leases). It is not necessary for a plaintiff to allege specifically what losses resulted from a breach

of contract as long as the facts support a reasonable inference of loss. *Id.* ATI alleges that its

confidential information related to its sales presentations and bid preparation was divulged to a

competing bidder causing a financial loss. At the pleading stage, ATI's allegations are sufficient.

*See Advanced Comfort Technologies, Inc., d/b/a Intellibed,* No. 2:17-cv-00497-JNP, 2017 WL

6060634, at *11 (D. Utah Dec. 6, 2017) (unpublished) (applying New York law and ruling that

plaintiff sufficiently pleaded damages from the breach of an agreement under which defendant

promised to use its best efforts to market plaintiff's products because "[plaintiff's] lost profits are

capable of proof with reasonable certainty.").

In the Response Defendants cite two cases; however, the Court agrees with ATI that the cases are inapposite. In *Nwachukwu v. Liberty Bank*, 257 F.Supp.3d 280 (D. Conn. 2017), the court dismissed a claim for breach of a contract for failure to sufficiently plead damages on a claim that Liberty Bank wrongfully closed the plaintiff's checking accounts. *Id.* at 293–94. The plaintiff alleged that closing his accounts made "other banks/financial institutions wary of the Plaintiff without reason." *Id.* The court held that in this allegation, "Plaintiff is speculating—the circumstances do not merit a stronger word—that this may happen to him in the future." *Id.* at 294.

Next, Defendants cite *Executive Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F.Supp.2d 694 (S.D.W.Va. 2009), holding that an insurance company's allegations as to its potential liability for additional settlement payments after an initial resolution of the parties' claims were "too remote and speculative to support [claimant's] claim that it was injured" by the plaintiff's breach of contract. *Id.* at 726. Despite this conclusion, however, the court allowed the breach of contract claim based on allegations that attorneys' fees, inconvenience, delay and other costs were incurred as a result of the breach. *Id.* Moreover, the court asserted that the insurance company's "allegation of nominal damages" was enough to avoid dismissal of its breach of contract claim. *Id.* In this case, ATI has sufficiently stated that Mitchell's conduct caused ATI to suffer lost profits and financial damages, and the Court will not dismiss Count Three for breach of contract.

B.     Count Four Claim against Mitchell for Breach of Covenant of Good Faith and Fair Dealing

The Supreme Court of New Mexico has explained: "Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." *City of Raton v. Arkansas River Power Auth.*, 611 F.Supp.2d 1190, 1199 (D.N.M.

2008) (quoting, *Watson Truck & Supply Co., Inc. v. Males,* 1990-NMSC-105, ¶ 12, 111 N.M. 57, 801 P.2d 639 (citations omitted)). "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." *Id.* Defendants contend that since ATI's breach of contract claim fails, the Court should also dismiss ATI's claim for breach of the covenant of good faith and fair dealing. However, ATI's contract claim is viable; therefore, the Court will not dismiss ATI's Count IV claim for breach of the covenant of good faith and fair dealing. *See City of Raton*, 611 F.Supp.2d at 1207 (refusing to dismiss a claim for breach of covenant of good faith and fair dealing that arose out of a breach of contract).

C.      Count Five Claim against Defendants for Breach of Fiduciary Duty

1.      Mitchell

For this claim ATI must allege that Mitchell owed a fiduciary obligation to ATI and that Mitchell violated that obligation. *MEI Techs., Inc. v. Detector Networks Int'l, LLC*, No. 09 CV 0425 RB/LFG, 2009 WL 10665560, *2 (D.N.M. July 6, 2009) (unpublished) (citing *Las Luminarias of the New Mexico Council of the Blind v. Isengard*, 1978-NMCA-117, ¶ 8, 92 N.M. 297, 587 P.2d 444). Defendants argue that ATI has not established that Mitchell owed a fiduciary duty to ATI. Defendants contend that in New Mexico law, a fiduciary relationship is a "particularly stringent relationship, and the law accordingly does not make all business relationships or prospective business relationships into fiduciary relationships." *Leon v. Kelly*, No. 07 CV 0467, 2008 WL 5978926, *6 (D.N.M. Dec. 8, 2008) (unpublished). In *Leon*, however, the court held that the defendant did not owe the plaintiff a fiduciary duty because the plaintiff had not sufficiently alleged the parties had formed a partnership. *Id.* In contrast, New Mexico courts consider the employment relationship as a relationship of "trust and confidence and places upon the employee a duty to use his best efforts on behalf of his employer." *Las*

