UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


ARRAY TECHNOLOGIES, INC.,       )   CASE NO: 1:17-CV-00087-JAP-LF
                                )
                 Plaintiff,     )            CIVIL
                                )
        vs.                     )     Albuquerque, New Mexico
                                )
COLIN MITCHELL, ET AL.,         )   Thursday, September 13, 2018
                                )
_____Defendants.    )    (9:35 a.m. to 11:24 a.m.)


DISCOVERY HEARING HELD TELEPHONICALLY

BEFORE THE HONORABLE LAURA FASHING,
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:            See page 2


Court Reporter:         Recorded; Liberty: Portable 1

Transcribed By:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988








Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES</u>:


For Plaintiff:                   MICHAEL J. HOWELL, ESQ.
                                 TYSON K. HOTTINGER, ESQ.
                                 Maschoff Brennan
                                 111 S. Main St., Suite 600
                                 Salt Lake City, UT 84111

                                 JENNIFER G. ANDERSON, ESQ.
                                 Modrall Sperling Roehl, et al.
                                 P.O. Box 2168
                                 Albuquerque, NM 87103

For Defendants:                  MATTHEW E. JACKSON, ESQ.
                                 Peifer Hanson & Mullins
                                 P.O. Box 25245
                                 Albuquerque, NM 87125

                                 KATHERINE PRESCOTT, ESQ.
                                 ZACH RHINES, ESQ.
                                 SARAH TOWNSEND, ESQ.
                                 Fish & Richardson
                                 500 Arguello St., Suite 500
                                 Redwood City, CA 94063

1        **Albuquerque, NM; Thursday, September 13, 2018; 9:35 a.m.**

2                    **(Hearing held telephonically)**

3                         **(Call to Order)**

4        **THE COURT:**  Good morning.  This is Laura Fashing, and

5    we are scheduled this morning for a hearing -- a telephonic

6    hearing on Array Technology, Inc.'s -- well, in the case of

7    Array Technologies, Inc. V. Mitchell et al.

8            And we're specifically here to hear, for the purpose

9    of considering Array Technologies, Inc.'s -- which we also call

10   "ATI's" -- Motion to Compel, pursuant to Federal Rule of Civil

11   Procedure 37(a), which is Document 192 on the docket sheet.  I

12   actually think it appears as Document 191 as well, but that may

13   be a redacted version.

14           So, first, could I have appearances, please, from the

15   Plaintiffs?

16       **MR. HOWELL:**  Good morning, Your Honor.  This is

17   Michael -- this is Michael Howell.  With me is Tyson Hottinger

18   and also Jennifer Anderson on behalf of Array.

19       **THE COURT:**  Okay, and then for the Defendants, who is

20   present?

21       **MS. PRESCOTT:**  Good morning, Your Honor.  This is

22   Katie Prescott from Fish & Richardson for the Defendant.  With

23   me is Zach Rhines, Sara Townsend, and Matt Jackson.

24       **THE COURT:**  Okay, so this morning, we do have a court

25   reporter here with us in the conference room.

1            And so, if you could, when you speak -- at least at

2    the beginning of the hearing -- could you identify yourself,

3    with respect to speaking, because we can't see you, obviously.

4            And the other issue that a telephonic hearing always

5    has, is I can't tell by looking at you -- because I can't see

6    you -- whether you want to speak.

7            So if you want to speak and I haven't called on you,

8    please politely interrupt and let me know that you have

9    something to say.  Okay?

10           All right, so we are -- we're going to start with the

11   Motion to Compel.  There are only a few issues raised in that

12   Motion to Compel.

13           But then, we've also received a couple of e-mails

14   that I'd like to discuss as well.  One, regarding 30(b)(6)

15   deposition of ATI, that seems to be approaching rapidly.  And

16   then, also, a second e-mail sort of raising a few other issues

17   that the Defendants -- I want to say we received that

18   yesterday.  But we'll deal with that a little later on in the

19   hearing.

20           Okay, with respect to the Motion to Compel, the --

21   one of the issues is ATI's Request for Production directed to

22   NEXTracker; Request for Production Number 57, which asks --

23   actually, let me get to the actual request.  I want to make

24   sure I get it accurate.

25           Request for Production Number 57 requests documents

1  related to any complaints from customers or potential

2  customers, from June 2015, to the present, related to

3  NEXTracker's projects, products, services, or customer service,

4  including, but not limited to project delays, product defects

5  or problems, and performance problems.

6          So I will tell you, I have reviewed both the motion,

7  the Defendants' response, and ATI's reply.  And it sounds like

8  the -- the main argument has to do with whether or not the

9  Defendant should have to -- or NEXTracker should have to

10 produce complaints with respect to any project or product or

11 only on projects that were overlapping in some way with ATI's,

12 in the sense that -- I assume it would be projects where

13 NEXTracker won the bid, as opposed to ATI.

14         So let me, first, hear from the Plaintiff.  It's

15 their motion.  So whoever wants to speak for the Plaintiff,

16 please go ahead.

17         **MR. HOWELL:**  Thank you, Your Honor.  This is

18 Mr. Howell.

19         **THE COURT:**  Uh-huh.

20         **MR. HOWELL:**  And I appreciate the Court's review of -

21 - of the briefing, obviously.  And if it's -- if it's okay with

22 the Court, I think these issues are somewhat related.  The

23 issue of documents related to the bid packages, as well as the

24 RFP 57.

25         **THE COURT:**  Okay.

1          **MR. HOWELL:**  If it's okay with the Court, could we

2    start with the bid package at issue and deal with that first,

3    and then deal with the RFP 57?

4          **THE COURT:**  Sure.  Why don't you tell me how those

5    are related.

6          **MR. HOWELL:**  Sure.  They -- they relate in the sense

7    that the Defendants are advancing this argument about an

8    agreement with respect to production of documents, and they're

9    trying to apply this alleged agreement to basically both --

10   both of these disputes.

11         And I think having some clarity about the -- the

12   scope of that agreement will provide some insight into -- and

13   rebuild the bid documentation issue as well as RFP 57.

14         **THE COURT:**  Okay.

15         **THE CLERK:**  Did somebody just join the conference?

16         **THE COURT:**  Or leave.

17         **THE CLERK:**  Or leave the conference?

18         **MR. HOWELL:**  So this is Mr. Howell again.

19   Mr. Hottinger is actually out of the country on another matter,

20   and he's calling in.  He's had kind of spotty reception, so he

21   may have dropped off and --

22         **THE COURT:**  Okay.

23         **MR. HOWELL:**  -- he may rejoin.

24         **THE COURT:**  Okay.

25         **THE CLERK:**  Okay, thank you.

1          **THE COURT:**  All right, so, Mr. Howell, please go

2    ahead and -- so let's talk about, then -- I guess we can talk

3    about it all together.  And let me just make sure that I

4    understand -- I want to make sure I understand where things

5    stand with respect to the other request.

6          We're talking about Request for Production -- is it

7    16, 17, and -- I was a little confused -- 16, 17, and 20; or

8    16, 17, and 18?

9          **MR. HOWELL:**  I believe it's 16, 17, and 20, Your

10   Honor.

11         **THE COURT:**  Okay, I just wanted to make sure.  And

12   those documents -- those are actually the result -- I haven't

13   previously ruled on those particular Requests for Production,

14   haven't I?

15         I thought that the parties came up with an agreement

16   with respect to what would be produced.  And now the current

17   dispute is what exactly that agreement was.  Do I have that

18   right?

19         **MR. HOWELL:**  I don't believe these specific requests

20   have been -- have been presented to the Court.  We -- we

21   briefly touched on them at the last hearing.  And if I recall,

22   the Court said that they -- that -- that, effectively, we would

23   wait on these until we address this third motion.

24         **THE COURT:**  Okay.

25         **MR. HOWELL:**  Because we ran out time at the second --

1    at the last hearing.

2            To give a little context, if I may, Your Honor --

3            **THE COURT:**  Sure.

4            **MR. HOWELL:**  I'll -- let me just back up.  As the

5    Court is aware, this case is about, among other things, trade

6    secret misappropriation allegations from ATI against the

7    Defendants, who for use and -- and disclosure improperly of

8    ATI's trade secrets and confidential information.

9            And ATI is seeking to discover the scope of that

10   discrimination and -- and the acquisition.

11           And here's what we do know, Your Honor, from some of

12   the documents that -- have they produced, mainly by a

13   Defendant's prior counsel.

14           We know that Mitchell was hired away from ATI by the

15   Defendants.  We know that Mitch -- that the Defendants knew

16   that Mitchell's contract with ATI -- which included a non-

17   disclosure provision and a non-competition provision -- were

18   enforceable.

19           We know that the Defendants concealed Mitchell's

20   employment from ATI.  We know that the Defendant sought

21   Mr. Mitchell's help to compete with ATI, and in response to the

22   Defendants' inquiries of Mr. Mitchell, we know that

23   Mr. Mitchell disclosed to Defendants ATI's benchmark pricing

24   and we know that he disclosed information about ATI's sales

25   strategy and, specifically, its value proposition.  And all of

1    these things, ATI considers to be its trade secret and its

2    confidential information.

3            And we're seeking to further discover additional

4    facts related to this improper acquisition and disclosure and

5    dissemination of ATI's information.

6            Now, Your Honor, we were, to -- to be candid, we were

7    a little perplexed and kind of frustrated when we read the

8    opposition, because it was the first time in this opposition

9    that we had heard of this alleged agreement about production of

10   bid packages.

11           We've been meeting and conferring about this issue

12   for months.  As the Court saw from the one snippet of an e-mail

13   that the Defendants included in their opposition, these

14   discussions began in January.

15           I have personally been involved in these discussions

16   since May, and never once, Your Honor, have we heard from the

17   Defendants about this alleged agreement.

18           Instead, what we've always heard is they're going to

19   be searching for and producing documents and they're trying to

20   gather documents.  Then we heard they don't know what projects

21   are at issue.

22           And there are three specific instances I'd -- I'd

23   like to highlight for the Court, just to give a little bit of

24   context here.

25           On June 18th, we had a meet-and-confer conference

1    with the Defendant, and we asked about the status of production

2    of these bid documents; the documents related to the

3    overlapping projects.  And they claimed they did not know the

4    projects that were at issue in the case.

5              And the reason for that, we -- I think we

6    understand -- when ATI responded to some interrogatories that

7    the Defendant had sent, ATI listed the projects at issue by the

8    project name that ATI uses.

9              And the Defendants claim they didn't know what these

10   projects were because they didn't know the naming convention,

11   which has been an ongoing, kind of, struggle, if you will, for

12   the parties to try to work together to figure that out.

13             And so one of the projects that the Defendant pointed

14   out on this call on June 18th, was a project that ATI listed

15   called, "The Swamp Box Project."  And the Defendants claim they

16   couldn't -- they didn't know what project that was.

17             So I actually pulled up the Defendants' salesforce

18   data on this call and I did a quick control find, and there was

19   one entry in the Defendants' salesforce date for Swamp Box.

