## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ARRAY TECHNOLOGIES, INC.,**

        **Plaintiff,**

    **vs.**                             **Civ. No.  17-087 JCH/LF**

**COLIN MITCHELL, and individual,**
**NEXTRACKER, a Delaware corporation,**
**MARCO GARCIA, an individual,**
**DANIEL SHUGAR, an individual,**
**SCOTT GRAYBEAL, an individual,**
**FLEXTRONICS INTERNATIONAL U.S.A., INC.,**
**a California corporation,**

        **Defendants.**


## SEALED MEMORANDUM OPINION AND ORDER

On August 30, 2019, Plaintiff Array Technologies, Inc. ("Array" or "ATI") filed a Motion for Partial Summary Judgment on Breach of Contract Claim (Count III) (ECF No. 478) and a Motion for Partial Summary Judgment on Tortious Interference with Contract Claim (Count VI) (ECF No. 480). Defendants oppose the motions. The Court, having considered the motions, briefs, evidence, applicable law, and otherwise being fully advised, concludes that the motions will be granted in part and denied in part as described herein.

### I.    INTRODUCTION OF CLAIMS[1]

This case involves two competitors in the solar tracking equipment industry, Array and NEXTracker, a wholly-owned subsidiary of Flex. *See* Am. Compl. ¶¶ 16, 33. This dispute arose when Array's Business Development Manager, Colin Mitchell ("Mitchell"), left Array's

---

[1] This section sets forth the allegations supporting Array's claims. It is provided for context only to better understand the facts upon which the Court relies in its Factual Background section.

employment and allegedly began working for NEXTracker and Flex. *See id.* at ¶¶ 27, 41-46. According to Array, Mitchell unlawfully disclosed Array's trade secrets and confidential information to NEXTracker, resulting in Array's loss of solar tracker projects to NEXTracker. *See id.* at ¶¶ 74-99, 155-57. Array alleges that the following constitutes valuable trade secrets: its marketing and business plans as well as details of its bid preparation and contract procurement process, including the details of the operations and maintenance ("O&M") costs for Array's solar tracking equipment, and its "distribution methods, pricing, consumer profiles, advertising strategies, customer lists, manufacturing processes, and engineering studies." *Id.* at ¶ 72. More specifically, according to Array's expert, Robert E. Parkins, Array asserts as trade secrets: (1) Array's sales strategy, pitch, and NPV tool[2]; (2) Array's benchmark pricing, costs, and margins; and (3) Array's customer and project pipeline information. *See* Parkins Report 1, ECF No. ECF No. 439-3.

Array asserts the following claims against all Defendants: misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (Count One); misappropriation of trade secrets under the New Mexico Uniform Trade Secrets Act, N.M. Stat. Ann. § 57-3A-1, *et seq.* (Count Two); breach of fiduciary duty (Count Five); conversion (Count Seven); and fraud and constructive fraud (Count Nine). Array also has claims for breach of contract (Count Three) and breach of the covenant of good faith and fair dealing (Count Four) against Defendant Mitchell.[3] Array additionally alleges that Defendants NEXTracker, Garcia, Shugar, and Flex committed tortious interference with contract (Count Six). Finally, Array has a cause of action against

---

[2] Array describes its NPV tool, or its Net Present Value tool, as a spreadsheet that allows customers to compare the cost over the life of the project of different tracking architectures using O&M costs and installation costs, among other factors. *See* Parkins Report 1, 20, ECF No. 439-3.

[3] The Honorable James A. Parker previously dismissed Array's unjust enrichment/restitution claim against Defendant Mitchell and Array's New Mexico Unfair Practices Act claim (Count Ten) against all Defendants. *See* Mem. Op. and Order 32, ECF No. 90.

Defendants NEXTracker, Garcia, Shugar, Graybeal, and Flex for unjust enrichment/restitution (Count Eight). Array has moved for partial summary judgment on Count Three, breach of contract, and Count Six, tortious interference with contractual relations.

## II.     FACTUAL BACKGROUND[4]

NEXTracker designs and manufactures solar tracking equipment and systems. Pl.'s UF ¶ 10, ECF No. 478. Flex is NEXTracker's parent company, having acquired it in September 2015. Pl.'s UF ¶ 26, ECF No. 478. NEXTracker is a wholly owned subsidiary of Flex. Graybeal Dep. 78:15-18, ECF No. 478-15. Flex manufactures photovoltaic ("PV") modules and did so in at least 2016-17 and February 2019. *See* Graybeal Dep. 74:6-75:12, ECF No. 478-15. Flex manufactures printed circuit board assemblies for NEXTracker. *See* Graybeal Dep. 77:3-23, ECF No. 478-15.

NEXTracker and Array are primary competitors in the United States in the solar tracker market and often compete for the same projects. *See* Shugar Dep. 110:6-8, ECF No. 480-3; Wheale Dep. 45:5-10, ECF No. 480-8. In the United States, most projects come down to either NEXTracker or Array. *See* Garcia Dep. 60:12-23, ECF No. 478-6. *See also* Pl.'s Ex. 9, ECF No. 480-9 at 1 of 4 (showing that in the United States NEXTracker and Array had an approximate combined 86% share of PV tracker market in 2017).

In 2015 and 2016, solar installations in Australia was less than 5% of the global market. *See* Stern Report ¶ 380, ECF No. 439-5. In 2015, NEXTracker was the only vendor with shipments to the Australian market. *Id.* at ¶ 381. Within the relatively small Asia-Pacific market, NEXTracker held the second largest share of tracker sales behind Arctech Solar in 2016. *Id.* at ¶ 380. Array was

---

[4] References to "Pl.'s UF" refer to a fact set forth in Plaintiff's respective motions that Defendants did not dispute, and thus, the Court considers an undisputed fact ("UF"). In responding to Plaintiff's motion for partial summary judgment on the contract claim, Defendant Mitchell did not dispute Plaintiff's Fact Nos. 1-3, 5-7, 10, 12, 16, 22, 28-29, and 48-49. *See* Def.'s Resp. 2 n.1-2, ECF No. 486. In response to Plaintiff's motion for partial summary judgment on the tortious interference claim, Defendants did not dispute Plaintiff's Fact Nos. 1-4, 6-7, 11-12, 14, 23, 26, 42-43, 45, 48-49, 52, 55, and 66. *See* Defs.' Resp. 3 n.1-2, ECF No. 488.

not one of the top nine tracker sales companies in Asia-Pacific during 2016 and had made zero sales in Asia-Pacific in 2016. *Id.* In September and October 2016, NEXTracker was already in Australia, and Array was just starting to break into Australia. Garcia Dep. 193:16-194:1, ECF No. 480-2. In 2017, Array and NEXTracker combined for approximately 80% of solar tracker market share in Australia with approximately 55% and 25%, respectively, based on PV tracker shipments. *See* Pl.'s Ex. 9, ECF No. 480-9 at 3 of 4.[5]

Solar trackers sold by NEXTracker do not typically include solar panels/PV modules. Stern Report ¶ 56, ECF No. 439-5. Solar tracker systems are just one component or sub-system of a PV power project and do not typically include elements associated with the generation, collection, conversion, and control of electricity. *Id.* In the solar tracker industry, multiple factors may influence a customer's decision about which tracker to buy. *See* Parkins Dep. 50:19-53:16, 188:8-189:9, ECF No. 475-1. No one factor is always more important than any other factor. *See id.*

Array hired Colin Mitchell as its Business Development Manager. Pl.'s UF ¶ 7, ECF No. 478. When Michell began his employment with Array, he signed a "Non-Disclosure, Non-Solicitation and Non-Competition Agreement" (hereinafter "Agreement") with Array on May 3, 2013. Pl.'s UF ¶ 1, ECF No. 478. New Mexico law governs its interpretation. *Id.*

The Non-Disclosure portion of the Agreement ("NDA") stated that the employee agrees to

(i) protect, safeguard and keep secret any Confidential Information (as defined below); (ii) only use or disclose Confidential Information as necessary in connection with Employee's work for Employer; (iii) refrain from using Confidential Information for Employee's benefit or the benefit of any third party or in any manner adverse to Employer's interests; and (iv) upon the termination of Employee's employment with Employer ... return or destroy all Confidential Information which is in Employee's possession or control, including all originals and copies thereof, whether maintained in physical or electronic format.

---

[5] Array asserts that it is NEXTracker's primary competitor in Australia as well as the United States. Shugar admitted in his January 2016 deposition that Array is NEXTracker's primary competitor in Australia. *See* Shugar Dep. 110:9-11, ECF No. 505-4. Defendants, however, cited additional evidence, which taken in their favor, suggests that Array was not NEXTracker's primary competitor in Australia in 2015 and 2016.

Agreement, ECF No. 478-1 at 1 of 2. The Agreement defined "Confidential Information" as

> any and all information concerning the business and affairs of Employer, whether or not separately identified as "confidential" or "proprietary;" provided, however, that information will not be considered Confidential Information if it is or becomes generally available to the public other than through a breach of this Agreement. Without limiting the scope of the foregoing, Confidential Information includes nonpublic information about Employer's marketing, business or development plans, financial data, customer or vendor lists, tax records, and personnel files or histories.

*Id.*

The Non-Solicitation section of the Agreement stated that during the employee's employment and for one year after the termination of employment, the employee

> shall not, directly or indirectly or on behalf of any other person: … Solicit or encourage any person who is known by Employee to be an actual or prospective customer of Employer to cease doing business, in whole or in part, with Employer, or knowingly to reduce, divert or otherwise interfere with any portion of the business between Employer and any such customer.

*Id.* at 2 of 2.

The Agreement next contained a non-competition provision stating that during his employment and for one year after the termination of his employment, the employee

> shall not, directly or indirectly engage in the ownership or operation of a business which designs and/or manufactures solar tracking equipment or systems, whether as an officer, director, partner, proprietor, investor, associate, employee, consultant, independent contractor or in any other capacity relating to such a business.

*Id.* (emphasis added). The non-competition and non-solicitation provisions were effective for one year following Mitchell's last day of employment at Array, and the non-disclosure provision was not limited in duration. Pl.'s UF ¶ 6, ECF No. 478.

Mitchell described himself in his resume as leading sales and business development activities for the world's leading single axis tracking manufacturer, successfully contracting 4 GW dc of tracker sales to a network of high profile developers and EPC companies in the United States,

and having responsibility for approximately 97% of Array's 2015 sales, accounting for nearly $400 million in sales. Mitchell Resume, ECF No. 478-2. Mitchell described himself as "the lead and sole business development resource and sales person" for Array's utility-scale tracker sales efforts. Pl.'s UF ¶ 9, ECF No. 478.

