## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ARRAY TECHNOLOGIES, INC.,**

            **Plaintiff,**

    **vs.**                                                     **Civ. No.  17-087 JCH/LF**

**COLIN MITCHELL, and individual,**
**NEXTRACKER, a Delaware corporation,**
**MARCO GARCIA, an individual,**
**DANIEL SHUGAR, an individual,**
**SCOTT GRAYBEAL, an individual,**
**FLEXTRONICS INTERNATIONAL U.S.A., INC.,**
**a California corporation,**

            **Defendants.**

## SEALED MEMORANDUM OPINION AND ORDER

On August 23, 2019, Defendants NEXTracker, Inc. ("NEXTracker" or "NX"), Marco Garcia, Daniel Shugar, Scott Graybeal, Flextronics International U.S.A., Inc., ("Flex"), and Colin Mitchell, collectively "Defendants," filed a Motion for Summary Judgment (ECF No. 475). Plaintiff Array Technologies, Inc. ("Array" or "ATI") opposes the motion. The Court, having considered the motion, briefs, evidence, applicable law, and otherwise being fully advised, concludes that the motion should be granted as to Array's fraud claim (Count Nine) and conversion claim (Count Seven). The Court will reserve ruling on the issue of damages for disgorgement of Defendant Mitchell's salary and will otherwise deny Defendants' motion for summary judgment.

## I.    FACTUAL BACKGROUND[1]

### A.  Solar Tracking Industry

---

[1] The facts set forth herein are those in favor of Array, the non-moving party.

Solar trackers are typically designed to allow solar panels to move to track the movement of the sun across the horizon and to increase the panels' direct exposure to the sun and the amount of energy the panels generate. *Compare* Am. Compl. ¶ 16, ECF No. 52, *with* Answer ¶ 16, ECF No. 96. NEXTracker supplies solar tracking equipment and is a wholly owned subsidiary of Flex. *Compare* Am. Compl. ¶ 33, ECF No. 52, *with* Answer ¶ 33, ECF No. 96. Array and NEXTracker, particularly in the United States and Australia, are primary market players in the utility-scale solar tracker market and often complete on the same projects. *See* Parkins Report 12, 50-53, ECF No. 439-3; Garcia Dep. 60:7-11, ECF No. 478-6. In the United States, most projects come down to NEXTracker and Array. Garcia Dep. 60:12-15, ECF No. 478-6. They sell single-axis tracker systems, also known as "trackers," which include solar panels and inverters. Parkins Report 12, ECF No. 439-3. Flex manufactures solar panels and inverters and has intermittently sold solar panels. *Id.*

Array manufactures centralized trackers, or "linked-row" trackers, which utilize one motor to provide power to rotate multiple rows of trackers in which each row is linked together. Parkins Report 12-13, ECF No. 439-3. In contrast, NEXTracker uses a de-centralized tracker architecture that uses a motor on each row of trackers, which are not linked together. *See id.* In a de-centralized system, there are many more electrical and electromechanical components, like motors, batteries, and controllers, than in centralized tracker systems. *Id.* at 13.

In the solar tracker industry, multiple factors can influence the customer's decision about which tracker to purchase. Defs.' Mot. for Summ. J. ("MSJ"), Undisputed Fact ("UF") ¶ 1, ECF No. 475.[2] Factors may include geographical location, site-specific considerations, capital costs ("CapEx"), operational costs, reputation of the tracker companies being considered, warranty

---

[2] "Undisputed Fact" or "UF" refers to those portions of facts set forth in the numbered statement of facts section in Defendants' Motion for Summary Judgment that Plaintiff did not dispute in its response (ECF No. 483).

coverage and terms, reliability, track record, bankability, levelized cost of electricity ("LCOE"), and power requirements (such as power generation, performance optimization, and performance guarantees). Parkins Report 13, ECF No. 439-3. For example, according to one customer, there are several key factors that it accounts for in selecting trackers: site specifics, energy production, installation efficiencies, system costs, with energy production being the most important in deciding which tracker to use on a particular product. *See* Hershman Dep. 30:11-33:19, 38:23-39:6, ECF No. 475-2. As another example, reliability for Australian utilities is a big factor. Parkins Dep. 241:20-242:17, ECF No. 475-1. The term "O&M" refers to operations and maintenance related expenses, which for trackers include replacement of inverters and other expendable parts. Parkins Report 14, ECF No. 439-3.

### B.  Array's NPV Tool

Array's Net Present Value ("NPV") tool highlighted Array's O&M and installation advantages. Parkins Report 1, ECF No. 439-3. The NPV tool was a spreadsheet that allowed customers to compare the cost over the life of the project of different tracking architectures. *Id.* at 20. It incorporated Array's actual installation costs and O&M costs based on its real-world observations and testing of its tracker architecture as well installation costs and O&M costs for other tracker architectures based on its experience and real-world observations. *Id.* at 26.

Array's practice was to have a non-disclosure agreement ("NDA") with its customers and prospective customers. Orshan Dep. 186:8-12, ECF No. 483-7. Array's NPV tool was only presented to customers that were under an NDA, and it emphasized that it was highly confidential. Hugo Dep. 59:10-15, ECF No. 483-6.

### C.  Colin Mitchell

#### 1.  Array's Hiring of Mitchell and their Non-Disclosure, Non-Solicitation and Non-Competition Agreement

In May 2013, Array hired Colin Mitchell as its Business Development Manager. *Compare* Am. Compl. ¶ 27, ECF No. 52, *with* Answer ¶ 27, ECF No. 96. On May 3, 2013, Mitchell signed a "Non-Disclosure, Non-Solicitation and Non-Competition Agreement" (hereinafter "Agreement") with Array. *Compare* Am. Compl. ¶ 28, ECF No. 52 & 52-1, *with* Answer ¶ 28, ECF No. 96. New Mexico law governs the interpretation of the Agreement. *Compare* Pl.'s Mot. for Partial Summ. J. on Breach of Contract Claim, UF ¶ 1, ECF No. 478, *with* Defs.' Resp. 2 n.2, ECF No. 486. *See also* Agreement, ECF No. 478-1 at 2 of 2.

> The Non-Disclosure portion of the agreement stated that the employee agrees to
>
> (i) protect, safeguard and keep secret any Confidential Information (as defined below); (ii) only use or disclose Confidential Information as necessary in connection with Employee's work for Employer; (iii) refrain from using Confidential Information for Employee's benefit or the benefit of any third party or in any manner adverse to Employer's interests; and (iv) upon the termination of Employee's employment with Employer … return or destroy all Confidential Information which is in Employee's possession or control, including all originals and copies thereof, whether maintained in physical or electronic format.

Agreement, ECF No. 52-1 at 1 of 2. The Agreement defined "Confidential Information" as follows:

> any and all information concerning the business and affairs of Employer, whether or not separately identified as "confidential" or "proprietary;" provided, however, that information will not be considered Confidential Information if it is or becomes generally available to the public other than through a breach of this Agreement. Without limiting the scope of the foregoing, Confidential Information includes nonpublic information about Employer's marketing, business or development plans, financial data, customer or vendor lists, tax records, and personnel files or histories.

*Id.*

> The Non-Solicitation section of the Agreement stated that during the employee's employment and for one year after the termination of employment, the employee
>
> shall not, directly or indirectly or on behalf of any other person…[s]olicit or encourage any person who is known by Employee to be an actual or prospective

customer of Employer to cease doing business, in whole or in part, with Employer, or knowingly to reduce, divert or otherwise interfere with any portion of the business between Employer and any such customer.

*Id.* at 2 of 2.

Finally, the Agreement contained a non-compete provision stating that during his employment and for one year thereafter, the employee

shall not, directly or indirectly engage in the ownership or operation of a business which designs and/or manufactures solar tracking equipment or systems, whether as an officer, director, partner, proprietor, investor, associate, employee, consultant, independent contractor or in any other capacity relating to such a business.

*Id.*

Mitchell described himself as "the lead and sole business development resource and sales person for Array Technologies 'utility scale' tracker sales efforts," June 19, 2017 letter, ECF No. 478-3, and indicated he was responsible for approximately 97% of Array's 2015 sales, accounting for nearly $400 Million in sales, *see* Mitchell Resume, ECF No. 478-2.

### 2. Mitchell's Termination

In May 2016, Mitchell approached Marco Garcia, NEXTracker's Chief Commercial Officer, and they began talking about Mitchell working for NEXTracker. *See* Garcia Dep. 26:5-9, ECF No. 478-6, and 53:25-54:17, ECF No. 486-1. Garcia described Mitchell as "the top salesperson at ATI ... that I am recruiting." June 10, 2016 email, ECF No. 478-7. In an email describing the salary they should offer Mitchell, Garcia stated, "We will cripple our top USA competitor" and "dominate the USA tracker market." June 1, 2016 email, ECF No. 478-8. Defendant Daniel Shugar, NEXTracker's Chief Executive Officer, told Garcia, "US market is expected to be way down next year so Colin [Mitchell] will help us get [a] bigger piece of smaller pie, crushing ATI, and fending off new competitors." June 11, 2016 email, ECF No. 478-9; Shugar Dep. 15:17-21, ECF No. 478-4.

While NEXTracker was communicating with Mitchell, his attorney evaluated the Agreement and advised Mitchell that "a non-compete of this kind is enforceable," which Mitchell told Garcia. *See* June 10, 2016 email, ECF No. 478-11 at 2 of 2. Mitchell attached to his email to Garcia a copy of the Non-Disclosure, Non-Solicitation and Non-Competition Agreement. *See* Pl.'s Ex. 21, ECF No. 505-1; Garcia Dep. 86:21-87:20, ECF No. 505-2. Garcia informed Shugar, who in turn informed Flex's Deputy General Counsel Susan Marsch, of what Mitchell told Garcia about his lawyer saying that the non-compete was enforceable in New Mexico. *See* Pl.'s Ex. 8, ECF No. 478-8; Graybeal Dep. 34:19-22, ECF No. 478-15.

