# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ARRAY TECHNOLOGIES, INC.,**

       **Plaintiff,**

    **vs.**                          **Civ. No.  17-087 JCH/LF**

**COLIN MITCHELL, and individual,**
**NEXTRACKER, a Delaware corporation,**
**MARCO GARCIA, an individual,**
**DANIEL SHUGAR, an individual,**
**SCOTT GRAYBEAL, an individual,**
**FLEXTRONICS INTERNATIONAL U.S.A., INC.,**
**a California corporation,**

       **Defendants.**

## SEALED MEMORANDUM OPINION AND ORDER

On September 24, 2019, Plaintiff Array Technologies, Inc. ("Array") filed a *Motion for Sanctions for Violation of Consent Order, Perjury, and Contempt* (ECF No. 500). Array asserts that Defendants Colin Mitchell, NEXTracker, Marco Garcia, Daniel Shugar, Scott Graybeal, and Flextronics International U.S.A., Inc., ("Flex"), (collectively "Defendants"), violated the Consent Order, committed perjury, and obstructed discovery. As a sanction for this alleged misconduct, Array asks for a $2 million sanction against Defendants, along with a jury instruction stating that Mitchell was actively working for NEXTracker from September 2016 until February 6, 2017; he worked in NEXTracker-related business during the period of the Consent Order; his conduct was intended to harm Array and assist NEXTracker in competing with Array; and his conduct caused Array harm in an amount to be determined at trial. *See* Pl.'s Mot. for Sanctions 26, ECF No. 500. Having considered the motion, briefs, arguments, evidence, and applicable law, the Court finds that the motion for sanctions should be denied without prejudice.

## I.    BACKGROUND

In May 2013, Array hired Colin Mitchell as its Business Development Manager. *Compare* Am. Compl. ¶ 27, ECF No. 52, *with* Answer ¶ 27, ECF No. 96. Mitchell signed a "Non-Disclosure, Non-Solicitation and Non-Competition Agreement" (hereinafter "Agreement") with Array. *Compare* Am. Compl. ¶ 28, ECF No. 52 & 52-1, *with* Answer ¶ 28, ECF No. 96. Among other things, the Agreement contained a non-compete provision stating, as relevant here, that during Mitchell's employment and for one year after, he shall not directly or indirectly engage in the operation of a business that manufactures solar tracking equipment or systems, whether as an employee or in any other capacity relating to such a business. *See* Agreement, ECF No. 52-1 at 2 of 2. Mitchell ended his employment with Array on July 8, 2016. Pl.'s Undisputed Fact ¶ c, ECF No. 483. The parties dispute whether Mitchell began working for Flex and/or NEXTracker in September 2016.

On January 17, 2017, Array filed suit against Mitchell, NEXTracker, and Garcia, and it later amended its complaint on August 30, 2017, to add claims against all Defendants for misappropriation of trade secrets and breach of contract against Defendant Mitchell, among other cause of action. *See* Compl., ECF No. 1; Am. Compl., ECF No. 52. On January 31, 2017, Mitchell's then-defense counsel sent him an email with the draft contents of a proposed Consent Order. *See* Jan. 31, 2017 emails, ECF No. 260-3. Before February 6, 2017, Sheryl Savage, General Counsel for NEXTracker, verbally instructed Mitchell that he could not work on NEXTracker business and he was to stop working for NEXTracker to the extent he was performing any such work. Savage Decl. ¶¶ 1, 3, ECF No. 260-1. She also instructed Dan Shugar, NEXTracker's CEO, and Garcia, NEXTracker's Chief Commercial Officer, that Mitchell could not work on

NEXTracker projects. *Id.* ¶ 4. On February 21, 2017, Savage instructed Mitchell to use Flex resources for support going forward. *See* Feb. 21, 2017 email, ECF No. 260-7.

This Court entered a negotiated Consent Order on February 6, 2017, which stated that, except as necessary to defend the claims in this case, Mitchell "shall have no communications directly or indirectly with Defendant NEXTracker regarding any matter related to NEXTracker's business…." Consent Order 1, ECF No. 17. The Consent Order bound "Defendant Colin Mitchell only" and Mitchell's counsel acknowledged personal service of the order upon him. *Id.* The Consent Order expired on July 12, 2017. *Id.* at 2. After the Consent Order issued, Scott Graybeal decided to have Mitchell report to Sol Hutson, Flex's Director of Alliances and Strategic Initiatives, for enhanced supervision. *See* Graybeal Dep. 168:7-10, 171:16-20, ECF No. 514-3; Hutson Dep. 32:7-33:8, ECF No. 514-4, and 177:16-178:7, ECF No. 514-5.

