# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**ARRAY TECHNOLOGIES, INC.,**

**Plaintiff,**

vs.                                                                    **Civ. No.  17-087 JCH/LF**

**COLIN MITCHELL, and individual,**
**NEXTRACKER, a Delaware corporation,**
**MARCO GARCIA, an individual,**
**DANIEL SHUGAR, an individual,**
**SCOTT GRAYBEAL, an individual,**
**FLEXTRONICS INTERANTIONAL U.S.A., INC.,**
**a California corporation,**

**Defendants.**

## SEALED MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the following motions filed by the parties: *Defendants' Further Motion for Summary Judgment Regarding Lack of Causation Evidence for Specific Solar Projects Per Order D.I. 537* (ECF No. 564) and *Array Technologies, Inc.'s Brief Regarding Pretrial Resolution of the Admissibility of Project-Related Evidence* (ECF No. 565). In a Memorandum Opinion and Order filed on September 30, 2020, this Court denied a motion for summary judgment filed by Defendants on the issue of causation after concluding that Plaintiff submitted sufficient evidence to present the issue of causation to the jury. (Mem. Op. and Order 32, ECF No. 537.) The Court noted, however that evidence on "projects for which Array could not prove but-for causation as a matter of law may be inadmissible at trial for lack of relevance." (*Id.* at 33.) Because the parties did not analyze many of the projects specifically, the Court was bereft of meaningful analysis and declined to conduct a summary judgment analysis project-by-project.

(*Id.* at 34.) Instead, the Court concluded that the matter was an evidentiary one and noted that the parties should file motions for pretrial resolution of the admissibility or inadmissibility of evidence pertinent to specific projects, not therein discussed, 90 days before trial. (*Id.*) The parties then timely filed their respective motions on these issues, contesting the admissibility of 28 specific projects.[1] Having considered the motion, briefs, evidence, applicable law, and otherwise being fully advised, the Court will grant in part and deny in part Defendants' *Further Motion for Summary Judgment Regarding Lack of Causation Evidence for Specific Solar Projects per Order D.I. 537* (ECF No. 564) and *Array Technologies, Inc.'s Brief Regarding Pretrial Resolution of the Admissibility of Project-Related Evidence* (ECF No. 565), as explained herein.

## I.    STANDARD

The parties dispute the applicable standard. Defendants contend that the applicable standard is that of summary judgment because, once the Court determines Array lacks sufficient evidence to support a finding of causation on a particular project, all evidence on that project becomes irrelevant. (*See* Defs.' Further Mot. for Summ. J. 6, ECF No. 564.) Array asserts that, because this Court denied Defendants' motion for summary judgment on causation, the issue is solely an evidentiary one and the relevancy standard is broad. Because Defendants have moved for summary judgment on whether Plaintiff can prove entitlement to particular lost profits from specific lost projects, the first issue is one invoking the summary judgment standard.

To determine the summary judgment issue, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings

---

[1] Defendants challenge the causation evidence for 29 projects. Array, however, no longer intends to present evidence on the Nevertire project, so the relevance of only 28 projects is now in dispute. (*See* Pl.'s Opp. 2 n.1, ECF No. 569.)

and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). Only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

As for the admissibility of specific evidence at trial, Rule 401 states that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. The degree of probative value necessary to meet the Rule 401 standard is very low. *United States v. McVeigh*, 153 F.3d 1166, 1190 (10th Cir. 1998). "Irrelevant evidence is not admissible." Fed. R. Evid. 402. A fact is relevant when it provides the jury "with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict." *McVeigh*, 153 F.3d at 1190. A court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

For projects that Array cannot show it lost because of the alleged misconduct in the case as a matter of law, Defendants will be entitled to partial summary judgment. Evidence related to those projects will not be relevant as to the issue of damages. This opinion only addresses the relevancy of the projects as to damages.

## II.    FACTUAL BACKGROUND

The Court incorporates the facts set forth in the Court's Memorandum Opinion and Order (ECF No. 537). Facts concerning the specific projects at issue are discussed herein.

### III.    ANALYSIS

Turning first to the issue of causation, the plaintiff has the burden of proving that the tortious act or breach of contract was a cause of its injuries and damages. *See Wilcox v. Homestake Mining Co.*, 619 F.3d 1165, 1166 (10th Cir. 2010); N.M. U.J.I. 13-302B. Generally, the jury determines the issue of causation, but the issue becomes one of law if the facts are not in dispute and the reasonable inferences to be drawn therefrom are plain and consistent. *Adamson v. Highland Corp.*, 1969-NMCA-007, ¶¶ 10-11, 450 P.2d 442. *See also Galvan v. City of Albuquerque*, 1973-NMCA-049 ¶ 12, 508 P.2d 1339 ("Where reasonable minds may differ on the question of proximate cause, the matter is to be determined by the fact finder. Where the facts are not in dispute and the reasonable inferences from those facts are plain and consistent, proximate cause becomes an issue of law.") (internal citation omitted). *See also Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 620 ("Although causation is generally a question of fact, the question becomes an issue of law when there is no evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries.") (internal quotations omitted).

In New Mexico, to establish liability, there must be a chain of causation initiated by a defendant's act or omission, "which in legal terms is the cause in fact or the 'but for' cause of plaintiff's injury." *Chamberland v. Roswell Osteopathic Clinic, Inc.*, 2001–NMCA–045, ¶ 18, 27 P.3d 1019. An act or omission is a "cause" of harm if "it contributes to bringing about the [injury] [harm] … [, and if injury would not have occurred without it]." N.M. U.J.I. 13-1305. *See also Chamberland*, 2001-NMCA-045, ¶ 18 (explaining that UJI 13-305 defines cause in fact as "that

… without which the injury would not have occurred"). The tortious act or breach, however, "need not be the only explanation for" the injury or harm. N.M. U.J.I. 13-1305. "It is sufficient if it occurs in combination with some other cause to produce the result." *Id.* To be a "cause," the act "must be reasonably connected as a significant link" to the harm. *Id.* This latter sentence expresses the proximate cause element of causation. N.M. U.J.I. § 13-305, Committee commentary. A plaintiff can recover from a defendant only if the defendant's conduct was "either (a) a but-for cause of the plaintiff's injury or (b) a necessary component of a causal set that (probably) would have caused the injury in the absence of other causes." *June v. Union Carbide Corp.*, 577 F.3d 1234, 1244 (10th Cir. 2009).

When a defendant breaches a contract, he is responsible for "all damages flowing naturally from the breach." *Sunnyland Farm, Inc. v. Central New Mexico Elec. Co-op, Inc.*, 2013-NMSC-017, ¶ 11, 301 P.3d 387 (internal quotations omitted). For consequential damages arising from a breach of contract claim, a plaintiff is required to prove that the breach in fact caused the loss. N.M. U.J.I. § 13-843A (listing as an element for special or consequential damages that damages "were in fact caused by" the breach of contract); *Porcell v. Lincoln Wood Products, Inc.*, 713 F.Supp.2d 1305, 1314 (D.N.M. 2010) (quoting 3 Dan B. Dobbs, *Law of Remedies* 65 (2d ed. 1993)).

A factfinder may rely on circumstantial evidence to draw reasonable inferences therefrom to support a conclusion on causation. *Cartel Asset Management v. Ocwen Financial Corp.*, 249 F. App'x 63, 75 (10th Cir. Sept. 18, 2007) (applying Colorado law). While a plaintiff need not prove a claim for lost profits with absolute certainty, the plaintiff must establish with "sufficient certainty that reasonable minds might believe from a preponderance of the evidence that such damages were

actually suffered." *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1184 (10th Cir. 2009) (applying Oklahoma law).

