# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**ARRAY TECHNOLOGIES, INC.,**

   **Plaintiff,**

  **vs.**             **Civ. No.  17-087 JCH/LF**

**COLIN MITCHELL, and individual,**
**NEXTRACKER, a Delaware corporation,**
**MARCO GARCIA, an individual,**
**DANIEL SHUGAR, an individual,**
**SCOTT GRAYBEAL, an individual,**
**FLEXTRONICS INTERANTIONAL U.S.A., INC.,**
**a California corporation,**

   **Defendants.**

## SEALED MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the following motions: (i) Defendants' *Motion* in Limine (ECF No. 587); (ii) Plaintiff's *Motion* in Limine *No. 1 to Exclude Defendants' Expert Graph Regarding Global Shipments and Market Share* (ECF No. 588); (iii) Plaintiff's *Motion* in Limine *No. 2 to Exclude Evidence Relating to Excuse of Performance Defense* (ECF No. 589); (iv) Plaintiff's *Motion* in Limine *No. 3 to Exclude Unclean Hands Evidence* (ECF No. 590); (v) Plaintiff's *Motion* in Limine *No. 4 to Exclude Evidence that Array's Damages are Limited Based Upon the TUV Report* (ECF No. 591); and Defendants' *Motion for Leave to File a Reply in Support of Defendants' Motions* in Limine (ECF No. 604). The Court will deny Defendants' request to file an additional reply brief and will grant in part and deny in part Defendants' motion *in limine*, as explained herein. As for Plaintiff's motions in limine, the Court will deny Plaintiff's Motion in

Limine Nos. 1, 3, and 4, and will deny Plaintiff's Motion in Limine No. 2 as to the specific evidence identified therein, but it will reserve ruling on objections to other specific evidence at trial.

## I.     STANDARD

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence is generally admissible. Fed. R. Evid. 402. The standard for relevance "is a liberal one." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587 (1993). A court, however, may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or needless presentation of cumulative evidence. Fed. R. Evid. 403. To be unfairly prejudicial, as opposed to merely damaging to the opposing party's case, the evidence must have an undue tendency to suggest decision on an improper basis, such as an emotional basis. *United States v. Caraway*, 534 F.3d 1290, 1301 (10th Cir. 2008). Evidence of wrongs or other bad acts is not admissible to prove a person's character or to show that on a particular occasion the person acted in accordance with that character. Fed. R. Evid. 404(b)(1). Evidence of other wrongs, however, may be admissible for a proper purpose, such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2).

## II.    BACKGROUND

The relevant facts, some disputed, some not, are set forth in the numerous Memorandum Opinions and Orders the Court entered in this case and the Court incorporates those facts for background purposes. (*See*, *e.g.*, Mem. Op. and Order 2-22, ECF No. 528.) A few facts are helpful to repeat here. The "Agreement" referred to in this opinion is the "Non-Disclosure, Non-

Solicitation and Non-Competition Agreement" that Defendant Colin Mitchell ("Mitchell") signed with his then-employer Plaintiff Array Technologies, Inc. ("Array" or "ATI") on May 3, 2013. Trial of this case arises from the breach of that Agreement and the alleged misuse of confidential and trade secret information that Mitchell purportedly disclosed to his new employer and Array's competitor in the solar tracking equipment industry, NEXTracker, Inc. ("NEXTracker"). NEXTracker is a wholly-owned subsidiary of Flextronics International U.S.A., Inc. ("Flex"), which Defendants argue was the entity that actually employed Mitchell during the period the Agreement was in effect.

### III.    ANALYSIS

#### A.  Defendants' request to file a reply brief

Defendants filed a motion asking for leave to file a reply in support of their motions *in limine*. The Court's pretrial scheduling order, based on its practice, is to permit only motions *in limine* and responses thereto, because the Court must review, research, and decide numerous issues in advance of trial on a tight schedule. Defendants' motion does not establish good cause to open and extend the briefing window. As to the specific matters on which Defendants wish to add further briefing, the Court has either ruled in Defendants' favor on those issues or reserved ruling until trial, at which point Defendants may supplement the record with their arguments. There is therefore no need for the Court to review a written reply brief on those matters. Accordingly, the Court will deny Defendants' request to file a reply brief in support of its motion *in limine*.

#### B.  Defendants' Motion *in Limine*

Defendants' motion *in limine* seeks the exclusion of eleven categories of evidence. The Court will address each request to exclude in turn.

##### 1.  Defendants' Motion *in Limine* No. 1 – Consent Order and related filings

This Court entered a negotiated Consent Order on February 6, 2017, which stated that, except as necessary to defend the claims in this case, Mitchell "shall have no communications directly or indirectly with Defendant NEXTracker regarding any matter related to NEXTracker's business…." (Consent Order 1, ECF No. 17.) The Consent Order bound "Defendant Colin Mitchell only." (*Id.*) Array filed a motion for sanctions based on a number of Mitchell's alleged violations of the Consent Order. The Court denied the motion for sanctions without prejudice. (Mem. Op. and Order 1, ECF No. 540.) As relevant here, the Court explained:

> Because the period of the Consent Order overlaps with the period in which Mitchell's Agreement with Array was still in force, the Court's findings regarding the Consent Order would overlap with factual issues for the jury. The better procedure is to permit the trial to proceed and the jury make its own credibility findings and reach its own verdict on the evidence. Array may raise any issues of violation of the Consent Order *after trial* should it continue to believe sanctions for violation of the Consent Order are warranted based on the more fully developed record.

(*Id.* at 12 (emphasis added).) The Court further stated that evidence concerning Mitchell's purported communications with NEXTracker related to its business during the time frame in which the Agreement was in effect would be admissible at trial and the Court may instruct the jury as to certain legal conclusions this Court made as a matter of law on summary judgment. (*Id.* at 7.)

Defendants argue that the Consent Order or evidence of non-compliance are not relevant to any findings the jury must make and would be unduly prejudicial. On the other hand, Array contends that, if the jury finds that Mitchell violated the Consent Order, that finding will help prove Mitchell's breach of the Agreement with Array. Array also asserts that it is relevant for punitive damages by showing willfulness and maliciousness.