*Luminarias*, 1978-NMCA-117 at ¶ 8. Therefore, as ATI's Business Development Director, Mitchell owed a fiduciary duty to ATI.

In *MEI Techs, Inc.*, the court allowed MEI Technologies, Inc. (MEI) to bring a claim for breach of fiduciary duty against a former employee, David Melanson. 2009 WL 10665560 at *1. Prior to Melanson's resignation, MEI entered into a "teaming agreement" with Detector Networks Int'l, LLC (DNI) in which DNI, as contractor, would submit a proposal to the Pacific Northwest National Laboratories (PNNL) to sell and install a radiation detection device and DNI would subcontract some of the work to MEI. *Id.* Melanson was the lead MEI engineer assigned to the project. *Id.* However, after the teaming agreement was executed, Melanson resigned from MEI and was hired by DNI, which allowed DNI to submit the proposal to PNNL without subcontracting with MEI. *Id.* at *2. The court concluded that MEI sufficiently alleged Melanson had breached his fiduciary duty to MEI. *Id.* at *3. Similarly, Mitchell owed a fiduciary duty to ATI as its employee.

Defendants next argue that ATI fails to show "Mitchell's pre-resignation contacts with Grupo Clavio and NEXTracker were anything other than Mitchell's attempts to seek alternative employment." (Mot. at 11.) However, ATI alleges that Mitchell breached his fiduciary duty when he disclosed ATI's cost information to Grupo and promised to improve Grupo's sales presence in the United States. Mitchell negotiated employment with NX and then downloaded ATI's confidential electronic files to his personal hard drive. Defendants assert that ATI failed to allege that Mitchell was not downloading this material "in connection with Mitchell's employment with ATI." (Mot. at 11.) However, the timing suggests that Mitchell wrongfully downloaded the information for his own purposes in violation of his fiduciary duty of loyalty to

ATI. In sum, ATI's allegations support its claim that Mitchell breached his fiduciary duty to ATI prior to his resignation.

## 2. NX/Flextronics Defendants

ATI's claim against the NX/Flextronics Defendants is based on derivative liability—aiding and abetting Mitchell's breach of fiduciary duty or conspiring with Mitchell to breach his fiduciary duty. (Am. Compl. ¶¶ 124–128.)

### a. Aiding and Abetting Breach of Fiduciary Duty

To successfully state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege that (1) a fiduciary of the plaintiff breached a duty owed to the plaintiff; (2) the defendant knew of the duty; (3) the defendant intentionally provided substantial assistance or encouragement to the fiduciary to commit an act which the defendant knew to be a breach of duty; and (4) damages to the plaintiff as a result of the breach. *GCM, Inc. v. Kentucky Cent. Life Ins. Co.*, 1997-NMSC-052, ¶ 17, 124 N.M. 186, 947 P.2d 143. In essence, this claim is against a defendant who is "an accomplice" to the principal tortfeasor. *Id.* ¶ 18.

ATI alleges that after learning the terms of the NDA and that the NDA was enforceable, Garcia and Shugar induced Mitchell to accept NX's offer of employment by acquiring Flextronics' agreement to cover a portion of Mitchell's legal costs. (Am. Compl. ¶¶ 34–39.) Graybeal acted as liaison with Flextronics related to hiring Mitchell and covering Mitchell's legal expenses. (*Id.* ¶ 34.)