20             So, again, we were a little perplexed, but we

21   offered -- and for the sake of trying to move this ball forward

22   and get the document -- to send them what we called a

23   "Correlation Table."  And that correlated ATI project names

24   with what we believe to be the corresponding name that the

25   Defendant chose.

11

1        And this e-mail was sent on June 19th, and it's

2   Exhibit D, to Mr. Hottinger's declaration, it was attached to

3   ATI's motion.  And I believe the docket number there is 192-4.

4        And in that e-mail, on June 19th, I wrote -- I don't

5   know if the Court is there -- but I wrote, "Pursuant to several

6   of our Requests for Production of documents, please produce

7   NEXTracker's complete file of the document associated with each

8   of the projects listed in the attached.

9        "These documents should include, but not be limited

10  to, all bid documents, both packages, financial information,

11  profitability analyses, and internal and external

12  communications about these projects."

13       The Defendants, in response, they never objected and

14  they never said, "Whoa, this is outside the scope of our

15  alleged agreement that we reached in January.  We said we're

16  only going to produce quotes, requests for proposal, and

17  contracts."

18       In fact, what they did, Your Honor -- and we had a

19  subsequent call the following week.  And they asked -- they

20  thanked us for sending this list, and they asked if we could

21  send a second list for the projects that ATI identified in

22  response to Interrogatory Number 10.

23       Now, this is a separate set of projects.  The first

24  list -- the January 19th e-mail -- was in response to

25  Defendants' request that we send them a list of projects that

12

1  we contended that we lost to them.  And that was in what we

2  included in response to Interrogatory Number 5 from the

3  Defendant.

4          And so, on June 30th -- and this is the following

5  exhibit; it's Exhibit E, to Mr. Hottinger's declaration.  We

6  sent a second list, and we, again, asked -- again, and we said

7  we trust that this list, like the last one we sent, will allow

8  Defendants to produce bid documents, quotes, correspondence,

9  internal and external, et cetera, for each of these projects

10  and for the projects identified in the correlation table sent

11  previously.

12          Again, we never got an objection.  We were never

13  notified that they believed that there was this alleged

14  agreement that only obligated them to produce contracts,

15  requests for proposal, and quotes.

16          We had then, again, spoke to them on August 3rd,

17  before we filed this motion.  And, again, we never heard this

18  new theory of what this alleged agreement meant.

19          And so when we get to this opposition, we -- we were

20  surprised and we -- we looked at this e-mail that they cited --

21  that they, again, never raised previously.  And, as we argue in

22  the reply, it -- it doesn't -- it does not set forth any

23  agreement about what constitutes -- the one e-mail they -- they

24  attach in their -- or they included in their opposition does

25  not set forth what bid packages mean.

1         And if we actually look at the e-mail, Your Honor,

2  the full e-mail -- and this is attached to Ms. Prescott's

3  declaration.  And that's Docket Number -- I apologize -- 2042,

4  I believe.  It's Exhibit 1 to her declaration.  The full string

5  of that e-mail is there attached.

6         And if -- if we look at the very first e-mail on the

7  string -- this is on the third page of, I believe, Docket 2042.

8  It may be 2032.  I'm -- I think it might be the redacted

9  version again.

10         But it says -- the very first e-mail on the string is

11  from Ms. Betty Chen.  She's an attorney at Fish & Richardson

12  for the Defendant.  And on the fourth line down, she said,

13  "NEXTracker also agrees to produce additional responsive

14  documents, including bid packages, by January 29th.

15         And in response, Mr. Braithwaite -- down at the

16  bottom of page 2 -- who was -- is an attorney for ATI.  He

17  works with me here at our firm.  He says, in the very first

18  paragraph, "Your recitation is generally correct, though it

19  would probably be beneficial to be more precise if your purpose

20  is to make a written record."

21         And in the third paragraph, he said, "With respect to

22  document production responsive to RFP, ATI agreed to produce

23  outstanding documents in accordance with its responses to

24  NEXTracker's first set of RFPs, including documents related to

25  ATI project bids.

1           That -- that's what we agreed; documents related to

2    the project bid.  And that's how ATI has conducted itself in

3    this case.  It has produced documents related to the project

4    bid.

5           The e-mail that the Defendants include in their

6    opposition, the snippet that they put in, that says nothing

7    about what bid packages constitutes.

8           What it talks about is how there are so many entries

9    in salesforce data that we're going to try to limit the --

10   the -- the projects at issue by only those on which ATI and

11   NEXTracker were competing.  And for those projects, the parties

12   would agree to produce the documents related to the project

13   bids.

14           And that's -- that's -- from the e-mail string,

15   that's what happening.  The original agreement here was to

16   produce documents by January 29th -- in Ms. Chen's e-mail.

17           ATI then started trying to compile that based on the

18   salesforce data and contacted Ms. Chen -- that's Tyson's e-mail

19   on the second page of that exhibit.

20           And that's when this call was had where Tyson

21   proposed, and they discussed – Tyson -- that he discussed,

22   comparing the projects and making a list of the competing

23   projects and exchanging that -- on January 29th.

24           That's what this is about.  There was never an

25   agreement to only produce quotes, requests for proposal, and

1   contracts.  And the requests for proposal -- I should mention,

2   Your Honor, those aren't even NEXTracker or ATI documents.

3   They're from third parties.  That's what ATI and NEXTracker

4   respond to with a -- with a quote or the information about

5   their product.

6           So there was never an agreement to limit bid packages

7   to be only, quotes, contracts, and requests for proposal.

8           **THE COURT:**  Can I interrupt you just real quick, and

9   ask you, Mr. Howell --

10          **MR. HOWELL:**  Sure.

11          **THE COURT:**  Was there an agreement to limit to

12  overlapping projects?

13          **MR. HOWELL:**  There was an agreement to limit the

14  production of documents related to the bid to the overlapping

15  project; that's correct.  And that agreement was reached in

16  January.

17          **THE COURT:**  Okay.

18          **MR. HOWELL:**  This is how it relates to the RFP 57

19  issue, Your Honor.

20          **THE COURT:**  Okay.

21          **MR. HOWELL:**  In January, when we reached that

22  agreement, that was with respect to these documents that --

23  that related to bid and -- and the overlapping projects -- the

24  internal correspondence.

25          That the Court, hopefully, can see from the -- the

1    exhibits that we attached to our reply, there is a huge

2    difference between internal deliberations and a contract.  It's

3    effectively a form contract.  And that's what ATI has been

4    given to work with in this case.

5            The RFP 57 issue, Your Honor, is separate.  That

6    issue was in response to the Defendants advancing this defense

7    that they are gaining market share; not because of trade secret

8    misappropriation or the other causes of action that ATI has

9    alleged, but because they're better.

10           And they have advance -- they advanced this theory --

11   I believe it was in July was the first we had seen it -- or

12   June, I'm sorry.  It was in June.

13           And that's when we served the RFP 57.  Because we are

14   seeking to discover, to test the -- the merits of that new

15   theory they were advancing to determine just how meritorious it

16   might be so we could have something to rebut this new theory.

17           And that's when we served RFP 57.  That was after

18   this so-called agreement.  The agreement was -- did not

19   contemplate that sort of defense at the time.

20           And, more importantly, Your Honor, as we said in the

21   reply, obtaining information about complaints just about the

22   competing projects isn't overly helpful because those projects

23   were already won by NEXTracker.

24           We're looking for general market perception and

25   complaints to NEXTracker from EPCs that would -- that would go

1  to the issue of how Defendants are truly competing with ATI.

2          And there's two other issues I want to raise, if I

3  may, Your Honor, about RFP 57.

4          **THE COURT:**  Okay, go ahead.

5          **MR. HOWELL:**  The Defendants have sent a subpoena --

6  and we attached this to our reply -- to an ATI former employee,

7  Denise Hugo, and in that subpoena, they are effectively

8  asking -- not limited by overlapping projects -- for the same

9  document that they are objecting to here -- in RFP 57.  That's

10 the first point.  They can't have it both ways.

11          The second point, Your Honor, is that two days ago,

12 the Defendants made a production.  And in that production --

13 which consists, I have to say, mostly of things like shipping

14 labels and shipping receipts and bills of lading for the

15 overlapping projects, because they are apparently trying to

16 produce everything but internal and external communications,

17 the other -- the other relevant documents that we're seeking in

18 this motion.

19          But they also produced a number of documents that

20 relate to, generally, NEXTracker's influence and presence in

21 the market, including customer reviews of the NEXTracker

22 system.

23          These are not specific reviews about the overlapping

24 projects.  They are more broad, market-based feedback and

25 customer reviews about NEXTracker's product.

1          They include a video discussing agricultural

2   installation, the amount of money saved through NEXTracker,

3   installed their monitoring system.

4          They have a video from an EPC about -- I'll give you

5   a quote:

6          "TrueCapture is an intelligent, self-adjusting

7   tracker control system that increases typical PV power plant

8   energy by 106 percent."

9          I won't read the whole thing.  But you -- you get the

10  idea.  They're -- they are selectively choosing what to

11  produce, and they have now produced general information about

12  the benefit to their system that they are presumably going to

13  try to advance to demonstrate the market feedback, generally,

14  about how great their products are.

15         And they're resisting providing any market

16  information about complaints of their -- of -- about their

17  projects, except for these overlapping projects -- which they

18  haven't even agreed to do that.

19         So that would be our response to the RFP 57 issue,

20  Your Honor.

21         **THE COURT:**  Okay, Ms. Prescott, will you be speaking

22  for the Defendants or --

23         **MS. PRESCOTT:**  Yes, I --

24         **THE COURT:**  -- someone else?

25         **MS. PRESCOTT:**  -- will, Your Honor.

1          **THE COURT:**  Okay.

2          **MS. PRESCOTT:**  And I'm going to set aside for now the

3    characterization of the (indisc.) history surrounding the

4    January agreement and just focus in on Request for Production

5    Number 57, while we turn to the other Request for Production.

6          I would like to revisit that, however.

7          **THE COURT:**  Okay, go ahead.

8          **MS. PRESCOTT:**  Request for Production 57 seeks

9    documents related to any complaint from any customers or

10   potential customers for more than the past three years.

11         The parties have agreed in the case that there is a

12   limited set of projects that are at issue.  I don't think

13   there's any dispute on that, separate and apart from the

14   January agreement.

15         For purposes of the discovery, NEXTracker has been

16   accepting ATI's set of projects that are in.

17         This Request for Production 57 is untethered, both

18   from that set of projects and from the set of customers that

19   are involved in those projects, whether it's been complaints

20   from any customer.

21         The articulated relevance that ATI has asserted is

22   that they need complaints from all customers to get at our

23   general market perception and our -- the NEXTracker's market

24   reputation.

25         The problem is, is that the information they are

1   seeking, individual complaints submitted by NEXTracker

2   customers to NEXTracker, are simply not probative of that

3   general marketed perception and reputation.

4          These aren't things that are then forwarded on and

5   shared with others so that the market can learn about these

6   issues.