In May 2016, Mitchell approached Marco Garcia, NEXTracker's Chief Commercial Officer, and they began talking about Mitchell working for NEXTracker. *See* Garcia Dep. 26:5-9, ECF No. 478-6, and 53:25-54:17, ECF No. 486-1. In June 2016, Garcia wanted Mitchell on his team. Garcia Dep. 82:9-25, ECF No. 478-6. Garcia told NEXTracker's Senior Director of Human Resources that Mitchell is "the top salesperson at [Array] that I am recruiting." Pl.'s UF ¶ 12, ECF No. 478; Pl.'s UF ¶ 11, ECF No. 480. In a June 1, 2016 email with Dan Shugar, NEXTracker's Chief Executive Officer, Garcia, when explaining what the terms of their offer to hire Mitchell should be, stated: "We will cripple our top USA competitor….We will dominate the USA tracker market." *See* Pl.'s Ex. 8, ECF No. 478-8; Shugar Dep. 15:17-21, ECF No. 478-4. *See also* Garcia Dep. 59:4-60:11, ECF No. 478-6. Shugar responded that "we should proceed to get him" and that Garcia needed to "quantify the incremental sales he will bring" and they "need to get flex on board." Pl.'s Ex. 8, ECF No. 478-8. Shugar meant that they needed to try to create an economic justification for bringing another person on board. Shugar Dep. 168:9-169:16, ECF No. 478-4.

Garcia learned that Mitchell had signed a non-compete agreement with Array and he shared that information with Shugar on June 3, 2016. *See* Pl.'s Ex. 8, ECF No. 478-8 at 1-2 of 2. Mitchell told Garcia on June 10, 2016 that his lawyer informed him that under New Mexico law "a non-compete of this kind is enforceable." Pl.'s Ex. 11, ECF No. 478-11. Mitchell attached to his email to Garcia a copy of the Non-Disclosure, Non-Solicitation and Non-Competition Agreement. *See* Pl.'s Ex. 21, ECF No. 505-1; Garcia Dep. 86:21-87:20, ECF No. 505-2. Garcia informed Shugar,

who in turn informed Flex's Deputy General Counsel Susan Marsch, of what Mitchell told Garcia about his lawyer saying that the non-compete was enforceable in New Mexico. *See* Pl.'s Ex. 8, ECF No. 478-8; Graybeal Dep. 34:19-22, ECF No. 478-15.

Garcia told Mitchell on June 11, 2016 that Flex was willing to support 80% of his legal expenses up to $20,000. *See* Pl.'s Ex. 11, ECF No. 478-11. Mitchell noted his appreciation of the support and relayed to Garcia his attorney's name. *See id.* Flex's common practice is to support legal expenses for employees in relation to matters that arise during the course of employment. Hutson Dep. 164:3-10, ECF No. 486-5. Shugar reviewed a copy of Mitchell's "non-compete" agreement and asked Flex's legal department to review it. *See* Shugar Dep. 175:15-176:7, ECF No. 480-3, and 179:16-182:1, ECF No. 478-4. NEXTracker did not have a legal team at the time, so NEXTracker relied on Flex's legal department for advice. Pl.'s UF ¶ 23, ECF No. 480.

Shugar told Garcia in a June 11, 2016 email that the "US market is expected to be way down next year so Colin will help us get [a] bigger piece of smaller pie, crushing ATI, and fending off new competitors." Pl.'s Ex. 9, ECF No. 478-9; Pl.'s UF ¶ 12, ECF No. 480. On June 21, 2016, Shugar asked Garcia to "develop [his] best estimate of the anticipated benefits to sales and GM$ [gross margin] from the engagement of Colin Mitchell over next 18 months." Pl.'s UF ¶ 26, ECF No. 480. Shugar provided his own educated guess for an economic analysis for Mitchell and told Garcia they would "need numbers to move forward with an offer." Pl.'s UF ¶ 16, ECF No. 478. Shugar anticipated Mitchell adding $60 million in revenue and approximately $12 million in increased gross margin to NEXTracker. Pl.'s UF ¶ 26, ECF No. 480.

Garcia informed Shugar by email that Mitchell was not in a hurry and he was ok with Mitchell not giving his notice immediately, noting the "important thing is that we get him on our team and cripple ATI." Pl.'s Ex. 7, ECF No. 480-7. Shugar responded: "We can wait to onboard

him to appropriate time. However[,] I disagree regarding urgency of his resignation. There are several large 2017 deals like Tranquility being negotiated and the sooner he is out of ATI the better for us." *Id.* Shugar felt no urgency, but he wanted to move forward with the process and get him on board at the earliest time they could properly do so. *See* Shugar Dep. 68:25-69:3, ECF No. 488-4, and 182:16-19, ECF No. 488-5.

On June 16, 2016, Mitchell responded to an email from Garcia, confirming his last day at Array would be July 8 and his "Start date with NX will be Sep 1." Pl.'s Ex. 12, ECF No. 478-12. Although Mitchell had agreed to the concept, he did not accept an employment contract with NEXTracker at that time. Mitchell Dep. 73:6-13, ECF No. 486-2. Mitchell was still interviewing with a lot of other companies between June 16th and September 2016. *Id.* at 72:23-73:5.

Mitchell resigned from Array on July 8, 2016. Pl.'s UF ¶ 14, ECF No. 480. As of August 11, 2016, after counsel for Flex opined that the non-compete was valid, NEXTracker concluded it could not hire Mitchell because of his non-compete agreement. *See* Garcia Dep. 112:2-8, ECF No. 486-1; Shugar Dep. 181:1-184:15, ECF No. 478-4; 187:12-23, ECF No. 486-3; and 66:15-67:6, ECF No. 478-14. Shugar understood the non-compete to be enforceable. Shugar Dep. 202:25-203:2, ECF No. 480-3.

Scott Graybeal is Flex's former Senior Vice President of the Energy Segment. Pl.'s UF ¶ 28, ECF No. 478. Douglas Britt has been the President of Flex Integrated Solutions since April 2018 and an officer of Flex, and he was the President of Flex Industrial and Emerging Industries prior to his current position. *See* Britt Dep. 9:24-10:11, ECF No. 478-5. Britt was informed by legal counsel that Mitchell had an enforceable NDA and non-compete under New Mexico law prior to the time Flex hired Mitchell. *See* Britt Dep. 73:12-74:6, ECF No. 480-6. He had never seen the agreement itself until his deposition. *See id.* at 74:7-16.

After a meeting took place between Shugar, Garcia, Britt, and Marsch, Garcia told Graybeal that Mitchell would report to him until Mitchell's non-compete ran out. *See* Graybeal Dep. 34:8-35:18, ECF No. 478-15. Graybeal thus first became aware of Mitchell's non-compete clause in August 2016. Graybeal Dep. 43:16-20, ECF No. 480-5. On August 11, 2016, Graybeal received an email from NEXTracker's human resources director, Dorothy Serdar, in which Serdar forwarded to Graybeal a copy of Mitchell's resume and "raise[d] a possible solution to the Non-Complete [sic] issue by having Colin join Flex and initially focus his efforts on selling solar panels/modules reporting to [Graybeal], while supporting NX behind the scenes." Pl.'s UF ¶ 28, ECF No. 478 (quoting Pl.'s Ex. 17, ECF No. 478-17). Garcia interpreted the phrase "behind the scenes" to mean that if Mitchell, while working for Flex, was with a company discussing storage modules and the company expressed an interest in trackers, he would refer them to a NEXTracker salesperson. Garcia Dep. 110:17-111:4, ECF No. 486-1. By August 11, 2016, NEXTracker had concluded that Mitchell should not be involved in the ownership or operation of a NEXTracker business. *See* Garcia Dep. 113:4-114:4, ECF No. 505-2.

The intention was for Mitchell not to work for NEXTracker until his non-compete expired. *See* Graybeal Dep. 47:10-13, ECF No. 486-4, and 107:18-25, ECF No. 480-5. *See also* Hutson Dep. 133:8-14, ECF No. 486-5. In the meantime, Graybeal had an excess number of PV modules to sell after the financial collapse of SunEdison left Flex with a massive liability it needed to offset, so Mitchell could help Flex with selling modules. *See* Graybeal Dep. 36:22-37:23, ECF No. 478-15, and 38:3-14, 39:22-25, ECF No. 488-2. Graybeal, however, never saw the Agreement, and no one told him the parameters of the non-compete provision. *Id.* at 72:15-73:18, ECF No. 488-2.

Mitchell accepted an offer to work for Flex in August 2016. *See* Def.'s Ex. N, ECF No. 486-14. Flex hired Mitchell to sell solar panel modules. *See* Britt Dep. 122:14-22, ECF No. 486-

8. Mitchell had a background in module sales, so that was his primary focus when he was first hired. Mitchell Dep. 124:7-16, ECF No. 486-2. More specifically for Flex, Mitchell was to do market research, socialize some energy storage-related efforts, work on digital O&M efforts, and facilitate and assist the remaining sale of Flex's leftover SunEdison solar module manufacturing supply. *Id.* at 97:5-9, ECF No. 486-2. *See also* Graybeal Dep. 43:21-44:9, ECF No. 486-4.

On August 31, 2016, Mitchell emailed Jeff Shubert of SFCE America that he was "going to be pretty busy with my Nextracker day job, keep that on the down low for now." *See* Pl.'s Ex. 21, ECF No. 478-21. Mitchell used "Nextracker" as a shorthand to avoid having to describe who Flex was, because Shubert was a solar colleague who would have been familiar with NEXTracker, not Flex. *See* Mitchell Dep. 76:25-77:12, ECF No. 486-2. A few days later, Mitchell emailed a different third party, stating that he had signed "with that other fracker [sic] company the other day but it's still on the quiet side." Pl.'s Ex. 22, ECF No. 478-22. Mitchell used the term "tracker company" as a shorthand. Mitchell Dep. 81:7-10, ECF No. 486-2.

On September 2, 2019, Britt approved Mitchell's position with Flex as Sr. Director Business Development. Pl.'s Ex. 10, ECF No. 480-10. Britt explained to the business team that Mitchell would not be hired to do anything other than selling panels. Britt Dep. 122:20-22, ECF No. 486-8.

Mitchell began working for Flex in September 2016. Mitchell Dep. 68:15-24, ECF No. 486-2.[6] Mitchell hoped to work for NEXTracker once his non-compete expired. Mitchell Dep. 69:15-23, ECF No. 486-2. Mitchell onboarded with Flex and Flex assigned him a computer.

---

[6] Array submitted various emails to support its position that Mitchell was working for NEXTracker. *See* Pl.'s Exs. 17, 21, 22, 23, ECF Nos. 478-17, 478-21 to -23. The Court, however, must construe the evidence in favor of the non-moving party. Defendants submitted testimony that Mitchell worked for Flex and testimony explaining why the emails did not mean Mitchell worked for NEXTracker. *See* Garcia Dep. 110:17-11:4, ECF No. 486-1; Mitchell Dep. 76:25-77:12, 81:7-10, ECF No. 486-2; Britt Dep. 122:20-22, ECF No. 486-8. For purposes of resolving this motion for summary judgment, the Court must rely on the latter evidence.