In a June 11, 2016 email, Garcia attached the non-compete document and notified Shugar that he would offer Mitchell attorney's fees support up to 80% or $20,000 per Shugar's email. June 11, 2016 email, ECF No. 480-7. He discussed the timing of Mitchell joining NEXTracker after an industry conference and explained that when Mitchell "resurfaces at NX 1 month after leaving, that is when the legal issues will begin." *Id.* Garcia also informed Shugar that Mitchell was not in a hurry and he was ok with Mitchell not giving his notice immediately, noting the "important thing is that we get him on our team and cripple ATI." June 11, 2016 email, ECF No. 480-7. Shugar responded: "We can wait to onboard him to appropriate time. However I disagree regarding urgency of his resignation. There are several large 2017 deals like Tranquility being negotiated and the sooner he is out of ATI the better for us." *Id.* Defendant Shugar had no other reason for his opinion on the urgency of Mitchell's resignation. *See* Shugar Dep. 79:1-6, ECF No. 483-4. Mitchell "was in direct competition with Nextracker on a number of large utility scale projects slated for 2017 NTP and it was communicated to [him] that Nextracker was keen on having [him] leave Array Technologies in order to remove [him]self as a factor in the decision making process for those opportunities." June 19, 2017 letter, ECF No. 478-3. Buckthorn, Upton, Southampton,

and Mount Signal 3 were large utility-scale solar project over which NEXTracker and Array were directly competing. *See* Nelson Report 55-56 & Schedule 3, ECF No. 439-2; Parkins Report 60 n. 191 (citing Shugar Dep. 84:16-88:2 in which Shugar admitted that Upton projects were likely some of projects to which he was referring); *id.* at 62-63 & n.209.

Shugar asked Garcia to "develop [his] best estimate of the anticipated benefits to sales and GM$ from the engagement of Colin Mitchell over next 18 months." Pl.'s UF ¶ o, ECF No. 483. Shugar provided his own "educated" guess for an "[e]conomic analysis for Colin Mitchell" and "'anticipate[d] [Mitchell] would help [NEXTracker] win new business, predicting six new deals worth $60 million and five deals with better margins at $12 million increased gross margin with NEXTracker's hire of Mitchell." *Id.*

Garcia subsequently asked Mitchell to confirm his last day at Array would be July 8 and his "Start date with NX will be Sep 1." June 15, 2016 email, ECF No. 478-12. Mitchell terminated his employment with Array on July 8, 2016. Pl.'s UF ¶ c, ECF No. 483.

### 3.  Mitchell's Post-Termination Work

On September 8, 2016, Mitchell sent an email, from a Flex email address, to Garcia and Ryan Booth, NEXTracker's Vice President of Utility Sales, and noted, "Excited to be on board[,] gentlemen." Sept. 8, 2016 email, ECF No. 478-34; Stern Report ¶ 295, ECF No. 439-5.

Robert Koch, then a Vice President of NEXTracker, *see* Shugar Dep. 40:8-18, ECF No. 478-14, emailed Mitchell in September "RE: Targets List – DRAFT" and said that there "are at least two reasons for us to undertake the task to talk to any/all of these players," including to "influence the sales of trackers that are likely procured by the EPC," Sept. 22, 2016 email, ECF No. 478-35. Koch explained: "Influence can be obtained by our relationships, by providing specs

that they can incorporate into the bid process that will uniquely favor NX, and getting insight into the decision making process that we can pass on to Marco and team." *Id.*

Mitchell attended a solar conference with NEXTracker executives. *See* Nov. 2, 2016 email, ECF No. 478-24. Kristin Kirsch from NEXTracker noted in an email to a NEXTracker "Sales and Marketing" group, "Overall it was a successful branding opportunity… and Colin Mitchell joined us (in stealth) for this US focused solar market event." *Id.*[3] Participating in trade shows is a way to generate sales leads. *See* Shugar Dep. 39:24-40:7, ECF No. 478-14.

Koch, who was in charge of NEXTracker sales and NEXTracker-related digital O&M efforts, *see* Mitchell Dep. 187:8-10, ECF No. 486-2, emailed Mitchell on November 15, 2016, stating that after reviewing "our account list with Dan," Shugar "prefers that we spend time and focus more on new accounts where we don't have current deep relationships," Nov. 15, 2016 email, ECF No. 478-40. Mitchell responded, "That makes our job easier and that is the filter we needed." *Id.* The next day, Mitchell emailed Koch "Re: Shugar's Priority Sales List," with an attachment entitled "Non-EPC target customer list 11.16.16 for NEXTracker.xlsx," and noted, "I added a 'Shugar' Page to this Excel and I contacted everyone on my list to see about a possible meeting." Nov. 16, 2016 email, ECF No. 478-39. The target list identified several projects. *See* Table, ECF No. 478-39 at 2 of 5. Two entries on the list regarding Southampton noted: "close relationship with Dominion" and "award made to Signal (Close relationship w/ ATI and Colin …)." *Id.* Koch and Mitchell attended meetings together with some customers. *See* Koch Dep. 73:9-74:17, ECF No. 493-1.

---

[3] Defendants cite deposition testimony in which Mitchell stated he was at the show as a representative of Flex. *See* Mitchell Dep. 164:10-17, ECF No. 486-2. The Court, however, must construe all reasonable inferences and evidence in the light most favorable to the non-moving party. It is reasonable to infer from the evidence presented that Mitchell attended the conference with NEXTracker executives to support NEXTracker, not only Flex.

On October 7, 2016, Garcia emailed Peter Wheale, NEXTracker's vice president of sales in the Australia Pacific region, and he opined that "we should bid aggressively to secure the business and keep ATI out of AU [Australia]." Oct. 7 and 9, 2016 emails, ECF No. 478-41 at 2-3 of 3. Garcia noted that he had been told that the tracker selection "will be based on price." *Id.* In response, Wheale told Garcia he "had a great conversation with Collin [sic], so I feel very confident with our pricing." Oct. 9, 2016 email, ECF No. 478-41 at 2 of 3. After Garcia asked who "Collin" is, Wheale replied, "Our Collin Mitchell. ATI. They are the only competition on this portfolio. He gave me their benchmark pricing. I heard the same thing from Edify." Oct. 9, 2016 email, ECF No. 478-41 at 1 of 3.[4] Wheale called Mitchell because he had worked for ATI. Wheale Dep. 220:7-9, ECF No. 478-42.

Douglas Britt, Flex's president of integrated solutions business, acknowledged he would not be ok knowing that Mitchell had an enforceable non-disclosure agreement with ATI if he were disclosing ATI's pricing to NEXTracker employees because "it's competitive information." Britt Dep. 9:24-10:1, 129:13-18, ECF No. 478-5. According to Shugar, the calculus at the "deal desk" to determine whether NEXTracker can price a project at a requested margin is confidential and he would not want a competitor to work on the deal desk with him. Shugar Dep. 129:18-24, ECF No. 478-4. Nor would he want the confidential details about relationships between NEXTracker and its customers to fall into the hands of one of its competitors. *See id.* at 131:1-11. Shugar acknowledged that if an employee discloses NEXTracker information that is confidential from a competitive nature, it could cause harm to NEXTracker. *See id.* at 116:4-12.

---

[4] Although Defendants cite testimony in which Wheale explained that the benchmark pricing from Mitchell "was just an estimate," and he received the same information from the developer, Wheale Dep. 217:25-218:2, ECF No. 486-11, the inferences to be drawn from the text of the email and construed in Plaintiff's favor are that Mitchell gave him "benchmark pricing."

In November 2016, NEXTracker lost a 180 MW project in Australia to Array, after which the client told NEXTracker it lost the deal on O&M. *See* Nov. 18, 2016 email, ECF No. 481-2. On November 9, 2016, Peter Wheale sent an email to Greg Beardsworth, cc'ing Mitchell among others, asking if his team could put together "an Apples to Apples datasheet on O&M costs between us and ATI" because "[w]e are getting hammered over here on this one issue." Nov. 9, 2016 email, ECF No. 478-43 at 1-2. He further explained: "The developers are using this against us with AU EPCs. I'm sure Colin can help shed the light on the ATI competitive analysis." *Id.* Mitchell responded, "I would be happy to help with that." *Id.*

On November 17, 2016, Wheale sent an email to Mitchell, Booth, and Garcia beginning, "Great talking yesterday! As discussed, want to get our messaging around the ATI pitch solidified asap." Nov. 17, 2016 email, ECF No. 481-12 at 3 of 3. Wheale opined that NEXTracker's relationship with the developer, Edify, was the only reason NEXTracker was still in the game for the remaining projects in the portfolio. *See id.* Wheale then repeated the EPC's explanation for why the portfolio went to Array, explaining that their analysis was based on factors including Capex and Opex. *See id.* The EPC had informed Array that one factor was pricing under $.10. *See* Oct. 26, 2016 email, ECF No. 493-2.

Garcia responded to Wheale by email, including Booth, Mitchell, Rogers, Koch, among others, noting that the issue "was discussed at length at the Exec Offsite today" and that "Marty Rogers and Rob Koch took an action item to prepare an O&M pitch to counter ATI." Nov. 17, 2016 email, ECF No. 439-1 at 5 of 9. Garcia also stated that it sounds like Wheale needed something sooner "to save the Edify 130 MW projects," so within the same email he stated:

> Colin – Really need your help here. ATI is kicking our ass with the O&M pitch that you helped create. What are the real O&M weaknesses of ATI? Please reply all.

> This is unacceptable to lose business to ATI when we have lower Capex and they
> win on lower O&M and lower LCOE.

> We are being out-sold and out-maneuvered.

*Id.* at 6 of 9.

On November 18, 2016 at 12:44 p.m., Mitchell sent an email with the subject line

"RE:ATI-Need to tighten up our pitch" to NEXTracker employees Garcia, Wheale, Booth, Rogers,

Koch, Mike Mehawich, Greg Beardsworth, and Shugar. Nov. 18, 2016 12:44 p.m. email, ECF No.