On February 7, 2017, Mitchell emailed his then-counsel asking if there were new developments on the case, to which his counsel responded that the Consent Order was filed and was awaiting the judge's signature. *See* Feb. 7, 2017 emails, ECF No. 260-4. On March 6, 2017, Mitchell emailed his counsel and asked if the Consent Order had been issued, saying he never signed anything. *See* Mar. 6, 2017 emails, ECF No. 260-8. His counsel responded the same day, informing him the Consent Order had been issued, attaching an executed copy, and noting there was nothing for him to sign. *Id.*

On November 15, 2018, Defendants NEXTracker, Flex, Shugar, Garcia, and Graybeal filed a *Notice of Activity Regarding Consent Order of February 6, 2017* (ECF No. 260) (hereinafter "Notice of Activity"), informing the Court of the discovery of emails related to the Consent Order. Specifically, they notified the Court of two email strings that Mitchell sent in February 2017 in

response to inquiries from Primoris Renewable Energy ("Primoris"), a prospective NEXTracker customer, regarding project quotes. *See* Notice of Activity 4-5, ECF No. 260.

## II.    STANDARD

"Under traditional principles of equity practice, courts have long imposed civil contempt sanctions to 'coerce the defendant into compliance' with an injunction or 'compensate the complainant for losses' stemming from the defendant's noncompliance with an injunction." *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1801 (2019) (quoting *United States v. Mine Workers*, 330 U.S. 258, 303–04 (1947)). Courts have broad discretion to use their contempt power to require parties to follow court orders. *United States v. Riewe*, 676 F.2d 418, 421 (10th Cir. 1982). Civil contempt, however, is a severe remedy, so parties should have notice of what conduct is forbidden before being held in civil contempt. *Taggart*, 139 S.Ct. at 1802.

"To prevail in a civil contempt proceeding, the plaintiff has the burden of proving, by clear and convincing evidence, that a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order." *Reliance Ins. Co. v. Mast Const. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998) (internal citation omitted). Courts should use an objective standard when determining whether the allegedly offending party reasonably believed that they were not acting wrongfully under the order. *See Taggart*, 139 S.Ct. at 1801-02. Civil contempt should not be imposed when there is a fair ground of doubt as to the wrongfulness of the offending party's conduct. *Id.* at 1801. If a court order is vague, violation of the order may sometimes be excused. *Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (1994). In contempt cases, the benefit goes to the person charged with contempt if there are ambiguities and omissions in the court orders. *Id.* When interpreting consent orders, a court should use traditional rules of contract interpretation. *Thompson v. U.S. Dep't of Housing & Urban Development*, 404 F.3d 821, 832 n.6 (4th Cir. 2005).

"Sanctions cannot be assessed without the basic requirements of due process, which are notice that such sanctions are being considered by the court and a subsequent opportunity to respond." *United States v. Melot*, 768 F.3d 1082, 1085 (10th Cir. 2014) (internal quotations omitted). "The notice must include not only the conduct alleged to be sanctionable, but also the standard by which that conduct [would] be assessed." *Id.* (internal quotations omitted). Civil contempt sanctions can include attorney's fees and other costs. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967). "Contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding." *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 833-34 (1994).

A finding of criminal contempt first requires the Constitutional protections afforded to a defendant in criminal proceedings, such as the privilege against self-incrimination and the right to proof beyond a reasonable doubt. *See id.* at 826-27. When a fine is not compensatory, even if it is only $50, it is civil only if the contemnor is afforded an opportunity to purge the fine by compliance with the court order. *Id.* at 829. In the absence of evidence establishing the amount of the loss, a court fine of any sum is speculative and arbitrary. *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992).

### III.    ANALYSIS

#### A. Violation of Consent Order

As an initial matter, Array contends that, even though only Mitchell is subject to the Consent Order, the other Defendants aided and abetted the violation of the order and should be sanctioned. Array, however, failed to cite persuasive authority for this proposition. The Court will deny Array's request to impose sanctions arising from alleged violations of the Consent Order

against Defendants who were not subject to the Consent Order based on its plain language. The Court instead will focus on the manner in which Mitchell purportedly violated the Order.