Plaintiffs have also asserted equitable remedies. Courts may turn to equitable remedies when money damages are speculative, and an equitable remedy does not preclude a monetary award. *See Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F.2d 556, 564-65 (4th Cir. 1990) (awarding constructive trust over competitor's ill-gotten profits where it was uncertain plaintiff's actual damages from former employee's breach of non-competition agreement). For an unjust enrichment claim, the plaintiff must trace lost profit damages to the misappropriation, or in other words, prove the gains to the defendant were from the breach or misappropriation. *See Cartel Asset Management*, 249 F. App'x at 76-79 (concluding there was enough evidence for jury to reasonably infer that bank used misappropriated names to contact agents, purchased broker price opinions, and resold the broker price opinions, creating a savings or profit for the bank traceable to the misappropriation).[2]

Array argues that in trade secret misappropriation cases a jury is entitled to infer from evidence of access to the trade secret that the defendant used the trade secret. From this proposition, Array contends that it is entitled to present to the jury evidence of all projects that NEXTracker won after it had access to Array's trade secrets. According to Defendants, Array is confusing issues of liability with causation. Defendants acknowledge, relying on N.M. Stat. Ann. § 57-3A-2(B), that under New Mexico law misappropriation of trade secrets is defined as acquisition *or*

---

[2] Array argues that *Cartel* stands for the proposition that Array only needs to show that Defendants used the trade secret and benefitted, and upon that showing, the burden of proof of causation shifts to Defendant to show that their profits were attributable to other factors distinct from the trade secret. In *Cartel*, however, the Tenth Circuit concluded that the plaintiff submitted enough circumstantial evidence for a jury to trace savings or profits to the bank arising from the misappropriation. After that, the burden shifted to the defendant to apportion its net profits between its product streams and the costs associated with its business. *See Cartel Asset Management*, 249 F. App'x at 79. *Cartel* does not relieve the plaintiff of the burden of showing that the defendants' savings or profits arose from the breach or tortious act.

disclosure *or* use. (*See* Defs.' Resp. 4, ECF No. 570.) Defendants instead argue that Array fails to offer even a minimal amount of circumstantial evidence from which a jury could infer a causal connection between any acquisition or use of misappropriated information and the alleged project loss.

Under Array's theory, it is entitled to damages for a project that NEXTracker won after it knew of the alleged trade secret even if there is no evidence suggesting that the acquisition or use of Array's trade secret had any bearing on the customer's decision on a particular project, for example, even if there is no evidence that the customer was concerned with O&M costs or that NEXTracker effectively underbid Array's pricing, the focus on which Mitchell's alleged trade secret disclosures was directed. While the jury is entitled to rely on circumstantial evidence, reasonable inferences must be more than speculation and conjecture. *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 (10th Cir. 1987). An inference is reasonable if an ultimate fact will logically follow a stated narrative or historical fact. *Id.* (quoting *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 895 (3d Cir. 1981)). A factfinder may not assume a causal connection between two events solely because one follows the other because such an inference is too speculative. *Id.* at 521 & n.8. *See also McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005) ("simply because a person takes drugs and then suffers an injury does not show causation" and drawing "such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy," meaning "after this, because of this"). Consequently, if all Array has to support that it lost a project to NEXTracker was that it lost the project to NEXTracker after NEXTracker had access to Array's trade secrets, then Array is relying solely on an insufficient temporal relationship to establish causation. With only temporal evidence, a jury may not reasonably draw a non-speculative inference on causation. *Cf. Christensen v. United States*,

No. 2:05CV55DAK, 2007 WL 1467347, at *7-8 (D. Utah May, 18, 2007) (granting summary judgment to defendant because of lack of any evidence of causation other than a temporal relationship).

Nevertheless, the Court agrees with Array that factual determinations are generally left to the jury on questions of causation. Where Array has presented evidence to support causation that is based on more than a mere temporal inference, the Court will permit Array to present the evidence to a jury so that it may determine if the circumstantial evidence is sufficient to establish causation. *Cf. Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1183-84 (10th Cir. 2009) (concluding that trial court's findings awarding lost profit damages arising from breach of non-competition agreement were not in error where there was evidence that former employer had lost just one order from company to its competitor in decade proceeding former employer's departure; former employer helped price former employer's quote before he left; former employer was friendly with the company's purchasing contact; and the bid was just slightly less than that of former employer's).

## A.     Projects that are relevant and admissible based on the Court's prior ruling

This Court previously concluded there was sufficient evidence on causation to present to a jury regarding the following projects: Upton, Mount Signal 3, Southampton, Buckthorn, and the Boa Hora projects. (*See* Mem. Op. and Order 28-31, ECF No. 537.) The Court's ruling on the Upton project extends to the Upton 2 project. (*See id*.; Defs.' Further Mot. 7 n.3, ECF No. 564). Defendants have not sought to exclude evidence from trial concerning the Dairy, Merrill, Lakeview, or Turkey Hill projects. (*See* Defs.' Further Mot. 50, ECF No. 564.) The Court will therefore restrict its analysis herein to the 28 projects whose relevance at trial the parties currently contest.

B.    **Projects for which the parties contest admissibility**

1. **Australia projects**

According to Defendants, the Australia projects should be excluded from evidence because Array has no evidence that Mitchell himself interacted with any of the customers for these projects, and that the little evidence there is related to these projects requires the jury to find causation based on assumptions and timing. On the other hand, Array contends there is ample evidence for a jury to reasonably conclude that Defendants' alleged misconduct caused it to lose the Australia projects to NEXTracker.

In a separate Memorandum Opinion and Order, this Court permitted Robert Parkins ("Parkins") to offer expert testimony related to the Australia projects. As relevant here, Parkins will testify that multiple factors can influence the customer's decision about which tracker to purchase, including geographical location, site-specific considerations, capital costs ("CapEx"), operational costs, reputation of the tracker companies being considered, warranty coverage and terms, reliability, track record, bankability, levelized cost of electricity ("LCOE"), and power requirements (such as power generation, performance optimization, and performance guarantees). (Mem. Op. and Order 5-6, ECF No. 536.) The term "O&M" refers to operations and maintenance related expenses, which for trackers include replacement of inverters and other expendable parts. (*See* Parkins Report 14, ECF No. 439-3.) O&M related expenses are an important factor in OpEx, the cost to operate and maintain the project or product, because dependability is crucial. (*See id.* at 14-15.) O&M reliability is especially critical for utilities, because to prepare for brown or black outs, utilities operate reserve or stand-by generation plants at considerable expense. (*Id.* at 15.)

Array's Net Present Value ("NPV") tool highlighted Array's O&M and installation advantages. (Parkins Report 1, ECF No. 439-3.) The NPV tool was a spreadsheet that allowed

customers to compare the cost over the life of the project of different tracking architectures. (*Id.* at 20.) Array developed its sales presentation, using the NPV tool with a PowerPoint presentation, to highlight its O&M advantages. (*See id.* at 20-24.) Array's NPV tool, sales pitch, and other related O&M information was valuable, and Mitchell's disclosures of information led to Defendants' use of that information to create a rebuttal pitch that would contribute to NEXTracker winning projects against Array. (*Id.* at 45.) After NEXTracker adjusted its sales pitch by attacking the specifics of Array's O&M pitch, it began to stop its losses in Australia. (*Id.*)  Reliability was a big factor for Australian utilities. (*See* Parkins Dep. 241:20-242:17, ECF No. 475-1.)