While the underlying evidence regarding what Mitchell purportedly did to violate the Consent Order is relevant to the breach of the Agreement because the time periods overlapped, the Consent Order itself is not relevant to what the jury must decide on the claims. To the extent it

may be relevant, the Court finds that its inclusion would confuse the issues and be substantially more prejudicial than probative. The jury's consideration of punitive damages relates to the maliciousness and recklessness of Defendants' conduct from which the claims arise. It is for the Court to determine punishment for violation of its own orders. Inclusion of evidence of the Consent Order might confuse the jury as to what conduct such damages should deter. The Court will therefore grant Defendants' motion *in limine* No. 1.

### 2.    Defendants' Motion *in Limine* No. 2 – Court's rulings

Array previously moved for partial summary judgment on multiple types of alleged breaches of contract. The Court found that questions of fact existed for a jury to resolve as to many of the assertions of breach, but the Court did rule in Array's favor in four ways: (1) "Mitchell's action in sending the AES quote constituted at least an indirect engagement in the operation of NEXTracker and violated the non-competition agreement as a matter of law," (Mem. Op. and Order 29, ECF No. 528); (2) "Mitchell's action in sending the Primoris quote constituted an indirect engagement in the operation of NEXTracker and violated the non-competition agreement as a matter of law," (*id.* at 32); (3) "Mitchell performed work for NEXTracker to assist it with messaging, which constitutes as a matter of law indirect work for NEXTracker in violation of the non-competition agreement," (*id.* at 34); and (4) sending the November 18, 2016, emails "constitutes, at least, indirect work for NEXTracker in violation of the non-competition agreement," (*id.*).

Defendants seek to prohibit Array from presenting the Court's prior rulings regarding certain activity and projects as evidence or in arguments. According to Defendants, presenting the Court's findings of fact or partial rulings would unduly prejudice the jury by implying what the Court's views are on the remaining, unresolved disputes, such as on credibility issues. This Court,

however, already determined that "the jury may be instructed as to the legal conclusions this Court made as a matter of law based on the undisputed evidence in its prior Memorandum Opinion and Order." (Mem. Op. and Order 7, ECF No. 540.) As for rulings the Court made as a matter of law, the jury may need to be informed of them so that it understands what findings it must make, and which other elements are satisfied as a matter of law. If requested, the jury may be instructed that the Court's rulings on the specific issues should not be taken to be indicative of what the Court believes on other issues, such as credibility, causation, and damages, as those are issues for the jury to decide. *Cf. Aristocrat Leisure Limited v. Deutsche Bank Trust Co. Americas*, No. 04 Civ. 10014 PKL, 2009 WL 3111766, at *11 (S.D.N.Y. Sept. 28, 2009) ("The Court's prior rulings, including its ruling on Aristocrat's breach of the Indenture, are probative of the present procedural posture of the case, which the jury will need to be aware of to understand why it is being asked only to determine whether the Bondholders unreasonably failed to mitigate their consequential damages."). Alternatively, if requested, the Court may consider presenting the legal rulings as a stipulation to avoid the danger of the jury reading more into the Court's legal rulings than it should. *Cf. Walker v. Pioneer Production Services, Inc.*, CVIL ACTION No. 15-0645, 2016 WL 8256742, at * 1 (E.D. La. July 6, 2016) ("The Court finds that referencing its *McCorpen* ruling presents a danger of misleading the jury, as the jury could mistake it for an imprimatur regarding Plaintiff's credibility. Instead, the parties should enter into a stipulation saying that Plaintiff does not oppose the specific prongs as enunciated by *McCorpen*, and Defendant may bring this stipulation to the attention of the jury.") For these reasons, the Court will deny Defendants' motion *in limine* No. 2.

### 3. Defendants' Motion *in Limine* No. 3 – Evidence of alleged bad acts for which there is no allegation of harm

Defendants next contend in their third motion *in limine* that, if certain alleged bad acts cannot be tied to direct harm or a lost project, then they are irrelevant and should be excluded.

6

Defendants apply this assertion to a few of the rulings the Court already made. For the reasons discussed below, the Court will deny Defendants' third motion *in limine*.

### a. November 18, 2016, text message

Array seeks to present evidence of a text message Defendant Marco Garcia ("Garcia") sent on November 18, 2016, to Mitchell's former Array phone number that said: "Hey Colin, you are cc d on an email about ATI winning 130MW in AU using an argument of lower O&M costs vs NX. Pete is now going after another 130MW. Can you please respond with you[r] knowledge of ATI O&M costs and issues?" (Am. Compl. ¶ 50, ECF No. 52.) Defendants argue that, because the text message refers to a set of projects that Array thereafter won and is not tied to a particular project loss at issue in this case, the evidence should be excluded as irrelevant, unduly prejudicial, and cumulative. Contrary to Defendants' argument, the text message is relevant to the issue of whether Mitchell was working for NEXTracker in breach of the Agreement and provides context as to whether he improperly disclosed trade secret information. Moreover, Array intends to show that the discovery of this text message led it to discover the grounds for initiating this lawsuit. The Court will deny Defendants' request to exclude it on relevance grounds.

Defendants, however, also assert that the text message was "unauthenticated." (Defs.' Mot. 6, ECF No. 587.) Array responded that the text message was authenticated in deposition testimony by Ronald Corio ("Corio"), who testified that they received a text on a company phone and looked into Mitchell's company phone records. (Pl.'s Resp. 7, ECF No. 600.) Defendants, in seeking additional briefing, contend that Corio was only shown Array's Complaint that quoted the text message, but the text message itself was never produced in the case or authenticated by any witness. (Defs.' Mot. for Leave to File Reply 2, ECF No. 604.) The content of the text message was produced in Array's Amended Complaint, and Corio was questioned about it during his

deposition, so the potential prejudice from a failure of production is unclear. Nevertheless, if Array seeks to include the text message in evidence, it will need to lay the proper foundation for authentication before it will be admitted. The Court will thus reserve ruling on the admission of the November 18, 2016, text message until trial.