Defendants contend that ATI merely alleges that the NX/Flextronics Defendants collectively aided and abetted Mitchell in the breach of his fiduciary duty but fails to allege what specific acts each Defendant committed. *Robins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (stating that "the burden rests on the plaintiffs to provide fair notice of the grounds for the

claims made against each of the defendants."). However, the June 2016 email exchanges among Mitchell, Garcia, and Shugar detail Garcia's and Shugar's specific actions in recruiting Mitchell on behalf of NX and allow the inference that Graybeal agreed that Flextronics would cover part of Mitchell's legal expenses. These allegations are sufficient for the NX/Flextronics Defendants to determine what alleged acts are attributable to whom.

Defendants finally argue that ATI failed to allege that it suffered damage as a result of Mitchell's breach of fiduciary duty. As with the breach of contract claim, ATI has sufficiently alleged it suffered economic harm from Defendants' conduct. The Court will not dismiss the Count Five claims against Mitchell for breach of fiduciary duty and against the NX/Flextronics Defendants for aiding and abetting the breach of fiduciary duty.

b. Civil Conspiracy Claim against the NX/Flextronics Defendants

To state a cause of action for conspiracy, a plaintiff must allege: (1) the existence of the conspiracy; (2) the wrongful act or acts done pursuant to the conspiracy; and (3) the damage resulting from such act or acts. *Las Luminarias*, 1978-NMCA-117, ¶ 5 (citations omitted). The existence of the conspiracy must be pled either by direct allegations or by outlining facts from which the existence of a conspiracy may be reasonably inferred. *Id.* ¶¶ 5, 12 (citations omitted) (finding that plaintiff had pleaded an actionable civil conspiracy claim with allegations that defendants conspired to prevent the award of a funding contract to plaintiff's business). Here, ATI plausibly alleges that the NX/Flextronics Defendants agreed to hire Mitchell with the promise to help Mitchell cover part of his legal expenses, which enabled Mitchell to breach his fiduciary duty to ATI. Therefore, ATI has stated a claim against the NX/Flextronics Defendants under either the theory of aiding and abetting or under the theory of civil conspiracy.

D.     Count Six Claim against the NX/Flextronics Defendants for Tortious Interference with Contract

A claim for tortious interference with an existing contractual relationship requires a showing that (1) the defendant knew of the contract; (2) the contract was breached; (3) the defendant played an active and substantial role in causing the plaintiff to lose the benefits of the contract; (4) damages flowed from the breach of contract; and (5) the defendant induced the breach without justification or privilege. *Ettenson v. Burke*, 2001-NMCA-003, ¶ 14, 130 N.M. 67, 17 P.3d 440. The plaintiff must also show that the defendant acted with an improper motive or used improper means. *Id.* In addition, the plaintiff must allege "that the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof." *Wolf v. Perry*, 1959-NMSC-044, ¶ 22, 65 N.M. 457, 339 P.2d 679 (citation omitted).

ATI claims that prior to Mitchell's resignation, the NX/Flextronics Defendants recruited Mitchell and agreed to help with his legal costs despite their knowledge that his employment with NX would violate the noncompetition provisions of the NDA. ATI alleges that after Mitchell's resignation from ATI, the NX/Flextronics Defendants continued to induce Mitchell to violate the confidentiality provisions of the NDA by urging him to disclose confidential information to help NX's sales efforts in Australia and elsewhere. According to ATI, these actions illustrate that the NX/Flextronics Defendants induced Mitchell to breach the NDA's noncompetition and nondisclosure provisions.