7          There are, however, other documents that are

8   probative of that.  There are commission surveys about customer

9   perceptions.  We've produced that.  One of those was attached

10  to my declaration in support of the opposition brief.

11         Additionally, there are market reports that could be

12  probative of that.  Several of those have produced in the

13  course of this litigation in response to other requests; for

14  example, requests about (indisc.).

15         We did go and do a search, specifically, for reports;

16  an analysis directed to the reputation of NEXTracker and

17  NEXTracker's product in the market.

18         But Request for Production 57, as it was propounded,

19  is much broader than that.  It's just seeking complaints from

20  all customers.

21         This information is highly burdensome to collect,

22  given its marginal relevance to general market perception.  And

23  customer feedback is received through numerous channels:

24  Through support, through technical contacts, through sales.

25         And this request is unlimited in geography, it's

1   unlimited in customer types.  It's not just limited to EPCs, as

2   Mr. Howell asserted.  It's not limited to the customers that

3   are at issue in this overlapping set of projects.  And so

4   Request for Production Number 57 is untethered.

5           We're happy to make a search for market reports and

6   analyses related to our market -- NEXTracker's market

7   reputation and NEXTracker's product market reputation.  But the

8   general request of -- Request for Production Number 57 is

9   simply too broad.

10          **THE COURT:**  Let me ask Mr. Howell, where -- where is

11  it that the Defense appears -- I mean, you assert this in your

12  motion that ENEX -- or NEXTracker contends that it has taken

13  market share because NEXTracker is more innovative, has better

14  products, and has better customer service.

15          Where does that come from?  Is that in there?

16          **MR. HOWELL:**  Yeah, let me -- let me get the docket

17  number for you.  I believe it's in our -- in our opening

18  motion.

19          **THE COURT:**  No.  But does that -- where are they

20  asserting that defense?  In their answer or somewhere else?

21          **MR. HOWELL:**  No.  I don't believe it was in their

22  answer.  It's been in the -- it's a theory there they are

23  advancing, and it was first advanced in their opposition memo

24  to our first Motion to Compel, I believe.

25          **THE COURT:**  Okay.

1          **MR. HOWELL:**  That -- that's -- again, that's why the

2   January alleged agreement -- I mean, this wasn't even

3   contemplated at the time.

4          **THE COURT:**  Okay.

5          **MR. HOWELL:**  So that's the issue.  And, like I said,

6   they're -- they're -- they're producing general market

7   information and -- and individual quotes and things from EPCs

8   and developers, reportedly to advance this theory, and -- and

9   they don't want to give the flip side of that.  And that's the

10  problem.

11         **THE COURT:**  And, Ms. Prescott, do you agree that

12  you're advancing this theory that you have better customer

13  service than ATI?

14         **MS. PRESCOTT:**  Your Honor, ATI is arguing that

15  NEXTracker is winning in projects because it has allegedly made

16  use of ATI's trade secrets.

17         We are advancing and showing that there were other

18  reasons why NEXTracker won those projects.

19         And, yes, those reasons include our customer service

20  and our product is best.

21         **THE COURT:**  All right.

22         **MS. PRESCOTT:**  However, that is with respect to

23  particular customers and particular projects that are at issue

24  here in the case.

25         And so, to the extent that customer feedback is

1  relevant, it is those customers that are the people responsible

2  for those projects that are at issue here.  Not all customers.

3          **MR. HOWELL:**  And, Your Honor, this is Mr. Howell.  If

4  I may, this -- this is the first we've heard that they're

5  limiting it to that.

6          It was not limited that way in their opposition to

7  our first Motion to Compel.  And their more recent production

8  does not seem to be limited to that either.

9          **MS. PRESCOTT:**  Your Honor, I wasn't making a

10  representation as to how we were limiting our production.  I

11  was making a representation as to what could arguably be

12  relevant in this case.

13          And that's the customers and the projects that are at

14  issue.  Not every project; not every customer that could be

15  theoretically here.

16          **MR. HOWELL:**  And, Your Honor, this is Mr. Howell.  If

17  I -- if I may respond?

18          **THE COURT:**  Okay.

19          **MR. HOWELL:**  Your Honor --

20          **THE COURT:**  You do have to give me a minute to think.

21  So every time I pause --

22          **MR. HOWELL:**  No, sorry.

23          **THE COURT:**  Sometimes I am just thinking.  So go --

24  but go ahead, Mr. Howell.

25          **MR. HOWELL:**  I was just going to reiterate.  I mean,

1    I understand what Ms. Prescott's saying now.  But what she's

2    saying is not -- it's not consistent with what they're

3    producing and what they're actually saying -- and the theory

4    they're advancing.

5         They can't say, we're limiting -- the only projects

6    that are relevant are the overlapping projects and

7    simultaneously say they're winning market share by being better

8    and producing documents that don't relate to overlapping

9    projects and instead relate to general market feedback.

10        That -- those are inconsistent to this.

11        **MS. PRESCOTT:**  Your Honor, if I could respond, based

12   on the scope of our production thus far?

13        **THE COURT:**  Sure.

14        **MS. PRESCOTT:**  So the scope of our production, as far

15   as not being in response to our Request for Production Number

16   57, it's been in response to other requests.  And the material

17   that we have produced related to customer feedback is marketing

18   material, stuff that is publicly available on our website.

19        What they are seeking here in Request for Production

20   Number 57 is all documents related to any complaints,

21   individual e-mails that are not going to be put out on websites

22   that will impact NEXTracker's general market perception and

23   market reputation.

24        That's what that issue as to whether we provide

25   customer service and whether customer -- what customers --

1    perception of that customer service.

2            The documents that are relevant to that, we are

3    willing to produce.  Those are market reports and surveys.  But

4    it is not individual e-mails from all customers being sent to

5    NEXTracker's service department that, when parts are two days

6    late.

7            **THE COURT:**  All right.  Hang on just a second.

8            All right, I -- with respect to the Request for

9    Production 57, it does seem to me that if -- if the Defendant -

10   - if NEXTracker is essentially going to present a defense that

11   the reason that their market share has increased is because

12   they have better customer service than ATI, then certainly

13   complaints -- customer complaints are relevant.  The question

14   is, to what extent?

15           And so I'm just going to look at Request for

16   Production Number 57, specifically.  It requests documents

17   related to any complaints from customers or potential

18   customers.

19           I think complaints from potential customers is not

20   relevant.  So we're going to -- I'm not going to order that you

21   produce any complaints from potential customers.

22           And then it's from June 2015 to the present, which

23   seems like a relevant time period because -- well, it's about a

24   year before Mitchell was hired.  So I think that that -- the

25   argument there is you want to see pre-Mitchell and post-

26

1   Mitchell, in terms of customer service.  So that time period

2   seems okay.

3           With respect to NEXTracker's projects, products,

4   services, or customer service, including, but not limited to

5   project delays, product defects or problems, or performance

6   problems --

7           All right, so let me just talk -- think for a minute

8   about whether or not it should include all projects or only

9   projects -- basically, that NEXTracker won over ATI.

10          **MS. PRESCOTT:**  Your Honor, this Katie Prescott.  And

11  I know you want to take an opportunity to -- I just want to

12  clarify that the projects at issue are not limited to projects

13  that NEXTracker won.

14          In certain circumstances, ATI has included projects

15  where NEXTracker and ATI were competing.  ATI won.  ATI alleges

16  that it had to reduce its profit because of NEXTracker's

17  sitting strategy.

18          **THE COURT:**  Right.

19          **MS. PRESCOTT:**  I just wanted to clarify that point.

20          **THE COURT:**  Ms. Prescott --

21          **MS. PRESCOTT:**  And then --

22          **THE COURT:**  Just a second.  Before we go to the

23  second -- your second point, since I'm limiting it to only

24  customers, I'm assuming that if you don't win the bid, they are

25  not your customers; is that right?

1        **MS. PRESCOTT:**  Not necessarily, Your Honor.  Because

2  customers have more than one project.

3        **THE COURT:**  Okay.

4        **MS. PRESCOTT:**  And NEXTracker may win one project and

5  lose one project;  ATI may win one project and lose one project

6  for the same customer.

7        So I think if we're focused on reputation here, what

8  the issue is, is the potentially overlapping customers, not all

9  projects.  I think we really need to be more focused on the

10  customer identity here and the overlap in customers in the

11  project at issue.

12        **THE COURT:**  All right.  Mr. Howell, what's your view

13  on that idea?

14        I mean, again, I'm -- I'm trying to limit it to a

15  reasonable production that will get you what you need, but

16  isn't overly burdensome.

17        **MR. HOWELL:**  I understand, Your Honor.  And -- and I

18  think we can agree to that with the understanding that

19  customers will include both EPCs and developers.

20        Because Ms. Prescott is correct.  And that's one of

21  the reasons why we want this.  But an EPC may -- may bid on

22  many projects --

23        **THE COURT:**  Okay, tell me --

24        **MR. HOWELL:**  -- and various developers.

25        **THE COURT:**  -- what an "EPC" is before you go --

1          **MR. HOWELL:**  I'm sorry.  You got it.  An EPC stands

2    for "Engineering Procurement and Construction."

3          And EPC is kind of like a general contractor that a

4    developer or an owner of a project will hire to solicit bids

5    for trackers and modules and inverters.

6          And then the EPCs often build the projects as well.

7    Sometimes developers do that all in-house; sometimes developers

8    hire EPCs to do this as well.

9          So ATI markets its product to both EPCs and

10   developers.  And I believe NEXTracker does as well.

11         **THE COURT:**  Is that accurate, Ms. Prescott -- just

12   that last sentence -- that you market to both --

13         **MS. PRESCOTT:**  It depends on the particular project.

14   Whether the --

15         **MR. HOWELL:**  I'm sorry --

16         **MS. PRESCOTT:**  -- the interaction is a type of EPC or

17   (indisc.).

18         **MR. HOWELL:**  Didn't hear any of that.

19         **THE COURT:**  Okay, can you repeat what you said?  We

20   couldn't hear it.

21         **MS. PRESCOTT:**  Apologies.  Whether NEXTracker is

22   marketing itself to the EPCs or developers depends on the

23   particular project.

24         But looking across projects, yes, NEXTracker does

25   market itself to those categories.

1          **THE COURT:**   Okay, so I'm going to limit Request for

2    Production Number 57 to documents related to any complaints

3    from customers, which we will understand to include both EPCs

4    and developers, from June 2015, to the present, related to --

5          And then help me here.  Is it going to be -- and I

6    don't know exactly what to call this body of projects.  Is it

7    "overlapping projects," Mr. Howell?

8          **MS. PRESCOTT:**   Your Honor, if it --

9          **MR. HOWELL:**   That's okay from ATI's prospective.

10         **THE COURT:**   Okay, Ms. Prescott?

11         **MS. PRESCOTT:**   We've been using at issue -- and one

12   of the things that would help greatly with this is if ATI would

13   supplement its interrogatory responses that requests its

14   contentions concerning what project it contends that NEXTracker

15   won and ATI lost because of misuse of -- alleged misuse of

16   these trade secrets, as well an interrogatory that seeks

17   identification of the project that ATI contends it won but had

18   reduced profits on.