Mitchell Dep. 92:16-93:11, ECF No. 486-2. Mitchell did not have an office at NEXTracker's facility. *Id.* at 93:23-25. His primary workplace was his home office in Albuquerque. Garcia Dep. 129:6-18, ECF No. 486-1.[7]

Mitchell reported to Graybeal from September 2016 until January 2017. *See* Graybeal Dep. 97:12-99:20, ECF No. 478-15. Graybeal believed Mitchell "likely" took direction from other people on the team to go and push the module inventory, but he could not say definitively from whom Mitchell may have been receiving guidance. *See id.* at 98:19-99:20. During his time at Flex, Mitchell did not sell trackers for NEXTracker. *See* Mitchell Dep. 102:21-103:17, ECF No. 486-2. Although while at Flex he did not sell a single PV module or any energy storage, his role was to introduce customers who had a need for those solar panels and to facilitate and support the team who sold energy storage. *See id.* at 29:6-15, ECF No. 500-1. He believed his introductions resulted in sales of PV modules by Flex. *See id.* at 29:14-15.

On September 8, 2016, Mitchell emailed Ryan Booth, NEXTracker's Vice President of Utility Sales for North America, and Garcia concerning "Colin's Slide on Utility & IPP [Independent Power Producer] BD [Business Development] Targets" and attached a document called "Utility and IPP Target List." *See* Pl.'s Ex. 34, ECF No. 478-34. He noted in the email that he was excited "to be on board." *Id.* Mitchell was referring to being excited to get the job that Garcia had helped him get at Flex. *See* Mitchell Dep. 83:8-15, ECF No. 486-2.

---

[7] Array contends that the alleged fact that Mitchell worked for Flex is so contrary to the documents, that the Court should pierce the veil and dispose of improbable factual assertions. Array urges the Court to consider Array's statement of facts as undisputed when determining this summary judgment motion. The Court, however, is not convinced that the documents are so contrary to cast doubt on the plausibility of Defendants' alleged facts that it may cast aside Defendants' evidence. Instead, the Court will consider the evidence supported by admissible evidence in the non-moving party's favor. Array has raised issues of perjury and contempt in a separate Motion for Sanctions for Violation of Consent Order, Perjury, and Contempt (ECF No. 500), and the Court will consider issues of perjury and appropriate sanctions, if any, when considering that motion.

On September 22, 2016, Robert Koch, then a Vice President of NEXTracker, and Mitchell exchanged emails about a "Targets List." *See* Pl.'s Ex. 35, ECF No. 478-35; Shugar Dep. 40:8-18, ECF No. 478-14. Koch explained reasons "for us to undertake the task to talk to any/all of these players," including to "influence the sales of trackers that are likely procured by the EPC." Pl.'s Ex. 35, ECF No. 478-35. Koch further stated: "Influence can be obtained by our relationships, by providing [specifications] that they can incorporate into the bid process that will uniquely favor NX, and getting insight into the decision making process that we can pass on to Marco [Garcia] and team." *Id.* On September 26, 2016, Koch sent Mitchell a "[n]on-EPC target customer list for NEXTracker." Pl.'s UF ¶ 48, ECF No. 480. The same day, Koch sent Garcia an email (and copied Mitchell to his personal email address) with the subject "review of accounts with Colin and Rob" and stated, "Colin and I have assembled a preliminary list of non-EPC customers for biz dev purposes that we'd like to review with you." Pl.'s UF ¶ 49, ECF No. 480. Koch worked for NEXTracker, not Flex. *See* Koch Dep. 11:14-17, ECF No. 478-36.

Mitchell was invited to visit the NEXTracker Alta Luna project site on September 28, 2016, likely by a NEXTracker employee or executive. *See* Mitchell Dep. 112:14-113:5, ECF No. 480-1. Modules were discussed at the meeting. *See* Pl.'s Ex. 11, ECF No. 480-11 at 2 of 4. Two days later, Mitchell circulated his notes from the meeting to Booth, Koch, and Garcia, including notes on warranty issues, requests of action from DE Shaw and Depcom, and a suggestion that NEXTracker needs to jump on an issue concerning twisting modules. *See id.* at 1-4.

In late October 2016, Mitchell attended a solar tracker conference as a representative of Flex. *See* Mitchell Dep. 164:10-165:14, ECF No. 486-2; Pl.'s Ex. 24, ECF No. 478-24.[8] That same

---

[8] Array cites an email in which a NEXTracker employee references Mitchell having "joined us (in stealth) for this US focused solar market event." Pl.'s Ex. 24, ECF No. 478-24. Mitchell testified, however, that he was at the conference for Flex, so the Court construes this fact in Defendants' favor.

month, Mitchell sent an email to Garcia, Shugar, and other NEXTracker employees stating, "I would love to take over the AES account, but I don't want to step on any toes either." Pl.'s Ex. 25, ECF No. 478-25. Shugar responded, "Toe stepping? F that!! The account is YOURS Colin pls bring in some tracker biz…. Pls bring home some tracker bacon." *Id.* Mitchell informed Graybeal by email: "I've been asked to take over the AES Solar account on the Nextracker side…. I wanted to let you know that I will be working the tracker sales angle for AES Solar." Pl.'s Ex. 26, ECF No. 478-26. Graybeal replied, "Thank you and glad to hear that you are working AES!" *Id.* Mitchell notified AES by email that he had been "asked to take over the AES Solar account for Nextracker from this point forward." Pl.'s Ex. 27, ECF No. 478-27. He further said in a subsequent email to AES that he had "been asked to take point on all tracker related quotes and inquiries you may have." Pl.'s UF ¶ 42, ECF No. 480. Mitchell sent a quote to AES prior to March 6, 2017. *See* Mitchell's Dep. 24:17-25:23, ECF No. 500-1.

AES was a large power producer, and Flex in 2016 was in the early stages of developing a relationship with AES regarding module and energy storage sales. *See* Graybeal Dep. 111:22-112:11, ECF No. 486-4. Mitchell was the account manager responsible for the AES account and selling modules and storage to AES for Flex. *See* Mitchell Dep. 116:15-17, 125:16-127:17, ECF No. 486-2. Shugar explained that Mitchell's responsibilities were selling modules and batteries for Flex, but there was friction and a lack of customer ownership between Flex and NEXTracker arising from calling on the same customer with the same salesperson. *See* Shugar Dep. 206:2-18, ECF No. 486-3. Mitchell went to sell batteries, but in the process, if the customer asked about trackers, Mitchell would refer the inquiry to NEXTracker. *Id.* at 206:19-25. Mitchell explained that from September 2016 until August 2017 he felt like he "could facilitate conversations between

Flex and its wholly owned subsidiary of NEXTracker to connect customers with a need to NEXTracker colleagues who could respond to that." Mitchell Dep. 105:6-10, ECF No. 486-2.

On October 7, 2016, Garcia emailed Peter Wheale, NEXTracker's vice president of sales in the Australia Pacific region, opining that "we should bid aggressively to secure the business and keep ATI out of AU [Australia]." Pl.'s Ex. 41, ECF No. 478-41 at 2-3 of 3. He noted that he had been told that "it will be based on price." *See id.* Two days later in response, Wheale told Garcia he "had a great conversation with Collin [sic] so I feel very confident with our pricing." *Id.*, ECF No. 478-41 at 2 of 3. After Garcia asked who "Collin" is, Wheale replied, "Our Collin Mitchell. ATI. They are the only competition on this portfolio. He gave me their benchmark pricing. I heard the same thing from Edify." *Id.*, ECF No. 478-41 at 1 of 3. Wheale called Mitchell because he had worked for ATI. *See* Wheale Dep. 220:7-9, ECF No. 478-42. The "benchmark pricing" to which Wheale referred was "just an estimate" and he received the same information from the developer, Edify. *See* Wheale Dep. 217:11-218:3, ECF No. 486-11. "Benchmark pricing" is routinely discussed and shared in the industry by customers to drive down the tracker price. *See* Stern Report ¶¶ 165-66, ECF No. 439-5. Customers will at times share documents that make up the quote itself. *See id.* at ¶ 166. Array has obtained NEXTracker quotes containing detailed NEXTracker pricing. *Id.* at ¶ 167.

A NEXTracker document for an October 20, 2016 "All Hands Meeting" listed Mitchell as a new team member with the title "Sr. Director, Business Development." *See* Pl.'s Ex. 12, ECF No. 480-12. That title, however, is the title he had at Flex. *See* Pl.'s Ex. 10, ECF No. 480-10.[9]

---

[9] In further support of its contention that Mitchell was a Sr. Director of Sales for NEXTracker, Array cites a June 20, 2017 letter from Mitchell to Flex and NEXTracker, in which he stated, "I also wish to request financial relief and to express my desire to re-join Nextracker as a Sr. Director of Sales or BD on July 9, 2017." Pl.'s Ex. 25, ECF No. 505-6. While the letter supports Array's position on this factual issue, the Court must construe the evidence and inferences in Defendants' favor at this stage and Mitchell testified he was working for Flex.

Similarly, Array cites evidence indicating that Mitchell was congratulated along with other employees for the Upton project win. *See* Pl.'s Ex. 13, ECF No. 480-13. Mitchell, however, testified that he was not involved at all

On November 9, 2016, Wheale sent an email to Greg Beardsworth, copying Mitchell and others and asking if his team could put together "an Apples to Apples datasheet on O&M costs between us and ATI" because "[w]e are getting hammered over here on this one issue." Pl.'s Ex. 43, ECF No. 478-43. He further explained: "The developers are using this against us with AU EPCs. I'm sure Colin can help shed the light on the ATI competitive analysis." *Id.* Mitchell responded, "I would be happy to help with that." *Id.* O&M costs are not confidential information, because they are generally known and ascertainable by proper means. *See* Stern Report ¶¶ 95-115, ECF No. 439-5.

On November 16, 2016, Garcia introduced via email Mitchell and Richard Rambaldo of Sempra, an IPP. *See* Pl.'s Ex. 23, ECF No. 478-23. Garcia stated, "I would like to introduce you to Colin Mitchell of Flex who supports our NEXTracker business development efforts…. We look forward to the opportunity to collaborate on successful tracker projects." *Id.* Sempra was never a customer of Array. *See* Mitchell Dep. 170:14-16, ECF No. 486-2. However, while Mitchell worked for Array, he worked with EPC firms that were customers of Sempra, so his work with Sempra while at Array was not direct. *See* Mitchell Dep. 85:6-16, 170:10-13, ECF No. 505-5.