478-44. Mitchell stated in this email that the "long term O&M issues for ATI are essentially, added

time and effort to wash and clean modules for a linked tracker row" and that the "vulnerabilities

in my mind are the 'torque limiting' gear box." *Id.* Mitchell said he "would concentrate on poking

at the torque limiting gearbox and the lack of any kind of monitoring on a per row level for ATI,"

and he opined that "their control system is pretty basic." *Id.* He noted that ATI did "a whole fleet

wide replacement … with the shock absorbers and mounting systems." *Id.* Finally, he ended with,

"Hope this helps and I'm willing to dive into any of this in more detail if anyone wants." *Id.*

The same day at 1:10 p.m., Mitchell sent another email to Garcia, Wheale, Booth, Rogers,

Koch, Mehawich, Beardsworth, and Shugar that said as follows:

> The ATI sales presentation these days basically consists of an excel spreadsheet
> that calculates component costs for Nextracker batteries, controllers, zigbee,
> motors, etc. and tries to make a comparison between the ATI electronics and the
> Nextracker electronics.

> This summary estimates a Net Present Value of a 30 year O&M for the Nextracker
> system as coming to somewhere close to $.01-.015/watt dc.

> I have a colleague at AES Solar who recently confirmed that they internally have
> estimated a $.01/watt dc NPV for Nextracker long term O&M.

> We will obviously be diving into this with this guy at AES and I have actually
> reached out to invite him to come to Nextracker so we can take a look at his
> numbers and understand where they are coming from.

A lot of the focus is on batteries and distributed tracker controllers.

As I understand this, AES has a funding scheme that sets aside slightly more money for Nextracker long term O&M than for an ATI system anticipating that at years 10 or 20 for example they would have needed to set aside sufficient money to replace motors, controllers, etc. Similarly, every 5 years they have a target total value of accrued long term O&M money to pay for battery replacements.

*I think if we can attack this aspect with data and reasonable figures for labor time to replace, etc, then we can really dismantle the basis for the ATI long term O&M argument*.

Nov. 18, 2016 email, ECF No. 439-1 at 5 of 9 (emphasis added) (hereinafter "RE:ATI-Need to tighten up our pitch" email). Shugar also noted regarding this loss that the client "swallowed the ATI crap and told us we lost the deal on this O&M." Nov. 18, 2016 email, ECF No. 481-2.

The next day, Mitchell emailed Wheale saying, "How can I help buddy? Let me know what I can do. I know that Rob Koch and I and Greg Beardsworth are going to work up a Long Term O&M analysis but I fear that may [be] too late for you." Nov. 19, 2016 email, ECF No. 481-12 at 2 of 3. Wheale responded by informing Mitchell that "We" lost a portfolio to Array and explaining that they had already "sold the LCOE to the client." Nov. 20, 2016 email, ECF No. 481-12 at 2 of 3. "LCOE" stands for "Levelized Cost of Electricity." *See* Slide, ECF No. 439-6 at 14 of 15.[5] Wheale later emailed Mitchell on November 21, 2016, thanking him for the time on the call and stating that it would make sense to speak directly with the developer (Edify) because they have "major O&M concerns and questions on our lifetime costs for trackers." Nov. 21, 2016 email, ECF No. 481-12 at 1 of 3.[6]

---

[5] The parties dispute whether it is also reasonable to infer from this cited slide that NEXTracker considers LCOE to include O&M. *Compare* Pl.'s Resp. ¶ aa, ECF No. 483, *with* Defs.' Reply ¶ aa, ECF No. 493. NEXTracker's slide states: "How did we win? Lowest LCOE" and then lists four items: "1. Bankability 2. Production 3. Operations & Maintenance 4. Installation." Slide, ECF No. 439-6 at 14 of 15. Although this Court must construe all reasonable inferences in Plaintiff's favor, this slide is so lacking in detail that it is unclear what the enumerated list means. Plaintiff did not cite other evidence in support of whether LCOE includes O&M. The Court thus finds it is not reasonable to infer from this slide that "NEXTracker includes O&M in LCOE."

[6] Defendants object that Wheale's statement that the developer had major O&M concerns constitutes impermissible hearsay and that this document does not relate to any project in dispute. *See* Defs.' Reply ¶¶ pp, ECF

### D. NEXTracker's use of Mitchell's "RE:ATI-Need to tighten up our pitch" email and the O&M campaign

#### 1. NEXTracker's O&M efforts

NEXTracker executives scheduled a meeting on November 21, 2016 regarding "O&M cost advantage arsenal" with the purpose to "develop enhanced materials to reinforce our O&M story, enable sales to push back on ATI." *See* ECF No. 483-8. Mitchell responded by email to Wheale, saying that we "have got to get a better handle on this O&M thing." Nov. 22, 2016 email, ECF No. 481-12 at 1 of 3.

On November 22, 2016, Koch emailed Mitchell with a pdf version of a power point attached that "is appropriate for Sempra" and welcoming his comments. Nov. 22, 2016 email, ECF No. 481-14. Koch noted that it is a "smaller file than the PPT but the downside is that you won't be able to edit it." *Id.*

Garcia notified NEXTracker executives that there was a November 28 meeting "to circle up and finalize the O&M analysis vs ATI." Nov. 22, 2016 email, ECF No. 483-9 at 1 of 8. Mehawich sent an email on November 28, 2016 to Garcia, Rogers, Koch, Beardsworth, Wheale, and Mitchell, among others, regarding "Finaliz[ing] O&M cost competitive analysis NX vs ATI" and attaching powerpoint slides for "NX Horizon OM." Nov. 28, 2016 email, ECF No. 483-9 at 1 of 8. One of the slides entitled "Key Points" listed items such as:

> NX Horizon's independent row architecture confers significant benefits for the biggest dollar items of an O&M budget – panel washing and vegetation management…
>
> NX has far fewer torqued connections than other trackers, significantly reducing inspection costs…

---

No. 493. The Court agrees that the statement constitutes hearsay but has included it not for the truth of the matter asserted but for context and its effect on NEXTracker in responding to the information from Wheale.

*Id.* at 3 of 8. Other slides focused on NEXTracker's lower O&M expenses, "Scheduled O&M Cost Comparison – 25 year NPV," and a scheduled maintenance comparison between NX Horizon and its competitor. *See id.* at 4-6 of 8.

In a November 30, 2016 email, Mitchell asked two Flex employees if they would like to participate in a January meeting with Sempra. *See* Nov. 30, 2016 email, ECF No. 483-12. Mitchell explained: "Really our intention is simply to talk about Nextracker future product and O&M monitoring and maintenance topics. We know nothing about energy storage and certainly don't want to step on your toes." *Id.*

### 2.  O&M information sent to RCR

On December 6, 2016, Wheale sent an email to Nick Farrington of RCR, a customer, entitled "ATI Information that we have been driving for Edify – Important" and he attached a PowerPoint to use as a reference to question Array concerning its technology. *See* Dec. 6, 2016 email, ECF No. 483-10; Parkins Report 79, ECF No. 439-3. After explaining aspects of Array's sales presentation, Wheale stated:

> I think if we can attack this aspect with data and reasonable figures for labor time to replace, etc, then we can really dismantle the basis for the ATI long term O&M argument.
>
> Here are some of the points I would push and that we will formalize for the future:
>
> 1. NX systems manages about 25kW while theirs is 800kW per motor drive systems. The down time of their system will disrupt a lot of production even if it is only for a day at a time. Assume a communication issue, a motor issue, or a gear binding issue[], all can and will happen on either system but in our case we reduce production on only a small part of the field. 800/25 = 3% of the production is lost for us, while 100% is lost for them. How men [sic] does it take to replace the ATI motor? NX systems have remote failure and remote capability. Meaning, NX can monitor and remediate problems remotely. Can ATI correct issues remotely or do they need to roll trucks to the site?
> ….

6. It is key to make them understand that in our system a minor issue on one array does not affect overall production, for ATI, the same issue would mean that the connected central inverter would not produce, or would be greatly curtailed during the outage….

Summary—the cost of maintenance is not driven by the part count, but by the scheduled and unscheduled maintenance. Lost production is most likely the higher value here and they need to understand this first. Again a system that is centralized in its control and command, will be much more likely to bring production down on a greater scale. If they are on site all the time this may be reduced but if they are remote – this will be very expensive over time….

Dec. 6, 2016 email, ECF No. 483-10. This email included verbatim copies of information from Mitchell's "RE:ATI-Need to tighten up our pitch" email. *See* Parkins Report 79, ECF No. 439-3; Nov. 18, 2016 email, ECF No. 439-1 at 5 of 9. RCR was an EPC in Australia involved in eight solar projects in 2016-2017: Clermont, Emerald, Greenough II, Longreach, Manildra, Oakey, Swan Hill, and Wemen, all of which NEXTracker won after Mitchell sent the aforementioned emails. *See* Parkins Report 77, ECF No. 439-3.

### 3.  O&M campaign and white paper

NEXTracker began an ad campaign whose key message was "Digital O&M and O&M cost benefit" and would include a GTM O&M webinar panel in March 2017. *See* ECF No. 483-11. Digital O&M was initially focused on NEXTracker trackers. Koch Dep. 60:5-8, ECF No. 483-13. NEXTracker's lower O&M cost analysis was focused only on Array. *See* Mar. 12, 2017 email, ECF No. 483-14. NEXTracker developed an O&M white paper it considered "high priority" as "sales is needing it worldwide." *See* Jan. 25, 2017 emails, ECF No. 439-9 at 2 of 6; Pl.'s Ex. 16, ECF No. 483-16. NEXTracker planned to send its O&M white paper campaign to a global audience in March 2017 and was to include GTM sponsorship to host and promote the white paper for three months on its homepage.  *See* Jan. 25, 2017 emails, ECF No. 439-9 at 2 of 6. NEXTracker's timeline for the white paper also included a March 21st strategic GTM webinar;

blog entries, contributed articles, and an email blitz leading up to the GTM webinar and O&M white paper in February and early March; and a Q&A e-campaign to the entire list of registrants. *See id.*; Pl.'s Ex. 17, ECF No. 483-17 at 3-4 of 4. NEXTracker also planned the NX Solar Forum in late March 2017 meant for customers and prospective customers to discuss the company's products and "ability to deliver on our customer service promise through superior O&M, design engineering, software and support services." Pl.'s Ex. 18, ECF No. 483-18; Jan. 25, 2017 email, ECF No. 439-9 at 2 of 6. By April 4, 2017, NEXTracker's O&M campaign with GTM "had excellent success" and resulted in 385 downloads for its O&M white paper, and 892 leads from the webinar. Pl.'s Ex. 21, ECF No. 483-21.