### 1. Sending project quotes

Array first argues that Mitchell sent quotes to NEXTracker customers for the sale of trackers on projects on which Array and NEXTracker were both bidding, communicating with NEXTracker executives about the projects and quotes. On February 24, 2017, Gus Wellin, NEXTracker Sales Analyst, Utility Sales, emailed Mitchell with "the three requested quotes" regarding the subject "Primoris Quotes – Turkey Hill, Merrill, and Lakeview." Pl.'s Ex. 2, ECF No. 500-2. In response, on February 27, 2017, Mitchell sent an email to Geoff Miller of Northern Energy and Power, cc'ing NEXTracker employees Ryan Booth and Dana Kennard, stating, "Please find the attached quotes for Turkey Hill, Merritt [sic] and Lakeview projects." *Id.* In a March 2, 2017 email to Miller, Kent James (with a prim.com email address), Kennard, and Booth, Mitchell said:

> I have been asked to hand off all of my accounts to my Nextracker colleagues until later this summer…. Kent, I will give you a call so we can keep the discussions going on the larger Primoris & Nextracker MSA type discussion….I'm not going anywhere, I have just been asked to work on a special project for Flextronics until the term of my ATI non-compete is over, approx… mid July 2017.

Mar. 2, 2017 email, ECF No. 478-33.

Regarding these emails, Defendants argue that Mitchell did not know the Consent Order had been filed when he sent the emails, and thus, Plaintiff has not met its burden of showing contempt. Defendants further note that they filed a Notice of Activity once they discovered the Primoris emails, evidencing their good faith in adhering to the Consent Order.

In the February 27, 2017 and March 2, 2017 emails, Mitchell communicated with NEXTracker employees by cc'ing NEXTracker executives on the email. As for the latter email,

Mitchell told them he was handing off his NEXTracker accounts to his colleagues. The Court thus does not find that the contents of the March 2, 2017 email violate the Consent Order in a way that warrant sanctions. More problematic is the February 27, 2017 email Mitchell sent to a customer while cc'ing NEXTracker employees Booth and Kennard in which he attached quotes for the Turkey Hill, Merrill and Lakeview projects. *See* Pl.'s Ex. 2, ECF No. 500-2. In a separate Sealed Memorandum Opinion and Order, this Court concluded that "Mitchell's action in sending the Primoris quote constituted an indirect engagement in the operation of NEXTracker and violated the non-competition agreement as a matter of law." Mem. Op. and Order 32, ECF No. 528. The Court has thus already concluded that the contents of this email related to NEXTracker's business. The Court thus finds that two of the three elements for a contempt finding have been met: a valid court order existed, and Mitchell disobeyed the order by communicating with NEXTracker employees regarding a matter related to NEXTracker business. The remaining question is whether Mitchell had knowledge of the order on February 27, 2017.

Although he was aware by January 31, 2017, that the parties were negotiating a Consent Order, there is evidence suggesting Mitchell was not aware that the Consent Order was entered until March 6, 2017. *See* Mar. 6, 2017 emails, ECF No. 260-9. On the high burden of clear and convincing evidence, the Court finds that Plaintiff has not established that Mitchell knew the Consent Order was in effect on February 27, 2017, when he sent the email. The Court is thus unwilling to find Mitchell in contempt and issue sanctions against him for his conduct before March 6, 2017. Nevertheless, this email evidence will be admissible at trial, and the jury may be instructed as to the legal conclusions this Court made as a matter of law based on the undisputed evidence in its prior Memorandum Opinion and Order.

### 2.  Digital O&M[1]

Array next contends that Mitchell worked on a project called "Digital O&M" and "analytics," which NEXTracker was developing to better market and sell its trackers. Array argues that the Digital O&M work Mitchell was supposedly doing for Flex was really for NEXTracker. Defendants assert, however, that Mitchell's Digital O&M efforts in February through July 2017 were Flex initiatives, and thus, his work did not violate the Consent Order.

Turning to the proffered evidence, in the fall of 2016, NEXTracker acquired BrightBox Technologies, an analytics company, and NEXTracker's and BrightBox's integrated teams worked on digital O&M capabilities. *See* Pl.'s Ex. 4, ECF No. 500-4. Robert Koch was the CEO of BrightBox and became NEXTracker's SVP of Business Development. *See* Mitchell Dep. 105:11-13, ECF No. 500-9; Pl.'s Ex. 7, ECF No. 500-7. NEXTracker's Digital O&M was a tool for its engineering team to gather O&M data and see how equipment was performing in the field, and it was presented to customers as a method of extracting data from their solar plant. *See* Koch Dep. 58:13-60:8, ECF No. 483-13, and 60:19-62:3, ECF No. 500-3. Digital O&M initially focused on NEXTracker trackers. *See id.* at 60:5-8, ECF No. 483-13. NEXTracker slides in late fall 2016 and in 2017 highlighted NEXTracker's analytics and Digital O&M capabilities. *See* Pl.'s Ex. 15, ECF No. 500-15; Nov. 22 and 28, 2016 emails, ECF No. 483-9.