On October 7, 2016, Marco Garcia ("Garcia") of NEXTracker emailed Peter Wheale ("Wheale"), NEXTracker's vice president of sales in the Australia Pacific region, and he opined that "we should bid aggressively to secure the business and keep ATI out of AU [Australia]." (Oct. 7 and 9, 2016 emails, ECF No. 478-41 at 2-3 of 3.) Garcia noted that he had been told that the tracker selection "will be based on price." (*Id.*) In response, Wheale told Garcia he "had a great conversation with Collin [sic], so I feel very confident with our pricing." (Oct. 9, 2016 email, ECF No. 478-41 at 2 of 3.) After Garcia asked who "Collin" is, Wheale replied, "Our Collin Mitchell. ATI. They are the only competition on this portfolio. He gave me their benchmark pricing. I heard the same thing from Edify." (Oct. 9, 2016 email, ECF No. 478-41 at 1 of 3.) Wheale called Mitchell because he had worked for ATI. (Wheale Dep. 220:7-9, ECF No. 478-42.)

In November 2016, NEXTracker lost a 180 MW project in Australia to Array, after which the client told NEXTracker it lost the deal on O&M. (*See* Nov. 18, 2016 email, ECF No. 481-2.) On November 9, 2016, Wheale sent an email to Greg Beardsworth, cc'ing Mitchell among others, asking if his team could put together "an Apples to Apples datasheet on O&M costs between us and ATI" because "[w]e are getting hammered over here on this one issue." (Nov. 9, 2016 email,

ECF No. 478-43 at 1-2.) He further explained: "The developers are using this against us with AU EPCs. I'm sure Colin can help shed the light on the ATI competitive analysis." (*Id.*) Mitchell responded, "I would be happy to help with that." (*Id.*)

On November 17, 2016, Wheale sent an email to Mitchell, Ryan Booth, and Garcia beginning, "Great talking yesterday! As discussed, want to get our messaging around the ATI pitch solidified asap." (Nov. 17, 2016 email, ECF No. 481-12 at 3 of 3.) Garcia responded to Wheale by email, including Booth, Mitchell, Marty Rogers, Robert Koch, among others, noting that the issue "was discussed at length at the Exec Offsite today" and that "Marty Rogers and Rob Koch took an action item to prepare an O&M pitch to counter ATI." (Nov. 17, 2016 email, ECF No. 439-1 at 5 of 9.) Robert Koch was in charge of NEXTracker sales and NEXTracker-related digital O&M efforts. (*See* Mitchell Dep. 187:8-10, ECF No. 486-2.) Garcia also stated that it sounds like Wheale needed something sooner "to save the Edify 130 MW projects," so within the same email he stated:

> Colin – Really need your help here. ATI is kicking our ass with the O&M pitch that you helped create. What are the real O&M weaknesses of ATI? Please reply all.
>
> This is unacceptable to lose business to ATI when we have lower Capex and they win on lower O&M and lower LCOE.
>
> We are being out-sold and out-maneuvered.

(Nov. 17, 2016 email, ECF No. 439-1 at 6 of 9.)

On November 18, 2016, Mitchell sent an email with the subject line "RE:ATI-Need to tighten up our pitch" to NEXTracker employees, stating that the "long term O&M issues for ATI are essentially, added time and effort to wash and clean modules for a linked tracker row" and that the "vulnerabilities in my mind are the 'torque limiting' gear box." (Nov. 18, 2016 12:44 p.m. email, ECF No. 478-44.) Mitchell advised he "would concentrate on poking at the torque limiting gearbox and the lack of any kind of monitoring on a per row level for ATI," and he opined that

"their control system is pretty basic." (*Id.*) He noted that ATI did "a whole fleet wide replacement

… with the shock absorbers and mounting systems." (*Id.*)

The same day, Mitchell sent the following email to, among others, Garcia, Wheale, Booth,

Rogers, Koch, and Shugar:

> The ATI sales presentation these days basically consists of an excel spreadsheet that calculates component costs for Nextracker batteries, controllers, zigbee, motors, etc. and tries to make a comparison between the ATI electronics and the Nextracker electronics.

> This summary estimates a Net Present Value of a 30 year O&M for the Nextracker system as coming to somewhere close to $.01-.015/watt dc.

> I have a colleague at AES Solar who recently confirmed that they internally have estimated a $.01/watt dc NPV for Nextracker long term O&M.

> We will obviously be diving into this with this guy at AES and I have actually reached out to invite him to come to Nextracker so we can take a look at his numbers and understand where they are coming from.

> A lot of the focus is on batteries and distributed tracker controllers.

> As I understand this, AES has a funding scheme that sets aside slightly more money for Nextracker long term O&M than for an ATI system anticipating that at years 10 or 20 for example they would have needed to set aside sufficient money to replace motors, controllers, etc. Similarly, every 5 years they have a target total value of accrued long term O&M money to pay for battery replacements.

> *I think if we can attack this aspect with data and reasonable figures for labor time to replace, etc, then we can really dismantle the basis for the ATI long term O&M argument*.

(Nov. 18, 2016 email, ECF No. 439-1 at 5 of 9 (emphasis added) (hereinafter "RE:ATI-Need to

tighten up our pitch" email).) Shugar also noted regarding this loss that the client "swallowed the

ATI crap and told us we lost the deal on this O&M." (Nov. 18, 2016 email, ECF No. 481-2.)

The next day, Mitchell emailed Wheale saying, "How can I help buddy? Let me know what

I can do. I know that Rob Koch and I and Greg Beardsworth are going to work up a Long Term

O&M analysis but I fear that may [be] too late for you." (Nov. 19, 2016 email, ECF No. 481-12 at

2 of 3.) NEXTracker was concerned about losing projects to Array if they did not get a handle on addressing O&M and reliability concerns. (*See* Nov. 22, 2016 email, ECF No. 481-12; Sept. 2, 2017 email, ECF No. 565-6.)

<strong>a.  RCR Projects (Clermont, Emerald, Greenough II, Longreach, Manildra, Oakey, Swan Hill, and Wemen)</strong>

RCR was an engineering, procurement, and construction ("EPC") project developer in Australia involved in eight solar projects in 2016-2017: Clermont, Emerald, Greenough II, Longreach, Manildra, Oakey, Swan Hill, and Wemen. (Parkins Report 77, ECF No. 439-3.) Array and NEXTracker were competing for these projects. (*See* Parkins Supp. Report 3-4, ECF No. 430-4.) RCR was one of the EPCs with which Wheale worked, and he worked on the Clermont, Emerald, Manildra, Oakey, Swan Hill, and Wemen projects. (*See* Wheale Dep. 48:10-20, 334:1-7, ECF No. 565-8; Pl.'s Ex. 9, ECF No. 365-9.)

On December 6, 2016, Wheale sent an email to Nick Farrington of RCR entitled "ATI Information that we have been driving for Edify – Important" and he attached a PowerPoint to use as a reference to question Array concerning its technology. (*See* Dec. 6, 2016 email, ECF No. 483-10; Parkins Report 79, ECF No. 439-3.) After explaining aspects of Array's sales presentation, Wheale stated:

> I think if we can attack this aspect with data and reasonable figures for labor time to replace, etc, then we can really dismantle the basis for the ATI long term O&M argument.
>
> Here are some of the points I would push and that we will formalize for the future:
>
> 1. NX systems manages about 25kW while theirs is 800kW per motor drive systems. The down time of their system will disrupt a lot of production even if it is only for a day at a time. Assume a communication issue, a motor issue, or a gear binding issue[], all can and will happen on either system but in our case we reduce production on only a small part of the field. 800/25 = 3% of the production is lost for us, while 100% is lost for them. How men [sic] does it take to replace the ATI motor? NX systems have remote failure and remote capability. Meaning, NX can

monitor and remediate problems remotely. Can ATI correct issues remotely or do they need to roll trucks to the site?