### b. AES account and correspondence

Mitchell admitted that he sent a NEXTracker quote to AES Solar prior to March 6, 2017. (Mem. Op. and Order 28, ECF No. 528.) The Court concluded that this act "constituted at least an indirect engagement in the operation of NEXTracker and violated the non-competition agreement as a matter of law." (*Id.* at 29.) Defendants, however, argue that this evidence is not relevant to harm Array suffered, a necessary element to sustain a claim for breach of contract or tortious interference, because the only AES project that Array claims to have lost due to Mitchell's conduct was Boa Hora in Brazil, and this quote did not relate to Boa Hora. Defendants assert that neither party bid on the Boa Hora project until October 2017, months after the expiration of Mitchell's non-compete contract.

Array responds that this evidence is relevant to prove motive, willfulness, and intent, which are relevant to breach of contract, tortious interference with contract, and punitive damages. The Court agrees that the evidence is relevant to issues in the case. Even though the particular quote may not pertain to a project loss at issue, the evidence tends to corroborate other evidence that suggests Mitchell worked for NEXTracker and his intent, so the Court will not exclude it.

### c. Primoris evidence

Defendants seek to exclude any mention of Primoris evidence, because the only project discussed in the email strings was Throckmorton, which Array never alleged as a basis for harm. Defendants note that, although Mitchell provided Primoris with quotations for four Oregon

projects that are in dispute (Turkey Hill, Merrill, Dairy, and Lakeview), Primoris was not involved in developing those projects. Defendants thus contend that this evidence is irrelevant to Array's loss of the Oregon projects or to any other purportedly lost project. Defendants seek exclusion under Rules 403 and Rule 404.

This evidence is relevant to issues in the case, such as breach of contract, and thus it is not improper bad act evidence under Rule 404. Whether harm resulted to Array from Mitchell's actions in sending the information to Primoris is a question for the jury. The Court will deny Defendants' request to exclude the email evidence related to Primoris.

### d. Sempra evidence

Defendants seek to exclude argument and evidence regarding customer Sempra because, at the summary judgment stage, the Court agreed with Defendants that they presented evidence that Sempra was not an Array customer. The Court's statement was in its explanation that factual disputes existed on the matter, so the Court could not grant summary judgment to Array on whether Mitchell violated the non-solicitation provisions of the Agreement with respect to target lists. (See Mem. Op. and Order 35, ECF No. 528.) The Court left that issue for the jury.

Defendants additionally argue that there is no evidence that Array was harmed in connection with any project for Sempra, so the evidence should be excluded. Array replies that this Court already recognized there is a factual dispute regarding whether Mitchell violated the non-solicitation provision by working on target lists, involving Sempra and AES, among others. This evidence is relevant to issues for the jury, such as Mitchell's intent and whether the other Defendants took actions to induce Mitchell to work for NEXTracker. The Court will allow some evidence of conduct that did not directly result in a lost project where the evidence is probative of issues in the case. The Court must balance the probative value of such evidence against the

likelihood of confusing the issues and wasting time, but finds as to the above identified evidence, the probative value outweighs any prejudicial effect.

### 4.   Defendants' motion *in limine* No. 4 – Mitchell's hard drive

Defendants move to exclude reference to and evidence of Mitchell downloading documents onto a hard drive prior to his departure from Array. A court-ordered independent forensic analysis confirmed that he did not access any files after his departure. Defendants thus contend that the evidence is not relevant. Array counters that the evidence is probative of his willfulness and intent and of his breach of a clause in the Agreement to return all confidential information in the employee's possession or control; the evidence is relevant to his misappropriation of Array's trade secrets that were included on the hard drive; and the files show the types of documents and information that Mitchell was aware of and had access to during his employment.

It appears undisputed that Mitchell never accessed any of the information on the hard drive and thus no harm flowed from that alleged manner of breach. Because Mitchell did not access the material, there is little probative value to the evidence to show his intent. With respect to the purported need for Array to show the types of documents and information Mitchell knew of and had access to at Array, that evidence is admissible with other proof without the need to delve into the contents of a hard drive Mitchell never looked at after the download. The danger of confusing the jury and wasting time is greater than the probative value of the evidence, so the Court will exclude it.

### 5.   Defendants' Motion *in Limine* No. 5 – New or already excluded expert opinions

Defendants are concerned that Array's experts may give opinions that the Court excluded. Array, however, confirms that it "does not intend to present expert testimony that has already been excluded by the Court in its prior orders." (Pl.'s Resp. 11, ECF No. 600.) Because the parties agree

on this request and it conforms with prior rulings, the Court will grant the request to disallow experts from testifying to opinions the Court has previously excluded.

Defendants also seek to prevent Array's experts from proffering opinions not set forth in their earlier reports or to backfill gaps in their reports. Array argues that, to the extent Defendants seek to prevent supplements based on new information or information unavailable to the experts, such supplementation should be permitted. Array cites Rule 26(a)(2)(E), which provides: "The parties must supplement these disclosures when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(E). Rule 26(e) states, as pertains to expert witnesses, that any additions or changes to information included in the expert's report and to information given during the expert's deposition "must be disclosed by the time the party's *pretrial* disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2) (emphasis added). Regarding rebuttal disclosures, Rule 26(a)(2)(D)(ii) states: "if the evidence is intended solely to contradict or rebut evidence on the same subject identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure." Array has not yet identified any specific supplementation necessary to disclose pretrial. Supplementation at trial is not permitted by the rules. The Court will thus generally exclude Array's experts from offering new opinions at trial that have not been otherwise disclosed in their reports.

With that said, the Court will leave rulings on more specific objections to expert testimony for trial. For example, Array argues it is permitted to present expert rebuttal testimony regarding NEXTracker's purported incremental costs, full costs of goods sold, and operating expenses. The Court will need the benefit of a more fully developed trial record before making rulings on the propriety of expert rebuttal evidence.

### 6. **Defendants' Motion *in Limine* No. 6 – Indemnification and insurance agreements**

Defendants argue that Array should be excluded from referencing or submitting evidence about any indemnification agreement or other insurance agreements between NEXTracker, Flex, other co-Defendants, and/or other third parties. As examples, Defendants cite letters from counsel discussing whether Flex and NEXTracker would indemnify Mitchell for damages, costs, fees, and costs of his legal defense. (Defs.' Mot. 13 & Ex. 15 and 16, ECF No. 587, 587-1, and 587-2.) Defendants argue that they would be prejudiced by this evidence, as a jury may view the evidence as an implicit admission of fault or to inflate the amounts of damages because they are perceived as having deep pockets. As for punitive damages, Defendants contend they do not intend to open the door to the evidence by contesting their ability to pay such damages. Accordingly, they argue that evidence of insurance or indemnification agreements should be excluded from trial.