The NX/Flextronics Defendants first argue that ATI has failed to adequately plead why Garcia's, Shugar's, and Graybeal's knowledge should be imputed to NX or Flextronics. "It is well established that a corporation is chargeable with the knowledge of its agents and employees acting within the scope of their authority." *Western Diversified Services, Inc. v. Hyundai Motor*

*America, Inc.,* 427 F.3d 1269, 1276 (10th Cir. 2005)) (citing *Sawyer v. Mid-Continent Petroleum*

*Corp.,* 236 F.2d 518, 520 (10th Cir. 1956)). The June 2016 emails sufficiently indicate that NX

employees Garcia and Shugar knew the terms of the NDA and that it was enforceable. Their

knowledge can be imputed to NX. The Amended Complaint raises the inference that Graybeal

knew about the NDA and agreed to cover a portion of Mitchell's legal costs. Graybeal's

knowledge can be imputed to Flextronics. Therefore, both NX and Flextronics are charged with

knowledge of the NDA and the plan to violate it.

Second, the NX/Flextronics Defendants argue that ATI fails to show how Garcia, Shugar,

and Graybeal played an active and substantial role in causing ATI to lose the benefits of the

NDA or that these Defendants induced Mitchell's breach. However, as the Court concluded

above, Garcia, Shugar, and Graybeal aided and abetted Mitchell in violating his fiduciary

obligation to ATI, and the same conclusion applies to find that these parties played an active and

substantial role in causing ATI to lose the benefits of the NDA. Third, the NX/Flextronics

Defendants argue that ATI has failed to adequately plead a basis for damages. As the Court has

determined, ATI has sufficiently plead financial losses from the NX/Flextronics Defendants'

conduct. Thus, ATI has stated a claim against Defendants for tortious interference with an

existing contractual relationship.

E.      Count Seven Claim against All Defendants for Conversion

Conversion is "the unlawful exercise of dominion and control over personal property

belonging to another in exclusion or defiance of the owner's rights, or acts constituting an

unauthorized and injurious use of another's property, or a wrongful detention after demand has

been made." *Muncey v. Eyeglass World, LLC*, 2012-NMCA-120, ¶ 22, 289 P.3d 1255.

Defendants argue that ATI's claim for conversion should be dismissed because it is based on the same set of facts as ATI's claim in Count Two under the New Mexico Uniform Trade Secrets Act (NMUTSA). In the NMUTSA, New Mexico adopted the Uniform Trade Secrets Act (UTSA). The UTSA provides in relevant part: "…this [Act] displaces conflicting tort, restitutionary and other laws of this State providing civil remedies for misappropriation of a trade secret." Blum, George L., *Uniform Trade Secrets Act (UTSA) as Preempting Civil Action Not Sounding in Contract and Based on Misappropriation of Confidential Information Other than Trade Secret, and UTSA as Precluding Plaintiff's Assertion that Claim Does Not Constitute Trade Secret in Order to Circumvent Preemption Bar* 29 A.L.R.7th Art. 4 (2017). Many states have adopted this express bar of common law claims for the misappropriation of trade secrets. *See, e.g., Gaedeke Holdings VII Ltd. v. Baker*, 683 F. App'x 677, 680 (10th Cir. 2017) (applying Oklahoma law). The New Mexico legislature, however, did not adopt the preemption provision in the NMUTSA. *See* NMSA § 57–3A–1 *et seq*.

Defendants' argument relies on case law from states that adopted the UTSA's preemption language. Hence, ATI correctly contends that New Mexico courts would not recognize preemption and would allow common law claims for conversion of trade secrets. The Court will not dismiss ATI's Count Seven claim for conversion.

F.     Count Eight Claim against All Defendants for Unjust Enrichment

To prevail on a claim for unjust enrichment, a plaintiff must show that: "(1) another has been knowingly benefitted at [plaintiff's] expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *City of Rio Rancho v. Amrep Sw. Inc.*, 2011-NMSC-037, ¶ 54, 150 N.M. 428, 260 P.3d 414 (quoting *Ontiveros Insulation Co. v. Sanchez,* 2000–NMCA–051, ¶ 11, 129 N.M. 200, 3 P.3d 695). Unjust enrichment claims have evolved largely to

provide relief where, in the absence of privity, a party may seek refuge in equity. *Ontiveros*,

2000-NMCA-051, ¶ 11 (citations omitted). "New Mexico law strongly disfavors unjust

enrichment claims when remedies exist under contract law" and those claims have been

dismissed in cases where a plaintiff has asserted a breach of contract claim. *Steadfast Ins. Co. v.