19         We've been asking them to supplement this so that we

20   aren't having this confusing way of referring to this set of

21   projects.

22         **THE COURT:**   Okay, well, I'm not going to -- at this

23   point, that's not an issue that's before me and I'm not going

24   to deal with it.

25         I'm -- and I'm -- I'm actually intending this to be a

1    broader universe than only the -- I mean, I don't want limit it

2    to only the projects that ATI says that it lost because of

3    Mitchell or that it won, but had to reduce its profit margin

4    because of Mitchell.

5             I want overlapping projects from June 2015, to the

6    present.  And I think -- and, Mr. Howell, is there a list of

7    those projects that has been shared with the Defendants?

8             **MR. HOWELL:**  There is, Your Honor.  Those are the

9    lists that we provided on June 19th and also on June 30th that

10   I spoke of earlier.

11            **THE COURT:**  Okay.

12            **MR. HOWELL:**  And just -- just to provide -- just so I

13   understand, Your Honor, when you said the "overlapping

14   projects" -- my understanding of what we've been discussing is

15   that they need to produce complaints from customers which

16   include EPCs and developers who were involved in or related to

17   these overlapping projects.

18            So in other words, if there's an EPC who is bidding

19   an overlapping project and then there's a complaint to that

20   EPC, they need to produce that; is that correct?

21            **THE COURT:**  A complaint by that, you concede, right?

22            **MR. HOWELL:**  Correct, yes.  That's correct.  Thank

23   you.  That -- sorry, I misspoke.

24            But that was my understanding.  I just want to make

25   sure it was clear.

1      **THE COURT:**  Yes.  Although, I'm -- I'm a little bit

2  concerned about how they're going to -- I don't know how

3  they're going to find that universe --

4      So in other words, you're saying if a particular EPC

5  complained about a project that ATI had nothing to do with, you

6  still want that complaint?

7      **MR. HOWELL:**  I think it's relevant because E-P -- as

8  Ms. Prescott just stated, EPCs will develop many different

9  projects.

10     And so complaints to the EPCs will certainly affect

11  the EPC's willingness to use NEXTracker on any projects,

12  including those that are overlapping.

13     **THE COURT:**  Okay, so is there a way to determine

14  who -- like the list of customers?

15     **MR. HOWELL:**  Well, NEXTracker should have that.  I

16  mean, it -- it -- it's part of the -- of all things they have

17  produced in this case, Your Honor, they certainly know who

18  the -- who their customers are with respect to these

19  overlapping projects because the quotes are directed many

20  times -- well, all the time to either the EPC or the developer.

21     So they're going to know who the EPCs and developers

22  were for each of these overlapping projects and they can easily

23  search for a complaint with respect to or from those EPCs and

24  developers.

25     And to be candid, Your Honor, that's the search that

1   ATI has done.  It -- it -- and that's why we've produced

2   575,000 pages of documents and they have not.

3        THE COURT:  Okay, but not all those documents are

4   complaints, I take it.

5        MR. HOWELL:  Oh, certainly not.  But with respect the

6   ability to search for overlapping projects and correspondence

7   about projects which -- which is going to be inherently from

8   the -- external from the EPCs or the developers, that

9   information can be fairly reasonably searched and obtained.

10        THE COURT:  Okay, I want to make clear, though, that

11   the time limitations still apply.  So from June 2015 to the

12   present.

13        So say there's a customer that has complained -- a

14   customer on an overlapping project, but the complaint was in

15   March of 2014, that does not need to be produced.

16        MR. HOWELL:  Understood.

17        THE COURT:  Okay?

18        MR. HOWELL:  Thank you, Your Honor.

19        THE COURT:  All right.  All right --

20        MS. PRESCOTT:  Your Honor, this is Ms. Prescott.  If

21   I could just get a final clarification as to the scope of

22   customers that we're dealing with, my understanding is that,

23   for purposes of this, Mr. Howell is focused on the customers

24   related to the projects in his June 18th e-mail to me?

25        THE COURT:  I thought it was June -- a little later

1    in June.  Am I wrong about that?

2              **MR. HOWELL:**  It was June 19th and June 30th.

3              **THE COURT:**  June 19 and June 30th?

4              **MR. HOWELL:**  And those are -- those are the exhibits

5    to Mr. Hottinger's declaration I referenced earlier, by the

6    way.

7              **MS. PRESCOTT:**  And -- and the issue that I have with

8    that, with respect to the June 30th, those are ones that

9    NEXTracker did not necessarily win.  So those may or may not be

10   NEXTracker customers.

11             And, additionally, one of the complicating factors

12   that we've had here is that there can be more than EPC that

13   bids a project to a -- to an ultimate developer or owner.

14             And the people -- the EPCs that NEXTracker submits

15   bids to can be different than the ones that ATI was submitting

16   too.

17             So I'm struggling with the June 30th set of

18   customers, how we define which ones of those are actually

19   customers and overlapping customers, given that those are

20   projects that NEXTracker did not win.

21             **THE COURT:**  Well, I think the idea is, is that you

22   will be -- if you can identify any of those people, I guess --

23   I mean, they're not people; they are entities -- who are

24   customers on other projects, then they would be included.

25             But if they're working for a developer that you're

1   not aware of, then I would say, you know, you can only do what

2   you can do, right?  It seems --

3           **MS. PRESCOTT:**  Right.  We will work with that

4   guidance and work with ATI to identify that set of customers,

5   if that's necessary.

6           And then the other point of clarification that I

7   wanted to seek is, you know, we have comparable requests that

8   we have made to ATI seeking communications about its customer

9   relationships, about installation issues, about manufacturing

10  defects.

11          And it was not clear to me whether Mr. Howell was now

12  representing that ATI has already produced documents concerning

13  customer feedback on those issues or not.

14          **THE COURT:**  How does that relate to this Request for

15  Production?  I mean, I know that that was mentioned earlier,

16  that he's -- it seemed to me that he was representing that

17  there had been a subpoena to a particular woman that's

18  requesting this -- these same types of documents.  And it

19  sounded to me like they were -- they had produced or were going

20  to produce them.

21          But, Mr. Howell, what's your --

22          **MR. HOWELL:**  Well, I --

23          **MS. PRESCOTT:**  Your Honor, I submit -- to clarify my

24  question --

25          **THE COURT:**  Sure.

1          **MS. PRESCOTT:**  Because it actually doesn't relate to

2    the subpoena to Ms. Hugo, because there has been no response to

3    that as of yet.

4          **THE COURT:**  Okay.

5          **MS. PRESCOTT:**  It relates to Request for Production

6    directly to ATI that have been served seeking information about

7    communications regarding customer relationships, inflation

8    issues, and manufacturing defects.

9          They include the same type information that's sought

10   here.  And it -- we are being ordered to produce this

11   information.  I just want to confirm that this is a mutual

12   production.

13         **THE COURT:**  Well, I mean, your request isn't -- isn't

14   before me.

15         But I will tell Mr. Howell that -- I assume, you

16   know, that he will take into consideration my rule on -- my

17   ruling on this Request for Production and assume, if they had

18   intended to object or not produce documents in response to your

19   request, that he might reconsider that position, based on this

20   ruling.

21         All right, mister --

22         **MS. PRESCOTT:**  Thank you, Your Honor.

23         **THE COURT:**  -- Mr. Howell?

24         **MR. HOWELL:**  Certainly, Your Honor.  Understood.

25         **THE COURT:**  Okay, because I really do try to be

1  consistent and I try to look at my prior orders to be

2  consistent.  And, certainly, if I'm inconsistent at some point,

3  you should speak up and let me know.

4        But, okay, now, with respect to Request for

5  Production 16, 17, and 18 --

6        **MR. HOWELL:**  I think it was twenty, Your Honor.

7        **THE COURT:**  I'm sorry.

8        **MR. HOWELL:**  Sorry about that.

9        **THE COURT:**  Twenty.  Sorry, it's -- I have it written

10  down here as 16, 17, and 20, relating to bid documents.

11        Ms. Prescott, I think that we -- I heard from

12  Mr. Howell already with regard to those, and now I'm ready to

13  hear from you.

14        **MS. PRESCOTT:**  Thank you, Your Honor.  So NEXTracker

15  has produced what was agreed upon.  And what was agreed upon is

16  what is actually relevant in this case.

17        If you turn to Docket Item 191-4, these are the

18  responses to Requests for Production 16, 18, and 20, that

19  NEXTracker served in the January or February time period.

20        And you'll see, in the response to Request for

21  Production Number 16, that the page 4, at 7, they responded --

22  about halfway through the page, quote, pursuant to the party's

23  February 3rd, 2018 agreement regarding the exchange of

24  overlapping bid documentation, NEXTracker, on or around

25  February 27th, 2018, will produce bid documentation related to

1   certain agreed upon projects.

2            So there's two issues here.  First, there's the scope

3   of the projects, and then there's the bid documentation, which

4   ATI is now reclaiming to be all documents and e-mails related

5   to projects.

6            With respect to the issue of the projects that are

7   here, that's what we have spent almost -- a good six months,

8   really until the e-mails that we received on June 19th and June

9   30th, going back and forth with ATI, trying to get

10  clarification as to what projects they were referring to.  And

11  these have shifted dramatically over time.

12           There are projects identified in the June

13  spreadsheets that were never previously discussed between the

14  parties as far as what projects might be at issue.  But I think

15  we've reached agreement on that.

16           We have that set that's set forth there.  And for

17  each of those projects that are identified in those two June

18  spreadsheets, NEXTracker has produced the bid documentation;

19  the documents memorializing NEXTracker's bid for those

20  projects.

21           Bid documentation includes any response to a request

22  for proposal, the bids or quotes themselves, estimator Excel

23  spreadsheets that are used to generate the bid.

24           And then when a project was won, that bid

25  documentation includes the contract that was negotiated and the

1    income statement.

2              With the respect to the response to RFPs -- Request

3    for Production -- I'm sorry.  Request for proposal; not request

4    for production -- the bid documentation that NEXTracker has

5    produced its responses to those proposals, not the -- the

6    requests for proposals themselves, as Mr. Howell suggested

7    earlier.

8              Sometimes that response is a presentation of product

9    documentation; other times, it's just the bid -- the quotes.

10   And sometimes with these quotes there's -- one, sometimes

11   there's more than one, so that ATI can see, by seeing multiple

12   quotes, the change in pricing strategy over time and when those

13   changes occurred.

14             These estimator Excel spreadsheets that are part of

15   the bid documentation then go into great detail about how each

16   quote was generated.  These are documents that we've produced

17   that needed Excel files.  If we printed them out, our

18   production would be a lot larger, voluminously, of page count.

19             But we didn't print them out.  We produced them

20   (indisc.).  And each of those spreadsheets typically includes

21   more than a dozen individual paths or worksheets.