Koch emailed Mitchell on November 15, 2016, informing him that Shugar preferred that "we spend time and focus more on new accounts where we don't have current deep relationships." Pl.'s Ex. 40, ECF No. 478-40. Mitchell replied, "That makes our job easier and that is the filter we needed." *Id.* Shugar explained that Koch and Mitchell were working together because of "co-selling between Flex with their product mix and NEXTracker with its product mix." *See* Shugar Dep. 129:5-10, ECF No. 486-10. Mitchell's job at Flex was to facilitate high-level customer relationships for the purpose of furthering Flex's solar module sales, energy storage, and digital

---

in the Upton 2 project. Mitchell Dep. 202:5-10, ECF No. 488-6. The Court must construe those facts in favor of Defendants.

O&M efforts, so he was paired with Koch who was in charge of NEXTracker sales and NEXTracker-related digital O&M efforts. Mitchell Dep. 186:23-187:10, ECF No. 486-2.

Later, Mitchell emailed Koch "Re: Shugar's Priority Sales List" and informed him: "I added a 'Shugar' Page to this Excel and I contacted everyone on my list to see about a possible meeting." Pl.'s Ex. 39, ECF No. 478-39. He attached a "Non-EPC target customer list 11.16.16 for NEXTracker." *Id.* According to the metadata, Mitchell is listed as the "Author" of the spreadsheet created on September 7, 2016. *Compare* Pl.'s Mot. ¶ 53, ECF No. 478, *with* Def.'s Resp. 9-10, ECF No. 486 (admitting that metadata lists Mitchell as "Author" but noting that metadata does not identify person who created spreadsheet). The spreadsheet identified Koch and Mitchell as "Lead" in a table listing various contacts. *See* Pl.'s Ex. 39, ECF No. 478-39 at 5 of 5.

Booth received an email introducing him to a colleague from Canadian Solar who was interested in NEXTracker's tracker product. *See* Pl.'s Ex. 17, ECF No. 480-17 at 2 of 2. Booth forwarded Mitchell the emails from Canadian Solar on November 17, 2016, explaining that he had another lead for Mitchell, and it would be another good one for him to run with. *Id.* at 1 of 2. Booth said he would coordinate being on the introductory call together. *Id.* Canadian Solar is an IPP owner with module manufacturing needs that Flex was contract manufacturing for in Brazil, so it was a great account for Mitchell to touch from a Flex point of view. Mitchell Dep. 206:3-11, ECF No. 488-6.

On November 17, 2016, in an email to Pedro Garcia at FRV Power US, Mitchell stated, "We are working on preparing a quote and layout for your Tucson project and Ryan requested that I take the lead on the FRV account for Nextracker." *See* Pl.'s Ex. 18, ECF No. 480-18.

That same day, Wheale sent an email to Mitchell, Booth, and Garcia beginning, "Great talking yesterday! As discussed, want to get our messaging around the ATI pitch solidified asap."

Nov. 17, 2016 email, ECF No. 439-1 at 6 of 9. Garcia responded to Wheale by email, including

Mitchell, among others, and noted that the issue "was discussed at length at the Exec Offsite today"

and that "Marty Rogers and Rob Koch took an action item to prepare an O&M pitch to counter

ATI." *Id.*, ECF No. 439-1 at 5 of 9. Garcia said that it sounds like Wheale needed something sooner

"to save the Edify 130 MW projects," so he further stated:

> Colin – Really need your help here. ATI is kicking our ass with the O&M pitch that
> you helped create. What are the real O&M weaknesses of ATI? Please reply all.
>
> This is unacceptable to lose business to ATI when we have lower Capex and they
> win on lower O&M and lower LCOE.
>
> We are being out-sold and out-maneuvered. All hands on deck.

*Id.* at 6 of 9. Garcia wanted to understand Mitchell's knowledge without disclosing any

confidential information. Garcia Dep. 216:24-217:1, ECF No. 486-1.

On November 18, 2016, Mitchell responded by email to Garcia, Wheale, Booth, Koch, and

Shugar, among others, and stated that the "long term O&M issues for ATI are essentially, added

time and effort to wash and clean modules for a linked tracker row" and that the "vulnerabilities

in my mind are the 'torque limiting' gear box." Pl.'s Ex. 44, ECF No. 478-44. Mitchell said he

"would concentrate on poking at the torque limiting gearbox and the lack of any kind of monitoring

on a per row level for ATI," and he opined that "their control system is pretty basic." *Id.* He noted

that ATI did "a whole fleet wide replacement … with the shock absorbers and mounting systems."

*Id.* Finally, he ended with, "Hope this helps and I'm willing to dive into any of this in more detail

if anyone wants." *Id.*

Later the same day, Mitchell sent another email to Garcia, Wheale, Shugar, and others that

said:

> The ATI sales presentation these days basically consists of an excel spreadsheet
> that calculates component costs for Nextracker batteries, controllers, zigbee,

motors, etc. and tries to make a comparison between the ATI electronics and the Nextracker electronics.

This summary estimates a Net Present Value of a 30 year O&M for the Nextracker system as coming to somewhere close to $.01-.015/watt dc.

I have a colleague at AES Solar who recently confirmed that they internally have estimated a $.01/watt dc NPV for Nextracker long term O&M.

We will obviously be diving into this with this guy at AES and I have actually reached out to invite him to come to Nextracker so we can take a look at his numbers and understand where they are coming from.

A lot of the focus is on batteries and distributed tracker controllers.

As I understand this, AES has a funding scheme that sets aside slightly more money for Nextracker long term O&M than for an ATI system anticipating that at years 10 or 20 for example they would have needed to set aside sufficient money to replace motors, controllers, etc. Similarly, every 5 years they have a target total value of accrued long term O&M money to pay for battery replacements.

I think if we can attack this aspect with data and reasonable figures for labor time to replace, etc, then we can really dismantle the basis for the ATI long term O&M argument.

Nov. 18, 2016 email, ECF No. 439-1 at 5 of 9. Later, in the same email thread, Mitchell discussed information about Array's system and design, the engineering of Array's system, and its ability to withstand certain wind speeds. *See* Nov. 28, 2016 email, ECF No. 439-1 at 2-3 of 9.

Mitchell, however, did not disclose any Array confidential or trade secret information in the emails. *See* Stern Report ¶ 301 & n.241, ECF No. 439-5. His discussion of the NPV tool is the type of information universally discussed and shared within the industry. *Id.* As noted by Mitchell in his email, some of the information he shared came from a colleague at AES Solar. *See* Nov. 18, 2016 email, ECF No. 439-1 at 5 of 9. Competitor O&M cost, pitch, and other information is commonly shared within the industry. *See* Stern Report ¶ 109, ECF No. 439-5. Array discussed its product specifications and capabilities on its website. *Id.* at ¶ 269. Array encouraged its employees to get NEXTracker O&M cost information from customers. *See id.* at ¶¶ 109-11. NEXTracker was

aware of Array's O&M pitch, O&M arguments, and sales tools before Mitchell resigned from Array. *Id.* at ¶ 155. Array's components are off-the-shelf equipment. *See* Corio Dep. 105:15-106:16, ECF No. 486-13. Array posted its O&M value proposition/pitch/strategy on its website on November 8, 2016 and made its O&M argument/pitch publicly available in the TUV Report published on September 8, 2017. *See* Stern Report ¶¶ 115-17, 144, 146, ECF No. 439-5. The TUV report also discussed aspects of Array's system and design information. *See* Defs.' Ex. H, ECF No. 488-8.

In December 2016, Booth forwarded email correspondence between him and Jeff Grienke from Fluor regarding NEXTracker's presentation of a proposal for the Champion Creek project in Texas. *See* Pl.'s Ex. 19, ECF No. 480-19. Booth asked Mitchell by email if he could "follow-up" and "take it from here." *Id.* Mitchell responded, "You got it!" *Id.* The nature of Mitchell's follow-up was to reach out to Greinke to get a sense for what activities Fluor was involved with in the utility solar space and to see if this project was still alive in his role as account manager for Flex. *See* Mitchell Dep. 200:1-201:12, ECF No. 488-6.

Mitchell received a W-2 Form from NEXTracker for 2016 wages, and he received a January 31, 2017 payment from NEXTracker. *See* Pl.'s Ex. 14 and 15, ECF Nos. 480-14 and -15. Flex's senior finance director explained, however, that the payment from NEXTracker was a clerical error. *See* Waldron Dep. 7:9-23, 53:22-54:25, ECF No. 488-7. Clerical errors in which an employee from either NEXTracker or Flex was paid by the other company occurred many times. *See id.* at 54:16-25. Notably, the address for NEXTracker listed on the W-2 and paystub are for a San Jose office, while NEXTracker's office is in Fremont, California. *Compare* Pl.'s Ex. 14 and 15, ECF Nos. 480-14 and -15, *with* Shugar Dep. 194:7-12, ECF No. 488-4.[10]

---

[10] The Court has considered the emails cited by Array indicating that NEXTracker transferred Mitchell to Flex's payroll after a court order. *See* Pl.'s Ex. 26, ECF No. 500-26. The Court is not convinced that this evidence

In January 2017, Booth asked Mitchell if he wanted to reach out directly to Geoff Miller, the Development Manager for Primoris Renewable Energy ("Primoris") who was seeking pricing information from NEXTracker for a project in Throckmorton, Texas. *See* Pl.'s Ex. 28, ECF No. 478-28 at 1-3 of 3. Mitchell responded that he would "love to reach out directly" and noted that these "are my guys." *Id.* at 1 of 3. *See also* Pl.'s UF ¶ 43, ECF No. 480. Booth responded, "Yes, please do." Pl.'s Ex. 28, ECF No. 478-28. Mitchell stated in an email to Booth and Gus Wellin of NEXTracker regarding "Quotes for Primoris – Throckmorton, TX" that "[t]hey have traditionally designed with ATI. Let[']s cure them of that habit." Pl.'s Ex. 29, ECF No. 478-29; Pl.'s UF ¶ 43, ECF No. 480. While he worked at Array, he was a sales member assigned to a project where Northern Energy and Power, now called Primoris, was a customer. *See* Mitchell Dep. 50:17-51:14, ECF No. 480-1.

In February 2017, Mitchell sent an email to Geoff Miller with "the attached quotes for Turkey Hill, Merri[ll] and Lakeview projects," located in Oregon. *See* Pl.'s Ex. 30, ECF No. 478-30; Pl.'s Ex. 32, ECF No. 478-32. Mitchell received the quotes from Wellin. *See* Pl.'s Ex. 30, ECF No. 478-30. Mitchell admitted he sent quotes to Primoris that NEXTracker created. *See* Mitchell Dep. 24:17-25:23, ECF No. 500-1. Miller forwarded the quote to Kent James, Senior Vice President of Primoris. *See* Pl.'s Ex. 31, ECF No. 478-31. Wellin sent Mitchell the quotes because James had reached out to Mitchell directly. Mitchell Dep. 331:2-6, ECF No. 486-2. On March 2, 2017, Mitchell emailed Miller and James to inform them that he would hand off his accounts to his NEXTracker colleagues until later in the summer when his non-compete would be over, and he told James he would call him to "keep the discussions going on the larger Primoris & Nextracker

---

shows the clerical error evidence so unbelievable or implausible that it may ignore Defendants' evidence. Accordingly, the Court has construed the evidence in favor of Defendants, as it must at the summary judgment stage, and it will leave for a jury the credibility determinations.