### 4. Buckthorn project

The Buckthorn project was an approximately 200 MW system in Texas, the developer of which was NRG and the ultimate EPC was Swinerton. Parkins Report 54, ECF No. 439-3. NRG had a major role in selecting the tracker they were going to own for the Buckthorn project and NRG ultimately had the say on what tracker was selected. *See* Stern Dep. 204:23-205:16, ECF No. 483-3.[7]

For Buckthorn, Array's bid for upfront cost, or capex, was less than NEXTracker's bid as of December 20, 2016. *See* Pl.'s Ex. 23, ECF No. 483-23. Array's tracker "would work well with

---

[7] Defendants assert that Swinerton did not rely on the O&M pitch or Mitchell when choosing which tracker to use for the Buckthorn project. *See* Defs.' Mot. 7, 18, ECF No. 475. Defendants rely on the testimony of George William Hershman, who worked for Swinerton and was involved in the Buckthorn project. *See* Hershman Dep. 30:11-21, 52:12-53:3, ECF No. 475-2. He testified he believed Swinerton selected NEXTracker for the trackers because Swinerton had previous success installing NEXTracker with the specific solar modules it was using for the project and its analysis showed it had better installation, performance, and lower overall costs. *Id.* at 53:13-22. He further stated that Mitchell's joining NEXTracker had no impact on Swinerton's selection of solar trackers for any solar project. *Id.* at 60:6-9. He additionally opined that Array's O&M presentation also had no effect on the selection. *See id.* at 36:11-37:9. This Court must construe facts and inferences in Array's favor, as the party opposing summary judgment. The Court finds that Array has presented evidence and reasonable inferences to be drawn therefrom that NRG made the decision for the tracker for Buckthorn, and therefore, will not rely on Defendants' cited evidence as to Swinerton's failure to rely on NEXTracker's O&M pitch when resolving the instant motion.

the existing 11,000 piles already installed." Oct. 3, 2016 email, ECF No. 483-24. Swinerton

informed NEXTracker it believed that ATI had a solid project and would work for 25 years. *See*

Nov. 16, 2016 email, ECF No. 483-25.

Approximately two months after Mitchell sent his "RE:ATI-Need to tighten up our pitch"

email, on January 19, 2017, Greg Beardsworth sent an email regarding "NRG O&M group call"

in which he stated he had a follow-up call "regarding O&M assumptions for NEXTracker," there

was no final decision yet on Buckthorn, and the "information we shared – NRG development team

is trusting it." Jan. 19, 2017 email, ECF No. 483-19. Beardsworth listed as an action item to send

them an updated O&M deck, highlighting the "capex vs. opex of unlinked rows." *Id.* NRG

informed Array that "NRG specified Nextracker as the Tracker" for Buckthorn. Pl.'s UF ¶ zz, ECF

No. 483.[8]

---

[8] As additional support that NRG ignored Array's arguments differentiating O&M costs, Array cited an email from George Gisel at Array who opined in an email that he could only conclude from his discussions with NRG that they were ignoring Array's arguments regarding the differences in O&M costs between NEXTracker and Array regarding the Buckthorn project. *See* Pl.'s Ex. 22, ECF No. 483-22. To further support that they lost the Buckthorn project because of O&M concerns, Array relies on an email dated November 4, 2016, in which Booth stated that NEXTracker was going "head-to-head against ATI for Buckthorn." Pl.'s Ex. 22, ECF No. 483-22. Booth stated in his email: "It's all even between us (pricing/technology). Final decision comes down to O&M." *Id.* Defendants object that these emails constitute inadmissible hearsay to the extent the first email is used to establish NRG's actual thinking and the second email is used to show Booth's understanding of one customer's concern. The Court agrees that it may not consider the hearsay contained in these emails to which Defendants objected. *See Treff v. Galetka*, 74 F.3d 191, 195 (10th Cir. 1996) (explaining that, while the form of evidence need not be admissible at trial, the content or substance of evidence opposing summary judgment must be admissible, and "[i]nadmissible hearsay evidence in an affidavit will not defeat summary judgment"); *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995) ("Today, we align ourselves with this line of authority and hold that Rule 56 precludes the use of inadmissible hearsay testimony in depositions submitted in support of, or in opposition to, summary judgment.").

Relatedly, Plaintiff asserts generally that O&M was a major concern for customers and that they relied on NEXTracker's O&M materials as part of their consideration in assessing O&M costs, allowing NEXTracker to salvage its position on projects. *See* Pl.'s Resp. ¶¶ pp, qq, ss, ECF No. 483. Defendants object that Plaintiff's evidentiary support for the generalized fact contained in the ¶¶ pp is hearsay and that the evidence cited for ¶¶ qq and ss does not establish who the recipient was or to what projects the emails related. For example, on March 29, 2017, Wheale shared NEXTracker's PowerPoint presentation and O&M white paper with Gustaf Schuler (with an @ostenergy.com email) who had requested the presentation Garcia and Wheale gave in person. *See* Pl.'s ¶ qq, ECF No. 483 (citing Pl.'s Ex. 20, ECF No. 483-20). Plaintiff does not establish who Schuler is or his connection to any project that Array asserts it lost. Accordingly, the Court finds Defendants' objections to ¶¶ pp, qq, and ss to have merit and the Court will not consider the hearsay or information contained therein the relevance of which has not been established by the record.

O&M was a "key factor" in NRG's decision in tracker selection for Buckthorn. *See* Stern Dep. 206:5-207:24, ECF No. 483-3. In his expert report, Parkins explained that NEXTracker's use of Array's trade secrets to adjust their sales pitch, particularly regarding O&M, effectively neutralized Array's O&M arguments, contributing to NEXTracker winning the Buckthorn project against Array. *See* Parkins Report 54-60, ECF No. 439-3.

### E.  Expert Report of Robert E. Parkins[9]

Robert E. Parkins has extensive experience in the solar industry field and is generally qualified to opine on issues relating to the selection of solar trackers. Mem. Op. and Order 21-23, ECF No. 536. Array hired Parkins to provide an opinion on whether Defendants' alleged misconduct was a contributing factor to Array's project losses and NEXTracker's project wins. Parkins Report 1, ECF No. 439-3. He focused on three categories of information Array contends are trade secrets: (1) Array sales strategy, pitch, and its NPV tool; (2) Array's benchmark pricing, costs, and margins; and (3) Array's customer and project pipeline information. *Id.* Any one of these three categories "would contribute to a tracker company winning a project from" Array, because it would be like handing a competitor Array's playbook during the bidding process. *Id.* at 18-19. NEXTracker's access to information that Array had gathered, developed, and analyzed over decades in the industry, jumpstarted its competitiveness in the tracker market, after having only joined the tracker market in late 2013. *Id.* at 48. NEXTracker used the information to restructure its own playbook and custom tailor its sales approach to unfairly compete with Array. *See id.* at 49.

---

[9] The testimony of Parkins was the subject of a motion to exclude (ECF No. 471), which this Court granted in part and denied in part in a Memorandum Opinion and Order (ECF No. 536) filed on September 14, 2020. The Court will not rely on Parkins' opinions that it excluded.

O&M is an important factor in OpEx, the cost to operate and maintain the project or product, as dependability is crucial. *See id*. at 14-15. O&M reliability is especially critical for utilities, because to prepare for brown or black outs, utilities operate reserve or stand-by generation plants at considerable expense. *Id*. at 15. Array developed its sales presentation, using the NPV tool with a PowerPoint presentation, to highlight its O&M advantages. *See id*. at 24. Array's NPV tool, sales pitch, and other related O&M information were valuable, and Mitchell's disclosures of information led to Defendants' use of that information to create a rebuttal pitch that would contribute to NEXTracker winning projects against Array. *Id.* at 45. After NEXTracker adjusted its sales pitch by attacking the specifics of Array's O&M pitch, it began to stop its losses in Australia. *Id.*

Mitchell's disclosure of Array's benchmark pricing to NEXTracker would contribute to NEXTracker winning projects against Array because it gave credible insight on what Array would likely bid and allowed NEXTracker to undercut the price with precision. *Id.* at 41, 49. Mitchell disclosed benchmark pricing and Defendants used Array's benchmark pricing to win projects. *Id.* at 41. In addition, detailed performance history information is valuable and would be damaging in the hands of a competitor. *Id.* at 48.

Customers choosing a tracker system rely on 11 or so interrelated factors, but the most important factor depends upon the customer, its needs, and the project's scope and situation. *See* Parkins Dep. 50:19-53:16, ECF No. 475-1. O&M is one of several factors that owners will want to consider, but it may be an important consideration for some owners. *See id.* at 188:8-25. As for specific projects, based on his industry experience and review of the evidence, Parkins concluded that Defendants' conduct contributed to NEXTracker winning projects against Array, including Buckthorn, Mount Signal 3, Southampton, the RCR projects, Susan River and Childers,

Hughenden and Karadoc, Rugby Run, and Bungala 1 & 2. *Compare* Parkins Report 54-94, ECF No. 439-3, *with* Mem. Op. and Order 30-40, ECF No. 536. Parkins acknowledged, however, that he did not ask any of the tracker customers why they made their decisions. *See* Parkins Dep. 234:20-235:5, ECF No. 475-1.