On October 31, 2016, Koch emailed a NEXTracker "Exec Team," including Mitchell, and said he attended a conference with Booth and Mitchell and explained that there is a big opportunity for NEXTracker to model long-term costs related to tracker O&M. Pl.'s Ex. 7, ECF No. 500-7. On December 11, 2016, Mitchell sent Koch a draft agenda for a Recurrent Energy Meeting with a bullet point for "Tracker Monitoring/Controls Discussion" about using "analytics to assess

---

[1] "O&M" refers to operations and maintenance related expenses. *See* Mem. Op. and Order 3, ECF No. 537.

performance (e.g. of a motor or battery) and anticipating failure rates," which was part of Digital O&M, and increasing output of a solar plant "based on optimized tracking." Pl.'s Ex. 8, ECF No. 500-8; Mitchell Dep. 289:10-17, ECF No. 500-9.

During the period of the Consent Order, on May 2, 2017, Koch sent an email about a "NX Analytics Presentation" to multiple NEXTracker employees and to Mitchell at his Flex email address, noting that the presentation should be relevant for current projects. *See* May 2, 2017 email, ECF No. 480-20. That same day, Mitchell forwarded the emails on the NX Analytics Presentation to Scott Graybeal of Flex and said, "Just wanted you to see this as well, along the lines of our conversation about flying below radar, potentially." *Id.* The May 2017 "NEXTracker: Data & Analytics Case Study" presentation was about NEXTracker tracker analytics and included slides on tracker angles, motor/panel/battery data, slew gear health analysis, motor health analysis, battery health analysis using a clustering technique, and yield enhancement product development using data tracking that would result in a "NEXTracker Advantage." *See* Pl.'s Ex. 10, ECF No. 500-10; Shugar Dep. 175:6-9, ECF No. 500-12; Koch Dep. 228:21-229:1, ECF No. 500-3; Britt Dep. 164:18-21, ECF No. 500-13. After receiving this email, Graybeal responded, "This is awesome. Thanks." May 2, 2017 email, ECF No. 480-20. Koch explained that he sent this email to Mitchell because he and others on the email "were working on Digital O&M" and his understanding was that Mitchell's main job when he was working for Flex was Digital O&M. Koch Dep. 230:3-13, ECF No. 500-3.

Based on the contents of the May 2, 2017 emails, NEXTracker executives communicated with Mitchell concerning NEXTracker business, but as discussed above, the Consent Order only applied to Mitchell, not NEXTracker. Accordingly, the Court finds that NEXTracker did not violate the terms of the Consent Order because it was not subject to the Order. Mitchell did not

respond by email to the NEXTracker executives, instead forwarding the email to Graybeal at Flex. This evidence thus does not show Mitchell sent communications to NEXTracker regarding NEXTracker business. The Court recognizes that inferences may be made from this evidence about Mitchell's potential involvement in NEXTracker business, but the finding on a contempt motion is clear and convincing evidence. The Court does not find that standard satisfied to justify imposing sanctions regarding the May 2, 2017 emails.[2]

Array also points to a weekly status report Mitchell purportedly wrote to his Flex manager on March 30, 2017, which among other things highlighted, "Coordinating with Rob Koch on the Digital O&M evaluation and Tracker SCADA efforts." Pl.'s Ex. 14, ECF No. 500-14.[3] When asked at his deposition whether he recalled such coordination, Mitchell said he did not specifically recall doing that. Mitchell Dep. 339:25-340:12, ECF No. 500-9. There is evidence in the record that Flex had its own Digital O&M initiative that was not unique to solar trackers. *See* Graybeal Tr. 179:6-181:7, 184:15-185:17, ECF No. 514-3; Hutson Tr. 179:1-182:13-18, 274:12-277:8, 278:19-25, ECF No. 514-4; Mitchell Dep. 369:2-22, ECF No. 514-7; Defs.' Ex. I, ECF No. 514-9; Mitchell Decl. ¶¶ 2-11 ECF No. 513-1. The Court does not find based on the heightened clear and convincing evidence standard that Mitchell should be found in contempt and sanctioned for communicating directly or indirectly with NEXTracker regarding NEXTracker business based on the March 30, 2017 weekly status report. While negative inferences may be drawn from Array's evidence, such determinations are more appropriately left for the jury.

---

[2] In its reply, Array cites additional evidence of NEXTracker executives sending emails to Mitchell on February 9, 2017, *see* Pl.'s Ex. 7, ECF No. 518-7, and Mitchell attending conferences, *see* Pl.'s Ex. 9-12, ECF Nos. 518-9 to 518-12. The Court need not consider new evidence in a reply to which the opposing party did not have an opportunity to address. Nevertheless, the Court notes that this evidence does not show on a clear and convincing evidence standard that Mitchell sent emails to or otherwise communicated with NEXTracker executives, as required to violate the Consent Order. The inferences to be drawn from this evidence are best left for the jury's resolution.