….

6. It is key to make them understand that in our system a minor issue on one array does not affect overall production, for ATI, the same issue would mean that the connected central inverter would not produce, or would be greatly curtailed during the outage….

Summary—the cost of maintenance is not driven by the part count, but by the scheduled and unscheduled maintenance. Lost production is most likely the higher value here and they need to understand this first. Again a system that is centralized in its control and command, will be much more likely to bring production down on a greater scale. If they are on site all the time this may be reduced but if they are remote – this will be very expensive over time.

Email received from an ex ATI #1 sales producer in the U.S. High Wind.

(Dec. 6, 2016 email, ECF No. 483-10.) This email included verbatim copies of information from Mitchell's "RE:ATI-Need to tighten up our pitch" email. (*See* Parkins Report 79, ECF No. 439-3; Nov. 18, 2016 email, ECF No. 439-1 at 5 of 9.) After this disclosure to RCR, RCR shared a version of Array's NPV tool with NEXTracker. (Parkins Report 80, ECF NO. 439-3.)

RCR was a conduit for disseminating information to owners and developers of the projects. (Parkins Report 81, ECF NO. 439-3.) NEXTracker won all eight RCR projects after Mitchell sent the aforementioned emails. (*See* Parkins Report 77, ECF No. 439-3.) Moreover, because Mitchell shared Array's benchmark pricing with Wheale, NEXTracker was positioned to bid just enough of a lower price to win these projects. (*See id.* at 81.)

According to Parkins, Array's O&M pitch had been well-received in the Australia market because of the high cost of labor there and a concern about reliability. (Parkins Report 75, 80, ECF No. 439-3.) Australia's solar market is uniquely driven to focus on O&M costs due to grid reliability issues and dispatchability of generation resources. (*See id.* at 74-75.) For projects in Australia, providers had to place funds in maintenance reserve accounts for the estimated

maintenance of the projects for a long duration of time. (*See* Shugar Dep. 135:5-136:21, ECF No. 565-4.) Array's sales pitch and strategy were well suited to the market in Australia because Array promoted the lifetime O&M cost advantages and comparative savings on installation costs for its tracker. (Parkins Report 75, ECF No. 439-3; Nov. 9, 2016 email, ECF No. 478-43.) Parkins believes that the disclosure of Array's trade secrets by Mitchell led to the loss of most if not all the RCR projects. (*Id.*)

Defendants argue that the above evidence is too generalized to establish causation as to each specific RCR project because Array has not provided direct evidence of what RCR considered most important in awarding these specific projects. Because Array's own expert opined that multiple factors go into a customer's decision about which tracker to purchase, Defendants argue that Array cannot show that it lost a particular project without project-specific evidence indicating the relative weight of various factors for the individual projects. Defendants contend that mere evidence that a customer was interested in or received some form of O&M information is not enough to show but-for causation.

With respect to the RCR projects, a jury may infer from the above evidence that NEXTracker itself believed it was in danger of losing the upcoming projects in Australia to Array because of O&M concerns. A jury could find that, because of NEXTracker's belief, it created a counter-pitch for O&M costs from Mitchell's disclosures to use to win the upcoming Australia projects, it gave the counter-pitch to Australian EPCs as it intended, and that the O&M counter pitch was critical to winning the projects from Array. This evidence is more than mere timing. Although the Court recognizes Defendants have evidence that disputes causation on the specific projects, the jury must resolve the factual questions.[3]

---

[3] For example, as for the Clermont, Wemen, and Greenough II projects, Defendants argue that the causal chain was broken because the first bids on the projects were submitted after the expiration of Mitchell's non-compete clause and

### b. Bungala 1 & 2

Array and NEXTracker were bidding for the Bungala 1 and 2 projects, located in South Australia and part of the Bungala Solar Farm. (*See* Stern Report 224, ECF No. 439-5; Parkins Supp. Report 5, ECF No. 430-4.) In May 2017, Elecnor, the EPC on the projects, expressed annoyance with NEXTracker's price increase and stated that it seemed as if NEXTracker were not interested in the projects. (*See* Pl.'s Ex. 74, ECF No. 565-74.) Elecnor indicated that for NEXTracker to get back on the short list for the project, it would need to provide the best price. (*Id.*) NEXTracker, however, had a prior relationship with Elecnor, and Array believed the decision was going to come down to Capex for the projects. (*See* Pl.'s Ex. 36, ECF No. 565-36.) Array was lower in total price than NEXTracker, yet NEXTracker was slightly lower than Array when considering just tracker price, which was after Mitchell disclosed pricing information to Wheale. (*See* Parkins Sur-Rebuttal Report 6, ECF No. 430-4.) Parkins opined that, if the EPC cared only about Capex, Array should have won. (*Id.*) According to Parkins, Array had O&M advantages; however, the timing of the projects after Mitchell's disclosures, which helped NEXTracker dismantle Array's O&M pitch, indicates the EPC may not have been willing to consider Array's O&M advantages. (*See id.*)

Defendants argue this evidence is insufficient to establish that the accused conduct was the but-for reason for the loss of the Bungala 1 & 2 projects, noting that the alleged benchmark pricing from Mitchell to Wheale related to separate projects and occurred in late 2016, far before the projects were awarded in mid-2017. Defendants also point to evidence indicating that other factors

---

the contract was signed after the publication of the TUV Report, which Defendants allege disclosed the information purported to be trade secret. Whether that timing breaks the causal chain is a question for the jury. A jury may determine that Array lost the projects due to Mitchell's disclosures of confidential information and/or his work on behalf of NEXTracker to win RCR's business prior to the expiration of the non-compete clause and publication of the TUV report.

could have affected the award – the customer's preference for a non-linked row tracker, the prior relationship, and the importance of capex to the customer.

Parkins' expert opinion, however, contradicts the importance of these latter factors and explains why O&M should have factored into the decision. The jury may consider the general evidence about why O&M costs were particularly relevant for Australia projects and how NEXTracker's O&M counter-pitch may have affected Elecnor's consideration of Array's O&M advantages. There is evidence that NEXTracker developed and used the O&M counter-pitch specifically to counteract developers' use of Array's O&M analysis with Australian EPCs, and thus, it is reasonable for a jury to infer that NEXTracker would have given its O&M counter-pitch to the Australian EPCs it had created the counter-pitch to target. Construing all inferences in Array's favor as it must, the Court finds there is sufficient evidence of causation to submit the Bungala projects to the jury. Defendants' arguments create a fact question but are not dispositive on summary judgment. The Court will therefore not exclude evidence of the Bungala 1 and 2 projects.

### c. Susan River and Childers

ESCO developed and Biosar built the Australia Susan River and Childers projects, and both Array and NEXTracker bid for the projects. (*See* Parkins Report 82, ECF No. 439-3.) NEXTracker submitted its first bids for the projects in March 2017. (*See* Pl.'s Ex. 37 and 42, ECF No. 565-37 and -42.) Wheale worked on both these projects for NEXTracker. (*See* Wheale Dep. 334:5-21, ECF No. 565-8; Pl.'s Ex. 9, ECF No. 565-9.) In November 2016, NEXTracker learned it lost a 130 MW ESCO project called Ross River to Array. (Parkins Report 83, ECF No. 439-3.) NEXTracker believed ESCO was pushing EPCs to choose Array's trackers. (Pl.'s Ex. 35, ECF No. 565-35.) ESCO was concerned about O&M, and in May 2017 ESCO requested O&M cost

build up information and NEXTracker's white paper on O&M "including the details of how NEXTracker [was] addressing the issues of serial defects and battery life." (Pl.'s Ex. 38, ECF No. 565-38.) NEXTracker provided ESCO with "the O&M White Paper and will follow up with the O&M costing tomorrow." (*Id.*) In October 2017, NEXTracker shared with ESCO a PowerPoint document about NEXTracker's quality and reliability. (Pl.'s Ex. 39, ECF No. 565-39.) NEXTracker won the contracts in late 2017. (Parkins Report 82, ECF No. 439-3.)