Array argues that evidence of indemnity agreements is not subject to Rule 411, but that in any event, the evidence is probative for other proper purposes. Array asserts that the evidence shows Mitchell's financial condition for purposes of analyzing punitive damages; it is probative of his employment arrangement and compensation by NEXTracker and/or Flex; it indicates ownership of the trade secrets by Array; it proves the indemnifying party induced Mitchell's breach and wrongful conduct; and it shows control, bias, and prejudice.

Federal Rule of Evidence 411 provides: "Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control." The existence of a liability insurance policy is not admissible to show the defendant's negligence or other wrongful conduct, because the probative value of such evidence is questionable, and it is often prejudicial. *Charter v. Chleborad*, 551 F.2d 246, 248 (8th Cir. 1977). "Knowledge that a party is insured may also affect

a verdict if the jury knows that some of the loss has been paid by insurance or that it would satisfy a judgment against a defendant." *Posttape Associates v. Eastman Kodak Co.*, 537 F.2d 751, 758 (3d Cir. 1976).

There is evidence that Mitchell, while negotiating for employment with Flex and/or NEXTracker, informed them of his Agreement with Array and that the parties negotiated paying for some of Mitchell's attorney's fees as part of his employment agreement. (*See* Mem. Op. and Order 6, ECF No. 537.) Relying on *DSC Communications Corp. v. Next Level Communications*, 929 F.Supp. 239 (E.D. Tex. 1996), Array contends that the indemnification agreements in this case are not subject to Rule 411. In *DSC Communications*, former employees started a new company that developed a product that would compete with the product of their former employer, DSC. *Id.* at 241. Their former employer sued them for theft of trade secrets. *Id.* When another company acquired the former employees' company, the new company provided an indemnity to the former employees against all expenses, judgments, and amounts paid to resolve the case. *Id.* At trial, DSC introduced evidence of the indemnification agreements, and the defendants moved for a new trial. *Id.* The court first determined that the indemnity agreement was not "liability insurance" in part because the agreements were negotiated after they already committed the acts that gave rise to the lawsuit and were an isolated business relationship, not the kind of insurance arrangement that spreads risk of a future harm among policy holders. *See id.* at 243-44. Turning then to the Rule 403 balancing test, the *DSC* court found the agreements probative of whether the employees believed that they may not have owned the trade secrets and as to damages because the purchase price of the company reflected the value of the alleged trade secrets, as no product had yet been sold. *See id.* at 244, 246-48. The conclusion of the *DSC* court that indemnity agreements are not subject to Rule 411, however, is not uniform, as other courts have indicated that indemnity

agreements are sufficiently similar to liability insurance to fall within Rule 411. *See*, *e.g.*, *Garnac Grain Co. v. Blackley*, 932 F.2d 1563, 1570 (8th Cir.1991) (explaining that fidelity bond, while not technically "insurance against liability," constitutes insurance subject to Rule 411); *Matosantos Commercial Corp. v. SCA Tissue North America, LLC.*, 369 F.Supp.2d 191, 194-95 (D.P.R. 2005) (finding that indemnity agreement signed before breach fell within Rule 411).

This Court, however, does not need to determine whether the evidence that Mitchell negotiated an indemnity agreement for legal fees arising from any claim for breach of the Agreement with Array falls within Rule 411's meaning of "insured against liability." Even assuming the indemnity agreement is subject to Rule 411, the Court finds that evidence that Mitchell and Defendants negotiated an indemnity agreement is relevant to other proper purposes, such as Defendants' knowledge and understanding of the Agreement between Array and Mitchell, Defendants' intent, inducement of breach, and the terms of the employment agreement Mitchell negotiated with Flex and/or NEXTracker. *Cf. H.B. Fuller Co. v. National Starch and Chemical Corp.*, 689 F.Supp. 923, 945 (D. Minn. 1988) (considering indemnification letter to be persuasive evidence as to issue of inducement of infringement of patent). The concern of Rule 411 is that the jury may learn about insurance and award damages because a third-party insurer with deep pockets will pay the award. Such is not the concern here when the indemnitors are defendants in the case. The Court will therefore permit introduction into evidence of the negotiations and any agreed-upon indemnity agreement between Mitchell and a defendant. *Cf. Galaxy Computer Services, Inc. v. Baker*, 325 B.R. 544, 552 (E.D. Va. 2005) (explaining that, because indemnifying party was itself a defendant, the relationship and understanding between the defendants with regard to liability for the acts that comprised the lawsuit were "especially probative" since plaintiff alleged defendants conspired with the co-defendant that agreed to indemnify them).

14

This ruling, however, does not mean that all evidence pertaining to Mitchell's indemnity agreement will be admissible at trial. For example, Defendants cited letters from counsel about their back-and-forth discussions as to whether Mitchell is entitled to full costs of his legal defense. The cited evidence indicates that some matters of indemnity may not be clear or yet resolved, and the Court is not interested in having a mini trial about whether Mitchell must be indemnified. Post-litigation indemnification evidence is less relevant to the parties' employment and compensation agreement and inducement of breach. Given that the Court is not certain of all the evidence Plaintiff seeks to submit on this topic, Defendants may make objections at trial to specific evidence that the Court has not explicitly ruled on herein.

Finally, Defendants assert that they do not intend to put their inability to pay damages at issue in this case. In light of this approach, evidence that Defendants are insured by a third-party entity that is not a defendant in this suit should be excluded under Rule 411. The prejudicial effect of submitting evidence of insurance secured by a non-defendant substantially outweighs the probative value of the evidence as to punitive damages. Nevertheless, evidence of indemnification or third-party insurance could potentially become relevant to punitive damages, should Defendants open the door to the evidence at trial by arguing that they are financially unable to pay an award. *See Lawson v. Trowbridge*, 153 F.3d 368, 378-79 (7th Cir. 1998) (explaining that, although general rule excludes admitting evidence of indemnification out of fear it will encourage jury to inflate damages award because another entity is footing bill, when defendants introduced evidence or argument of financial weakness, such testimony "opened the door" and court should have permitted plaintiff to point to state's indemnification statute).