Legacy Safety & Consulting, LLC*, No. 15 CV 00218 WPJ/CG, 2015 WL 12803775, at *4

(D.N.M. June 25, 2015) (unpublished). Because ATI has a complete and adequate remedy at

law—a contract claim against Mitchell—the Court will dismiss ATI's unjust enrichment claim

against Mitchell. *Id.* at *5. *See Elliot Industries Ltd. Partnership v. BP America Prod. Co.*, 407

F.3d 1091, 1117 (10th Cir. 2005) (applying New Mexico law and dismissing claim for unjust

enrichment brought with a contract claim for underpayment of royalties).

    Nevertheless, ATI may assert an unjust enrichment against the NX/Flextronics

Defendants because they are not parties to the NDA. ATI plausibly states a claim that the

NX/Flextronics Defendants "knowingly received a benefit at ATI's expense as a result of

inequitable circumstances." (Resp. at 18.) ATI also points out that New Mexico courts have

allowed unjust enrichment claims to proceed along with breach of contract claims. *Starko, Inc. v.

Presbyterian Health Plan, Inc.*, 2012-NMCA-053, ¶ 94, 276 P.3d 252, 278 (reversing dismissal

of unjust enrichment claim brought by one party not in privity of contract and allowing both

breach of contract and unjust enrichment claims to go forward), *rev'd on other grounds*, 2014-

NMSC-033. Thus, the Court will not dismiss the Count Eight unjust enrichment claim against

the NX/Flextronics Defendants.

G.      Count Nine Claim against All Defendants for Fraud and Constructive
        Fraud

    ATI must state with particularity the circumstances constituting fraud or mistake. Fed. R.

Civ. P. 9(b). The elements of fraud are (1) misrepresentation of fact; (2) either knowledge of the

falsity or recklessness on the part of the party making the misrepresentation; (3) intent to deceive and to induce reliance on the misrepresentation; and (4) detrimental reliance on the misrepresentation. *Williams v. Stewart*, 2005-NMCA-061, ¶ 34, 137 N.M. 420, 112 P.3d 281. "An action for constructive fraud is maintainable where there is a nondisclosure of material facts and the person charged with the constructive fraud had a duty to speak under existing circumstances." *Wagner Equip. Co. v. Wood*, CV 11-466 MV/ACT, 2012 WL 12863314, at *2 (D.N.M. July 2, 2012) (unpublished).

### 1.    Mitchell

Defendants contend that ATI failed to state claims for fraud and constructive fraud with particularity under Rule 9(b). This argument is belied by the description of emails among the NX/Flextronics Defendants and Mitchell revealing the plan to conceal Mitchell's employment with NX. Next, Defendants argue that ATI fails to state a constructive fraud claim against Mitchell because according to Defendants, Mitchell had no duty to disclose his search for alternative employment. *MEI Technologies, Inc.*, 2009 WL 10665560, at *2. Defendants point to the statement in *MEI*: "[a]n employee may lawfully seek other employment or even make arrangements to compete with his employer[.]" *Id.* *2. The *MEI* court, however, was considering claims under a nondisclosure agreement that did not contain a noncompetition provision. *Id.* And, the court determined that a duty arose not only from the nondisclosure agreement but also from an employee's duty of loyalty to the employer. *Id.* at *2.

In short, Mitchell had a duty to inform ATI that he had accepted other employment. One can infer that as a result of Mitchell's failure to disclose his new employment, Mitchell was able to download ATI's confidential information. One can infer that ATI would have barred Mitchell's access to ATI's confidential information if it knew Mitchell had accepted NX's offer

of employment. After Mitchell accepted NX's offer of employment, Mitchell along with the

NX/Flextronics Defendants actively concealed that employment. Mitchell filled out Flextronics

employment paperwork, agreed to Graybeal's "supervision," and told ATI's CEO Ron Corio at

the September 2016 trade convention that he worked for Flextronics and not NX. These

allegations support both a fraud and constructive claim against Mitchell.