22             These worksheet include a change log that sets forth

23   the change of (indisc.) between each of the different quotes as

24   it changes over time; it specifies the estimated gross margins

25   of the bid.

1          These estimators are exceedingly detailed.  They go

2    down and price out the individual one-quarter inch fasteners

3    that are used on projects.

4          If a project was won, the bid documentation that's

5    been produced then includes a contract.  These contracts,

6    although they might look like a form contract, many of them are

7    happily negotiated and include different terms, not only will

8    it in price, but schedules and warrantee and other terms and

9    conditions.

10          And then, finally, we have produced a per-project

11   income statement.  NEXTracker has produced what was agreed back

12   in February.  This is a bid documentation; the documents

13   memorializing NEXTracker's bidding process from the projects

14   that overlap.

15          This is also what is relevant in this situation.

16          The -- the e-mails here that we were referring to

17   earlier, the Exhibit 1 to my declaration that Mr. Hottinger

18   sent, it is referring to the production of bid packages.  This

19   is in the second to the last paragraph.

20          Mr. Hottinger says, "One item we did not discuss in

21   detail yesterday was the date for identifying the overlapping

22   project and then producing the bid packages."

23          A bid package is the material that you are providing

24   that shows the bid.  That's what we've produced and it wasn't

25   until this summer that that then got expanded to email.  This

40

1    is also evidence by each side on production.  The parties

2    agreed to make this exchange of bid packages in late February.

3    (indisc.) February production didn't include emails.  It

4    included bid packages.

5         And so I think the issue really is we've fulfilled

6    our commitment that we agreed and this is what's really

7    responsive.  The email about the project generally, it's not

8    proportional to the needs of the case.  You know, there is

9    email talking about pricing.  That gets memorialized in these

10   quotes.  It gets memorialized in the contracts in theory.

11        **THE COURT:**  I think though, Ms. Prescott -- and maybe

12   I'm wrong about this, Mr. Howell, but you can correct me if I'm

13   wrong.  I think part of the issue though is getting to the why

14   that bids may change over the course of the negotiations and I

15   think that's what the Plaintiffs are trying -- or the Plaintiff

16   is trying to get at.  Am I wrong about that, Mr. Howell?

17        **MR. HOWELL:**  No, Your Honor.  That's correct and if I

18   may, that's exactly correct.  And just a quick contrast, if I

19   may, Your Honor.  In our reply in Mr. Hottinger's declaration

20   at Docket 215-1, we attached a few emails there.  And Docket

21   215-2 and 3, if you compare those documents -- and these are

22   emails that do discuss the why, Your Honor.  This is -- this,

23   again, was produced by Defendants' prior counsel but this is

24   the one.  I'm looking at 215-2.  There, again, Mitchell

25   disclosed ATI's benchmark pricing to NEXTracker -- a NEXTracker

1   vice president.  This was three months after he left his

2   employment with ATI.

3           If you look also at Exhibit 2 -- Exhibit M -- I think

4   it's Docket 215-3 -- this is where Mr. Mitchell discloses -- if

5   I recall, this is the one -- he did.  He said -- the last

6   paragraph of Mr. Mitchell's email in 215-3.  He goes through

7   all the bases and the details of ATI's sales strategy and its

8   value proposition.  In the last line, "I think if we can attack

9           this aspect with data and reasonable figures for

10          labor time to replace, et cetera, then we can really

11          dismantle the basis for the ATI long-term O&M

12          argument."

13          That's the why and that's what we're looking for and

14  you contracted with what Ms. Prescott claims is relevant and

15  that's Exhibit N.  It's 215-4, I believe, the purchase order

16  agreement.  There's nothing there.  The next exhibit, the

17  quote, there's nothing there.  I mean, the why isn't in any of

18  those documents.  The only why that we've received, we received

19  from prior counsel and that's the real problem that we have.

20  We need to get to the why.

21          **THE COURT:**  Okay.

22          **MS. PRESCOTT:**  Your Honor, may I address the why?

23          **THE COURT:**  Sure.

24          **MS. PRESCOTT:**  First of all, I want to clarify that

25  the documents that Mr. Howell just pointed to were produced by

1    Fish & Richardson in February, not by prior counsel.  So that

2    is part of the production that we have made and we made that

3    production in response to NEXT -- I'm sorry -- in response to

4    ATI's other request for production -- request for production

5    that sought information about how NEXTracker was competing

6    against ATI.

7            We made it about NEXTracker's efforts to counter

8    ATI's value proposition and in particular, its O&M.  To the

9    extent that there are emails regarding the why about

10   competition related to ATI, those documents are being searched

11   or have already been produced.  The issue is that this request

12   is asking for all correspondence related to these projects

13   regardless of whether ATI's value proposition is at issue.

14           And, additionally, the estimator addresses in large

15   part the why.  The estimators go into great detail about the

16   cost and the changed assumptions between different quotes and

17   why these changes are being made.  The assumptions are being

18   called out there.  So between the estimators and email that is

19   responsive to other requests, the why is being addressed.

20           **THE COURT:**  Okay.  Well, let me -- I mean, I guess

21   I'm a little bit intrigued by, I guess, these things that were

22   mentioned by Peter Wheale, W-h-e-a-l-e, at his deposition, that

23   there's a box folder for all projects.  Would you tell me a

24   little bit about what's contained in the box folder,

25   Ms. Prescott?

1          **MS. PRESCOTT:**  Certainly, Your Honor.  Those are the

2   bid documentations that we have produced to ATI.  It's the

3   response to their request for proposal.  It's the estimators.

4   It's the quote and in some instances, it is shipping labels and

5   layouts, the documents that Mr. Howell was contending are

6   irrelevant and he does not want produced but we have gone

7   through and produced the folder that relates to the bidding of

8   each and every one of these projects that are at issue that is

9   maintained in NEXTracker's box.com.

10         **THE COURT:**  Okay.  So in other words, you have

11   already produced the box folder for all overlapping projects?

12         **MS. PRESCOTT:**  Yes, the bid folder for all projects

13   that are overlapping.

14         **THE COURT:**  Okay.

15         **MR. HOWELL:**  Your Honor, I'm not sure if there's a

16   distinction between the bid folder and the box folder but what

17   hasn't been produced, as we've heard is the email.  And I'll

18   just add, Your Honor, this price estimator spreadsheet -- I

19   won't use the language that was used in the exhibit but there

20   are no references to butt-kicking in the bid estimator

21   spreadsheet.  Nor are there references to ATI's benchmark

22   pricing.  Those are in emails and these emails were referenced

23   in the complaint -- at least the butt-kicking email was which

24   was before Fish & Richardson became involved and so they may

25   have been also produced by Fish & Richardson but they were in

1   the amended complaint, the butt-kicking email was --

2           **THE COURT:**  Okay.

3           **MR. HOWELL:**  -- just to clarify that.

4           **THE COURT:**  Well -- so, Ms. Prescott, is there a

5   separate bid folder versus box folder or -- I mean, is there a

6   central place where substantive emails regarding particular

7   projects and bid proposals are kept with respect to any

8   particular project?

9           **MS. PRESCOTT:**  No, Your Honor, the box.com folder may

10  occasionally -- the bid folder is a folder that pulls together

11  the documentation related to the bidding process for a

12  particular project that is then stored on box.com.

13  Occasionally, emails are pulled into that folder but it is not

14  a systematic process that the substantive emails are stored in

15  a central location.

16          What is stored centrally is what has been produced.

17  It's the bid documentation that reflects the change in the bids

18  over time and how that has evolved, when their changes were

19  made and then the estimators, why those changes were made, what

20  the assumptions were for them.

21          **MR. HOWELL:**  Your Honor, this is Mr. Howell.  What --

22  if I may?  Please let me know when I can respond to that.  I

23  don't want to interrupt you or Ms. Prescott.

24          **THE COURT:**  Go ahead.

25          **MR. HOWELL:**  Sure.  So thank you, Your Honor.

1          The location of the emails, we assume, is on the

2    email server.  I can let the Court know that that is how ATI

3    searched for and produced these emails that the Defendants have

4    had the benefit of for months now and have used in depositions.

5    We searched our email server by project name and we searched

6    for privilege and we produced them.  And that's what we've

7    produced and that's what the Defendants had the benefit of.

8          And we'd ask that they be required to do the same.  I

9    mean, that' -- this is discovery and we're trying to figure out

10   the why and they can easily go -- without disrupting employees

11   at NEXTracker, they can do a search of PST files -- their IT

12   department can -- of the server and can produce these emails.

13   It's not hard.

14          **THE COURT:**  And that would -- from your perspective,

15   that would satisfy you?

16          **MR. HOWELL:**  I think it -- what would satisfy us is

17   they do a reasonable search and they do a search for responsive

18   emails for the projects, the overlapping projects here.  Yes,

19   that would satisfy us.

20          **MS. PRESCOTT:**  Your Honor --

21          **THE COURT:**  Yes.

22          **MS. PRESCOTT:**  -- I just want to address two points.

23   First, again, the whole way that we've been operating since

24   February was that we were producing bid documentation, not

25   emails.  We've structured our discovery accordingly.  Discovery

46

1   has been extended multiple times here.  Then with respect to

2   actually making a reasonable search for email, we can look

3   through the box folders -- all the box folders for these

4   projects and start -- and produce all email that relates to the

5   overlapping projects that have been filed in these box folders.

6          THE COURT:  I thought you already produced those.  I

7   thought you --

8          MS. PRESCOTT:  We have produced those from the bid

9   documentation.  If they would like to -- us to expand that out

10  from the bid and not just confine ourselves to the bid folder,

11  that email related to the project more generally -- documents

12  related to the project more generally and its development, not

13  just the bidding process.

14         THE COURT:  Okay.  So what's the problem with doing a

15  search of your emails, just generally, whether they're in the

16  box.com folder or in some other repository?

17         MS. PRESCOTT:  Your Honor, the projects that are

18  overlapping are not confined to projects that Mr. Mitchell

19  handled.  In fact, I don't know that any of them are projects

20  that Mr. Mitchell handled.  They are not confined to projects

21  that two or three salespeople handled.  This is projects that

22  were handled across the sales department within NEXTracker and

23  so this is dealing with gigs and gigs of data.

24         THE COURT:  Well, no, I understand it's probably

25  going over a lot of data but that's the beauty of computers, is

1   they can do these searches.  But I guess I see from the

2   Plaintiff's perspective, it's not just things that Colin

3   Mitchell was personally involved in.  It's if he brought -- I

4   mean, the idea is if he brought over information that he then

5   shared with NEXTracker, any employee at NEXTracker or anybody

6   that he shared that information with or if NEXTracker sort of

7   just institutionalized somehow the information that he shared,

8   then they could use it on every project.

9            And so it seems to me that these substantive emails

10  regarding the overlapping projects certainly are relevant and

11  ATI is representing -- and I think the problem is -- and

12  perhaps I'm wrong, Mr. Howell, and clarify -- I'll ask you.  I

13  guess I'll just ask you.  What was your understanding of bid --

14  overlapping bid documentation?