MSA type discussion." Pl.'s Ex. 33, ECF No. 478-33. Array did not quote Primoris for these projects. *See* Nelson Rebuttal Report, ECF No. 486-9.[11]

On May 2, 2017, Mitchell forwarded Graybeal an email from NEXTracker personnel with the subject "NX Analytics Presentation" and stated he "wanted [Graybeal] to see this as well, along the lines of our conversation about flying below radar, potentially." Pl.'s UF ¶ 66, ECF No. 480. Graybeal responded, "This is awesome." *Id.*

Britt acknowledged it would not have been appropriate for Mitchell to work the tracker sales angle with an EPC or to be selling trackers because of his non-compete clause. *See* Britt Dep. 135:15-21, 137:15-138:12, ECF No. 478-5. Britt also admitted he would not be ok knowing that Mitchell had an enforceable non-disclosure agreement with Array if he were disclosing Array's pricing to NEXTracker employees because it is competitive information. *Id.* at 129:13-18. He further noted that Mitchell should not have been disclosing anything related to his previous employer because of the confidentiality agreement. Britt Dep. 149:22-150:1, ECF No. 505-3.

Shugar acknowledged that if an employee of NEXTracker who was subject to an NDA did not keep information confidential from a competitive nature or other way, it could harm NEXTracker. Shugar Dep. 115:25-116:12, ECF No. 478-4. According to Shugar, the calculus at the "deal desk" to determine whether NEXTracker can price a project at a requested margin is confidential and he would not want a competitor to work on the deal desk with him. *Id.* at 129:18-24. Nor would he want the confidential details about relationships between NEXTracker and its customers to fall into the hands of one of its competitors. *See id.* at 131:1-11.

Array's hired Parkins, its solar industry expert, to give an opinion on whether Defendants' conduct relative to the misappropriation of and use of confidential information and trade secrets

---

[11] The Court recognizes this fact is disputed by Array. *See* Pl.'s Ex. 32, ECF No. 478-32.

could have led to NEXTracker winning projects and Array losing certain projects. *See* Parkins Dep. 10:8-19, ECF No. 475-1. He testified that he was not saying that no rational customer would have chosen the NEXTracker system in the absence of the alleged misconduct by Defendants. *Id.* at 241:6-13. He has not opined that Defendants' conduct was the primary factor in NEXTracker winning certain projects over Array, instead testifying that the conduct was a contributing factor as to certain projects. *See id.* at 233:24-234:9, 249:20-250:10.

NEXTracker hired Mitchell on August 16, 2017, after his non-compete clause elapsed. *See* Shugar Dep. 184:2-7, ECF No. 478-4; Def.'s Ex. L, ECF No. 486-12.

### III.    STANDARD

"A party may move for summary judgment, identifying each claim or defense--*or the part of each claim* or defense--on which summary judgment is sought." Fed. R. Civ. P. 56(a) (italics added). On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). Only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### IV.    ANALYSIS

### A.  Contract Claim

To prevail on a breach of contract claim, a plaintiff is required to prove a valid contract, breach of the contract, and damages caused by the breach. *See Constr. Contracting & Mgmt., Inc. v. McConnell*, 1991-NMSC-066, ¶ 10, 112 N.M. 371. Array seeks partial summary judgment on two elements of its breach of contract claim: (1) that the Agreement between Array and Mitchell was valid and enforceable and (2) that Mitchell breached the Agreement.

### 1.  Validity of contract

Turning first to the validity of the contract, Defendant presented no arguments or evidence suggesting that the Agreement was invalid and not enforceable. Based on the record and the lack of opposing argument, the Court determines as a matter of law that the contract is valid. *Cf. MAI Basic Four, Inc. v. Basis, Inc.*, 880 F.2d 286, 287-88 (10th Cir. 1989) (interpreting New Mexico law in holding that confidentiality and non-disclosure provisions in employment agreement were not void for lack of additional consideration beyond continued employment); *Lovelace Clinic v. Murphy*, 1966-NMSC-165, 76 N.M. 645, ¶¶ 23-25, 28-29 (upholding non-competition contractual provisions so long as they are reasonable as applied to contracting parties and general public, they are not against public policy, and they are not any detriment to public interest).

### 2.  Breach

Defendant asserts partial summary judgment should be denied on the breach element because Array failed to provide any analysis of how the facts relate to the specific contract provisions. Additionally, he argues there are genuine factual disputes that preclude summary judgment on this issue. The Court will examine each of the alleged breaches to which Array claims it is entitled to partial judgment as a matter of law.[12]

---

[12] Array is not moving for partial summary judgment on all the breaches of the Agreement it asserts against Mitchell. *See* Pl.'s Mot. 24 n.7, ECF No. 478.

### a. Non-disclosure agreement

Array asserts that Mitchell breached the non-disclosure provision in at least three ways: (i) discussing with and disclosing to NEXTracker and Wheale Array's pricing and pricing strategies; (ii) disclosing vulnerabilities in Array's trackers and advising NEXTracker to "poke at" certain components of Array's trackers when attacking Array's O&M capabilities and competing against Array on projects; and (iii) shedding light on Array's competitive analysis from an O&M perspective and disclosing details of its sales presentation and a roadmap of how to dismantle the basis for Array's long-term O&M argument.

As relevant here, the terms of the non-disclosure provision require the employee to protect and keep secret confidential information; only use or disclose confidential information as necessary in connection with work for Array; and refrain from using confidential information for the employee's or a third party's benefit or in any manner adverse to Array. *See* Agreement, ECF No. 478-1 at 1. Confidential information includes all information concerning the business and affairs of Array, unless it is or becomes generally available to the public other than through a breach of the Agreement. Array has not set forth undisputed evidence that the information Mitchell shared was not generally available to the public, as required to show a breach of the non-disclosure agreement. According to Stern, all the information Mitchell gave to NEXTracker is generally known in the industry.[13] Consequently, there is a question of fact for the jury as to whether Mitchell breached the non-disclosure agreement and the Court will not grant partial summary judgment on this issue.

---

[13] Although the Court has not yet determined whether Stern is qualified to render his opinion or whether the opinion is relevant and reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court assumes for purposes of this opinion that the evidence will be admissible at trial. Should the Court exclude Stern's testimony regarding the confidentiality of the information Mitchell shared, the parties may revisit this issue with the Court.

### b.  Non-competition & non-solicitation agreements

Array asserts that Mitchell breached both the non-competition and non-solicitation agreements by engaging in multiple types of misconduct. The non-solicitation agreement said Mitchell, for one year after his employment ends, shall not, directly or indirectly or on behalf of another person, solicit or encourage any person who he knew to be an actual or prospective customer of Array to cease doing business, in whole or in part, with Array, or knowingly to reduce, divert, or otherwise interfere with any portion of the business between Array and any such customer. Agreement, ECF No. 478-1 at 2. For the same one-year period, the non-competition provision prohibited Mitchell from "directly or indirectly" engaging in the "ownership or operation of a business" that designs or manufactures solar tracking equipment, whether as an "officer … investor, associate, employee, consultant, independent contractor or in any other capacity relating to such a business." *Id.*

The parties dispute the meaning of to "engage in the … operation of a business." Relying on *United Rentals, Inc. v. Keizer*, 355 F.3d 399 (6th Cir. 2004), Defendants contend that the term "operation" implies a management or oversight role. In *Keizer*, the former employee had entered into a covenant not to compete that stated neither the employee nor any of his affiliates shall, anywhere in the target area, "directly or indirectly, acting individually or as the owner, shareholder, partner, or employee of any entity … engage in the operation of any equipment sale, rental or leasing business." *Id.* at 406. The Sixth Circuit determined that, to operate a business in the target area, the business must be physically located in that area; soliciting business from and selling to customers in the target area is not enough. *See id.* According to the *Keizer* court, the common sense meaning of where a business operates is where a business is located. *See id.* at 406-07. The *Keizer* court rejected the former employer's definition of "operation" as a "process or series of acts aimed

at producing a desired result or effect," in favor of dictionary definitions more specific to business. *See id.* at 407. The Sixth Circuit relied on the *Oxford English Dictionary Online Edition* that defined operation as "a business activity or enterprise" and the word "operate" as "[t]o direct the working of; to manage, conduct, work (a railway, business, etc.)." *Id.* The court thus concluded:

> Taken together, these definitions strongly indicate that in the business context an operation requires a discrete physical location, such as a railway or a grocery store. But even assuming that an operation can transcend a particular physical location, the definition of "operate" indicates that management or oversight is an essential element of a business operation.

*Id.* Because the former employee did not manage or oversee a competing enterprise in the target area, but merely conducted some business inside the target area by carrying out some sales and delivering in the target area, the Sixth Circuit held that there was no breach of the non-compete covenant. *See id.* at 407-09.

Array argues that the *Keizer* opinion is limited to the specific contract terms, which are different from those here, and that this Court is not bound by Michigan law. Array instead urges the Court to construe "operation" to mean "any supporting activity." According to Array, the express language of the provision prohibiting competition identifies several non-managerial roles, such as associate, employee, consultant, independent contractor, or a person in any other capacity relating to such a business, rendering Defendants' construction of the provision unreasonable. Array also points to the evidence in the record indicating that Mitchell and executives of NEXTracker and Flex understood the provision to mean that Mitchell could not work for NEXTracker, regardless of whether he held a managerial position.