### F.  Claims

Array asserts the following claims against all Defendants: misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.* (Count One); misappropriation under the New Mexico Uniform Trade Secrets Act ("NMUTSA"), N.M. Stat. Ann. § 57-3A-1, et seq. (Count Two); breach of fiduciary duty (Count Five); conversion (Count Seven); and fraud and constructive fraud (Count Nine). Array also asserts breach of contract (Count Three) and breach of the covenant of good faith and fair dealing (Count Four) against Defendant Mitchell. Array additionally alleges that Defendants NEXTracker, Garcia, Shugar, and Flex committed tortious interference with contract (Count Six). Following this Court's entry of a Memorandum Opinion and Order dismissing certain claims, Array has claims against Defendants NEXTracker, Garcia, Shugar, Graybeal, and Flex for unjust enrichment/restitution (Count Eight).

## II.    STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought." Fed. R. Civ. P. 56(a) (italics added). On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

designate specific facts showing there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). Only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## III.     ANALYSIS

According to Defendants, they are entitled to judgment as a matter of law because Array cannot prove the causation element required to prevail on each of its claims. Additionally, Defendants argue that judgment should be entered in their favor on Array's fraud claim because Array has no evidence to establish detrimental reliance on the alleged misrepresentation. Finally, Defendants urge the Court to grant them summary judgment on Array's conversion claim because, as a matter of law, the tort of conversion in New Mexico does not apply to intangible property of the type allegedly misappropriated here.

### A.  Causation for Tort Claims

Turning first to the issue of causation, the plaintiff has the burden of proving that the tortious act or breach of contract was a cause of its injuries and damages. *See Wilcox v. Homestake Mining Co.*, 619 F.3d 1165, 1166 (10th Cir. 2010); N.M. U.J.I. 13-302B. Generally, the jury determines the issue of causation, but the issue becomes one of law if the facts are not in dispute and the reasonable inferences to be drawn therefrom are plain and consistent. *Adamson v. Highland Corp.*, 1969-NMCA-007, ¶¶ 10-11, 450 P.2d 442. *See also Galvan v. City of Albuquerque*, 1973-NMCA-049 ¶ 12, 508 P.2d 1339 ("Where reasonable minds may differ on the question of proximate cause, the matter is to be determined by the fact finder. Where the facts are not in dispute

and the reasonable inferences from those facts are plain and consistent, proximate cause becomes an issue of law.") (internal citation omitted).

In New Mexico, to establish liability, there must be a chain of causation initiated by a defendant's act or omission, "which in legal terms is the cause in fact or the 'but for' cause of plaintiff's injury." *Chamberland v. Roswell Osteopathic Clinic, Inc.*, 2001–NMCA–045, ¶ 18, 27 P.3d 1019. An act or omission is a "cause" of harm if "it contributes to bringing about the [injury] [harm] … [, and if injury would not have occurred without it]." N.M. U.J.I. 13-1305. *See also Chamberland*, 2001-NMCA-045, ¶ 18 (explaining that UJI 13-305 defines cause in fact as "that … without which the injury would not have occurred"). The tortious act or breach, however, "need not be the only explanation for" the injury or harm. N.M. U.J.I. 13-1305. "It is sufficient if it occurs in combination with some other cause to produce the result." *Id.* To be a "cause," the act "must be reasonably connected as a significant link" to the harm. *Id.* This latter sentence expresses the proximate cause element of causation. N.M. U.J.I. § 13-305, Committee commentary.

Under the Restatement (Second) of Torts, an act "is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent." Rest. 2d Torts § 432(1). Under this Restatement, a plaintiff can recover from a defendant only if the defendant's conduct was "either (a) a but-for cause of the plaintiff's injury or (b) a necessary component of a causal set that (probably) would have caused the injury in the absence of other causes." *June v. Union Carbide Corp.*, 577 F.3d 1234, 1244 (10th Cir. 2009).

*Wilcox v. Homestake Mining Co.*, 619 F.3d 1165 (10th Cir. 2010), is instructive on causation. *Wilcox* was a toxic tort case in which the plaintiffs' experts opined that the plaintiffs' radiation exposure from the defendants' uranium mill operations was a substantial factor contributing to them developing cancer. *Id.* at 1166. The plaintiffs argued that but-for causation is

not required in every case, relying in part on the placement of brackets around the phrase "and if injury would not have occurred without it" in New Mexico Uniform Jury Instruction 13-305. *Id.* at 1167. The Tenth Circuit, however, explained that the commentary to the instruction listed only two situations in which but-for causation may be inappropriate: cases involving alternative liability and cases in which multiple acts each may be a cause of indivisible injury regardless of the others. *Id.* The *Wilcox* court described the alternative liability situation as the unusual circumstance of when more than one defendant engages in simultaneous or nearly identical negligent acts but only one of the acts causes the injury, making it difficult to prove which defendant caused the harm. *Id.* For example, two defendants each shot in the plaintiff's direction at the same time while hunting, and the plaintiff was struck by birdshot. *Id.* at n.1. In such situations, the burden shifts to the defendants to prove who was responsible. *Id.*

The second but-for exception invokes Section 432(2) of the Restatement (Second) of Torts and involves a situation like when independently set forest fires converge to burn a building, either one of which alone would have caused the same harm. *Id.* at 1167-68 (citing Restatement (Second) of Torts § 432 cmt. D, illus. 3 (1965)). The Tenth Circuit noted that it had considered this exception in the *June v. Union Carbide* case and interpreted Section 432(2) to require the plaintiff to show that the conduct would in fact have caused the injury if the competing cause or causes had not been present. *Id.* at 1168. The Tenth Circuit saw no reason to conclude that New Mexico courts would interpret the exception differently. *Id.* In the Tenth Circuit's view, "New Mexico cases using the phrase 'substantial factor' … do not create an alternative ground to but-for causation." *Id.* In other words, to prevail, a plaintiff must meet its burden to show that the conduct "was a but-for cause of the injury or would have been a but-for cause in the absence of another sufficient cause." *Id.* at 1169.

Defendants assert that it is undisputed that many factors affect why a tracker supplier may win or lose a project, only one of which is O&M costs. According to Defendants, Array does not have evidence that, absent Defendants' alleged misconduct, NEXTracker would have lost the projects and Array won them, and thus, Array cannot establish causation. Defendants also rely greatly on one admission in Parkins' deposition. At one point, counsel asked: "So no rational customer would have chosen the NEXTracker system in the absence of the alleged misconduct by the defendants?" Parkins Dep. 241:6-8, ECF No. 475-1. Parkins responded, "No. Please don't put words in my mouth. I'm not saying that at all." *Id.* at 241:12-13. Defendants assert that this admission by Parkins means that NEXTracker could have won the projects at issue in the absence of the alleged misconduct.

Turning first to the admission by Parkins, the Court is not convinced that Parkins' generalized statement is enough to establish that no genuine issue of material fact exists regarding causation. At this stage in the proceedings, the Court must construe all facts and inferences in favor of the non-moving party. After Parkins conceded that he was not saying that no rational customer would have chosen NEXTracker in the absence of Defendants' alleged misconduct, Parkins explained the many factors that go into a decision and explained why for utilities, and utilities in Australia in particular, reliability is so important. *See* Parkins Dep. 241:6-242:17, ECF No. 475-2. Parkins' statements could be construed as merely confirming that NEXTracker might hypothetically be the right choice for a customer under some set of circumstances and that whether a customer chose NEXTracker for the identified projects depends on multiple factors. His statement could also be interpreted as limiting the scope of his testimony – that he is only giving an opinion that the alleged misconduct is a contributing factor in NEXTracker winning and Array losing certain projects, depending on factors particular to the project. While Parkins was unwilling

to say a rational customer would never choose NEXTracker, the totality of his opinions demonstrates his belief that Defendants' alleged misconduct contributed to certain customers choosing NEXTracker over Array. Given the ambiguity in his testimony, and that reasonable inferences should be construed in favor of Array, the Court is not convinced Parkins' admission that a rational customer could choose NEXTracker in some contexts negates but-for causation.

Turning then to Array's evidence, Array asserts that the Court should consider Parkins' opinions that Defendants' misconduct was a contributing factor to NEXTracker winning certain projects against Array. *See* Parkins Report 52-53, 93-94, ECF No. 439-3. Array admits, however, that Parkins has not opined on the ultimate issue of causation. *See* Pl.'s Resp. 16-17, ECF No. 483. Array further acknowledges that Parkins "did not claim that Defendants' misconduct was the only factor contributing to these project outcomes" nor did he "opine on the relative weight of other factors that may have contributed to Array's project losses or NEXTracker wins." Pl.'s Opposition to Def.'s Mot. to Strike 7, ECF No. 439. Consequently, Defendants argue that Parkins' "significant factor" opinion refers to the volume of available information to him; it does not refer to how much Defendants' alleged misconduct influenced the customers' decision-making. Defendants contend that if Array's expert cannot estimate the relative significance of Defendants' alleged misconduct in contributing to the loss of specific projects, then a jury cannot do so without resorting to improper speculation.

This Court in a separate Memorandum Opinion and Order ruled on portions of Parkins' opinions that it will exclude from evidence for failing to satisfy the *Daubert* and Rule 702 standards. As a consequence of that ruling, Parkins will be limited to testifying to a reduced number of projects in which he believes Defendants' alleged misconduct was a contributing factor to NEXTracker winning the project over Array. As Array acknowledges, Parkins did not testify to

the weight to give Defendants' alleged misconduct relative to other factors at play in the decision-making process for each project. This Court has therefore concluded that Parkins may not testify that Defendants' alleged misconduct was a "significant" factor in contributing to the particular project loss.