[3] "SCADA" refers to Supervisory Control and Data Acquisition. Mitchell Decl. ¶ 2, ECF No. 513-1.

Finally, Array contends that work on Digital O&M for Flex related to NEXTracker's business. In its reply, Array relied on an email string in which Mitchell emailed Sol Hutson and Sergio Gonzalez of Flex on May 11, 2017, about a conversation he had with the Director of Sales for Green Power Monitoring ("GPM") in which the GPM director relayed that the bulk of data coming off of solar sites is tracker data and he thought "our timing is perfect to try and bring a new level of sophistication and professional software engineering approach to tracker data." May 11, 2017 email, ECF No. 518-20. Hutson replied to be sure to share, perhaps as a "VOC compilation" with "NX and BB folks." *Id.* Mitchell replied, "I'm not supposed to have any direct communications from my end, so Sergio can you send this out to Ryan Booth and Robert Koch?" *Id.* Later that same day, Gonzalez sent an email entitled "Digital O&M – Voice of Control Intel" to Koch, Booth, and other NEXTracker employees, stating among other things, "Overall our timing in Digital O&M is perfect to try and bring a new level of sophistication and professional software engineering approach to tracker data." May 11, 2017 email, ECF No. 518-21. Koch responded the next day asking Gonzalez a couple follow-up questions. *See* May 12, 2017 email, ECF No. 518-21. Koch forwarded the emails to Mitchell on May 12, 2017, noting "I just got your text – I should have cc:d you." *Id.*

Array also cited in its reply another string of emails from June 16, 2017, with subject line "NEXTracker Digital O&M w/Ryan Hoffman," between Hutson and Gonzalez of Flex and Koch and Allan Daly of NEXTracker, with Mitchell on the emails, regarding a call with Ryan Hoffman, the president of Miller Bros. Solar, about the "tracker ops portal." Pl.'s Ex. 18, ECF No. 518-18. The emails seek input from Mitchell, but do not contain an email from Mitchell to the NEXTracker executives. *See id.* Shugar testified that the tracker ops portal was a software capability developed by BrightBox for NEXTracker to portray information about the tracker. Shugar Dep. 140:20-25,

ECF No. 518-8. Array also cited in its reply emails dated June 23, 2017 with the same Flex and NEXTracker executives, including Mitchell, with subject line "RE: Prep for call w/Ryan Hoffman," in which Gonzalez noted that overall it was a great call, they were on track for a market solution, but the question is whether it extends beyond trackers or not. Pl.'s Ex. 19, ECF No. 518-19. Hutson replied to all in the email on June 26, 2017, thanking "Allan and Colin for helping set this up and presenting." *Id.*

Because Array did not present this May 11-12 and June 16, 23, and 26, 2017 email evidence in its motion for sanctions, Defendants did not have an opportunity to respond to the evidence. The Court will therefore not consider the evidence at this time and will deny the motion for sanctions based on the new evidence submitted for the first time in the reply brief. Even if the Court considered the evidence now, it would not award the drastic sanction of instructing the jury in a way that essentially grants partial summary judgment against Defendants on issues of liability that the jury should consider. *See Gomes v. Williams*, 420 F.2d 1364, 1366 (10th Cir. 1970) ("The preferred disposition of any case is upon its merits and not by default judgment."). Consequently, the Court is not convinced that these issues are appropriately addressed prior to trial of this matter. Array raised these issues after the Consent Order ended, so the motion is not about mandating future compliance. Because the period of the Consent Order overlaps with the period in which Mitchell's Agreement with Array was still in force, the Court's findings regarding the Consent Order would overlap with factual issues for the jury. The better procedure is to permit the trial to proceed and the jury make its own credibility findings and reach its own verdict on the evidence. Array may raise any issues of violation of the Consent Order after trial should it continue to believe sanctions for violation of the Consent Order are warranted based on the more fully developed record.