Defendants cite an email dated July 21, 2017, in which Michael Corio, a Sales Leader for Array, after learning the latest bid from NEXTracker on the Susan River project, advised that "we should focus on the other large projects in the market." (Defs.' Ex. 37, ECF No. 564-21.) Defendants argue that this email shows that Array chose not to pursue the Susan Rivers project. While a jury may accept Defendants' argument, the Court must construe inferences in favor of Array at this stage and does not find that this email alone establishes the fact as a matter of law. The Court finds that the circumstantial evidence produced by Array is sufficient for a jury to conclude that Defendants' alleged misconduct caused ESCO to award the project to NEXTracker rather than Array. The Court will therefore not exclude evidence concerning the Susan Rivers or Childers projects.

### d. Rugby Run

Rugby Run is an 85 MW project in Australia that Adani and its subsidiary owned, developed, and constructed. (Parkins Report 89, ECF No. 439-3.) On October 24, 2016, Wheale noted: "Received some good new[s] today from Adani. We have a tentative exclusivity for the Australia projects. The pricing we gave them on Rugby Run was good enough to keep the tracker piece out of the bid process and spec us into the design." (Pl.'s Ex. 57, ECF No. 565-57.) Mitchell shared Array "benchmark pricing" with Wheale only shortly before on October 9, 2016. (Parkins

Report 89, ECF No. 439-3.) In September 2017, in response to an email from Adani seeking a comparison between trackers in terms of "overall project cost and implementation," Wheale provided Adani with "the O&M PPT we discussed," NEXTracker's O&M counter-pitch. (*See* Pl.'s Ex. 59, ECF No. 565-59; Parkins Report 90, ECF No. 439-3.) That same month, Adani reached out to Array to invite it to bid on Rugby Run. (Pl.'s Ex. 60, ECF No. 565-60.) NEXTracker won the project in December 2017. (Parkins Report 90, ECF No. 439-3.) According to Parkins, NEXTracker's original pricing closed the door on Array's ability to compete with NEXTracker on this project. (*See id.*)

Defendants argue that the evidence shows that Array increased its total price per watt between October 2017 and November 2017, while NEXTracker ultimately offered Adani a lower price than Array's final bid. Furthermore, Defendants assert that the pricing disclosed in October 2016 related to a separate project and EPC. Parkins, however, opines that it is reasonable to infer that Wheale used the same benchmark pricing for other Australia projects and that the pricing was good enough to eliminate Array's opportunity to win the project. (Parkins 89-90, ECF No. 439-3.) Defendants additionally contend that the evidence only shows Adani was interested in overall costs, not O&M specifically, and thus the evidence is too weak to establish Adani chose NEXTracker because of its O&M counter-pitch. Construing all inferences that can be drawn from the circumstantial evidence in Array's favor, the Court finds this evidence is sufficient to present to a jury on the issue of causation and will not exclude this evidence.

### e. Hughenden and Karadoc

BayWa.re is an EPC, developer, and O&M provider for both the Hughenden and Karadoc projects in Australia. (Parkins Report 85, ECF No. 439-3.) BayWa.re's objective for the Hughenden project was to sell it after construction while continuing to provide O&M services.

(*Id.*) Because BayWa.re would continue to provide O&M services for these projects, it would care about long-term O&M costs. (Parkins Report 85, ECF No. 439-3.) BayWa.re had a relationship with Array in the United States and the Hughenden project was BayWa.re's test case in Australia. (Parkins Supp. Report 4, ECF No. 430-4.) NEXTracker knew that BayWa.re only purchased trackers from Array in the United States. (*See* Pl.'s Ex. 45, ECF No. 565-45.) While NEXTracker first bid on Hughenden in May 2016, it did not win the project until May 15, 2017. (Pl.'s Ex. 48 & 49, ECF No. 565-48 & -49.) In February 2017, Wheale provided Island Green Power, the developer for Hughenden and Karadoc, an updated quote and noted that Array could not match it. (Pl.'s Ex. 50, ECF No. 565-50.) Defendant Marco Garcia stated that it worked hard to win this first project against Array to build a long-term relationship with BayWa.re. (*See* Pl.'s Ex. 51, ECF No. 565-51.)

NEXTracker experienced shipping delays on the Hughenden project, making BayWa.re unhappy and putting Array back in the mix for the Karadoc project. (*See* Pl.'s Ex. 44, ECF No. 565-4; Parkins Report 87, ECF No. 439-3.) In June 2017 (after BayWa.re awarded Hughenden to NEXTracker), Wheale sent Beon, a project developer, an O&M spreadsheet in connection with the Karadoc project. (*See* Pl.'s Ex. 47, ECF No. 565-47.) In September 2017, Wheale informed Baywa.re that he was finalizing quotes for Karadoc and that they should work with Marty Rogers of NEXTracker "when you are doing the DD on the O&M front. We have made some major improvements with the Gen 2 design that you should know. Attached is a O&M worksheet and white paper that was drafted by Marty. Please review and let us know if you would like to set up a call." (Pl.'s Ex. 52, ECF No. 565-52.) Rogers was included in the November 2016 "ATI – Need to tighten up our pitch" emails in which Mitchell shared information concerning Array, and Rogers took an action item at an executive meeting concerning the issue in which he was "to prepare an

O&M pitch to counter ATI." (November 2016 emails, ECF No. 439-1.) NEXTracker won the

Karadoc project in December 2017. (Pl.'s Ex. 55, ECF No. 565-55.)

Array argues that, from this evidence, a jury could conclude that NEXTracker used

Mitchell's trade secret and confidential information and that, without its use, NEXTracker would

not have won these projects. Defendants, however, assert that this information is not sufficient to

establish causation for these projects. Defendants rely on an email from Baywa.re to Array on

December 26, 2017, which explained why Array was not selected for Karadoc: "The fact that []

your competitor was undertaking fully the footing design and soil risk as per our expectations was

a critical factor in combination with lower pricing and matching delivery times." (Dec. 26, 2017,

email, ECF No. 439-12.) Defendants contend that no reasonable jury could find that any alleged

misconduct was a but-for cause for Array's loss of Karadoc when the customer itself identified

another factor as a critical one and did not list O&M costs as a reason.

This Court already ruled that Parkins' opinions on these two projects is admissible at trial.

(*See* Mem. Op. and Order 35-36, ECF No. 536.) According to Parkins' expert testimony, BayWa.re

would be interested in long-term O&M costs when awarding these two projects and O&M costs

were particularly critical to projects in Australia. BayWa.re also had a long-term exclusive

relationship with Array in the United States. From the facts that Wheale worked on these two

projects for NEXTracker and was interested in using Mitchell's disclosures on pricing and O&M

issues to secure the projects in Australia, Parkins believes, and a jury could infer, that Wheale used

his information on benchmark pricing and O&M concerns when attempting to secure this project

for NEXTracker. Because inferences must be construed in Array's favor at this stage, the Court

will not exclude evidence of the Hughenden project at trial. *Cf. Southwest Stainless, LP*, 582 F.3d

at 1183-84 (upholding trial court's award of lost profit damages in part where there was evidence

that former employer had lost just one order from company to its competitor in decade preceding former employer's departure); *Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*, 584 F.2d 946, 952-53 (10th Cir. 1978) (concluding that sufficient circumstantial evidence existed to take case to jury because, while it may be argued that plaintiff's pricing information was too out-of-date, it may also reasonably be inferred, since the uncontradicted evidence showed that former employee possessed that information, that his immediate success in bidding against former employer may have been due at least partially to the use of plaintiff's pricing information).