### 7. Defendants' Motion *in Limine* No. 7 – Evidence of trade secrets not causally connected to lost projects

Array's expert, Robert Parkins, focused on three categories of trade secrets in his report: (1) Array's sales strategy, pitch, and Net Present Value ("NPV") tool; (2) Array's benchmark pricing, costs, and margins; and (3) Array's customer and project pipeline information. (Parkins Report 1, 18, ECF No. 439-3.) Parkins defined the latter category as "projects in ATI's pipeline and discount structures that ATI has historically applied to its products and projects; forecasts of tracker installations by megawatt and by customer, location, and/or EPC, along with forecasted pricing and 'win rate' on a per watt basis; guidelines and policies on quoting bids and projects, including specific pricing that may be applicable to certain projects or EPC's; ATI's pricing information for certain EPC's and project owners; ATI's manner and method of negotiating with customers and prospective customers; the circumstances under which ATI may be willing to reduce its margins or offer discounts to customers and prospective customers." (*Id.* at 1-2 n.5.) Array repeated these trade secret contentions for its customer and project pipeline information in the Pretrial Order. (*See* PTO 9-10, ECF No. 578.)

Defendants contend that Array has not identified any causal connection between such alleged trade secrets and the lost projects remaining in the suit. According to Defendants, Array has not argued or shown evidence that any customer chose NEXTracker over Array for a given solar project on any basis other than benchmark pricing or O&M information. Defendants thus move to preclude Array from presenting evidence of its "pipeline" trade secrets or any other category of trade secrets other than O&M information and benchmark pricing under Rules 401 and 403.

On the other hand, Array argues that this evidence is relevant because it connects the relationships Mitchell developed with Array's customers and the protected information that he had access to and relied on while he worked there. Array seeks to present evidence that Mitchell

prepared a target customer list for NEXTracker CEO Daniel Shugar and that, in creating the list, Mitchell relied on the identity of Array's customers and knowledge of project forecasts. The Court agrees that evidence of the customer and pipeline information Mitchell had access to before he left Array, and evidence of how he may have used this information to benefit NEXTracker, such as target lists, are relevant to Array's claims. Whether Array can connect the evidence to specific projects lost for the projects that remain in the case are questions for the jury, so the Court will not generally exclude such evidence and will deny Defendants' motion *in limine* No. 7. Nevertheless, the Court is not aware at this juncture of all the specific evidence Array intends to present, and there may be some evidence falling within this category whose probative value becomes outweighed by Rule 403 concerns. This ruling is not a way to introduce through the backdoor considerable evidence relevant only to excluded projects, and thus, Defendants are not prohibited from objecting to specific evidence presented at trial on which the Court has not yet directly ruled herein.

### 8. Defendants' Motion *in Limine* No. 8 - Evidence of Flex's acquisition of NEXTracker

Flex acquired NEXTracker in September 2015. Defendants seek to exclude as irrelevant any evidence relating to Flex's acquisition of NEXTracker, including discussions, valuations, or terms of the acquisition deal, such as the compensation to individual employees. Defendants also argue that evidence of Flex's valuation in 2015 would mislead the jury and unfairly prejudice Defendants because it skews the damages timeframe for the jury and could cause the jury to artificially inflate the damages calculation beyond what is adequate compensation.

In response, Array argues that it should be permitted to present evidence relating to the acquisition for multiple reasons. Array first argues that the fact that Flex acquired NEXTracker and the relationship between the two companies is probative as to which entity hired Mitchell and

which was Mitchell's employer. The Court agrees that the relationships between all the Defendants are relevant to the jury's consideration of issues pertaining to the potential liability of each defendant, so Flex's acquisition of NEXTracker is relevant and admissible.

Next, Array argues that the acquisition is relevant because it pertains to the motivations of Defendants Daniel Shugar and Marco Garcia in hiring Mitchell. Array intends to present evidence that, as part of the acquisition, Shugar and Garcia expected to be paid earn-outs if NEXTracker reached certain revenue targets within the first two years following the acquisition. The earn-out period was based on NEXTracker sales made during a 24-month period from October 1, 2015, to September 30, 2017. Array believes this evidence explains Shugar's and Garcia's motivations to urgently hire Mitchell prior to the expiration of his non-compete clause because they would benefit personally if NEXTracker reached certain revenue targets. Defendants argue that the evidence is more prejudicial than probative because the earn-out period does not directly correspond to the relevant time-period at issue in the case because it began before Mitchell left Array. While the time-period does not exactly correspond, the Court finds that the evidence's probative value as to Shugar's and Garcia's motives for hiring Mitchell outweighs any prejudice and the Court will allow evidence of the earn-outs in evidence.

As for the probative value of NEXTracker's size, revenue, and the individual defendants' wealth at the time of acquisition by Flex, Array asserts that evidence of Defendants' financial condition is relevant to the issue of punitive damages. The financial capacity of a defendant is relevant in determining the amounts of punitive damages that are appropriate for punishment and deterrence. *See* N.M.U.J.I 13-1827 ("The property or wealth of the defendant is a legitimate factor for your consideration."). The cases cited by Defendants relate to the issue of compensatory damages, not punitive damages, and thus are distinguishable. The Court recognizes, however, that

18

the acquisition occurred before the events in question, and thus, the valuations or terms of the acquisition deal may not be relevant to the financial capacity of Defendants in the relevant timeframe. The Court will need the benefit of a more fully developed record to determine whether financial information from 2015 informs calculations for the financial capacity of Defendants during the time of the alleged misconduct. Accordingly, the Court will deny at this time Defendants' motion *in limine* No. 8, but Defendants are not foreclosed from making objections at trial to specific evidence, not otherwise ruled upon herein, that falls within this category of evidence.

### 9. Defendants' Motion *in Limine* No. 9 – Offer of judgment

Array does not oppose Defendants' request to prevent Array from referencing the offer of judgment made in this case. The Court will thus grant the request.