2. NX/Flextronics Defendants

The NX/Flextronics Defendants assert that ATI fails to allege that they committed fraud

or constructive fraud by making false statements or omissions. The NX/Flextronics Defendants

correctly maintain they had no duty to inform ATI that they had recruited and hired Mitchell.

Again, however, this claim is based on derivative liability. ATI alleges that the NX/Flextronics

Defendants aided Mitchell's fraud by offering to pay for a portion of Mitchell's legal fees and by

creating a paper trail giving the impression that Mitchell worked for Flextronics. Consequently

ATI sufficiently states a claim that the NX/Flextronics Defendants aided Mitchell's fraud and

constructive fraud. Thus, the Court will not dismiss ATI's Count Nine claim against all

Defendants.

H. Count Ten Claim against Defendants under the New Mexico Unfair<br/>Practices Act

The NMUPA prohibits the use of false representations in connection with the sale, lease,

rental, or loan of goods or services. NMSA 1978 §§ 57–12–2(D). Specifically, the NMUPA

prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct

of any trade or commerce." NMSA 1978 § 57–12–3. The NMUPA defines an "unfair or

deceptive trade practice" as "a false or misleading oral or written statement, ... knowingly made

in connection with the sale ... of goods or services...by a person in the regular course of the

person's trade or commerce, that may, tends to or does deceive or mislead any person...." *Id.* §

57–12–2(D). Trade or commerce means the "sale … of any services and any property." NMSA 1978 § 57–12–2(C). A "person" is defined under the Act to include, "where applicable, natural persons, [and] corporations[.]" *Id.* § 57–12–2(A). ATI contends it has standing to bring this claim as a "person" damaged by Mitchell's false statements or omissions made in connection with the sale of his "services" to ATI. ATI claims that Mitchell violated the NMUPA because he "continued to sell his services to ATI but failed to tell ATI that his loyalties had shifted from ATI to NX." (Am. Compl. ¶ 174.) ATI further claims that the NX/Flextronics Defendants conspired to assist Mitchell in violating the NMUPA.

Although the NMUPA is primarily designed to prevent false advertising to consumers of goods or services, New Mexico courts have allowed claims under the NMUPA in the context of other commercial relationships. For example, one court allowed a seller of goods to bring a NMUPA claim against a competing seller for misrepresentations made to consumers that caused harm to the competing seller. *See Navajo Nation v. Urban Outfitters, Inc*., 935 F. Supp. 2d 1147, 1172 (D.N.M. 2013) (Hansen J.).

Defendants argue that ATI fails to state a claim under the NMUPA because Mitchell was not selling "services" to ATI within the purview of the NMUPA. Although the NMUPA has been interpreted broadly, the Court can find no New Mexico case law applying the NMUPA to the employer/employee relationship. And, the Court believes that New Mexico courts would not extend the NMUPA to that relationship.

The Court agrees with United States District Judge Robert C. Brack, that the NMUPA is primarily "aimed at consumer protection." *Fisher Sand & Gravel Co. v. FNF Constr., Inc.*, 10-CV-0635 RB/SMV, 2013 WL 12121876, at *8 (D.N.M. Mar. 27, 2013) (unpublished) (citing *Ashlock v. Sunwest Bank of Roswell*, 1988-NMSC-026, ¶ 7, 107 N.M. 100, 753 P.2d 346,

*overruled on other grounds by Gonzales v. Surgidev Corp.*, 1995-NMSC-036, 120 N.M. 133, 899 P.2d 576 ("[W]e ensure that the Unfair Practices Act lends the protection of its broad application to innocent consumers.")). In *Fischer*, Judge Brack dismissed a claim under the NMUPA brought by a road construction contractor against a competing contractor for disseminating disparaging information that caused the claimant to lose a road construction contract with the New Mexico Department of Transportation. *Id.* at *9. Judge Brack determined that the claimant had no standing under the NMUPA because it "was not a consumer of goods or services." *Id.*