15           **MR. HOWELL:**  Sure, Your Honor.  Our understanding was

16  Mr. Brakley (phonetic) said it in his email, the email we

17  talked about bidding, whatever that is, 204-2, documents

18  related to project bids.  That's what we understood it to be.

19  That's what we produced and, Your Honor --

20           **THE COURT:**  And it included email?

21           **MR. HOWELL:**  Oh, of course, it did.  And, in fact,

22  Your Honor, we did the search of emails.  Like we said, we

23  searched by project name and we produced it and that's one of

24  the reasons it took a little while to produce, as Ms. Prescott

25  indicated earlier, is because it was a lot of information and

1    we were communicating that to the Defendants.  I don't have it

2    off the top of my head how many gigs we've produced but I can

3    tell the Court it's about 575,000 pages and it -- I want to say

4    it's, like, 200 gigs that we've produced in this case.

5          We've had to produce on hard drives, not through FTP

6    sites because it's voluminous and it's big.  In fact, Your

7    Honor, I have the emails of it.  I believe we've produced about

8    73,000 pages of emails.  I believe the Defendants have produced

9    -- or I'm sorry -- not pages.  We've produced 71,869 emails.  I

10   believe NEXTracker has produced about 3,354 emails, give or

11   take.  I obviously didn't count every single one but based on

12   file extensions and how they were identified, that's the

13   disparity of email production, if that helps the Court

14   understand kind of what we've done and where we are in this

15   case.

16         **MS. PRESCOTT:**  Your Honor, I'd like to address the

17   agreement that was reached back in February.  Mr. Howell was

18   not involved in the case at that time.  He indicated to you

19   earlier that he joined this case in May.  The parties agreed

20   that they would make their bid documentation production on

21   February 28th or -- yeah, it was a leap year -- February 28th.

22   The production that ATI made on that date did not include a

23   single email.  That was the bid documentation, the initial bid

24   documentation production.  That shows that the understanding of

25   both parties at that point in time is that bid documentation

49

1   was not email.  It was the documents memorializing the bid, the

2   contract, the quote and the responses to reply to the proposal.

3           And now, a couple months later, ATI is asking that

4   that agreement be thrown out the window because it chose to

5   produce a bunch of the emails for that email was responsible to

6   -- responsive to other requests for production at NEXTracker as

7   the Defendants propounded.

8           **MR. HOTTINGER:**  Your Honor, this is Mr. Hottinger.

9   If I may say one thing.  I (indisc.).

10          **MR. HOWELL:**  Can I --

11          **THE COURT:**  Mr. Hottinger, we're having a hard time

12  hearing you.  I know -- it sounds like you're out -- or we

13  heard earlier you're out of the country.  I don't know if you

14  can get to --

15          **MR. HOTTINGER:**  I -- can the Court hear me now?

16          **THE COURT:**  A little bit.  You're pretty muffled

17  though.  So speak slowly and clearly.

18          **MR. HOTTINGER:**  Yes, Your Honor.  I was a part of

19  those discussions in January and February and my understanding,

20  my belief is emails were absolutely part of the bid packages.

21  We've never would have agreed not to produce emails on these

22  overlapping projects.

23          **THE COURT:**  And how is it though that -- I mean, a

24  lot of time has passed since the production in February.  I

25  mean, I'm just wondering.  Weren't you obligated to bring your

1    motion to compel sooner than you did or am I wrong about that?

2         MR. HOWELL:  No, Your Honor.  This is Mr. Howell.  I

3    can speak to that.  I believe as a rule, we were not because

4    what we've been told is that they would be producing documents.

5    We were never told they weren't going to produce emails until

6    their opposition was filed.  It was always, we are searching

7    for and will produce documents.  We're searching for and will

8    produce documents.  We would have -- had we known this was the

9    position they were going to take, we would have moved sooner

10   because now we're -- we have fact discovery closing in three

11   months and we're just now learning their interpretation of this

12   agreement that didn't require them to produce anything except

13   for "contracts and responses and requests for proposal."  So,

14   no, we don't believe so.

15        THE COURT:  Do you still have requests for production

16   available to you?

17        MR. HOWELL:  I'm sorry, Your Honor?

18        THE COURT:  I mean, have you used up all your limit

19   on your requests for production?  I'm just curious.

20        MR. HOWELL:  Well, the parties have agreed -- when we

21   got the last extension, we agreed there'd be no more written

22   discovery served between the parties.

23        THE COURT:  Oh, okay.

24        All right.  I mean, I have to say this seems to me

25   like a bit of a misunderstanding and so -- but I do think -- it

1   does seem to me that substantive emails regarding these

2   projects are relevant and would have been responsive to the

3   requests as they were originally propounded.

4          Now, did we -- was there an agreement with respect to

5   the timeframe or are you still -- was it still documents from

6   2013 to the present?  Mr. Howell?

7          **MR. HOWELL:**  I believe that it's just -- it's the

8   emails that relate to these projects, the overlapping projects.

9   I don't believe that they were being actively bid or pursued

10  earlier than -- you know, in 2013.  So I think June 2015 would

11  be agreeable.

12         **THE COURT:**  All right.  So I'm going to --

13         **MS. PRESCOTT:**  Your Honor.

14         **THE COURT:**  Yes.  Go ahead, Ms. Prescott.

15         **MS. PRESCOTT:**  I just wanted to say that I agree with

16  Mr. Howell that the second project defines the relevant time

17  period as June 2015.  So where it's reasonable and

18  additionally, since we're rewriting the agreement, we just ask

19  that ATI produce the things, that have been documentation since

20  this was a mutual agreement and that does include every -- that

21  they produce the email that went, like, to each of the products

22  -- projects and, for instance, requests now, I guess, is every

23  email, not just from a limited set of custodians or a subset of

24  custodians and that ATI make that same production.

25         **THE COURT:**  Okay.  Well, ATI, why don't you tell me

1    what it is you've produced?  Did you produce all substantive

2    emails or what?

3           **MR. HOWELL:**  I believe -- I have to look at my notes

4    on this.  It may take me a minute but I believe that we

5    searched for -- all emails from the sales individuals, the

6    engineering folks at ATI and I believe we also searched for the

7    custodians of the marketing people and the executive team, if

8    you will, at ATI.  Essentially, we searched --

9           **MS. PRESCOTT:**  Your Honor --

10          **MR. HOWELL:**  -- the people who have -- as I recall

11   and as I understand it, who have emails.  We did not search the

12   email of the person who works on the production line.  I'm not

13   even sure they have email but -- you know, company email, I

14   should say but that was the nature of the search that we did.

15   We went to -- I believe it was probably 20 or 30 individuals

16   that we searched.

17          **MS. PRESCOTT:**  Your Honor, if we could get a

18   representation of that number of individuals, then we will make

19   a similarly proportional search.  We just ask that the order be

20   reciprocal that the parties are making the same efforts on both

21   sides.

22          **THE COURT:**  All right.  I have no problem making the

23   order reciprocal.

24          Do you have any problem with that, Mr. Howell?

25          **MR. HOWELL:**  No, I don't and I would say we believe

53

1  we've done that but we can -- we're happy to work with

2  Ms. Prescott and the Defendants to help them understand what

3  we've done but I think the number of emails that have been

4  produced speak for themselves.

5      **THE COURT:**  Okay.  What I would like you to do is

6  agree in advance to the scope of the search.  Okay?  And I

7  always say this with a little bit of heartburn because I'm

8  concerned that you won't be able to agree and will come back to

9  me but, I mean, I think I've dealt with this before in cases

10  that deal with a lot of electronic discovery and it's just

11  extremely helpful if the parties can agree at the outset what

12  the scope of the search is so that NEXTracker doesn't do this

13  huge search that ATI then says, no, that's not what we wanted.

14      So I really want you to agree to the scope of the

15  search in advance but generally I will order that both parties

16  mutually reciprocally produce substantive emails relating to

17  this set of overlapping projects which it seems to me everybody

18  has now agreed on what those projects are and that the

19  timeframe is essentially from June 2015 to the present.

20      Is that acceptable to you, Mr. Howell?

21      **MR. HOWELL:**  Yes, Your Honor.  Thank you.

22      The one -- I guess my only concern would be

23  substantive email.  I understand that the Court is trying to

24  avoid, like we mentioned last time, producing emails that say,

25  let's go meet for doughnuts or coffee or whatever.  I get that.

1   My concern would just be that if we get some false positives in

2   the production, we're okay with that because we have a strategy

3   and a theory in the case and we don't want the Defendants being

4   the ones who determine what is substantive and likewise, I

5   don't think they want us to do that as well.  And we haven't

6   done that.  We've been pretty open as far as I know from our

7   searches of what we've produced and so that would be my only, I

8   guess -- not concern but just -- I just wanted to put that on

9   the record.

10          **THE COURT:**  So you -- in other words, if you found an

11  email that said, let's go meet for doughnuts and discuss this

12  project, you produced it?

13          **MR. HOWELL:**  Well, given the number of emails we

14  produced, we didn't look at every single email before we

15  produced them.  We ran searches on the projects and we ran

16  searches for privilege and we produced them.

17          **THE COURT:**  Okay.

18          **MR. HOWELL:**  That's what we've done and so it's --

19  you know, is there an email that says, let's go meet for coffee

20  and it doesn't even say the project but, you know, a project

21  name is mentioned somewhere in the stream, did it get produced?

22  I think it would have because it would have come up in the

23  search and we would have produced it.  We didn't look at every

24  single email beforehand.

25          **THE COURT:**  Okay.  So in other words, you're relying

1    on the Defendants to determine whether or not they think the

2    email is relevant or not.  You just sort of did a -- I won't

3    call it a "dump" but essentially it was a dump minus --

4          **MR. HOWELL:**  No, we didn't do a dump.  We did a

5    reasonable search --

6          **THE COURT:**  Sure.

7          **MR. HOWELL:**  -- based on the project and these

8    overlapping projects --

9          **THE COURT:**  Right.

10          **MR. HOWELL:**  -- and that's from custodians who we

11    thought were involved and would have information and, like I

12    said, they've used a fair amount of these in depositions so

13    far.  So --

14          **THE COURT:**  Okay.

15          **MR. HOWELL:**  -- you know -- yeah.

16          **THE COURT:**  Let me just then -- I'll --

17          **MS. PRESCOTT:**  Your Honor --

18          **THE COURT:**  What?  Go ahead, Ms. Prescott.

19          **MS. PRESCOTT:**  In order to help the parties reach

20    agreement in advance as to the scope of the search that

21    NEXTracker will be producing, could you order ATI to identify

22    to us the custodians and the search terms that it used because

23    I think that would help us determine the reciprocal efforts?

24          **THE COURT:**  I don't have a problem with that.  Do you

25    have a problem with that, Mr. Howell?

1          **MR. HOWELL:**  No.  We can -- certainly.  We'll let

2     them know what search -- or what custodians we search and what

3     terms we use.  That's fine.