"The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive." *Rivera v. American General Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 27, 150 N.M. 398 (quotations and

citation omitted). A court may examine extrinsic evidence when considering whether contract language is ambiguous. *See C.R. Anthony Co. v. Loretto Mall Partners*, 1991-NMSC-070, ¶ 15, 112 N.M. 504. Whether the agreement contains an ambiguity is a matter of law for the trial court. *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 114 N.M. 778. "If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." *Id.* If, however, the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. *Id.* "At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder." *Id.* The jury must determine the meaning of unclear terms. *Id.* at ¶ 13. If "the parties do not offer evidence of the facts and circumstances surrounding execution of the agreement and leading to conflicting interpretations as to its meaning, the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation." *Id.*

Based on the plain language of the contract and record evidence, the Court finds no ambiguity. The Court is not convinced that the ordinary meaning of "operation" is limited to management or oversight based on the terms of the "Non-Competition Agreement." In this case, the prohibition of engagement in the ownership or operation of a business is modified by the phrase "whether as an officer, director, partner, proprietor, investor, associate, employee, consultant, independent contractor or in any other capacity relating to such business." Agreement, ECF No. 478-1 at 2. The broad list of roles, including "any other capacity," does not suggest "operation" is limited to management or oversight, distinguishing this case from *Keizer*. This interpretation is consistent with the ordinary dictionary definition of "operation" as meaning the "performance of

a practical work," "an exertion of power or influence," "the quality or state of being functional or operative;" and "a method or manner of functioning." *Operation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/operation (last visited May 25, 2020). *See also Operation*, Dictionary.com, https://www.dictionary.com/browse/operation?s=t (last visited May 25, 2020) (defining "operation" as "an act or instance, process, or manner of functioning or operating;" "the state of being operative;" "the power to act;" "the exertion of force, power, or influence; agency;" "a process of a practical or mechanical nature in some form of work or production;" or "a course or procedure of productive or industrial activity").[14] The extrinsic evidence in this case, even construed in Defendants' favor, also indicates that Flex and NEXTracker did not believe the terms were ambiguous.

Consequently, that Mitchell may not have had a management or oversight role at NEXTracker during his time at Flex does not preclude him from breaching the non-competition agreement. It is also undisputed that NEXTracker "designs and/or manufactures solar tracking equipment or systems." Keeping those matters in mind, the Court will now examine each alleged breach in order.

**(1) Taking over NEXTracker customer accounts**

First, Array asserts Mitchell took over NEXTracker customer accounts, including for AES Solar, and Shugar instructed him to "bring home some tracker bacon." Mitchell admitted that he sent a NEXTracker quote to AES prior to March 6, 2017. *See* Mitchell's Dep. 24:17-25:23, ECF No. 500-1.

---

[14] Array urges the Court to construe "operation" as "any supporting activity." Pl.'s Reply 7, ECF No. 507. Array offers no authority for this definition. The Court will instead apply the common, plain meaning as reflected in dictionary definitions. *Cf. Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶¶ 38, 43, 147 N.M. 583 (turning to lay dictionary to determine plain meaning of words used in statute).

With respect to the non-solicitation provision, Array has not shown evidence in support of this motion that AES was known by Mitchell to be an actual or prospective customer of Array. The Court thus cannot find as a matter of law that Mitchell's work on the AES account established breach of the non-solicitation provision.[15]

Turning to the non-competition provision, aside from the managerial/oversight argument that this Court has already rejected, Defendant additionally contends that a reasonable jury could conclude based on the record that Mitchell was simply a Flex salesperson and his correspondence with AES was in his role as a Flex employee. Even if a jury were to make those factual determinations, the non-competition agreement prohibited Mitchell in any capacity relating to NEXTracker from directly *or* indirectly engaging in the operation of NEXTracker. Regardless of any other acts related to AES Mitchell may or may not have taken, Mitchell admitted sending a NEXTracker quote to AES. Sending a quote for NEXTracker is an activity or work done for NEXTracker; it is a process of a practical nature in form of work for NEXTracker. Accordingly, Mitchell's action in sending the AES quote constituted at least an indirect engagement in the operation of NEXTracker and violated the non-competition agreement as a matter of law.

### (2) Supporting NEXTracker behind the scenes, attending tracker conferences, and engaging in business development efforts

Array argues that Mitchell supported NEXTracker behind the scenes and attended tracker conferences in stealth and that the conferences were a way NEXTracker gathered sales leads and engaged in business development efforts. Array also contends that Mitchell admitted in August

---

[15] The record in this case is extensive. The Court recognizes that AES is discussed elsewhere in the record, but it is Plaintiff's burden to set forth the facts, with citations to the particular evidence in the extensive record, in its motion for partial summary judgment to give the Defendant an opportunity to respond to that evidence as it relates to the motion at hand. It is not the Court's place to scour the record for Plaintiff. Because of Plaintiff's failure to establish in its motion that AES was a potential or current customer of Array, the Court cannot grant Array partial summary judgment on the non-solicitation provision regarding Mitchell's actions with respect to AES.

31, 2016 that he was going to be busy with his NEXTracker job and had signed with a tracker company. The record construed in Defendant's favor, however, suggests that Mitchell attended conferences on behalf of Flex, and thus, that Mitchell did not act or perform work at the conferences for NEXTracker. Nor has Array cited evidence of Mitchell's interactions with specific customers at the conferences who were known by him to be actual or prospective customers of Array. Although Array cites an email in which Mitchell indicated he was working for NEXTracker, Mitchell explained in his deposition that he used NEXTracker as a shorthand for Flex. Viewing the facts and inferences in Defendant's favor, the evidence indicates his job was with Flex and his attending tracker conferences was on behalf of Flex. Accordingly, Array is not entitled to summary judgment for breach of either the non-solicitation or non-competition provisions based on Mitchell having attended conferences for NEXTracker or working behind the scenes for NEXTracker.

### (3) Taking over NEXTracker's Primoris customer account

Array contends Mitchell breached the Agreement by taking over NEXTracker's customer account for Primoris and supporting NEXTracker's tracker sales efforts by providing quotations for solar projects and discussing a potential master supply agreement with NEXTracker. Mitchell admitted sending quotes to Primoris that NEXTracker created prior to March 6, 2017. *See* Mitchell Dep. 24:17-25:23, ECF No. 500-1.

With respect to the non-solicitation agreement, there are questions of fact as to whether Primoris was an actual or prospective customer of Array. Although there is evidence Mitchell knew Primoris had been a customer of Array, *see*, *e.g.*, Pl.'s Ex. 29, ECF No. 478-29, the record and inferences construed in Defendant's favor does not establish that Primoris, *during the time the non-solicitation provision was in effect* was an Array customer or prospective customer. As for the

projects related to Primoris, there are fact questions as to whether Array bid on the Turkey Hill, Merrill, or Lakeview projects. Array submitted a spreadsheet entitled "EPC Cost Template Origis Energy 2016 Portfolio," an Array document listing information concerning the Turkey Hill, Merrill, and Lakeview projects, *see* Pl.'s Ex. 32, ECF No. 478-32, but Array neglected to provide an affidavit, deposition testimony, or other admissible evidence in this motion to explain to the Court why this document establishes that Mitchell knew that Primoris was still a customer or potential customer of Array. Moreover, Defendant submitted portions of the expert report of Clarke B. Nelson, which indicates Array quoted other entities (not Primoris) for the Turkey Hill, Merrill, and Lakeview projects. *See* Nelson Report, ECF No. 486-9.

Furthermore, Defendant cited evidence indicating that Kent James of Primoris reached out to Mitchell, not the other way around, so there is an additional fact question concerning whether Mitchell solicited or encouraged James and Primoris to cease doing business with Array. Finally, although there is evidence Mitchell emailed James concerning a master supply agreement with Primoris, construing the evidence in Defendant's favor, Array has not shown that Mitchell followed up with James or took any actions about a potential master supply agreement. Construing the record in favor of Defendant, the Court cannot grant partial summary judgment for Array as to this non-solicitation breach theory related to the Primoris customer account.

According to the non-compete clause, Mitchell could not indirectly engage in the operation of NEXTracker in any capacity relating to its business. Mitchell admits to sending a NEXTracker quote to Primoris. As discussed *supra* regarding the AES quote, sending a quote for NEXTracker is an activity or work done for NEXTracker; it is a process of a practical nature in form of work for NEXTracker. Therefore, regardless of whether Mitchell directly engaged in operations for

NEXTracker, Mitchell's action in sending the Primoris quote constituted an indirect engagement in the operation of NEXTracker and violated the non-competition agreement as a matter of law.

### (4) Discussing with NEXTracker Array pricing and pricing strategies

According to Array, when Mitchell disclosed to NEXTracker Array pricing and pricing strategies to help NEXTracker bid aggressively to keep Array out of Australia, he breached the Agreement. The evidence upon which Array relies are emails between Garcia and Wheale in which Wheale says he got "benchmark pricing" information from Mitchell and Wheale's admission that he called Mitchell because he had worked at Array. *See* Pl.'s Ex. 41-42, ECF No. 478-41 and -42. This evidence, however, construed with inferences in favor of Defendant, does not establish as a matter of law that Mitchell solicited or encouraged any person known by him to be an actual or prospective customer of Array to cease doing business with Array or knowingly to reduce, divert, or interfere with business between Array and a particular customer. The jury must determine those issues. As for the non-competition agreement, the Court also finds questions of fact as to what information Mitchell shared with Wheale and whether what he shared constitutes the operation of NEXTracker business. The Court therefore will not grant Array summary judgment on its theory that Mitchell breached the agreement by giving Wheale pricing information.

### (5) Disclosing vulnerabilities in Array's trackers

Next, Array contends that Mitchell breached his Agreement when he disclosed vulnerabilities in Array's trackers and advised NEXTracker to "poke at" certain components of Array's trackers when attacking Array's O&M capabilities and competing against Array on projects. To demonstrate a breach, Array relies on the November 18, 2016 emails Mitchell sent to NEXTracker executives (ECF No. 439-1). Although it is undisputed Mitchell sent the emails to NEXTracker executives, there are factual questions concerning the effect of the emails on any

business Array had with NEXTracker customers. The email exchange indicates that Garcia solicited the information from Mitchell to save Edify 130 MW projects. Array, however, has not set forth evidence in support of this motion as to what the Edify 130 MW projects were and to show that Mitchell knew Edify was an actual or prospective customer of Array. At this stage, the Court construes inferences and ambiguities in the record in favor of Defendant.

Moreover, a jury may determine that sending the emails to NEXTracker executives does not constitute the requisite direct or indirect solicitation or encouragement necessary to violate this provision of the Agreement. Array in its reply suggests that solicitation or encouragement is not required to violate the non-solicitation agreement; rather, Mitchell can violate the agreement by knowingly reducing, diverting, or otherwise interfering with any portion of the business between Array and its customer. *See* Pl.'s Reply 11, ECF No. 507. To interpret the reduce/divert/interfere clause as modifying what the employee shall not do is not plain from the provision, which would require reading the agreement as: "Employee shall not, directly or indirectly or on behalf of any other person … knowingly to reduce, divert or otherwise interfere with any portion of the business between Employer and any such customer." *See* Agreement, ECF No. 478-1. The "to" after knowingly does not make it clear whether the reduce/divert/interfere clause modifies "Employee shall not" or if it modifies "Solicit or encourage any person." The briefing on the distinction is cursory at best. On the record as it stands before the Court, Array has not demonstrated an unambiguous interpretation for which the Court could find for Array as a matter of law, rather than sending the matter to the jury. The Court thus will not grant partial summary judgment to Array on the issue of breach of the non-solicitation agreement on this fifth theory.