According to Defendants, they are entitled to summary judgment because Array does not have expert testimony on but-for causation, suggesting that expert opinion testimony is required on this issue. Citing *Williams v. Curtis*, No. 12-CV-716 MCA/LAM, 2014 WL 12569376, at *3 (D.N.M. Aug. 20, 2014), Array asserts that expert testimony is not required to establish causation in cases in which the subject matter is not wholly scientific or is not so far removed from the usual and ordinary experience of the average juror. In *Williams*, the court determined that causation for future medical treatment damages required expert medical testimony, but that plaintiff's testimony that she endured pain and suffering from the collision was enough to survive summary judgment on her personal injury claim. *See id.* at *4. The Court agrees with Array that expert testimony is not essential in this case to establish but-for causation. Array has presented expert testimony to explain to the jury the dynamics of the solar tracker industry, the factors bearing on the decision to choose a tracker, and the projects for which Parkins believes Defendants' alleged misconduct contributed to the injury. The jury's decision on whether a customer chose NEXTracker over Array because of Defendants' alleged misconduct is not wholly scientific or so far removed from the usual and ordinary experience of the average juror that it could not make the decision based on the evidence. Consequently, the Court must determine if a reasonable jury, when construing the evidence and Parkins' non-excluded opinions in favor of Array, could find but-for causation.

### 1. Whether proving misappropriation establishes some degree of harm

Before turning to those facts, however, the Court will address Array's assertion that the fact of misappropriation itself demonstrates harm to the value of the trade secret through loss of secrecy. Array seems to suggest that in trade secret cases a showing of misconduct necessarily results in some harm; the question is only of the amount. Array's cited authority, however, does not establish that proposition. Array relies on *Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183 (10th Cir. 2014), but in that case the plaintiff was seeking damages for a reasonable royalty rate. In *Kirby*, the defendant disclosed source code to a rival company and plaintiff wanted a royalty reflecting an assumed license, regardless of whether the competitor had made commercial use of the intellectual property. *See id.* at 1185-86. Under Utah's Trade Secrets Act, like New Mexico's Uniform Trade Secrets Act, the legislature created three kinds of damages remedies: plaintiff's actual loss, unjust enrichment, and imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret. *Compare id.* at 1185, *with* N.M. Stat. Ann. § 57-3A-4(A). Unlike the plaintiff in *Kirby*, Plaintiff here has not chosen to seek damages in the form of a reasonable royalty rate in lieu of damages measured by the other methods. *See* N.M. Stat. Ann. § 57-3A-4(A) ("*In lieu of damages* measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty….") (emphasis added). Plaintiff thus must establish the element of causation for its actual loss or for unjust enrichment.

Plaintiff's reliance on *Nichols v. Anderson*, 1939-NMSC-028, 92 P.2d 781, is similarly misplaced. Although the New Mexico Supreme Court stated, "it is apparent that damages must occur upon violations where the former employee is active and perseveres in his efforts to build up a competing business," *id.* ¶ 18, the *Nichols* court examined the plaintiff's evidence to determine if he established actual loss of business, *see id.* ¶¶ 21-22. The plaintiff in *Nichols*

provided evidence that he lost customers to the defendant. *See id.* Accordingly, *Nichols* does not hold that the Court should presume harm from Array's evidence of breach of contract and/or tortious conduct; instead, Array must prove actual losses or unjust enrichment where those are the damages it is seeking.

### 2.     Whether the evidence creates a question of fact as to but-for causation

To show a question of fact exists, Array relies in part on evidence that Defendants specifically intended to cause harm to Array. NEXTracker executives believed hiring Mitchell would "cripple" Array and help NEXTracker get a "bigger piece of smaller pie." *See* June 1, 2016 email, ECF No. 478-8; June 11, 2016 email, ECF No. 480-7; June 11, 2016 email, ECF No. 478-9. Shugar wanted to hire Mitchell away immediately because of the 2017 projects being considered (like Upton, Mount Signal 3, Southampton, and Buckthorn). *See* June 11, 2016 email, ECF No. 480-7; June 19, 2017 letter, ECF No. 478-3; Parkins' Report 60-61, 63-64 & n.191 and 209, ECF No. 439-3; Nelson Report 55-56 & Schedule 3, ECF No. 439-2. Shugar predicted that hiring Mitchell would help NEXTracker win new business over the next 18 months, estimating six new deals worth $60 million and five deals with better margins at $12 million increased gross margin. *See* Pl.'s UF ¶ o, ECF No. 483.

Defendants respond that this evidence is only speculation about the future and does not establish what actually transpired. While the Court agrees that this information alone does not establish but-for causation, the evidence is relevant as to what NEXTracker executives anticipated Mitchell's contributions to the company would be, based on their experience. Furthermore, for the Upton, Mount Signal 3, Buckthorn, and Southampton projects, Array presented additional evidence indicating Shugar's prediction (that having Mitchell's help with these projects would help NEXTracker win those projects) came to fruition.

Although Parkins cannot testify to his opinion about Upton, a jury may consider the evidence he did: Mitchell worked on the Upton project while at Array; the developer on Upton, Con Edison, up to that point had only used Array for its solar trackers on utility projects; Mitchell switched companies and worked with the NEXTracker team trying to win this project; and NEXTracker won its first tracker contract with Con Edison. *See* citations to record in Parkins Report 60-62 n. 188, 192-99, ECF No. 439-3. Although this evidence is circumstantial, a jury could consider the inferences to be drawn from the evidence favorably to Array and conclude that NEXTracker would not have won the Upton project without Mitchell having worked on the project on behalf of NEXTracker and/or having disclosed confidential information.

Mount Signal 3 was another of the large utility-scale projects for which NEXTracker was competing when Shugar indicated he wanted Mitchell out of Array immediately. Parkins Report 63, ECF No. 439-3. After considering numerous factors pertaining to the tracker selection decision, Parkins' opined that NEXTracker's O&M counter-pitch, which relied on confidential information from Mitchell, contributed to NEXTracker winning the Mount Signal project over Array. Parkins Report 62-64, ECF No. 439-3; Parkins Sur-Rebuttal Report 1-2, ECF No. 430-4. A jury, viewing all the evidence and inferences in favor of Array, including Shugar's prediction and the timing of the project win, could determine that Mitchell's assistance to NEXTracker in creating the O&M counter-pitch contributed to bringing about NEXTracker's winning the Mount Signal 3 project and that NEXTracker would not have won the project without Mitchell's assistance.

With respect to the Southampton project, Mitchell worked on Southampton project bids while at Array, and he assisted the NEXTracker sales team on the Southampton project. *See* Parkins Report 67-68, ECF No. 439-3. Parkins explained why Mitchell's work on the project and disclosure of confidential information were contributing factors to Array losing the project to

NEXTracker. *See id.* at 67-69. Defendants' expert, Stern, admitted that O&M would be a factor on choosing a tracker on the Southampton project. *See* Stern Dep. 241:2-6, ECF No. 484-2. Moreover, with inferences construed in Array's favor, a jury could find from Array's evidence that NEXTracker employees believed they had begun losing projects to Array because of the O&M factor, and they believed they needed to revise their own O&M pitches and urgently create a revised O&M campaign.[10] While Defendants contend that the evidence is insufficient to show that any specific project was awarded to NEXTracker because of the information Mitchell disclosed about Array, the record contains enough circumstantial evidence from which a reasonable jury could disagree with Defendants and conclude that the misconduct was the but-for cause of the loss of specific projects, such as Southampton.

Likewise, regarding the Buckthorn project, Defendants' expert admitted that O&M was a key factor in NRG's decision in tracker selection for Buckthorn, *see* Stern Dep. 206:5-207:25, ECF No. 483-3, and Array's expert opined that NEXTracker used Array's trade secrets to adjust their sales pitch, particularly regarding O&M, and effectively neutralized Array's O&M arguments, contributing to NEXTracker winning the Buckthorn project against Array. *See* Parkins Report 54-60, ECF No. 439-3. Additionally, a fact issue exists as to whether Swinerton or NRG made the decision on which tracker to use at Buckthorn. Although many factors go into the award of a project, a jury, construing all the evidence in Array's favor, could reasonably find that the information Mitchell gave to NEXTracker combined with other factors to produce the win for NEXTracker and loss to Array on Buckthorn, and without the misconduct, the injury would not

---

[10] *See* Nov. 9, 2016 email, ECF No. 478-43 at 1-2; Nov. 17, 2016 email, ECF No. 481-12 at 3 of 3; Nov. 17, 2016 email, ECF No. 439-1 at 5-6 of 9; Nov. 18, 2016 12:44 p.m. email, ECF No. 478-44; Nov. 18, 2016 email, ECF No. 439-1 at 5 of 9; Nov. 18, 2016 email, ECF No. 481-2; Nov. 19, 2016 email, ECF No. 481-12 at 2 of 3; ECF No. 483-8; Nov. 28, 2016 email, ECF No. 483-9 at 1-8; ECF No. 483-11; Jan. 25, 2017 emails, ECF No. 439-9 at 2 of 6; Pl.'s Ex. 16, ECF No. 483-16; Pl.'s Ex. 17, ECF No. 483-17 at 3-4 of 4; Pl.'s Ex. 18, ECF No. 483-18; Pl.'s Ex. 21, ECF No. 483-21.

have occurred. Alternatively, a reasonably jury could conclude from the evidence that Mitchell's disclosure of confidential information was a necessary component of a causal set that would have caused the injury in the absence of other causes.

As a final example, with respect to the Boa Hora projects in Brazil, the evidence in Array's favor indicates that Mitchell took over the AES account for NEXTracker, after having worked the AES Solar account on behalf of Array. *See* Pls.' Ex. 25, ECF No. 478-25, Ex. 26, ECF No. 478-26; Parkins Report 92, n.342 (citing Mitchell's deposition in which he admitted to worked AES Solar account during his time at Array). Prior to Mitchell's work for NEXTracker, NEXTracker had not sold any trackers to AES. *See* Parkins Report 93 & n.343, ECF No. 439-3 (citing Shugar's testimony). Although Parkins' opinion testimony concerning the Boa Hora projects will not be admitted, a reasonable jury could, taking all inferences in favor of Plaintiff, conclude that Mitchell's efforts as the lead on the AES account contributed to bringing about NEXTracker's project win, and without his participation and/or disclosures of confidential information, Array would not have lost the project.