### B.  Perjury

Perjury generally requires showing that a witness (1) gave false testimony under oath, (2) concerning a material matter, (3) with willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. *United States v. Smith*, 81 F.3d 915, 918 (10th Cir. 1996). According to Array, Mitchell lied about his violations of the Consent Order as evidenced by the following. On April 18, 2017, Mitchell sent an email from his personal email address to Dylan Sontag of Silicon Ranch Corp., an owner/developer of solar power systems, stating that he appreciated "your help with our Digital O&M study in the past" and "[w]e certainly hope that we continue to earn your Nextracker business and your assistance with the digital O&M information is informing how we advance and grow our product offering in the future." Apr. 19, 2017 email, ECF No. 159-10; Mitchell Dep. 344:17-347:14, ECF No. 500-9. Although he used Flex in his signature in the email, Mitchell further said, "We definitely want to alert them [Green Power Monitoring] to what we are doing at Nextracker and find creative ways to work with them on our digital O&M offering." Apr. 19, 2017 email, ECF No. 159-10. Mitchell swore in his deposition, however, that the Digital O&M project study he was referring to was as a Flex employee doing market research. Mitchell Dep. 344:17-345:1, ECF No. 500-9. He testified that the "we" in the email referred to NEXTracker and Flex and that he used "NEXTracker," a well-known name in the industry, as a shorthand because Flex is a lesser-known name. *Id.* at 344:17-347:7. Mitchell averred that the Digital O&M project was a Flex initiative and his reference to "our digital O&M offering" in the email referred to Flex's Digital O&M project, not to the sale of solar tracker equipment or solar tracker systems. Mitchell Decl. ¶¶ 7-8, ECF No. 166-1. He also said he did not specifically know what NEXTracker's product offering in the Digital O&M space was, despite what he suggested in the email. *See* Mitchell Dep. 346:20-347:14, ECF No. 500-9.

This April 18, 2017 email to Mr. Sontag did not violate the express terms of the Consent Order because it was not a communication with Defendant NEXTracker. Array nonetheless contends the evidence is an admission by Mitchell that he was violating the Consent Order with his Digital O&M work, and that his deposition testimony was so unbelievable that the Court should find it constitutes perjury. Perjury, however, requires a high burden of proof. The Court is not convinced on this record that a perjury finding is warranted and that sanctions should be imposed. Instead, any negative inferences to be drawn from the email and the resolution of whether Mitchell's work on Digital O&M benefitted NEXTracker or Flex is better left for the jury at trial when resolving factual questions concerning liability.

Array additionally points to Mitchell's own testimony about communications he believed he was allowed to have with NEXTracker or NEXTracker customers from September 2016 until August 2017: "I felt like I could have conversations. I could facilitate conversations between Flex and its wholly owned subsidiary of NEXTracker to connect customers with a need to NEXTracker colleagues who could respond to that." Mitchell Dep. 105:1-10, ECF No. 500-9. This testimony, however, does not establish a violation of the Consent Order or perjury based on the heightened burden of proof, and for the reasons described above, the Court does not find sanctions are warranted. Once again, this testimony may be used against Mitchell at trial, but the Court will not impose sanctions based on it.

Next, Array asserts that Defendants lied to cover up Mitchell's employment with NEXTracker. Plaintiff points to numerous documents suggesting that Mitchell was working for NEXTracker, not Flex. *See* Pl.'s Mot. 18-19, ECF No. 500.[4] Array asserts that Defendants

---

[4] Plaintiff's cited evidence includes an Aug. 23, 2016 email from Marco Garcia, ECF No. 500-18 ("Colin will start his training at NX in Fremont on Tues 9/6. I will complete the Freshdesk request for IT onboarding."); a 2016 Form W-2, ECF No. 480-15 (listing Mitchell as employee and NEXTracker as employer); a paystub dated 1/31/2017 paid by NEXTracker to Mitchell, ECF No. 480-14; a Jan. 31, 2017 email, ECF No. 500-25 ("I spoke to

committed perjury by repeatedly testifying that Mitchell worked for Flex, not NEXTracker, until August 2017. *See*, *e.g.*, Shugar Dep. 36:17-20, ECF No. 500-12; Garcia Dep. 53:17-24, ECF No. 500-23; Graybeal Dep. 97:12-20, ECF No. 500-6; Mitchell Dep. 77:25-12, 100:11-15, ECF No. 500-9. Array further contends that Mitchell committed perjury when he swore that, in 2017, he was working on the sale and promotion of Flex photovoltaic modules or solar panels. *See* Pl.'s Reply 2, ECF No. 518 (and evidence cited therein).

Array's evidence of perjury is the same evidence that the jury will examine at trial to determine whether Mitchell was working for NEXTracker rather than Flex. Defendants dispute this evidence, relying on their competing evidence indicating Mitchell worked for Flex. *See*, *e.g.*, Defs.' Resp. 15-17, ECF No. 514 (and cited evidence).[5] The question of perjury is disputed in this case, unlike many of the cases upon which Plaintiff relies. This issue is one for the jury and will require credibility determinations and weighing the parties' respective evidence. The Court declines to co-opt that determination and hold an evidentiary hearing that litigates the very same issues that will be fleshed out at trial. The Court will not impose sanctions based on the disputed factual issues. *Cf. Fontell v. Hassett*, 870 F.Supp.2d 395, 414 (D. Md. 2012) ("Factual disputes are common in litigation, and it is not the province of the Court to make such credibility determinations…. [I]t is beyond the Court's purview in this civil matter to provide relief under criminal statutes."); *Emanuel v. State*, 601 So.2d 1273, 1275 (Fla. Dist. Ct. App. 1992) ("Where,