With respect to Karadoc, Array submitted evidence linking the alleged misconduct to O&M information NEXTracker provided to Karadoc while it was deciding which entity to award the project. A jury could infer that the use of that information for the Karadoc project caused Array to lose the project. While Array did not submit direct evidence that BayWa.re believed O&M costs were critical, a jury could infer from Parkins' expert testimony, Wheale's concerns that O&M costs were important to focus on for Australia EPCs, and NEXTracker's submission of its O&M documents to BayWa.re that O&M costs were significant to BayWa.re. Defendants argue that the December 26, 2017, email from BayWa.re is evidence that the critical factor was not O&M but a different factor, and thus, the email supports Defendants' contention that BayWa.re did not award the project to NEXTracker because of information derived from Mitchell about O&M concerns. Alternatively, a jury could conclude that NEXTracker's use of its O&M counter pitch shut Array out of the process before it could fully address foundation design concerns. (*See* Parkins Supp. Report 4, ECF No. 430-4.) The Court views the email as creating a material factual issue that must be resolved by the jury, which is free to view the email as dispositive or to disregard it and find that the impact of O&M disclosures caused Array to lose the project to NEXTracker. Because the Court at this stage must view the evidence Array submitted in its favor, the Court will deny partial

summary judgment to Defendants on the Karadoc project and allow Array to submit evidence concerning it to the jury.

### 2. United States projects

#### a. Redwood 4

Array bid on the Redwood 4 project. (*See* Pl.'s Ex. 111; Pl.'s Ex. 112.) The evidence construed in its favor indicates that 8minutenergy, which owned Redwood 4, was seeking information on O&M costs from NEXTracker and that NEXTracker on June 29, 2017, sent 8minutenergy an updated O&M document that discussed battery and other major component replacement costs for materials and labor. (*See* Pl.'s Ex. 113 & 114, ECF No. 565-113 & -114.)

Defendants request the Court exclude evidence pertaining to damages for the Redwood 4 project, because the Court excluded Parkins from offering expert testimony on this project and the email evidence is not enough to take the question to a jury. For this project, Parkins failed to analyze the specifics for why O&M costs would have been important for the Redwood 4 project, and thus, the Court excluded his opinions regarding this project. (Mem. Op. and Order 39, ECF No. 536.)

Even assuming that NEXTracker used trade secret information from Mitchell in the O&M documents it sent to 8minutenergy, the fact that 8minutenergy requested O&M information from NEXTracker is not enough for a jury to reasonably infer that 8minutenergy awarded the project to NEXTracker because of its use of the O&M counter-pitch. Unlike the Australia projects, there is no other fact or expert opinion on which a jury could rely to logically conclude that O&M concerns were so important that NEXTracker's use of the alleged trade-secret derived counter-pitch was the cause-in-fact of the decision to award the project to NEXTracker.

### b. Essex

Array provided multiple quotes for the Essex project, and thus was competing with NEXTracker for the project. (*See* Parkins' Supp. Report 6, ECF No. 430-4). Mitchell was involved in supplying a quote for Array to a developer who did not get the Essex project, and he received an email on June 6, 2016, with Array's formal quotes for the Essex project attached while he still worked for Array. (*See* Pl.'s Ex. 90 & 91, ECF No. 565-90 & -91; Defs.' Ex. 19 & 20.) Because NEXTracker hired Mitchell to cripple Array and used his knowledge to dismantle Array's O&M sales pitch, Array argues it has enough evidence for a jury to infer that Mitchell used the information about the Essex quotes against it and that Array lost this project to NEXTracker because of Mitchell's breach and Defendants' tortious actions.

Array has relied on *Sokol Crystal Products* for the assertion that, where there is evidence showing that the misappropriating party had access to the trade secret, it is entirely reasonable for the jury to infer that the defendant used the trade secret. *Sokol Crystal Products, Inc. v. DSC Communications Corp.,* 15 F.3d 1427, 1432 (7th Cir.1994). Array, however, omits a key fact in the Seventh Circuit's conclusion. In that case, the jury inferred the defendant's use of the trade secret from both the defendant's access to the confidential information and the similarity of the plaintiff's and defendant's devices. *See id.* at 1429, 1432. The Seventh Circuit determined that it was not unreasonable for the jury to infer that the defendant used the plaintiff's trade secret where it inferred the defendant had access to the plaintiff's trade secrets from the fact that the engineer who designed the defendant's device had access to the information, and the defendant's product was similar to the plaintiff's product. *Id.* at 1432. Notably, the Seventh Circuit's discussion of inferences pertained to access and use, not causation and damages.

In this case, there is no evidence Mitchell shared information from Array's quote to NEXTracker. Nor is there evidence that Mitchell was otherwise involved in the Essex project on behalf of NEXTracker or that a NEXTracker employee sought information from him about the Essex project. Even assuming a jury could reasonably infer that NEXTracker had access to the bid information because Mitchell had access to it, there is no other information, comparable to a similar product design, indicating that NEXTracker used that information. Array has not shown evidence of the types of information NEXTracker provided to the developers that a jury could use to compare with the information Mitchell knew to draw a reasonable conclusion that NEXTracker used confidential information from Mitchell to help it win the project. For example, Array has not cited evidence showing that NEXTracker submitted a bid just under Array's quoted price or that the decision on Essex came down to price. There is no evidence that the decisionmakers for Essex were concerned about O&M or that NEXTracker sent them the updated O&M counter-pitch. Moreover, Parkins cannot proffer opinions as to Essex. (Mem. Op. and Order 38-39, ECF No. 536.) There are too many gaps in the evidentiary record for a jury to conclude that Array lost the Essex project because of Mitchell's breaches or his alleged trade secret disclosure or that this project win by NEXTracker is traceable to the alleged misconduct. The Court will therefore exclude evidence of damages arising from the Essex project at trial.

### c. Sumrall II/MS3

Mitchell worked on and was responsible for this project while at Array. (*See* Pl.'s Ex. 80, ECF No. 565-80 at 2 of 25.) Mitchell sent a quote to the owner of Sumrall II while he was still working for Array, but Array marked the project as closed and lost to competitor in May 2016. (*See* Defs.' Ex. 22, ECF No. 564-6.) Array, however, continued to bid on the project in February 2017. (*See* Defs.' Ex. 23.) Array asserts that Mitchell would have been familiar with Array's

pricing and constraints on the project from his work thereon, so it is reasonable to infer from all the evidence that Mitchell would have shared his information to NEXTracker, which in turn would have used the confidential information to win the project.

There is no evidence about whether the decisionmakers on the Sumrall II project were concerned with O&M or that NEXTracker provided them with its O&M counter-pitch to draw a reasonable inference that Mitchell's alleged O&M trade secret disclosures benefitted NEXTracker on this particular project. Nor is there evidence that Mitchell worked with NEXTracker on this project or disclosed pricing information related to this project. Array has not shown evidence of the types of information NEXTracker provided to the developers that a jury could use to compare with the information Mitchell knew to draw a reasonable conclusion that NEXTracker used confidential information from Mitchell to win this project.