### 10. Defendants' Motion *in Limine* No. 10 – Hearsay testimony of Dorothy Serdar

Dorothy Serder, NEXTracker's Senior Director of Human Resources during the relevant time-period, authored multiple documents and database entries. According to Defendants, Array chose not to depose Serder and instead seeks to introduce her impressions and the content of her discussions with others by asking the recipients of Serdar's emails, Defendants Scott Graybeal ("Graybeal") and Garcia, about the meaning of Serdar's entries. Defendants assert that Array cannot show a foundation for many of these documents because the witnesses do not have personal knowledge of the document. Defendants argue this evidence is improper double hearsay and must be excluded under Rules 403, 602, and 802.

As to the authentication issue, Array responds that Garcia's testimony properly authenticated the documents. Garcia was NEXTracker's Rule 30(b)(6) designee. Rule 901(a) says that, to authenticate evidence, "the proponent must produce evidence sufficient to support a finding

that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Garcia's testimony appears to authenticate the emails as emails he received from or sent to Serdar, but the Court will need to await trial to rule definitively on any authentication objection. *See* Fed. R. Evid. 901(b)(1) (evidence that satisfies the authentication requirement may include testimony that an item is what it is claimed to be). Nevertheless, the contents of an authenticated document are also subject to the hearsay rules.

Hearsay, an out-of-court statement offered "in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c), is generally not admissible unless it meets the definition of non-hearsay set forth in Rule 801(d) or falls within a hearsay exception, *see* Fed. R. Evid. 801(d), 803, and 804. "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

Because the emails relate to Serdar's "onboarding" Mitchell as an employee, Array argues they are not hearsay. Rule 801(d)(2)(D) says that a statement is not hearsay when it is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). According to Garcia's testimony, Serdar was a senior director of human resources for NEXTracker, and Garcia was communicating with her as part of his work to recruit Mitchell. (*See* Garcia Dep. 81:5-83:25, 107:7-111:4, ECF No. 600-3.) Because the evidence indicates that Serdar created and sent the emails on a matter within the scope of her employment, the emails are not hearsay under Rule 801(d)(2)(D). *Cf. Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F.Supp.2d 966, 973 (C.D. Cal. 2006) (concluding that emails sent between corporate officials and employees were all admissible non-hearsay under Rule 801(d)(2)(D)).

Defendants also request that Array not question Garcia or Graybeal at trial about the meaning of what Serdar said. To the extent the witnesses do not have personal knowledge of what Serdar meant in some of her statements in the emails, they should not be asked questions that would require them to speculate. Array, however, may ask questions of Garcia and Graybeal about what and why they were communicating with Serdar regarding Mitchell's employment, and to the extent they have personal knowledge of the meaning of the emails, they may testify thereto. Serdar's statements to them also may provide context for their communications to her.

Defendants additionally object to double hearsay in the emails. For example, in an August 11, 2016, email to Graybeal and Garcia, Serdar stated: "In speaking with Dan this week, he asked me to provide you his resume and raise a possible solution to the Non-Comp[]ete issue by having Colin join Flex and initially focus his efforts on selling solar panels/modules reporting to you, while supporting NX behind the scenes…." (Defs.' Ex. E, ECF No. 587-5 at 4 of 5.) Defendants argue this double hearsay cannot be admitted. Shugar, however, fits within the party-opponent definition, so there is a separate justification for admitting his statement. *Cf. Jordan v. Binns*, 712 F.3d 1123, 1128-31, 1134 (7th Cir. 2013) (holding that court did not err in admitting trooper's testimony about what husband said that his wife said or in admitting trooper's report recording husband's statement reciting what his wife said because both husband and wife were party-opponents, so the statements were not hearsay under Rule 801(d)(2)(A) and crash report was admissible public record); *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 34 (1st Cir. 1998) (suggesting that, while unattributed statements repeated by party-opponents are not admissible, if the original declarant is known and fits within the party-opponent definition, the statement may be admissible).

Defendants argue that this double hearsay is particularly problematic because, in his deposition, Dan Shugar indicated he did not recall saying that to Serdar, but instead recalled

"speaking with her about having Colin join Flex to sell the solar panels…." (Shugar Dep. 196:20-24, ECF No. 587-3 at 6 of 7.) "Treating party admissions as nonhearsay is rooted in the nature of the adversarial system, and trustworthiness is not a requirement for admission." *Jordan*, 712 F.3d at 1128. "There is less concern about trustworthiness, especially in civil cases, because the party against whom the statements are offered generally can take the stand and explain, deny, or rebut the statements." *Id.* Consequently, the Court will not exclude the emails that were made by Serdar, an employee of a party-opponent, or statements within the emails that were also made by a party-opponent. Defendants' motion *in limine* No. 10 will be denied.

### 11. Defendants' Motion *in Limine* No. 11 – Only admit evidence pertaining to projects and customers that remain in dispute

Pursuant to Rule 403, Defendants ask the Court to exclude as irrelevant evidence of the parties' customers or potential customers who were only involved in projects the Court has already barred from the case. The Court finds this general request too broad and will deny it. Instead, the Court will focus on specific items or categories of evidence that Defendants identify in the motion.

Defendants move to prohibit the introduction of evidence regarding customer Silicon Ranch, an EPC. Array objects to this request because it seeks to admit evidence that in April 2017 Mitchell told Silicon Ranch, "we certainly hope that we continue to earn your Nextracker business." The Court will not exclude this evidence because it is probative of the issue of Mitchell's breach of contract and his intent for purposes of punitive damages, and its probative value is not outweighed by potential prejudice.

Defendants also request that the Court omit evidence pertaining to customers of nine excluded projects that they allege have nothing to do with the remaining admissible projects: Hunt Electric (Patua Geothermal project), First Solar (Rosamond and Willow 1 projects), CIP (Sage project), RES Americas (Sage project), and DEPCOM (NC92 project). As to these listed customers

and projects, Array does not argue the relevance of any evidence it intends to present, so the Court will grant Defendants' request to exclude evidence relevant only to these identified excluded projects. As for objections to other evidence relevant only to excluded projects, the Court will address objections to specific evidence at trial.