In *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 2005 NMCA-051, ¶¶ 14–18, 137 N.M. 524, 113 P.3d 347, the plaintiff, a manufacturer of custom window shutters, brought a claim under the NMUPA against Home Depot, which had agreed to sell the shutters to its customers. *Id.* The court found that the NMUPA "gives standing only to buyers of goods or services." *Id.* The court rejected the plaintiff's argument that it was a "buyer" of Home Depot's marketing "services." *Id.* Likewise, to have standing to bring a NMUPA claim, ATI must show it was a "buyer" of Mitchell's "services" within the context of the NMUPA.

In *Fogelson v. Wallace*, the court held that an agreement to provide construction services rendered prior to the completion of a residential home was governed by the NMUPA. 2017-NMCA-089, ¶ 81, 406 P.3d 1012. In *Fogelson*, the plaintiffs contracted with Wallen Development, Inc. (Wallen) to construct a residential home in Bernalillo, New Mexico. *Id.* at ¶ 8. Before the home was completed, Wallen ceased operations. *Id.* at ¶ 10. After winning an arbitration award against Wallen, the plaintiffs sued Wallen's officers individually in state court under the NMUPA. *Id.* ¶ 74. The court dismissed the NMUPA claims finding that this was essentially a real estate transaction expressly exempted from the NMUPA. The Court of Appeals

reversed and concluded that the sale of construction services prior to the completion of the residence distinguished it from the sale of real estate. *Id.* at ¶ 77. In its opinion, the Court discussed the meaning of "services" covered by the NMUPA.

> Rather than entering into a sale agreement for a completed house, the Purchase Agreement called for Wallen to construct the Home on a designated vacant lot. Importantly, Appellees never received a "completed" house because Wallen closed before completing construction of the Home. Under such circumstances, the "combined" view of goods and services ... does not apply. Instead, we must consider the plain meaning of the word "services" as it is used in Section 57-12-2(D).

*Id.* at ¶ 78. The court concluded that the construction services provided by Wallen were undoubtedly "work done by one person at the request of another" and as such, the services fit within the definition of "trade or commerce" as the "sale . . . of any services and any property" in NMSA § 57-12-2(C). *Id.* at ¶ 81 (citation omitted).

Despite the broad interpretation of the word "services" in *Fogelson*, the Court does not believe New Mexico courts would extend the NMUPA to find that ATI, as an employer, was purchasing Mitchell's services on a daily basis. Under ATI's interpretation, an employer could sue its employee under the NMUPA for misrepresentations made on the job. Simply put, applying the NMUPA to the employer/employee relationship would "open the UPA to uses never before contemplated in New Mexico and generate an unforeseen wave of UPA litigation." *Fisher*, 2013 WL 12121876, at *9. Therefore, ATI as an employer may not bring a claim under the NMUPA against its employee, Mitchell, and derivatively against the NX/Flextronics Defendants. The Court will dismiss Count Ten.

IT IS ORDERED that DEFENDANTS' MOTION TO DISMISS COUNTS III-X OF ARRAY TECHNOLOGIES, INC.'S AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) (Doc. No. 61) is granted in part and denied in part:

1.      The claim in Count Eight for unjust enrichment/restitution against Mitchell will

        be dismissed with prejudice.

2.      The claim in Count Ten for violation of the New Mexico Unfair Practices Act

        against all Defendants will be dismissed with prejudice.

3.      The DEFENDANTS' MOTION TO DISMISS COUNTS III-X OF ARRAY

        TECHNOLOGIES, INC.'S AMENDED COMPLAINT PURSUANT TO

        FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) (Doc. No. 61) is

        otherwise denied.

_____
SENIOR UNITED STATES DISTRICT JUDGE