4          **THE COURT:**  Okay.  So -- and I'll -- what I'll do,

5     Ms. Prescott, is I will take out the modifier substantive.

6     Obviously, you can withhold things based on privilege but

7     anything you withhold needs to be included on a privilege log

8     and I will order ATI to disclose to you essentially the search

9     -- the reasonable search that it conducted as a starting point

10    for the parties to agree what the reasonable search will be

11    that NEXTracker will do.  Okay?

12         **MS. PRESCOTT:**  Yes, and to the extent that further

13    reasonable searches required of ATI because, again, if this is

14    a mutual search and we're not aware of what their search terms

15    have been in the past, we want to make sure that both of us are

16    on the same page.

17         **THE COURT:**  All right.  That's fine.  I'll make --

18    the order is reciprocal and I'm really hopeful the parties can

19    agree on what's a reasonable search but that will be my order.

20    So that takes care of the formal motion to compel that has been

21    filed.

22         As per usual, I'm going to order ATI to draft the

23    order, run it by Ms. Prescott, decide on the appropriate

24    timeframe for production and submit it to me.

25         And so I'll start with you, Mr. Howell.  How long

57

1    will it take you to prepare a proposed order?

2         **MR. HOWELL:**  Your Honor, I think if we have -- let's

3    see.  Today is Thursday.  If we have until the 21st to exchange

4    with Ms. Prescott, I think that would be fine.

5         **THE COURT:**  Okay.  So I will order you to draft it

6    and give it to Ms. Prescott by the 21st and then would you like

7    about a week to try to come to an agreement?  Is that

8    acceptable to you, Ms. Prescott?

9         **MS. PRESCOTT:**  Yes, so we can come to an agreement on

10   the proposed order and submit it to the Court is reasonable.

11   Thank you.

12        **THE COURT:**  Okay.  So you'll submit it to the Court

13   by about -- let's -- I don't have a calendar in front of me but

14   I think that means that it would be September 28th.  All right.

15   And -- so that takes care of that.

16        So the next issue that we have is the emails -- the

17   email first with regard to the 30(b)(6) depositions -- and one

18   thing I wanted to discuss first is, does either side have a --

19   any heartburn if we docket these emails?  The -- one was the

20   email first that was sent to me on September 5th and then ATI's

21   response set -- sent on September 12th.

22        **MS. PRESCOTT:**  If I may --

23        **MR. HOWELL:**  No problem with me.

24        **THE COURT:**  I'm sorry.  Let me first ask.  Let's see.

25   Ms. Prescott, do you have any problem with your email being

1    docketed?

2            **MS. PRESCOTT:**  No, Your Honor.

3            **THE COURT:**  Okay.  And then, Mr. Howell?

4            **MR. HOWELL:**  No, Your Honor.

5            **THE COURT:**  Okay.

6            **MR. HOWELL:**  Thank you.

7            **THE COURT:**  All right.  So where do we stand with

8    this at this point?  It does seem to me that -- let's see.

9    30(b)(6) states ATI, "must designate one or more officers,

10           directors or managing agents or designate other

11           persons who consent to testify on its behalf and it

12           may set out the matters on which each person

13           designated will testify."  Is Mr. Corio -- and I'll

14   -- for the court reporter, it's C-o-r-i-o.  Is he going to

15   testify on all topics?

16           **MR. HOWELL:**  This is Mr. Howell.  Yes, Your Honor.

17   At this point, that's our intention and we've done that as a

18   courtesy.  We've tried to work with the Defendants and -- yes,

19   that's correct.

20           **THE COURT:**  Okay.  Ms. Prescott, do you have -- I

21   mean, is there still an issue with respect to this -- these --

22   this 30(b)(6) deposition?  I think it's going to take place

23   next week, right?

24           **MS. PRESCOTT:**  Yes, Your Honor.  The deposition is

25   scheduled for next week and there remains an issue.  This

1  morning is the first time that ATI has confirmed that Mr. Corio

2  is the designee for all 30(b)(6) topics.  This is the first

3  we're hearing it.  Even in the email that they submitted to the

4  Court yesterday, they did not make that representation.  They

5  said that he would be the likely designee.

6          Mr. Corio now is the designee on more than 47

7  30(b)(6) topics and NEXTracker anticipates that it will need

8  more than one day with him in a 30(b)(6) capacity to fairly

9  examine ATI on the broad range of subject matter that's

10  relevant to this case.  If he's been designated on all topics,

11  he's been designated to cover the full scope of the -- this

12  case, liability issues and damages issues.

13          ATI has alleged that it has more than 20 categories

14  of trade secrets and Defendants need to be able to go through

15  those trade secrets with ATI to understand what those alleged

16  trade secrets are and whether they are actually trade secrets.

17  They have to go through Mr. Mitchell's work performance and

18  history at ATI.  The topics also relate to an explanation of

19  detailed financial data, corporate relationships and business

20  practices and the discussion of more than a hundred projects

21  that are at issue.

22          We don't anticipate that this can be covered fairly

23  with seven hours and so we would request additional time with

24  ATI's 30(b)(6) designee given that there's one individual

25  covering 47 different topics.

60

1          **THE COURT:**  Mr. Howell?

2          **MR. HOWELL:**  Sure.  Thank you, Your Honor.

3          A couple of points in response.  First of all, our

4   obligation is to designate a witness.  We've done that.  We're

5   not obligated to disclose the witness ahead of time but we've

6   done that as a courtesy.

7          The second issue, Mr. Corio here is the founder of

8   Array.  We've already agreed to put him up as the 30(b)(6)

9   designee and he's going to be deposed personally next week as

10  well.  I'm not even sure that the Defendants in a case like

11  this when the designee is also going to be personally deposed

12  are even entitled to more than seven hours but we've offered

13  him for 14 in the interest of compromise, to be frank.  We

14  could have cited some cases and made the argument that they

15  only get seven hours with Mr. Corio, period because Mr. Corio

16  is the founder of ATI and he is -- it's not a publicly traded

17  company and -- but we've offered 14.

18         Now, before the deposition even occurs, they're

19  asking for more time and, frankly, this is procedurally

20  improper.  There's case law -- I'll read the Court one.  It's

21  *Malik versus Trustees of Boston College*.  The citation there is

22  208 FR.d 23 and there the Court held that the -- I'll read it.

23         "The better practice is for the deposition to go

24             forward to determine how much is able to be covered

25             in the seven hours and then if additional time is

```
 1                needed for counsel to stipulate to extend the

 2                deposition.  If the parties cannot reach a

 3                stipulation, then Court intervention may be sought."

 4                It's just this is premature and I wish we could fully

 5     brief this issue but at this point, we don't know how much

 6     they're going to be able to cover and they certainly should not

 7     be entitled to these serial deposition hours where the time

 8     just piles up.  And we cited some of these cases in our email

 9     response back but they're not entitled to just hours and hours

10     of deposition.  That is incredibly burdensome on the witness

11     and it gives them multiple bites at the apple.

12                And so we would request that this issue just be

13     tabled.  There's no reason to even address it right now.  We've

14     offered Mr. Corio for 14 hours even though I think an argument

15     could be made he was only -- he could have only been designated

16     for seven and if they think they need more time, they can go to

17     the Court and ask for it if they weren't able to cover the

18     issues they needed to cover in the deposition.  That's the

19     better practice, as the one Court called it and that's what

20     should be applied here.

21                THE COURT:  Mr. Howell, have you taken any 30(b)(6)

22     depositions yet on --

23                MR. HOWELL:  We have --

24                THE COURT:  Not you personally but the Plaintiff.

25                MR. HOWELL:  I'm sorry, Your Honor.  I didn't mean to
```

1   cut you off.  I'm sorry.

2          THE COURT:  That's okay.  Has the Plaintiff taken any

3   30(b)(6) depositions or have any been set?

4          MR. HOWELL:  No, we have not and we've actually never

5   gotten dates for 30(b)(6) but that's -- we also obviously

6   haven't had the documents we would have needed.  In the last 30

7   days, we've received financial documents and now we're

8   presumably going to be receiving emails.  So we have not taken

9   any 30(b)(6) depositions yet.

10          THE COURT:  Okay.  All right.

11          MS. PRESCOTT:  Your Honor, can I address just a

12   couple points of clarification regarding Mr. Corio?  I

13   understand that they have 14 hours reserved with him for next

14   week.  My initial question is whether those 14 hours are -- can

15   be made available entirely in his capacity as ATI's corporate

16   representative and then that we could have ongoing availability

17   reserved for him so that to the extent additional time is

18   needed to be able to fairly examine ATI on the topic, that time

19   is available.

20          We've struggled to get deposition dates in this case.

21   A month ago ATI unilaterally cancelled the scheduled 30(b)(6)

22   deposition.  They did that because they were delayed in their

23   own document production.  In the past three weeks, ATI has

24   increased its document production by 50 percent and it was

25   conveyed to me earlier this week that it anticipates producing

1   still further documents this week that are relevant to those

2   30(b)(6) depositions scheduled for next week.

3         **THE COURT:**  Okay.  Let me ask what exactly you're

4   asking.  Are you suggesting that you have some flexibility in

5   terms of if you have additional -- like if you don't finish

6   with your 30(b)(6) deposition the first day, you'd like to

7   continue that on the second day and still be able to call him

8   as a personal -- in his personal capacity at a later date?

9         **MS. PRESCOTT:**  Your Honor, we request that we begin

10  with his 30(b)(6) deposition.  If topics are outside of the

11  scope, they can object and we can ask the question in his

12  personal capacity.  We don't need to schedule a separate day

13  specifically for his personal capacity but then that he

14  continue to be able not just on Thursday of next week but also

15  on Friday and that we have set days reserved on Saturday or

16  Sunday as is necessary to complete a fair examination.

17        I'm hopeful that we can complete it over the course

18  of two, two and a half days but I don't know that until we are,

19  as Mr. Howell said, there but we want to have the time reserved

20  because of the difficulties that we have encountered in

21  scheduling this 30(b)(6) deposition as we could have raised

22  this issue earlier if we had known that Mr. Corio was the

23  designee on all 30(b)(6) topics but we didn't receive that

24  confirmation until this telephone call.

25        **THE COURT:**  All right.  Mr. Howell, what's your

1    response?  And I'll just -- at the very beginning, I'm going to

2    say I'm not inclined to order Mr. Corio to sit for anything

3    beyond the 14 days that he's committed to right now -- 14

4    hours, sorry, 14 hours but -- because it will probably feel

5    like 14 days at the end of those 14 hours.  But I do want to

6    know if you want to have very strict lines drawn between

7    30(b)(6) and individual capacity or if you're willing to be a

8    little flexible on that.

9         **MR. HOWELL:**  Your Honor, I mean, under the rule, Rule

10   30, they're entitled to seven hours with the corporate designee

11   and they're entitled to 30 hours with an individual and --

12        **THE COURT:**  You mean seven.  Seven.

13        **MR. HOWELL:**  I'm sorry, seven.  Thank you.  Oh, man,

14   that would also -- it might feel like 30 as well, right?