Although there are questions of fact for the jury whether Mitchell worked directly for NEXTracker and whether the information that he shared was confidential or trade secret, it is

undisputed he sent the emails in response to a request by Garcia for his help with messaging around Array's pitch to help save Edify 130 MW projects. Those emails contained Mitchell's thoughts on Array's engineering and long-term O&M vulnerabilities, information concerning its sales presentation, and Mitchell's opinion on how to dismantle the basis for Array's long-term O&M argument. The undisputed evidence demonstrates Mitchell performed work for NEXTracker to assist it with messaging, which constitutes as a matter of law indirect work for NEXTracker in violation of the non-competition agreement.

### (6) Shedding light on Array competitive analysis from an O&M perspective

Array asserts as a separate sixth theory that Mitchell breached the agreement by disclosing details of Array's competitive analysis and sales presentation and giving a roadmap on how to dismantle the basis for Array's long-term O&M argument. Again, this assertion is based on the November 18, 2016 emails discussed above. For the same reasons discussed *supra*, there are questions of fact that preclude partial summary judgment that sending the emails constitutes a breach of the non-solicitation provision, but sending the emails constitutes, at least, indirect work for NEXTracker in violation of the non-competition agreement.

### (7) Preparing target customer lists

In addition, Array contends Mitchell breached the Agreement by preparing target customer lists, receiving feedback from NEXTracker executives about the lists, and visiting customers to try to help sell NEXTracker trackers and generate sales leads. As an initial matter, Array has not explained how receiving feedback from NEXTracker executives is a violation by Mitchell of the Agreement. Because inferences must be construed in Defendant's favor, that Mitchell received emails from NEXTracker executives does not establish that he was working for them. The jury

will have to resolve those fact issues regarding the inferences to be drawn from the emails Mitchell received.

Turning to the evidence Array cites regarding target lists, Mitchell said his September 8, 2016 email to Booth in which he said he was excited to be on board meant he was excited to be on board with Flex. Moreover, Array has not shown undisputed evidence that Mitchell knew that the listed "targets" were actual or potential customers of Array or that this email undisputedly constituted direct or indirect work for NEXTracker and not for Flex. As for the November 16, 2016 email in which Mitchell said he added a "Shugar" page to the spreadsheet and contacted everyone on his list to see about a possible meeting, Array has not cited undisputed evidence as to which customers Mitchell contacted and whether Mitchell knew they were actual or potential customers of Array. For example, although the Non-EPC target list has Mitchell listed as a lead for AES Solar and Sempra, Defendant has presented evidence that Sempra was not an Array customer and, as discussed above, there is a factual dispute about whether Mitchell knew AES was a customer or potential customer of Array. There are therefore factual issues for a jury to resolve regarding whether Mitchell violated the non-solicitation provisions of the Agreement with respect to target lists.

As to the non-competition clause, the Court has determined that sending a NEXTracker quote to AES violated that clause. Array, however, has separated out that evidence to support its first breach theory from the "target list" evidence it relies upon for its seventh breach theory. Regarding the list of targets, Defendant presented evidence that Mitchell contacted AES for his work with Flex regarding module sales. Aside from sending the NEXTracker quote, which Mitchell admitted was a quote for NEXTracker, the jury will need to determine whether other actions he took regarding target lists was work for NEXTracker or for Flex. Finally, as for visiting

35

customers, there are disputed facts as to whether Mitchell visited any customers to help sell NEXTracker trackers or to help Flex sell modules. The Court cannot grant partial summary judgment to Array on this seventh theory of breach because of the factual issues.

### c.   Injury in Fact

In its motion, Array argues that it suffered an injury in fact as a result of Mitchell's breaches, so it is entitled to partial summary judgment on liability. Array failed to specify what facts or law support its argument as to an injury in fact. In its reply, however, Array asserted its motion was narrowly tailored to partial summary judgment on two issues (1) a valid Agreement and (2) breaches of that Agreement. Pl.'s Reply 1, 3, & n.2, ECF No. 507. Nevertheless, in a footnote, Array asserts that Mitchell's breaches are sufficient to demonstrate harm for the purpose of causation and cites cases in support.

The Court disagrees Array is entitled to partial judgment for liability on the contract claim. Causation is an element of damages for breach of contract, and Defendants have shown evidence that creates a genuine issue of fact as to causation, not just factual issues as to the amount of damages. The cases upon which Array relies in its footnote are distinguishable because here questions of fact exist as to whether the breaches caused any harm to Array and whether the disclosed information was confidential or trade secret.

### B.   Tortious Interference with Contract Claim

To establish tortious interference with a contract, the plaintiff must prove that (1) the defendant had knowledge of the contract between the plaintiff and a third party, (2) the plaintiff was unable to fulfill its contract obligations, performance of the contract was refused, or the contract was not fulfilled, (3) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of the contract, (4) plaintiff suffered damages resulting from the

breach, and (5) the defendant induced the breach without justification or privilege to do so. *See Deflon v. Sawyers*, 2006-NMSC-025, ¶ 16, 139 N.M. 637; *Ettenson v. Burke*, 2001-NMCA-003, ¶ 14, 130 N.M. 67; *Premier Medical Enterprise Solutions, Inc. v. New Mexico Software, Inc.*, No. CIV 09-0165 BB/RHS, 2010 WL 11500883, *8 (D.N.M. Oct. 25, 2010) (unpublished). "It is well established that a corporation is chargeable with the knowledge of its agents and employees acting within the scope of their authority." *Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1276 (10th Cir. 2005).

Defendants contend that Array is not entitled to summary judgment on liability for many reasons. First, Defendants assert that Array failed to present any evidence that it suffered damages resulting from the breach. Defendants argue that, although evidence of the amount of damages is not required to establish liability, Array must demonstrate that Defendants' tortious misconduct caused it harm to demonstrate liability. Array acknowledges that it "does not seek disposition" on the fourth element, *see* Pl.'s Reply 9, ECF No. 505, and thus the Court cannot grant partial summary judgment as to *liability* for Count VI.

Array nonetheless seeks partial summary judgment that (i) Defendants had knowledge of the Agreement, (ii) the Agreement was not fulfilled, (iii) Defendants played an active and substantial part in causing Array to lose the benefits of the Agreement, and (iv) Defendants induced the breach without justification. *See id.* The Court will turn to these four elements in turn.

### 1.  Knowledge of the contract

Defendants argue that Array has not cited evidence that each of the Defendants knew of the non-disclosure and non-solicitation provisions. Defendants additionally contend that more than knowledge of the contract is required: Array must show that they knew they were interfering with the performance of the contract and that it failed to establish that fact as to each Defendant.

The undisputed evidence demonstrates that Defendant Garcia, NEXTracker's Chief Commercial Officer, knew of the non-compete provision and received a copy of the entire Agreement, including the non-disclosure and non-solicitation provisions. *See* Pl.'s Ex. 21; Garcia Dep. 86:21-87:20, ECF No. 505-2. Because a corporation is chargeable with the knowledge of its agents and employees acting within the scope of their authority, NEXTracker is chargeable with Garcia's knowledge. *See Western Diversified*, 427 F.3d at 1276. Array has thus satisfied its burden on summary judgment of demonstrating that Defendants Garcia and NEXTracker knew about all three provisions of the Agreement.

The record also shows that Defendant Shugar reviewed a copy of the "non-compete" agreement, as did Flex's counsel. *See* Shugar Dep. 175:15-176:7, ECF No. 480-3. The undisputed evidence shows that Shugar asked for a copy of Mitchell's "non compete" from Garcia, *see* Pl.'s Ex. 9, ECF No. 478-9, and that Shugar received and reviewed a copy of Mitchell's "non-compete," *see* Shugar Dep. 175:15-19, ECF No. 480-3. Shugar admitted that he had Flex review the copy of the "non-compete." Shugar Dep. 175:15-176:7, ECF No. 480-3. Britt, the President of Flex, was told by counsel that the NDA and non-compete were enforceable. *See* Britt Dep. 73:22-74:6, ECF No. 480-6. Although Defendant attempts to create ambiguity by saying that the question to Britt was compound and that he only meant the non-compete was enforceable, there is no ambiguity evident in the deposition. Defendants could have, but did not, submit an affidavit from Britt to establish that he was confused by the question and his answer only referred to the non-compete clause.

The inference that Defendants wish the Court to make – that they only knew of the "non-compete" clause, not the entire Agreement – is not reasonable, even viewing the record in the light most favorable to Defendants. The undisputed evidence is that Garcia, and thus NEXTracker, had

the entire Agreement, which is contained in one document and which Mitchell emailed as one attachment to Garcia. *See* Pl.'s Ex. 21, ECF No. 505-1 It is unreasonable to infer that Garcia did not give Shugar and Flex's legal counsel the entirety of the attachment with the full Agreement he received, especially in light of the evidence that Garcia referred to the entire agreement as the "non-compete," *see* Garcia Dep. 87:14-20, ECF No. 505-2. Moreover, Britt's admission indicates that Flex, indeed, had the full agreement, not just the non-compete clause. Britt admitted that Flex's counsel reviewed the non-disclosure and non-compete provisions, which were in the same document with the non-solicitation provision. The reasonable inferences to be drawn from the undisputed facts are that Defendants Garcia, Shugar, NEXTracker, and Flex had possession of and knowledge of the full Non-Disclosure, Non-Solicitation and Non-Competition Agreement.

As for Defendant Graybeal, however, the evidence construed in Defendants' favor is that he was aware of the non-compete clause, but he never saw the Agreement, and no one told him of the parameters of the non-compete. Viewing all facts and inferences in Defendants' favor, a reasonable jury could find that Defendant Graybeal did not know of the non-disclosure and non-solicitation provisions.

According to commentary in the Restatement (Second) of Torts, the defendant must have knowledge of the contract with which he is interfering *and* of the fact that he is interfering with the contract's performance. Rest. (Second) of Torts § 766, comment i. Defendants urge the Court to require as an additional element to the tortious interference with contract claim that each Defendant had knowledge of the fact that he/it was interfering with the contract's performance. New Mexico, in recognizing tortious interference with contract, adopted the view promulgated in the Restatement of Torts § 766. *See Schmitz v. Smentwoski*, 1990-NMSC-002, ¶ 50, 109 N.M. 386. Defendants, however, did not cite New Mexico law requiring as an additional element that the

defendant knew he was interfering with the contract's performance. Nor was the Court able to find any such cases. Instead, the cases repeatedly describe the knowledge element as merely knowledge of the contract. The Court thus declines to analyze separately the element of knowledge of the fact that the defendant was interfering with the contract's performance; instead, it will follow the elements as set forth in multiple New Mexico cases.