Although a jury may rely on circumstantial evidence when determining the ultimate fact at issue, the plaintiff must prove each fact in the chain of proof. *See Franchise Tax Board of State of California v. Hyatt*, 407 P.3d 717, 749 (Nev. 2017), *rev'd and remanded on other grounds*, 139 S.Ct. 1485 (2019). Construing all facts and inferences in the plaintiff's favor, Array has done so here. Array presented evidence that Mitchell disclosed confidential information to NEXTracker executives who used that information in communications with customers as well as to implement a new O&M marketing strategy. Array's expert testified that the O&M confidential information was a contributing factor in Array losing certain identified projects to NEXTracker because O&M was an important factor in the selection decision for those projects. In hiring Mitchell, NEXTracker

executives intended to cause and predicted causing Array project losses. The jury may consider the timing of the disclosures, the importance of the O&M factor to certain projects, and the resulting project losses and draw reasonable inferences therefrom. Considering the totality of the evidence in Array's favor, the Court is unable to find as a matter of law that the reasonable inferences to be drawn from the disputed facts are plainly and consistently in favor of Defendants on the issue of causation for the projects discussed herein. Accordingly, Array has sufficient evidence to support each circumstantial fact in the causal chain to overcome summary judgment and present the issue of causation to a jury.

### 3. Evidence as to specific projects

Defendants also argue that summary judgment should be granted in their favor for the 25 "contributing factor" projects because of the "failure of analysis altogether" by Parkins. Defs.' Mot. 21, ECF No. 475. Defendants assert in their reply that Array only cited evidence for the Buckthorn project, so it is entitled to summary judgment on the remaining 47 projects. The record, however, contains evidence regarding project losses as to more than just the Buckthorn project, as explained herein. Notably, Array's response brief incorporated the evidence cited by Parkins in pages 53-93 of his report and in his supplemental report, which included discussion of his opinions concerning specific projects and the evidence supporting his opinions. *See* Pl.'s Resp. ¶ bbb & n.26. Because Defendants' initial motion only called out the Buckthorn project with specificity, Array responded with particular evidence for the Buckthorn project but cited Parkins' report generally for the evidentiary support for all the other projects. In reply, Defendants generally disputed ¶ bbb, but without discussion of the evidence or lack thereof regarding specific projects. Consequently, the briefing by both parties largely lacked detailed arguments as to the evidentiary support, or lack thereof, for most of the projects.

Moreover, since the parties completed briefing on this motion for summary judgment, this Court has entered a Memorandum Opinion and Order excluding the opinion testimony of Parkins as to certain projects on which his analysis was insufficiently reliable to assist the jury. The order also permitted the introduction of certain opinion testimony in Parkins' supplemental report. The admissible evidentiary support for certain projects has therefore changed from the time of the briefing.

Because this Court has decided that Array presented enough evidence regarding causation as to some of the identified projects to take the claims to the jury, Array will be able to present evidence of causation to the jury. However, the question left for resolution is what evidence is relevant on the issue. Evidence on projects for which Array could not prove but-for causation as a matter of law may be inadmissible at trial for lack of relevance. The evidence regarding specific projects varies. For example, this Court determined that Parkins "did not use a reliable methodology to arrive at his conclusions that Defendants' misconduct was a contributing factor to Array losing" the following projects: Jasper; Patua Geothermal; Rattlesnake; Ridgeland; Rosamond; Willow 1; Sage I, II, and III; Shoe Creek; and NC92. Mem. Op. and Order 37, ECF No. 536. The Court noted that there was "no substantive analysis regarding factors important to any of these projects, or any reasoning at all as to why Parkins included these projects in his 'contributing factor' opinion." *Id.* Nor did Array cite any additional evidence regarding those projects in its response. Accordingly, the Court agrees with Defendants that Array failed to demonstrate causation for its losses of Jasper; Patua Geothermal; Rattlesnake; Ridgeland; Rosamond; Willow 1; Sage I, II, and III; Shoe Creek; and NC92 based on its complete failure of analysis for these projects.

That said, by citing Parkins' initial report and supplemental report, Array incorporated evidence specific to the other projects. The Court therefore cannot say that Array failed to analyze any facts as to the other projects. Because both parties did not break the analysis down project-by-project, the Court is bereft of meaningful analysis and declines to do the work of the parties in parsing the record project-by-project. Given that the Court is permitting the issue of causation to proceed to a jury, the Court finds the matter to be an evidentiary one. The parties may file motions for pretrial resolution of the admissibility or inadmissibility of evidence pertinent to specific projects (not herein discussed), but must do so 90 days before trial to give the Court adequate time to rule on the issue in time for the parties to prepare for trial. Trial will be set in a separate notice.

## B.  Causation and Damages for Contract Claims

In addition to tort claims, Plaintiff asserts claims for breach of contract and breach of the covenant of good faith and fair dealing against Defendant Mitchell. Am. Compl. 22-24, ECF No. 52.

### 1.  Consequential Damages

Array claims "loss of sales and profits it would have earned but for Mitchell's contractual breaches." *Id.* ¶ 108. Array contends it "has sustained severe economic injury for which it is entitled to monetary compensation" and "an injunction to prevent further unlawful dissemination of ATI's confidential information and trade secrets." *Id.* ¶¶ 109, 117.

When a defendant breaches a contract, he is responsible for "all damages flowing naturally from the breach." *Sunnyland Farm, Inc. v. Central New Mexico Elec. Co-op, Inc.*, 2013-NMSC-017, ¶ 11, 301 P.3d 387. General damages are those that give the plaintiff the value of the contract. *See id.* A plaintiff may also be entitled to consequential damages, which are not based on the present value of the promised performance but on benefits it can produce or losses that were caused

by the failure of performance on the contract. *Id.* Under New Mexico contract law, "a defendant is liable only for those consequential damages that were objectively foreseeable as a probable result of his or her breach when the contract was made." *Id.* ¶ 16. When a plaintiff claims consequential damages for a contract claim, it is required to prove that breach in fact caused the loss. N.M. U.J.I. § 13-843A (listing as an element for special or consequential damages that damages "were in fact caused by" the breach of contract); *Porcell v. Lincoln Wood Products, Inc.*, 713 F.Supp.2d 1305, 1314 (D.N.M. 2010) (quoting 3 Dan B. Dobbs, *Law of Remedies* 65 (2d ed. 1993)). For the same reasons given above, the Court finds that Array's evidence creates questions of fact for the jury to decide on whether Mitchell's breach in fact caused the project losses and whether Array losing the projects was foreseeable as a probable result when the contract was made. Notably, there is evidence in Array's favor that Defendant Shugar predicted, and thus foresaw, that Array would sustain specific project losses from Mitchell working for NEXTracker. Accordingly, the Court will not grant summary judgment to Defendants on the issue of causation of consequential damages for Mitchell's alleged breach of contract.

### 2.    Disgorgement of Mitchell's Salary

Array's expert, Clarke B. Nelson, offers opinions on the calculation of damages. He calculated the compensation to Mitchell from NEXTracker on the assumption it may also be considered a measure of Mitchell's profits that may be disgorged. *See* Nelson Report 92, ECF No. 475-8. Defendants argue that Array does not offer any evidence to refute the notion that Mitchell could have earned the same salary working at another company besides Flex. Defendants thus assert that there is no evidence that "but for" Mitchell's alleged breach, he would not have earned his salary. Array's only response to the request for summary judgment on Array's damages theory

for disgorgement of Mitchell's salary is that Defendants failed to cite any evidence that Mitchell could have earned the same salary elsewhere.

"Disgorgement is an equitable remedy whereby a wrongdoer is forced to give up the benefits obtained as a result of his wrongdoing." *Peters Corp. v. New Mexico Banquest Investors Corp.*, 2008-NMSC-039, ¶ 32, 144 N.M. 434. "The remedy may not be used punitively, and thus a causal connection must exist between the breach and the benefit sought to be disgorged." *Id.* Neither party cited any law regarding disgorgement in support of their respective positions on the burden of proof on this issue. Defendants cited no case to support their position that Mitchell's ability to earn a salary at another company must be factored into the disgorgement analysis and that it is the plaintiff's burden to prove that he could not have earned the same salary elsewhere. Nor did Array cite authority in support of its causation argument related to disgorgement of Mitchell's salary. The Court therefore requests additional briefing on this disgorgement issue. The parties must file simultaneous briefs setting forth their respective arguments, with citations to the evidence and authority, as to whether the Court should grant summary judgment on the issue of damages based on disgorgement of Mitchell's salary. The simultaneous briefs must be filed within twenty-one days (21 days) of entry of this Memorandum Opinion and Order and be no longer than seven pages.

### C. Fraud

Array alleges Mitchell failed to disclose he accepted employment at NEXTracker, and before resigning, he downloaded approximately 7,000 electronic folders from Array's hard drive. Am. Compl. ¶¶ 159-60, ECF No. 52. Additionally, Array claims Mitchell, after beginning employment with NEXTracker, told Array's CEO that Mitchell was working for Flex, not NEXTracker. *Id.* ¶ 161.

A plaintiff must prove fraud by clear and convincing evidence. *Rael v. Cisneros*, 1971-NMSC-073, ¶ 11, 487 P.2d 133. To prove fraud, a plaintiff must establish (1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness by the defendant in making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation. *Williams v. Stewart*, 2005-NMCA-061, ¶ 34, 112 P.2d 281.

Defendants contend that Array has no evidence that it relied on any of the alleged misrepresentations or that any reliance was detrimental to Array. According to Defendants, Array's harm is limited to an unjust enrichment theory – that Defendants were unjustly enriched by Mitchell's work for NEXTracker – which they assert is not sufficient to show detrimental reliance. In response, Array contends that "Defendants base their argument entirely on Array's detrimental reliance, or lack therof, on Mitchell's affirmative misrepresentations and they ignore Mitchell's fraudulent omissions during his continued employment with Array." Pl.'s Resp. 23, ECF No. 483. Array then quotes this Court's Memorandum Opinion and Order in which it declined to dismiss the fraud claim: "'Mitchell had a duty to inform [Array] that he had accepted other employment'" and, thus, a jury can thereby infer that as a result he was able to download Array's confidential information. *Id.* (quoting Mem. Op. and Order 27, ECF No. 90). Array asserts the download of information was to its detriment.