---

Scott Graybeal and there will be enough work for Colin in the Flex space."); and a Feb. 13, 2017 email, ECF No. 500-26 ("NEXTracker has a court order that requires this transfer."). Notably, many of the exhibits Plaintiff relies on discuss activity prior to entry of the Consent Order. *See* Sept. 8, 2016 email, ECF No. 478-34; Sept. 22, 2016 email, ECF No. 478-35; Sept. 26, 2016 email, ECF No. 478-38; Sept. 30, 2016 email, ECF No. 480-11; Oct. 9, 2016, ECF No. 478-25; Oct. 11, 2016 email, ECF No. 478-26; Nov. 2, 2016 email, ECF No. 478-24; Nov. 16, 2016 emails, ECF Nos. 478-39 and 478-40; Nov. 17, 2016 emails, ECF Nos. 480-17 and 480-18; Nov. 30, 2016 email, ECF No. 483-12; Dec. 16, 2016 email, ECF No. 500-20; Jan. 9, 2017 email, ECF No. 478-28; Jan. 18, 2017 email, ECF No. 500-21.

[5] For example, Defendants cite testimony from NEXTracker and Flex executives that Mitchell worked for Flex and evidence he attempted to sell solar modules for Flex. *See*, *e.g.*, Shugar Dep. 169:17-170:3, ECF No. 486-3; Waldron Dep. 61:6-62:8, ECF No. 514-11; Graybeal Dep. 43:21-44:20, ECF No. 486-4; Sept. 14, 2016 email from Mitchell ("Flex wants to ship modules this quarter … when do you need those modules").

however, the falsity of the testimony is denied and is a matter merely of inference of opinion, the court should not weigh the conflicting evidence in a contempt proceeding, but should leave the alleged contemner to be punished criminally if guilty of perjury.") (quoting *State v. Coleman*, 138 Fla. 555, 189 So. 713, 715 (1939)).

### C.  Obstruction of Discovery

Array asserts that Defendants obfuscated Array's efforts to obtain complete discovery and made misrepresentations to the Court, relying on the following evidence. On July 3, 2018, Array moved to compel Defendants to fully produce all Mitchell's emails because it had only received 512 emails, which seemed low. *See* Pl.'s Mot. to Compel 10, ECF No. 159. Defendants replied that Mitchell made a reasonable search for and produced responsive, non-privileged communications and there remained nothing further to produce. Def.'s Resp. to Mot. to Compel 17-18, ECF No. 166. Based on this representation, the Honorable Laura Fashing denied Array's request to search for and produce additional emails. *See* Order ¶ 3, ECF No. 226.

On October 25, 2018, Array filed another motion to compel the production of all relevant Mitchell emails after having received some Mitchell emails in response to a third-party subpoena that Defendants should have produced but did not. *See* Pl.'s Mot. to Compel 2, ECF No. 238. According to Defendants, there was a problem with the vendor in conducting its word searches and they subsequently remedied the problem and produced the requested emails as of November 16, 2018, except for those hitting on privileged terms. *See* Nov. 20, 2018 Discovery Hr'g Tr. 28:13-29:21, 35:7-37:19, ECF No. 279. Defense counsel explained at a hearing that the review process for privileged documents was ongoing, and if they determined emails were not privileged, they would produce them. *See id.* at 29:17-21. Judge Fashing later noted, "your representation now today is that all the emails have been produced? I'm going to say right now you better hope that

they don't find other emails from other third parties that were not produced. I'm just suggesting that to you." *Id.* at 39:18-22. On November 21, 2018, Defendants produced over 900 additional emails after their manual privilege review, and they produced 600 more emails in February 2019 after Array served a subpoena on Koch. *See* Defs.' Ex. M, ECF No. 514-13; Pl.'s Mot. for Sanctions 23, ECF No. 500.

Defendants contend this motion for sanctions based on purported obstruction of discovery is untimely because it is based on an old discovery dispute and the filing of this motion occurred after the deadline for discovery motions. Moreover, they note that they stated at the hearing that they would produce emails that were not privileged as part of their manual review process, and they subsequently did produce those emails. Defendants argue there was no prejudice from the disclosure, which occurred months before Mitchell's deposition.