Array submitted evidence that NEXTracker was told it lost two Origis projects (Turkey Hill and Lakeview) "based purely on price," and in response, Garcia told Booth to "bid aggressively to win business down to 10% GM" because he was "concerned that other bidders will come in even lower." (Pl.'s Ex. 96, ECF No. 565-96.) Garcia sent this email mere days after Mitchell gave Wheale Array's "benchmark pricing." (*See* Oct. 9, 2016 email, ECF No. 478-41.) Array's evidence supporting the importance of pricing, however, relates to the Turkey Hill and Lakeview projects, with the only connection being the same owner, Origis, with no explanation of how or why Origis' decision on price as to those two projects would be the same for the Sumrall II project. (*See* Pl.'s Br. 45, ECF No. 565.) For example, Array did not show the Court how NEXTracker's bids for Sumrall II incorporated the aggressive pricing discussed in the email for the Turkey Hill and Lakeview projects. Nor is there expert evidence that pricing or O&M concerns would have been the basis for awarding this project to NEXTracker. (*See* Mem. Op. and Order 39,

ECF No. 536.) The lack of evidence tying this project to the alleged misconduct in this case is insufficient as a matter of law for a factfinder to award damages to Array for the loss of this project. The Court will therefore exclude evidence at trial on the Sumrall II/MS 3 project.

### d. Champion, St. Matthews, Odyssey, and Swamp Fox

It is undisputed that Cypress Creek managed the Champion, St. Matthews, Odyssey, and Swamp Fox projects. Array cites evidence that it submitted bids on the projects, but Defendants contend that the bids in evidence were to Hanwha Q Cells, which is not the EPC that won the right to develop the Cypress Creek projects. (*See* Pl.'s Ex. 75, ECF No. 565-75; Pl.'s Ex. 80, ECF No. 565-80 at 10 of 25; Pl.'s Ex. 81, ECF No. 565-81; Pl.'s Ex. 83, ECF No. 565-83.)

On January 5, 2017, Robert Koch sent an email to Ryan Booth and Mitchell about meetings Koch and Marty Rogers intended to have with customers, including with Cypress Creek, to solicit feedback on NEXTracker and float some proposals for maintenance agreements. (*See* Pl.'s Ex. 76, ECF No. 565-76.) Koch asked Mitchell if there was anyone else geographically that they should target, if he wanted to come along, and if he was ok if Koch set up meetings on a particular date. (*See id.*) Array, however, cites no follow-up evidence indicating Mitchell answered the email or attended the meetings discussed in the email. Array also relies on a May 4, 2017, email in which a Flex employee suggested that Mitchell reach out to his contact at Cypress Creek to make an introduction "with our SCP team." (Pl.'s Ex. 77, ECF No. 565-77.) Array presented no evidence indicating what Mitchell did in response to this email.

The evidence linking Defendants' purported tortious activities or Mitchell's breaches to these projects essentially comes down to the timing of NEXTracker winning these projects after Mitchell's alleged tortious disclosures. The jury would have to make too many inferential leaps – it would have to infer that Mitchell worked on these projects and then infer that his work may have

affected the decision to award the project to NEXTracker. There is no evidence indicating that either O&M or benchmark pricing was a factor for these projects for a jury to infer reasonably that Mitchell's purported trade secret disclosures caused Array to lose these projects to NEXTracker. The Court has excluded Parkins' expert opinions as to these projects. (*See* Mem. Op. and Order 38, ECF No. 536.) The Court finds as a matter of law that there is insufficient evidence for a reasonable factfinder to determine that Array lost this project to NEXTracker because of the alleged misconduct or that the loss of this project is traceable to the misconduct. The Court will therefore exclude evidence of these projects at trial.

### e. Pinal Solar

Pinal Solar was an Arizona project owned by NextEra and developed by Mortensen, on which both Array and NEXTracker bid. (*See* Pl.'s Ex. 102, ECF No. 565-102; Pl.'s Ex. 103, ECF No. 565-103.) In an April 24, 2017, email between Array executives, an Array executive said that Mortenson sought out a quote from Array on the Pinal project after NextEra changed the configuration, but Array noted that, while NextEra may prefer Array, Array was "fighting an uphill battle with Mortenson." (Pl.'s Ex. 105, ECF No. 565-105.) On May 15, 2017, the Array executive believed that the project was between Array and Sunpower because NEXTracker, per Mortenson, did not have a solution for the project. (*See* Pl.'s Ex. 106, ECF No. 565-106.) Array sent an email to NextEra on July 14, 2017, in which Array noted that Mortenson was planning to use NEXTracker for the project, the relationship with Array and Mortenson was fairly new, and that the two companies had not yet finalized a supply agreement. (*See* Pl.'s Ex. 107, ECF No. 565-107.) Array inquired whether NextEra would support a change in the Pinal trackers to Array because it expected to finalize its agreement with Mortenson in time to not affect the project schedule. (*See id.*)

As for evidence of Mitchell's involvement in the project, Array cites a January 5, 2017, email in which Ryan Booth from NEXTracker cc'd Mitchell on an email string discussing the invitation NEXTracker received to bid on the Pinal Solar project. (*See* Pl.'s Ex. 108, ECF No. 565-108.) In the email, Booth told all the recipients that, after seeing who else bids, they would "discuss appropriate margin/strategy to ensure one of our horses win." (*Id.*) On January 11, 2017, Robert Koch sent an email to Booth, copying Mitchell, stating that he had meetings confirmed the following week with Cypress Creek and "let's sync on Nextera and Dominion." (Pl.'s Ex. 109, ECF No. 565-109.) On May 4, 2017, Mortenson emailed NEXTracker saying that it was looking for NEXTracker to provide an economically engineered plan to address "concerns/past failures with technical documentation/calculations to prevent those failures." (Pl.'s Ex. 110, ECF No. 565-110.) Array's total price for the project was lower than NEXTracker's. (*See* Parkins' Supp. Report 7, ECF No. 430-4.)

Array has not submitted any evidence to indicate that Mortenson or NextEra were concerned about O&M such that Mitchell's O&M disclosures would have affected their decision. Nor is there evidence that NEXTracker sent Mortenson or NextEra its O&M counter-pitch. Instead, Array has evidence indicating that Mitchell was looped into discussions about the project. Even if a factfinder could reasonably infer from this evidence that Mitchell worked on the Pinal Solar project and provided input on margins and strategy, there are no additional facts on which a jury could rely that his worked caused Array to lose the project. Because the record does not reveal what work Mitchell did specific to the project, the factfinder would have to speculate that NEXTracker's project win was traceable to his work. Notably, Array's own email evidence indicates it was an uphill battle to win this project from the beginning. Array also had a lower total price, so a jury would be left to speculate that Mitchell's disclosures on benchmark pricing had an

impact on this project. The evidence in the record, even with inferences construed in favor of Array, requires too many inferential leaps for a reasonable factfinder to conclude that NEXTracker's Pinal Solar win is traceable to the Defendants' misconduct or that Mitchell's work on the project or confidential disclosures about pricing and O&M concerns were the cause-in-fact of Array's loss. The Court will therefore grant partial summary judgment to Defendants as to damages linked to this project and will thus exclude evidence of the Pinal Solar Project at trial because of lack of relevance.

### f. Adams, Bear Creek, Bly, and Elbe

Adams Solar Center owned the Adams, Bear Creek, Bly, and Elbe projects, while GCL developed these four projects, all located in Oregon. (*See* Pl.'s Ex. 61, ECF No. 565-61.) It is undisputed that both Array and NEXTracker placed bids on these four projects. (*See* Proposed PTO 8, ECF No. 578.) Array began bidding on the Adams, Bear Creek, and Elbe projects in November 2015, and the Bly project in October 2016, all while Mitchell was still employed at Array. (*See* Pl.'s Ex. 64, 68, 70, 72, ECF No. 565-64, -68, -70, -72.) Mitchell was included on an Array email on June 16, 2016, in which the four projects were listed by name as going out to bid for a tracker decision. (*See* Pl.'s Ex. 62, ECF No. 565-62.)