### C. Plaintiff's Motions *in Limine*

####    1. Plaintiff's Motion *in Limine* No. 1 – Expert graph regarding global shipments and market share

Array seeks to exclude Defendants from presenting evidence of NEXTracker's and Array's respective shares of global shipments before and after the Defendants' alleged misconduct and as depicted in a "Figure 5" graph. Array argues that NEXTracker's global success, as reflected by global shipments, are not at issue in this litigation because only certain solar projects are at issue. According to Array, Figure 5 is inaccurate, misleading, and prejudicial because the graph does not depict where the power output was distributed across the globe per vendor. Array asserts that whether NEXTracker already had a larger market share relative to Array before the misconduct is not relevant to the harm Array claims. Defendants respond that Figure 5 is an accurate, relevant demonstrative exhibit that may be used at trial as an aid to understanding Vellturo's opinion of the underlying data.

Currently, Array will present evidence at trial of projects on three continents spread across the globe: Australia, the United States, and Brazil. In a prior Memorandum Opinion and Order, this Court concluded that Defendants' damages expert, Christopher Vellturo, is "qualified to give opinions that NEXTracker had success and increased market share and that those opinions are reliable under *Daubert/Kumho Tire*." (Mem. Op. and Order 60, ECF No. 536) The Court further noted, "Arguments concerning Vellturo's failure to consider certain facts or rely on additional data points, like assertions that the global market is not the appropriate market upon which to focus, go

to the weight, not admissibility, of his opinions." (*Id.* at 60-61 (internal footnote omitted).) Furthermore, this Court found data and charts regarding Worldwide Estimated PV Tracker Shipments and Associated Share from 2011-17 and the Worldwide Estimated PV Tracker Shipments from 2012-2018 in the United States and the rest of the world relevant to Vellturo's opinions regarding NEXTracker and Array's market share and helpful to explain those opinions to the jury. (*Id.* at 62.)

The Court will not prevent Defendants using Figure 5 as a demonstrative exhibit or exclude evidence regarding NEXTracker's and Array's respective shares of global shipments, as measured by the amount of power output (MWdc) in megawatts that each vendor shipped per year. *Cf. United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998) (explaining that trial courts have discretion to permit use of summaries that clarify and simplify complex testimony and that such summaries may reflect to some extent inferences and conclusions drawn from underlying evidence by summary's proponent). The parties dispute that Defendants' alleged misconduct caused the specific project losses alleged by Array, and NEXTracker seeks to include the evidence at issue to show that the companies' growth trends indicate that Array's project losses were due to factors other than the alleged misconduct. The evidence is relevant to damages and the jury must determine the weight to give the evidence. The Court will therefore deny Array's motion *in limine* No. 1.

### 2. Plaintiff's Motion *in Limine* No. 2 – Evidence relating to excuse-of-performance defense

In the Pretrial Order, Defendants assert that Array's "recovery is barred by its own material breaches of its agreements with Colin Mitchell, including its failure to compensate Colin Mitchell at the rates and in the manner agreed to by ATI and Colin Mitchell, ATI's failure to support Colin Mitchell's sales efforts, and ATI's expansion of the scope and nature of Colin Mitchell's duties

while he was employed by ATI." (PTO 5-6, ECF No. 5). This assertion largely tracks Defendants'
Second Affirmative Defense raised in their Answer. (Answer 15, ECF No. 20.) Array requests the
Court exclude evidence and arguments that Mitchell was excused from performing his contractual
obligations to Array because this Court already determined that the contract was enforceable, and
that Mitchell breached certain contractual obligations owed to Array under the contract.
Additionally, Array contends that Defendant waived his excuse-of-performance defense by failing
to raise the issue at the summary judgment stage.

Array previously sought partial summary judgment on two elements of its breach of
contract claim: (1) that the contract between Array and Mitchell was valid and enforceable and (2)
Mitchell breached the Agreement. This Court concluded that because "Defendant presented no
arguments or evidence suggesting that the Agreement was invalid and not enforceable," the
contract is valid as a matter of law. (Mem. Op. and Order 23, ECF No. 528.) As for the alleged
breaches of the contract, Array moved for partial summary judgment, and as discussed above, the
Court ruled in its favor in the following ways: (1) "Mitchell's action in sending the AES quote
constituted at least an indirect engagement in the operation of NEXTracker and violated the non-
competition agreement as a matter of law," (Mem. Op. and Order 29, ECF No. 528); (2)
"Mitchell's action in sending the Primoris quote constituted an indirect engagement in the
operation of NEXTracker and violated the non-competition agreement as a matter of law," (*id.* at
32); (3) "Mitchell performed work for NEXTracker to assist it with messaging, which constitutes
as a matter of law indirect work for NEXTracker in violation of the non-competition agreement,"
(*id.* at 34); and (4) sending the November 18, 2016, emails "constitutes, at least, indirect work for
NEXTracker in violation of the non-competition agreement," (*id.*). Array argues that the Court, in
making these conclusions, "inherently found that Mitchell's performance of the Agreement was

not excused by reason of Array's own conduct." (Pl.'s Mot. 2, ECF No. 589.) The Court disagrees that it made any such finding because that issue was not before it.

Nonetheless, Defendants state that they do not intend to present argument contesting any of the Court's prior findings or conclusions. (Defs.' Resp. 1, ECF No. 597.) Defendants, however, assert that Array impermissibly expands the Court's prior Order to exclude evidence of Array's own conduct that is relevant to other claims and defenses. Specifically, Defendants argue that they should be allowed to present evidence that Array failed to conduct a formal exit interview with Mitchell to inform him of his obligations to Array. They argue the evidence is relevant to whether Array took reasonable precautions to protect its purported trade secrets and to punitive damages. Additionally, Defendants contend they should be able to present evidence as to why Mitchell left Array to rebut Array's assertion that NEXTracker pursued hiring Mitchell. The Court will not exclude this specific evidence, as the Court finds it relevant to contested issues in the case.