15        **THE COURT:**  Right.

16        **MR. HOWELL:**  But -- and that's our position right

17   now.  That's where we are.  That's what they're entitled to

18   under the rules and will be willing to be a little flexible?

19   Sure.  But can I sit here right now without knowing how it's

20   going to go, how flexible we're going to be?  No, I can't.  I

21   mean, I can't commit to that but what I can commit to is

22   Mr. Corio will be available for seven hours as a designee and

23   for seven hours personally.  We're willing to work with them

24   and to consider flexibility but I'm not sure exactly what the

25   limits are of what Ms. Prescott is requesting right now because

1    we haven't gone into the deposition and taken it.

2            And certainly we would object -- I know the Court

3    already said limit it to 14 but this is the first we've heard

4    of Saturday and Sunday.  I don't even know if Mr. Corio is

5    available and we're not agreeable to that.

6            **THE COURT:**  Okay.  No, I'm not going to order that.

7    So at this point, this is what I'm going to rule.  The

8    deposition obviously will go forward.  I'm encouraging the

9    parties to try to be a little reasonable with each other and

10   little flexible with each other to -- I mean, it would be great

11   if you could finish his deposition, both 30(b)(6) and

12   individual capacity, in the 14 hours that have been allotted.

13           If that's not possible, you can come back to the

14   Court and ask for additional time but I will -- I don't -- I'm

15   not all that inclined to -- well, I just really would like the

16   parties to try to be reasonable with each other in working out

17   an agreement in terms of additional time.  Obviously, whatever

18   I order for the Defendants in terms of taking the 30(b)(6)

19   deposition of ATI, again, it's likely to be reflected in

20   whatever is needed and ordered on the other side, on the flip

21   side.

22           So what goes around comes around.  Please be

23   reasonable with each other and try to -- if you need a couple

24   more hours on the 30(b)(6) and couple fewer on the individual,

25   it would be nice if you could just do the whole ball of wax in

1    the two days that have already been scheduled.  But if you

2    can't reach an agreement, you can submit it to me.  You can

3    submit it to me -- I mean, you can do it by full-blown

4    briefing.

5         There's been a lot of discovery disputes in this case

6    and a lot of full-blown briefing.  I would guess by now it's

7    getting somewhat expensive but you can also -- I suppose not

8    doing -- not do it by briefing but I will want -- if you need

9    additional time, I will want to see the deposition and to see

10   whether I feel like you used your time efficiently in terms of

11   taking those depositions and whether you were reasonable with

12   each other.

13        So at this point, I'm not going to order anything

14   different than what's already going to take place but I'm not

15   giving any assurance to either side that I either will order

16   further deposition testimony or not but it will depend somewhat

17   on how the deposition goes and, again, I just encourage the

18   parties to be reasonable with each other.

19        Okay.  Now, with respect to this other email that we

20   received -- I think it was yesterday -- this is an email sent

21   by Mr. Jackson with regard to a number of subjects.  One, it

22   has to do with NEXTracker documents -- or ATI had in its

23   possession documents relating to NEXTracker that were not

24   produced in a timely manner.  The second issue had to do with

25   documents that were produced without metadata and the third

1    issue had to do with getting possible dates for ATI's executive

2    chairman Brad Forth.

3              Okay.  Mr. Howell, you obviously probably just -- I

4    don't know.  Hopefully you've seen this email.  I'm sure you're

5    seen it and, again, I would like to docket this.  How do you

6    feel about that, Ms. Prescott?

7              **MS. PRESCOTT:**  That's fine, Your Honor.

8              **THE COURT:**  Okay.  And then -- so, Mr. Howell, what

9    are your thoughts with respect to the things that were raised

10   in this email?

11             **MR. HOWELL:**  Sure.  Thank you, Your Honor.

12             As far as docketing goes, obviously we did not submit

13   a response.  To be perfectly candid, we weren't sure how the

14   Court felt about getting these emails the day before -- you

15   know, multiple emails and this email the day before the hearing

16   raising additional matters.  It would be nice if we had a

17   fulsome opportunity to respond in writing but I can address

18   them here.

19             With respect to the first issue, Your Honor, this

20   possession of NEXTracker documents.  We had a meet-and-confer

21   about this.  The Defendants wrote us a letter.  We met and

22   conferred and the meet-and-confer call was very short.  My

23   understanding was it was about two minutes long and the

24   question was asked, did we do a search?  And we said, yes,

25   we've done a reasonable search.  We produced what was located

 1  and that was that.

 2          And then in response, we got this email from

 3  Defendants' counsel that had language like what's in

 4  Mr. Jackson's email, a complete and comprehensive search and

 5  produced all documents responsive to the same.  We didn't

 6  renege.  We said we did a reasonable search and this is far

 7  beyond -- this language is far beyond what was discussed and

 8  what we are obligated to do under the rules.

 9          So to this first issue, have we conducted a search

10  and have we produced the documents?  We have and we've told the

11  Defendants that.  So we're not sure exactly what they're going

12  for here other than trying to build a record.  But we have done

13  it.

14          The second issue, Your Honor, metadata, my

15  understanding is this issue was overlooked or not addressed

16  during the call and I believe Mr. Hottinger sent an email

17  saying, we're going to look into this.  This is before --

18  Mr. Hottinger's email was before this -- Mr. Jackson's email to

19  the Court and it said, we're looking into this and we're not

20  intending to withhold metadata and we're investigating this and

21  we'll get back to them on it.  There was no effort to hide

22  metadata here but, again, that communication isn't part of the

23  record that they submitted to Your Honor.  So that's that

24  issue.

25          Number three, with regard to Mr. Forth, we notified

1   them.  I believe it was a few weeks ago by email that we were

2   trying to get dates for Mr. Forth.  This morning actually on

3   the call I received a communication that Mr. Forth is generally

4   available in October and we're happy to communicate that to the

5   Defendants and I'm sure we can reach an agreeable date in

6   October for his deposition to be taken.  But I think that takes

7   care of these three issues unless the Court has questions for

8   me.

9            **THE COURT:**  No.  What I'm going to do is I'm going to

10  hold these issues in abeyance basically and ask the parties to

11  do further meet-and-confer and try to work them out.  I'm

12  hopeful that you can work out certainly a date for Mr. Forth's

13  deposition.  Is he here in New Mexico?

14           **MR. HOWELL:**  Sometimes.

15           **THE COURT:**  Okay.

16           **MS. PRESCOTT:**  Your Honor --

17           **MR. HOWELL:**  (indisc.) in New Mexico.

18           **THE COURT:**  Okay.  All right.  And then --

19           **MS. PRESCOTT:**  Your Honor, in the meet-and-confer

20  process, should I request that ATI provide to NEXTracker what

21  its reasonable search was for the documents related to

22  NEXTracker that are in ATI's possession?  Because we've had

23  this what we've perceived as a flip-flop back and forth and I

24  think having that specificity would be helpful.  And can I also

25  request that the Court order when that meet-and-confer will

1    occur?  Because one of the issues has been that we have sent

2    emails repeatedly on Mr. Forth's deposition and on the metadata

3    and simply not received a response.

4           **THE COURT:**  Well --

5           **MS. PRESCOTT:**  We wanted to meet and confer about

6    these issues but we were not obtaining that.

7           **THE COURT:**  Okay.  Well, is it true that

8    Mr. Hottinger did response -- did respond with respect to the

9    thing about the metadata?

10          **MS. PRESCOTT:**  I have not received that response.

11   Perhaps one of my colleagues did but I have not seen it.  None

12   of my colleagues in this room have seen it.

13          **MR. HOWELL:**  And, Your Honor, this is Mr. Howell.

14   Oh, Mr. Hottinger is on the line.  Sorry, go ahead,

15   Mr. Hottinger.

16          **MR. HOTTINGER:**  Yes, Your Honor.  During the meet-

17   and-confer call, I told the Plaintiff that I may have

18   overlooked their metadata email.  I asked them to re-send it

19   and that we would certainly provide the metadata.

20          **THE COURT:**  Okay.

21          **MS. PRESCOTT:**  He did not make the representation

22   about the (indisc.) --

23          **THE COURT:**  Okay.  You know what?  At this point --

24          **MS. PRESCOTT:**  -- point the metadata meet and confer

25   and he asked us to re-send the request which had already been

1    sent twice beforehand.

2          **THE COURT:**  Okay.  Ms. Prescott, we mostly did not

3    catch that but let me just tell you at this point.  I'm really

4    not interested in who did what, when and who's right and who --

5    I mean, at this point, I just want you to get your discovery

6    done and I want you to be reasonable with each other.  I've

7    issued a lot of orders in this case regarding discovery and I

8    would think by this time, you have some sense of the way I'm

9    going to go on most of these issues.

10          Mr. Forth's deposition needs to be taken.  Work out a

11   date.  The metadata, it sounds like they have no problem with

12   producing it.  Produce it within a reasonable period of time.

13   And with respect to the other search things, yes, it's

14   certainly reasonable and, again, with all electronic discovery,

15   it is very helpful if you share it with the other side,

16   particularly if it's in advance but even if it's

17   retrospectively, what search you conducted and if there's a

18   problem with the search, then we can talk about it.

19          But, yes, please be clear with each other.  Please be

20   reasonable with each other and please work it out.  But at this

21   point, I am not going to make any sort of particular ruling on

22   this issue.  It's helpful if the parties can pick up the phone

23   and talk with each other and then if you want, after you've

24   come to an agreement, you can solidify that agreement in

25   writing but this is getting a little old, I will say, from the

1   Court's perspective.  And so I urge you to work it out.

2          I'm not going to order a date by which you must meet

3   and confer.  Just do it within a reasonable period of time,

4   within a week.  I can't -- I mean, just work it out.  So at

5   this point, I'm not going to -- I'm just going to hold this

6   particular email in abeyance.  If down the road you cannot work

7   it out, I encourage you -- well, these are things that I would

8   expect that the parties could work out.  So please do so.  But

9   I --

10          **MR. HOWELL:**  Certainly, Your Honor.

11          **THE COURT:**  All right.  Is there anything further we

12   need to discuss at this point?

13          Let me ask you first, Mr. Howell.  Is there anything

14   further?

15          **MR. HOWELL:**  No, Your Honor.  Just we want to thank

16   the Court for the Court's time and attention to these matters.

17   So thank you.

18          **THE COURT:**  All right.  And, Ms. Prescott, do you

19   have anything further you'd like to raise?

20          **MS. PRESCOTT:**  Not today, Your Honor.

21          **THE COURT:**  All right.  Well, thank you all for

22   calling in.  I appreciate it.

23          **MR. HOTTINGER:**  Thank you.

24          **MR. HOWELL:**  Thank you.

25          **MS. PRESCOTT:**  Thank you, Your Honor.

        THE COURT:  Okay, bye-bye.

     (This proceeding adjourned at 11:24 a.m.)


                    CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.



_____              September 20, 2018

        Signed                             Dated



            TONI HUDSON, TRANSCRIBER