Accordingly, Array is entitled to partial summary judgment on the knowledge element of the tortious inference with contract claim as follows: Defendants Garcia, Shugar, NEXTracker, and Flex had knowledge of the full Non-Disclosure, Non-Solicitation and Non-Competition Agreement and Defendant Graybeal had knowledge of the non-competition clause in the contract. A jury must determine whether Defendant Graybeal also had knowledge of the non-disclosure and non-solicitation clauses.

### 2. Contract was not fulfilled and Defendants each played an active and substantial part in causing Array to lose the benefits of the contract

Array asserts that Defendants induced and interfered with the non-disclosure provisions in at least three ways. The breach theories mirror those relied upon by Array in its motion for partial summary judgment on the breach of contract claim. As discussed *supra*, however, questions of fact exist for the jury to decide whether Mitchell breached the non-disclosure agreement, so the Court cannot find as a matter of law that the non-disclosure provision was not fulfilled or that Defendants played an active and substantial part in causing Array to lose the benefits of the non-disclosure provision.

Turning to the non-competition and non-solicitation provisions of the Agreement, Array contends that Defendants induced and interfered with the provisions in at least five ways: (1) Defendants recruited and/or approved or sanctioned the recruitment of Mitchell to work for NEXTracker; (ii) Defendants authorized and asked Mitchell to take over NEXTracker customer

accounts, including AES Solar; (iii) Defendants asked and knew Mitchell would support NEXTracker "behind the scenes" and attend tracker conferences "in stealth;" (iv) Defendants asked and allowed Mitchell to take over NEXTracker's customer account for Primoris and supported NEXTracker's sales efforts by providing quotations for solar projects; and (v) Defendants asked Mitchell to prepare target customer lists and to visit customers in an effort to help sell NEXTracker trackers and generate sales leads. Again, these breach theories reflect those relied upon by Array in its motion for partial summary judgment on the breach of contract claim, so the Court's resolution of the breach claim informs the Court's decision on the second and third elements of the tortious interference with contract claim.

As this Court determined *supra*, Mitchell breached the non-competition agreement as a matter of law by sending quotes to AES and Primoris and sending the aforementioned November 18, 2016 emails to NEXTracker executives. As to Array's other theories, this Court determined that factual issues precluded granting Array partial summary judgment for breach of either the non-solicitation or non-competition provisions. Consequently, the evidence demonstrates as a matter of law that the non-competition clause was not fulfilled based on Mitchell's actions of sending quotes to AES and Primoris and sending the November 18, 2016 emails. Factual questions exist, however, as to whether the contract was not fulfilled based on Array's other breach theories.

Turning to whether Defendants played an active and substantial part in causing Array to lose the benefits of the Agreement, the Court will limit its analysis to the theories of breach for which the Court has found no factual questions for the jury. Array has largely grouped the Defendants together and has not argued how each separately played an active and substantial part in causing lost contractual benefits. For example, Array cited evidence that Ryan Booth, the Vice President of Utility Sales for NEXTracker, asked Mitchell if he would reach out directly to Geoff

Miller of Primoris, and that Gus Wellin of NEXTracker gave Mitchell the quotes that Mitchell in

turn gave to Primoris. Array has not provided the Court with argument or authority as to why the

named Defendants played an active or substantial part in Mitchell giving the quotes to Primoris.

Although Array cited case law that an employee's or agent's *knowledge* may be imputed to the

corporation, it has not cited authority for or argued why Booth's or Wellin's *actions* are those of

NEXTracker.[16] The Court will not do Array's work for it – it is Array's burden on summary

judgment to establish the facts and law in support of its motion before the Court may take the

issues away from the jury.

As for the AES account, it is undisputed Defendant Shugar told Mitchell that the account

was his and asked him to bring in tracker business. Based on these undisputed facts, Array has met

its burden of showing that Defendant Shugar played an active or substantial part in causing Array

to lose the benefits of the non-competition agreement based on authorizing Mitchell to work on

getting AES business. *See Wolf v. Perry*, 1959-NMSC-044, ¶ 21, 65 N.M. 457 ("There must be

some voluntary conduct on the part of the defendant, some overt act which influences the promisor

to breach his contract.").

With respect to Defendant Graybeal, Array presented undisputed evidence that Defendant

Graybeal told Mitchell he was glad he was working on AES. There is also evidence, however, that

Mitchell did work for Flex regarding AES, so the Court finds that a jury must determine whether

Defendant Graybeal played an active or substantial part in causing Array to lose the benefits of the

non-competition agreement.

---

[16] In its reply, Array cites *Ocana v. American Furniture Co.*, 2004-NMSC-018, ¶ 29, 135 N.M. 539, in support of its assertion that Shugar's actions are imputed to NEXTracker. *Ocana* stated that an employer is liable for an employee's torts committed within the scope of his employment. *Id.* The *Ocana* court went on to say, "an employer is not generally liable for an employee's intentional torts because an employee who intentionally injures another individual is generally considered to be acting outside the scope of his or her employment." *Id.* Because Array did not cite *Ocana* until its reply, Defendants did not have an opportunity to address this case or the law of agency theory and its application to each of the Defendants here.

Array has not provided the Court with argument or authority as to whether the other named Defendants played an active or substantial part in Mitchell giving the quotes to AES. For the reasons given *supra* in footnote 17, Array has not sufficiently established through argument and authority that Shugar's actions are those of NEXTracker as a matter of law. Consequently, the Court will leave for the jury whether this element has been satisfied as to Defendants Graybeal, Garcia, NEXTracker, and Flex.

Regarding the November 18, 2016 emails Mitchell sent, the record shows that Mitchell sent the emails in response to a request from Defendant Garcia for Mitchell's help to inform him of Array's O&M weaknesses to rebut Array's O&M pitch. Garcia admitted wanting Mitchell's knowledge, albeit without disclosing confidential information. As to Array's breach theory based on the November 18, 2016 emails from Mitchell, the Court concludes, relying on the undisputed evidence, that Defendant Garcia played an active and substantial part in causing Array to lose the benefits of the non-competition clause. Whether or not the information Garcia sought was confidential, Garcia actively encouraged and asked Mitchell to help him with NEXTracker work. Again, Array failed to cite authority for or argue why NEXTracker must be held accountable for Garcia's breach, as is its burden. Accordingly, the Court finds that Array has only demonstrated as a matter of law that Defendant Garcia played an active and substantial part in causing Array to lose the benefits of the non-competition clause based on the November 18, 2016 emails Mitchell sent to NEXTracker employees. *See Wolf*, 1959-NMSC-044, ¶ 21.

### 3.  Induced the breach without justification or privilege to do so

A defendant acts without justification or privilege when he acts either with an improper motive or by use of improper means. *Ettenson*, 2001-NMCA-003, ¶ 14. When the interference is with an existing contract, the improper motive or improper means need not be the sole motive. *See*

*Fikes v. Furst*, 2003-NMSC-033, ¶ 22, 134 N.M. 602. A court must determine if the defendant's primary motivation for the interference was primarily improper, in which case the defendant has no privilege, or whether the defendant's motivation for the interference was primarily proper, in which case liability should not attach. *See id.* at ¶ 23. "The desire to earn a profit is not an improper motive." *Martin v. Franklin Capital Corp.*, 2008-NMCA-152, ¶ 15, 145 N.M. 179 (citing *Williams v. Ashcraft*, 72 N.M. 120, 122, 381 P.2d 55, 56-57 (1963)). "What may qualify as 'improper means' depends to some degree on context and can include, but is not limited to predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs." *Zarr v. Washington Tru Solutions, LLC*, 2009-NMCA-050, ¶ 11, 146 N.M. 274. "[B]ehavior that is wrongful based on an established standard of a trade or profession" may also constitute improper means. *Bogle v. Summit Inv. Co., LLC*, 2005-NMCA-024, ¶ 21, 137 N.M. 80.

Array argues that Defendants had improper motives based on their statements that they wanted to "cripple" and "crush" Array, dominate the tracker market, and use Mitchell to help NEXTracker's market position. Array also asserts that Defendants' second improper motive was to gain additional sales and revenue by unfairly competing against Array. Furthermore, Array contends that Defendants engaged in improper means by using deceit and misrepresentation to hide Mitchell's association with NEXTracker and encouraging him to disclose confidential information in violation of business ethics and customs.

According to the New Mexico Court of Appeals, a desire to earn a profit is not an improper motive, so a jury must decide whether Defendants' motives stemmed from merely profit or if they had an improper motive. Moreover, Defendants presented evidence that Mitchell worked for Flex and that the information he relayed was not confidential, so a jury must decide whether Mitchell

indeed worked for Flex or if his employment with Flex was a sham to hide his work for NEXTracker and whether Defendants encouraged the disclosure of confidential information that violated business ethics and customs. Array is therefore not entitled to partial summary judgment on the element that Defendants induced the breach without justification or privilege.

**IT IS THEREFORE ORDERED** that

1. Plaintiff's Motion for Partial Summary Judgment on Breach of Contract Claim (Count III) (**ECF No. 478**) is **GRANTED IN PART AND DENIED IN PART** as follows:

   a. Plaintiff's request for partial summary judgment on the element of validity of the contract is **GRANTED**.

   b. Plaintiff's request for partial summary judgment on the element of breach of the contract is **GRANTED** as to Plaintiff's theories that Defendant Mitchell breached the non-competition provision of the contract by sending quotes to AES and Primoris and sending the November 18, 2016 emails to NEXTracker executives. Plaintiff's requests for partial summary judgment on all other breach theories are **DENIED**.

2. Plaintiff's Motion for Partial Summary Judgment on Tortious Interference with Contract Claim (Count VI) (**ECF No. 480**) is **GRANTED IN PART AND DENIED IN PART** as follows:

   a. Plaintiff's request for partial summary judgment on the element that Defendants had knowledge of the contract is **GRANTED** as to Defendants Garcia, Shugar, NEXTracker, and Flex, and is **GRANTED** as to Defendant Graybeal as to his knowledge of the non-compete provision of the contract, but is **DENIED** as to

Defendant Graybeal's knowledge of the non-disclosure and non-solicitation provisions.

b. Plaintiff's request for partial summary judgment on the element that the non-competition provision of the contract was not fulfilled is **GRANTED** based on Mitchell's actions of sending quotes to AES and Primoris and sending the November 18, 2016 emails, but in all other respects partial summary judgment on this element is **DENIED**. Plaintiff's request for partial summary judgment on the element that Defendants played an active and substantial part in causing Array to lose the benefits of the contract is **GRANTED** as to Defendant Shugar with respect to the breach based on Mitchell sending quotes to AES and as to Defendant Garcia with respect to the breach based on Mitchell sending the November 18, 2016 emails, but is otherwise **DENIED**.

c. Plaintiff's request for partial summary judgment on the element that Defendants induced the breach without justification or privilege is **DENIED**.

_____
**SENIOR UNITED STATES DISTRICT JUDGE**

46