From the lack of argument, it appears Array concedes that it has no evidence to support detrimental reliance regarding the alleged affirmative misrepresentation to Array's CEO that Mitchell worked for Flex. Turning to the alleged fraudulent omission, Array cited no admissible evidence in its summary judgment response that Mitchell downloaded confidential information and that the download caused any harm to Array. The Court's prior Memorandum Opinion and

Order was on a motion to dismiss and the Court presumed the truth of the plaintiff's allegations in its amended complaint. Mem. Op. and Order 1-2, ECF No. 90. On summary judgment, Array has the burden to come forward with admissible evidence. The Court will therefore grant Defendants summary judgment on Array's fraud claims.

### D. Conversion

"Conversion is the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *Muncey v. Eyeglass World, LLC*, 2012-NMCA-120, ¶ 22, 289 P.3d 1255 (internal quotations omitted). In a conversion case, when the property has not been returned, the damages are the value of the property at the time of the conversion, plus interest. *Id.* ¶ 23. Damages also may include the exchange value of the subject matter, plaintiff's interest therein at the time of the conversion, or a different value where necessary to give just compensation. *Id.* (quoting *Frank Bond & Son, Inc. v. Reserve Minerals Corp.*, 65 N.M. 257, 335 P.2d 858, 861 (1959)).

In support of its conversion claim, Array asserts that Defendants intentionally exercised dominion and control over Array's trade secrets and confidential information, dispossessing it of its right to the exclusive use and possession thereof. Am. Compl. ¶¶ 147-48, ECF No. 52. According to Defendants, the New Mexico Supreme Court would likely find that conversion does not apply to unmerged intangible intellectual property. Defendants thus argue they are entitled to summary judgment on Plaintiff's conversion claim because it relies on intangible trade secrets and confidential information.

In response, Array contends that Defendants ignore that at least some of Array's trade secrets and confidential information were downloaded onto Mitchell's personal hard drive, and

thus, the information and trade secrets constitute merged electronic documents. Once again, however, Array failed to cite admissible evidence in its response brief to support its assertion that Mitchell downloaded electronic files onto his personal hard drive, and thus, the Court will not consider that argument. Array nevertheless identifies other documents (with evidentiary support) it says contain Array's trade secrets and confidential information that Mitchell converted into email form. *See* Pl.'s Ex. 27, ECF No. 483-27 (listing Bates numbers of documents). Array argues that Defendants failed to address why those documents are not merged documents for conversion.

New Mexico law is unresolved on whether intangible intellectual property is considered personal property under conversion law. *See Tomlinson v. Burkett*, No. A-1-CA-35610, 2018 WL 3868704, at *5 (N.M. Ct. App. July 18, 2018) ("We have not found any New Mexico case[] that addresses whether conversion applies only to tangible items of personal property."); *President and Fellows of Harvard College v. Elmore*, 222 F.Supp.3d 1050, 1064 n.2 (D.N.M. 2016) ("Some states may include intangible intellectual property as personal property, while others may not. New Mexico conversion law is unresolved on the matter.") (internal citations omitted). Although some cases define the tort as involving chattels, none decided whether the tort should be limited to tangible property. *See Tomlinson*, 2018 WL 3868704 at *5 (and cited cases). Those cases are not authority for propositions not considered. *See id.* (quoting *Fernandez v. Farmers Ins. Co. of Ariz.*, 1993-NMSC-035, ¶ 15, 857 P.2d 22).

According to Array, the New Mexico courts would recognize Array's conversion claim, noting that the New Mexico Court of Appeals in *Muncey* recognized a claim for conversion based on the wrongful copying of intangible intellectual property merged into a document. *See Muncey*, 2012-NMCA-120, ¶ 58 (affirming jury verdict on conversion claim for doctor because jury could find that defendant acted in defiance of doctor's rights in patient files by unauthorized copying of

patient files for intended future optometry use). Defendants correctly point out that *Muncey*'s analysis was limited to tangible patient files, not the intangible data therein, because the plaintiff had so confined his conversion claim, and thus the case is of little help to the issue at hand. *See id.* at ¶ 18 ("As such, we conclude that the conversion claim, concerned with dominion or interference with ownership rights in tangible property, is not equivalent to the elements of copyright infringement.").

The Restatement (Second) of Torts offers some guidance on the issue, and the New Mexico Supreme Court has relied on the Restatement for other aspects of conversion law. *See Frank Bond*, 65 N.M. at 261 (relying on Restatement's measure of damages for conversion). Section 242 recognizes a tort of conversion where "there is conversion of a document in which intangible rights are merged," and "the damages include the value of such rights." Rest. 2d Torts § 242(1). The commentary explains that conversion applies when the documents represents a personal obligation or the title to the chattel and when an intangible obligation is represented by a document, which is considered the equivalent to the obligation itself. *Id.*, Comment a. As examples, the commentary lists promissory notes, bonds, bills of exchange, share certificates, and insurance policies, among others. *Id.*, Comment b.

Subsection (2) of Section 242 provides: "One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted." Rest. 2d Torts § 242(2). According to the commentary, this section recognizes decisions by a number of courts holding that "the recovery was for the interference with the intangible rights themselves, and that the conversion of the document was merely the means by which this was accomplished." *Id.*, Comment e. Many courts have determined "that there may be 'conversion' of such an intangible

right, of a kind customarily identified with and merged in a document, even though the document is not itself converted." *Id.* The Restatement notes, however, that this expansion does not accord well with the traditional limitations of the tort. *Id.* The illustrations in the Restatement for subsection (2) are in situations where C steals from B a negotiable check that A made to B for an indebtedness or where C corporation wrongfully refuses to register on its books the transfer of stock from B to A, as represented by a stock certificate. *See id.*, Illustrations. According to comment f, "It is at present the prevailing view that there can be no conversion of an ordinary debt not represented by a document, or of such intangible rights as the goodwill of a business or the names of customers." *Id.*, Comment f.

As an initial matter, the Court agrees with Plaintiff that New Mexico is likely to recognize that electronic documents may constitute documents for purposes of conversion law. *See Thompson v. UBS Financial Services, Inc.*, 115 A.3d 125, 132 (Md. Ct. App. 2015) ("Digital media is both tangible (*i.e.*, capable of being seen on an electronic device's screen) and transferable (*i.e.*, subject to an exertion of ownership or dominion), … [so] for conversion's purposes, there is no distinction between hard copy and electronic data[,] as long as a document, either paper or digital, embodies the plaintiff's right to the plaintiff's intangible property.") (internal quotations omitted); *Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, 1278 (N.Y. Ct. App. 2007) ("We cannot conceive of any reason in law or logic why this process of virtual creation should be treated any differently from production by pen on paper or quill on parchment. A document stored on a computer hard drive has the same value as a paper document kept in a file cabinet.").

The question then becomes whether the electronic document must be the equivalent of the obligation, such as a promissory note, or whether an electronic document disclosing trade secrets constitutes a document that can be converted. The case law outside of New Mexico is conflicting

on this topic. *Compare Warshall v. Price*, 629 So.2d 903, 905 (Fla. Ct. App. 1993) (concluding that plaintiff had claim for conversion where defendant took confidential patient list and used it to plaintiff's disadvantage); *Conant v. Karris*, 165 Ill. App. 3d 783, 791-92 (1987) (holding plaintiff stated conversion claim where it alleged defendant disclosed confidential information contained in a computer printout because owner was deprived of benefit of information), *with Community Ties of America, Inc. v. NDT Care Services*, No. 3:12-CV-00429-CRS, 2015 WL 520960, at *19-20 (W.D. Ky Feb. 9, 2015) (granting summary judgment to defendants on plaintiff's conversion claim based on alleged copying of confidential files off laptops "because the tort of conversion requires an unauthorized taking or dispossession *to the complete exclusion* of the rightful possessor, not a mere temporary interference with property rights"); *Northeast Coating Tech., Inc. v. Vacuum Metallurgical Co., Ltd.*, 684 A.2d 1322, 1324 (Me. 1996) ("The unfair use and appropriation of information that is not customarily merged in a particular document is more appropriately addressed by other remedies, including those created for unfair competition or misappropriation of trade secrets.").

Array's claim is not based on an electronic document representing a personal obligation or the title to the chattel or some other document that is considered the equivalent to the obligation itself. Instead, Array's conversion claim is based on electronic documents containing Array's trade secret or confidential information. Although Array alleges that Defendants have prevented its exercise of rights to confidentiality and trade secrets, Array has not shown that those are rights of the kind customarily merged in a document. Array has not convinced the Court that New Mexico courts would expand the tort of conversion in such a way as necessary to sustain a conversion claim in this case. The Court will therefore grant Defendants summary judgment on the tort of conversion.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (**ECF No. 475**) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Defendants' requests for summary judgment on Plaintiff's fraud and constructive fraud claim (**Count Nine**) and conversion claim (**Count Seven**) are **GRANTED**.

2. The Court will **RESERVE RULING** on the issue of Plaintiff's damages based on disgorgement of Mitchell's salary. The parties must file simultaneous briefs setting forth their respective arguments, with citations to the evidence and authority, as to whether the Court should grant summary judgment on the issue of damages based on disgorgement of Mitchell's salary. The simultaneous briefs must be filed **within twenty-one days (21 days)** of entry of this Memorandum Opinion and Order and must be **no longer than seven (7) pages**.

3. The parties may file motions for pretrial resolution of the admissibility or inadmissibility of evidence pertinent to specific projects (not herein discussed) but must do so no later than **90 days before trial**.

4.  Defendants' motion for summary judgment is otherwise **DENIED**.



_____
SENIOR UNITED STATES DISTRICT JUDGE