As for these discovery delays, the Court declines to find Defendants in contempt over them. Plaintiff has not relied on other discovery rules in support of its motion for sanctions. *See Bagwell*, 512 U.S. at 833 ("Courts traditionally have broad authority *through means other than contempt*—such as by striking pleadings, assessing costs, excluding evidence, and entering default judgment—to penalize a party's failure to comply with the rules of conduct governing the litigation process. *See*, *e.g.*, Fed. Rules Civ. Proc. 11, 37.") (italics added). Moreover, Plaintiff's requested monetary and equitable sanctions for the discovery violations seem disproportionate to the harm, and they have not requested a lesser form of sanctions, such as attorneys' fees stemming from the need to file repeated motions to compel.[6]

---

[6] Although Plaintiff notes in a footnote in its reply that the Court has wide discretion to fashion an appropriate remedy, including awarding Array its attorney's fees and costs incurred during fact discovery, the Court will not consider an argument raised for the first time in a reply brief when the opposing party did not have an opportunity to address the argument. *See* Pl.'s Reply 18 n.9, ECF No. 518. Moreover, Plaintiff has not requested a specific sanction in the form of what attorney's fees. The Court thus declines to issue a contempt sanction in the form of attorney's fees based on the current record.

### D. Sanctions Requested in Motion Will Not Be Granted

Even if Array were able to show contempt, the sanctions requested in its motion are not sufficiently tied to its resulting harm. Turning first to Array's request for a $2 million sanction, Plaintiff has not met its burden of showing that the requested amount compensates Array for losses it sustained resulting from Mitchell's alleged noncompliance with the Consent Order. An award in that amount will not serve a compensatory function and would instead require procedures more akin to those afforded a criminal defendant. *See Taggart*, 139 S.Ct. at 1801. Array in its motion relied on a general statement by Defendants' industry expert that NEXTracker's analytics helped it sell trackers, but Array cited no evidence in its motion relating the $2 million figure to specific losses sustained and has not met its burden for showing it is entitled to such a serious contempt fine. *Cf. O'Connor*, 972 F.2d at 1211 (explaining that amount of fine imposed for compensatory purposes must be based upon complainant's actual losses sustained as a result of disobedience and holding fine was arbitrary because of absence of evidence showing amount of loss).[7] Furthermore, while Array explains why NEXTracker could afford a $2 million sanction as the cost of doing business, Array has not shown the same reasoning applies to Mitchell, the only defendant bound by the Consent Order.

Array also requests jury instructions that (1) Mitchell was actively working for NEXTracker from September 2016 until February 6, 2017; (2) he worked in NEXTracker-related business during the period of the Consent Order; (3) his conduct was intended to harm Array and assist NEXTracker in competing with Array in the market and on the projects at issue; and (4) his

---

[7] Array supplied some evidence in its reply brief on damages resulting from NEXTracker's Digital O&M efforts, *see* Pl.'s Reply 17-18, ECF No. 518, but the Court will not consider evidence submitted for the first time in a reply brief when Defendants did not have an opportunity to respond to the evidence. Moreover, causation is a heavily contested issue in the case, one for the jury first to decide. As discussed below, for reasons of efficiency, the Court will not hold a pretrial evidentiary hearing on Plaintiff's sanctions request that will duplicate the evidence at trial.

conduct caused Array harm in an amount to be determined at trial. *See* Pl.'s Mot. for Sanctions 26, ECF No. 500. This Court already made detailed rulings on numerous motions for summary judgment, including rulings as to whether the parties were entitled to partial summary judgment on various legal elements of the claims in this case. For example, this Court granted Plaintiff's request for partial summary judgment on the breach of contract element as to Plaintiff's theory that Mitchell breached the non-competition provision of his contract with Array by sending quotes to Primoris. *See* Mem. Op. and Order 45, ECF No. 528. The jury may be instructed on the Court's legal rulings arising from the undisputed facts. However, as discussed *supra*, the requested jury instructions in this motion for sanctions are not warranted. The record is not so egregious as to compel the serious sanction of deciding issues of liability and taking those decisions from the jury.

### E.  Ruling is Without Prejudice

For reasons of efficiency and to avoid interfering with the jury's role, the Court will not hold a pretrial evidentiary hearing that will duplicate the presentation of evidence at trial. Array, however, may re-raise issues of violation of the Consent Order after trial, should it wish to do so. If after any such briefing the Court finds a hearing is warranted, it will have the benefit of a fully developed record, and its consideration of issues surrounding the Consent Order will not interfere with the jury's role in making necessary evidentiary findings.

**IT IS THEREFORE ORDERED** that Plaintiff's *Motion for Sanctions for Violation of Consent Order, Perjury, and Contempt* (**ECF No. 500**) is **DENIED without prejudice**.


_____
SENIOR UNITED STATES DISTRICT JUDGE