GCL had an independent engineer, Blue Oak Energy, assisting on the project. (*See* Pl.'s Ex. 65, ECF No. 565-65.) In a meeting invitation for January 11, 2017, organized by Robert Koch for a NEXTracker visit to Blue Oak, Mitchell was listed as a required attendee in which "O & M needs" were among the topics to be discussed, although the subject says, "Canceled: Nextracker visit to Blue Oak." (*See* Pl.'s Ex. 66, ECF No. 565-66.) A meeting invitation for January 25, 2017, between NEXTracker and Blue Oak was to "sync up on new products and projects" in which Mitchell was listed among the required attendees. (*See* Pl.'s Ex. 67, ECF No. 565-67.) In a May

25, 2017, email, a senior sales manager at NEXTracker stated that they had lost the four projects in the GCL Oregon portfolio, even though its price was better, but GCL preferred Array and there was a bit of concern with NEXTracker batteries in cold climate. (*See* Pl.'s Ex. 63, ECF No. 565-63.) Nevertheless, NEXTracker ultimately won the projects in November 2017. (*See* Pl.'s Ex. 61, 69, 71, ECF No. 565-61, -69, -71.)

Array argues that its evidence demonstrates that Mitchell was involved in pitching NEXTracker's products to Blue Oak and in discussing O&M concerns in order to win the projects. Array further relies on evidence that Mitchell helped create the O&M counter-pitch for NEXTracker in response to a string of November 2016 emails from Wheale requesting assistance on the O&M issue because NEXTracker was "getting hammered" on this one issue. (*See* Mem. Op. and Order 10-16, ECF No. 537.)

Although the Court must construe all inferences in favor of Array, and recognizes that Array may rely on circumstantial evidence, the Court finds this information insufficient to establish that the losses of these projects were traceable to the alleged misconduct. As an initial matter, there is no direct evidence that Mitchell worked on these projects for NEXTracker. Array presented no evidence that Mitchell attended the meeting with Blue Oak. To conclude that he attended the meeting, the jury must so infer by an email listing him as a required attendee. Array submitted no other context for this meeting invite. There is no evidence, for example, that NEXTracker employees generally were expected and did attend meetings when listed as a required attendee. Defendants, however, submitted testimony that Koch was the only person who met with Blue Oak from NEXTracker. (Koch Dep. 207:16-23, ECF No. 564-15.) Array presented no other evidence to refute this evidence that Mitchell did not attend the meeting.[4] A jury is thus left to

---

[4] Instead, Array argues that, because the question to Koch was that he was the only person who met with Blue Oak from the NEXTracker side, Koch's testimony is ambiguous, as perhaps Mitchell attended for the Flex side. Array then

impermissibly speculate that Mitchell attended the meeting in the face of uncontradicted testimony indicating that he did not attend the meeting on behalf of NEXTracker.

But even more speculation would be required to conclude that the Adams, Bear Creek, Bly, and Elbe project losses are linked to Defendants' alleged misconduct. Although there is evidence that Mitchell was at Array when it was bidding on these projects and that he was aware of the projects, Array has not cited evidence showing Mitchell was otherwise involved with, worked on the quotes for these projects at Array, or knew important information concerning these projects. Although there is evidence that a meeting between Blue Oak and Koch occurred, there is no evidence that O&M was discussed in that meeting. There is no evidence that the EPC or owner requested O&M information from NEXTracker or that Defendants provided the EPC or owner with its O&M counter-pitch. The inferential gaps in the evidence for these four projects is too wide for a reasonable jury to find causation in favor of Array. The Court will therefore grant partial summary judgment to Defendants on the issue of causation on the Adams, Bear Creek, Bly, and Elbe projects and exclude evidence as to these projects for the purpose of establishing damages for lack of relevance.

### g. Millington and Cumberland

Silicon Ranch owned the Millington project in Tennessee and the Cumberland project in Alabama, while McCarthy was the EPC on the projects. (*See* Defs.' Ex. 21, ECF No. 564-5 at 3 of 62.) Both Array and NEXTracker placed bids on these two projects. (*See* Proposed PTO 8-9, ECF No. 578.) On April 18, 2017, Mitchell emailed Dylan Sontag, Silicon Ranch's O&M Manager, asking for a contact at Green Power Monitoring. (Pl.'s Ex. 85, ECF No. 565-85.) In that

---

says that the jury from there may infer that he was doing work for NEXTracker, despite being on the Flex side. The amount of inference upon inference required to arrive at this conclusion becomes speculation, at best. The Court is not convinced that a reasonable jury could find from the scant evidence that Mitchell met or conversed with Blue Oak.

email, Mitchell stated: "We certainly hope that we continue to earn your Nextracker business and your assistance with the digital O&M information is informing how we advance and grow our product offering in the future." (*Id.*) In a June 12, 2017 email to Sol Hutson from Flex, Mitchell noted that he had "a last minute push to go to the Texas Solar Conference, primarily to spend some[ ]time with some folks from Silicon Ranch and Meridian Solar." (Pl.'s Ex. 86, ECF No. 565-86.) In a document dated June 15, 2017, Mitchell noted regarding the "Texas Solar Conference" that "good meetings with McCarthy Builders and Silicon Ranch Corp. Where I made some solid contacts on the O&M side." (Pl.'s Ex. L, ECF No. 439-10.) It is undisputed NEXTracker won the Millington project in November 2017 and the Cumberland project in March 2018. (*See* Pl.'s Ex. 89, ECF No. 565-89; Pl.'s Br. 38, ECF No. 565.)

Defendants argue that this evidence is insufficient for a factfinder to find that NEXTracker won these two projects over Array because of the alleged misconduct in this case. They note that Mitchell's email to Silicon Ranch was to request a contact and did not mention or discuss either Millington or Cumberland. Similarly, Defendants assert that the evidence concerning Mitchell meeting with McCarthy and Silicon Ranch at the conference does not mention either of the projects or the substance of the communications. Array contends that this circumstantial evidence is enough for a jury to infer that Mitchell's assistance helped NEXTracker win the project over Array.

The Court concludes that this evidence is insufficient as a matter of law for the jury to conclude that Silicon Ranch or McCarthy viewed O&M concerns as important on these projects or to infer that O&M and any pitch by NEXTracker about O&M affected their decision to award the projects to NEXTracker. The Court will therefore grant partial summary judgment to Defendants on the issue of causation on the Millington and Cumberland projects and thus exclude evidence as to these projects for lack of relevance.

**IT IS THEREFORE ORDERED** that Defendants' *Further Motion for Summary Judgment Regarding Lack of Causation Evidence for Specific Solar Projects per Order D.I. 537* (**ECF No. 564**) and *Array Technologies, Inc.'s Brief Regarding Pretrial Resolution of the Admissibility of Project-Related Evidence* (**ECF No. 565**) are **GRANTED IN PART AND DENIED IN PART** as follows:

1. Defendants' request to exclude evidence on the following projects is **GRANTED** and Array's request to admit evidence of the following projects is **DENIED**: Redwood 4, Essex, Sumrall II/MS 3, Champion, St. Matthews, Odyssey, Swamp Fox, Pinal Solar, Adams, Bear Creek, Bly, Elbe, Millington and Cumberland.

2. Defendants' request to exclude evidence of the following projects is **DENIED** and Array's request to admit evidence of the following projects is **GRANTED**: the RCR projects (Clermont, Emerald, Greenough II, Longreach, Manildra, Oakey, Swan Hill, Wemen), Bungala 1 & 2, Susan Rivers and Childers, Rugby Run, Hughenden, and Karadoc,

_____
SENIOR UNITED STATES DISTRICT JUDGE