As for whether Defendants waived the issue of excusal of performance on the contract, Defendants contend that they did not waive the defense because they asserted it in their Answer, have diligently taken discovery on the issue, and both experts addressed the issue in their reports. Array, however, moved for summary judgment on the issue that the contract was valid and enforceable and on certain breaches. If a party fails to assert a legal reason why summary judgment should not be granted, the argument is waived. *See Smith v. Ochsner Health Sys.*, 956 F.3d 681, 688 (5th Cir. 2020). Defendants acknowledge that they will not present argument contesting the Court's prior rulings, and thus, evidence that would be relevant only to contest those rulings will not be admitted. But, without reference to specific evidence, it is unclear whether evidence might only be relevant to an issue resolved by the Court or whether that evidence will be relevant to the many other issues the Court left for the jury. Accordingly, the Court will reserve ruling on the

other issues raised in Array's motion *in limine* and take up objections to specific evidence at trial when it is in a better position to evaluate relevancy and waiver issues.

### 3. Plaintiff's Motion *in Limine* No. 3 – Unclean hands evidence

Array seeks to preclude the admission of evidence relating to its possession and use of NEXTracker information. Defendants respond that they should be allowed to present evidence that neither the industry at-large, nor Array specifically, treated pricing and O&M information as confidential. Array argues that any such evidence and testimony is precluded by the Court's prior ruling on the unclean hands defense. The Court disagrees.

This Court granted Array's motion for summary judgment on Defendants' affirmative defense of unclean hands after concluding that the record did not show that Array's obtaining, possessing, and using NEXTracker's non-confidential information amounted to improper or inequitable conduct as required to support the affirmative defense. (Mem. Op. and Order 9-10, ECF No. 525.) The Court noted, however, that Defendants' evidence and arguments, while not supporting the *affirmative* defense of unclean hands, supported a *defense* as to certain "elements Array must prove – that the information relayed was not confidential or trade secret when it left NEXTracker and it was not confidential when it allegedly came back to NEXTracker." (*Id.* at 9.) The Court will therefore deny Array's Motion in Limine No. 3.

### 4. Plaintiff's Motion *in Limine* No. 4 –Evidence that Array's damages are limited by TUV report

Array commissioned an independent engineering services firm, TÜV Rheinland, to publish a report (the "TUV Report") on September 8, 2017, with information on O&M costs associated with Array's trackers compared to NEXTracker's trackers. (*See* Pl.'s Mot. 1, ECF No. 591; Stern Report ¶ 115, ECF No. 439-5.) According to Defendants' expert, Array's founder acknowledged that the information in the TUV report was previously trade secret to Array but is no longer after

publication therein. (Stern Report ¶ 115, ECF No. 439-5.) Array argues this publication was, in part, a response to the harm that NEXTracker was causing Array via its theft and use of Array's trade secrets and that they are entitled to damages that resulted from Defendants' misconduct, even if the projects were not finally awarded until after the TUV report was published. Array thus urges the Court to preclude Defendants from presenting evidence that Array's damages should be limited based upon the release of the TUV report because the evidence would mislead the jury and prejudice Array.

The Court declines to do so. Evidence concerning the TUV report is relevant to certain issues in the case, including whether the information was trade secret and whether Defendants obtained improper advantage in bidding certain projects because of the alleged misappropriation of information that was published in the TUV report. Whether Defendants' pre-TUV report conduct caused Array harm that continued after the publication of the TUV report is a question for the jury. The Court will not exclude the evidence that is relevant to factual questions at trial and thus will deny Plaintiff's Motion *in Limine* No. 4.

**IT IS THEREFORE ORDERED** that:

1. Defendants' *Motion* in Limine (**ECF No. 587**) is **GRANTED IN PART AND DENIED IN PART** as follows:

   a. Defendants' motion *in limine* **No. 1 is GRANTED**.

   b. Defendants' motion *in limine* **No. 2 is DENIED**.

   c. As for Defendants' motion *in limine* **No. 3**, the Court will **RESERVE RULING** on the admission of the November 18, 2016, text message until trial, but the motion is otherwise **DENIED**.

   d. Defendants' motion *in limine* **No. 4** is **GRANTED**.

    e.   Defendants' motion *in limine* **No. 5** is **GRANTED**, but the Court will **RESERVE RULING** on issues related to rebuttal testimony by experts for trial.

    f.   Defendants' motion *in limine* **No. 6** is **DENIED**, but Defendants may make objections to specific evidence not otherwise discussed herein at trial.

    g.   Defendants' motion *in limine* **No. 7** is **DENIED**.

    h.   Defendants' motion *in limine* **No. 8** is **DENIED**.

    i.   Defendants' motion *in limine* **No. 9** is **GRANTED**.

    j.   Defendants' motion *in limine* **No. 10** is **DENIED**.

    k.   Defendants' motion *in limine* **No. 11** is **GRANTED IN PART AND DENIED IN PART**: the motion is **DENIED** as to the identified evidence regarding Silicon Ranch; the motion is **GRANTED** as to evidence relevant only to Hunt Electric (Patua Geothermal project), First Solar (Rosamond and Willow 1 projects), CIP (Sage project), RES Americas (Sage project), and DEPCOM (NC92 project); and is otherwise **DENIED** with the understanding that the Court will take up objections to specific evidence not discussed herein at trial.

2.  Array's *Motion* in Limine *No. 1 to Exclude Defendants' Expert Graph Regarding Global Shipments and Market Share* (**ECF No. 588**) is **DENIED**.

3.  Array's *Motion* in Limine *No. 2 to Exclude Evidence Relating to Excuse of Performance Defense* (**ECF No. 589**) is **DENIED** as to the specific evidence identified herein. The Court will otherwise **RESERVE RULING** on the motion by taking up any objections to other specific evidence at trial.

4.  Array's *Motion* in Limine *No. 3 to Exclude Unclean Hands Evidence* (**ECF No. 590**) is **DENIED**.

5.  Array's *Motion* in Limine *No. 4 to Exclude Evidence that Array's Damages are Limited Based Upon the TUV Report* (**ECF No. 591**) is **DENIED**.

6.  Defendants' *Motion for Leave to File a Reply in Support of Defendants' Motions* in Limine (**ECF No. 604**) is **DENIED**.

_____
**SENIOR UNITED STATES DISTRICT JUDGE**